Jason Castle, Esq. (Attorney ID: 277222019)
**THE CASTLE FIRM, LLC**
50 Park Place, Suite 900
Newark, NJ 07102
(201) 371-3368
Attorneys for Plaintiff, Salah Hobbi

|  |  |
|---|---|
| **SALAH HOBBI**<br><br>Plaintiff,<br><br>v.<br><br>**2U, INC.**<br><br>Defendant. | Case No.:<br><br>CIVIL ACTION<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT, FINES, RESCISSION AND REIMBURSEMENT OF ATTORNEY FEES** |

Plaintiff, **Salah Hobbi** (hereinafter "Mr. Hobbi"), by and through his attorneys, **The Castle Firm, LLC**, upon information and belief, alleges as follows:

## INTRODUCTION

1.      This action challenges a pervasive and predatory practice by 2U, Inc.—an education technology company that claims to "expand access to high-quality education"—yet systematically exploits its employees through unlawful, overreaching employment contracts that bar them from earning a living after separation unless they surrender all legal rights. Under the guise of protecting trade secrets, 2U has institutionalized the use of non-compete, non-solicitation, and intellectual property assignment clauses that are not only legally unenforceable under New Jersey and Maryland law—**they also violate The Sherman Antitrust Act by stifling free and fair competition.**

2.      2U operates as an Online Program Manager (OPM), partnering with top universities to deliver bootcamps and online degree programs in fields like coding, cybersecurity, and data analytics. Through these partnerships, 2U generates significant revenue from tuition-sharing arrangements and federal financial aid streams. It is a highly profitable, competitive, and aggressively branded tech-education company with extensive investor backing and industry influence. But behind the marketing veneer lies

1

a company that crushes former employees under the weight of predatory legal agreements—particularly older employees who are least equipped to fight back.

3.    Plaintiff Salah Hobbi, a 61-year-old Arab Muslim man and former Lead Instructor in 2U's Bootcamp Division, was one of the most experienced and respected educators in the organization. Over six years of service, he received glowing performance reviews, merit-based raises, and profit-sharing bonuses for his role in delivering and improving technical education programs across numerous universities. And yet, while on approved vacation in August 2024, he was abruptly terminated without cause or warning—stripped of his livelihood by an email that offered no explanation, only a severance agreement designed to force his silence.

4.    What followed was a clear display of 2U's coercive blueprint: the company offered to waive Mr. Hobbi's non-compete and other restrictions, but only if he signed away his right to sue and acknowledged that the company had done nothing wrong. In other words, **2U made clear that its so-called "fear of competition" could be instantly dissolved—so long as the employee agreed to release all legal claims. The implication was plain: the covenants are not about protecting business interests. They are about silencing potential litigants and immunizing the company from scrutiny.**

5.    To make matters worse, 2U's restrictive covenants remained binding even though the Bootcamp Division in which Mr. Hobbi worked was later shut down. Despite this, Mr. Hobbi remained blocked from working in his field—unable to accept offers or apply to roles in adjacent programs for fear of violating vague and overbroad restrictive covenants. The damage is not hypothetical. It is real, measurable, and ongoing. Mr. Hobbi seeks to be made whole for his inability to secure employment as a direct result of 2U's unlawful restraints, which continue to suppress his career and income during a critical period in his life.

6.    At 61, Mr. Hobbi faces compounded barriers to re-employment in the technology sector—an industry known for its rampant ageism and preference for younger professionals. The combination of

his age, national origin, and industry bias means that every missed opportunity cuts deeper, and every week of unemployment becomes more destabilizing. 2U's insistence on enforcing restrictive covenants against him—despite having no division left to protect—does more than violate contract law; it perpetuates discrimination against older workers and reinforces systemic inequities in the modern workforce.

7.      Moreover, internal data from 2U's own layoff notices reveal a pattern of terminations disproportionately affecting older employees. In Mr. Hobbi's unit, the employees with the oldest ages in clearly identifiable age groups were selected first for termination, while younger peers were uniformly retained. The resulting "decisional unit" paints a disturbing picture of intentional age-based attrition—raising serious questions about 2U's compliance with the Age Discrimination in Employment Act (ADEA).

**8.      Through this litigation, Mr. Hobbi seeks a declaratory judgment invalidating the unlawful employment provisions imposed by 2U, including non-compete, non-solicitation, and intellectual property clauses that violate public policy, state law, and federal antitrust statutes. He also seeks an order rescinding those provisions ab initio and compensatory relief for the harm already inflicted—including lost wages and attorney fees incurred in challenging the scheme.**

9.      But this case is bigger than one man. It exposes a corporate model designed to suppress mobility, intimidate former employees, and punish those who dare to assert their rights. 2U's employment practices are not only coercive and manipulative—they are fundamentally unjust. This Court is asked to intervene and send a clear message: that no company—no matter how powerful—may use legal instruments as a bludgeon to deprive its workers of economic freedom and lawful redress.

10.     As relief Mr. Hobbi seeks the entry of an Order declaring: (1) that the restrictive covenants are unenforceable as a matter of law; (2) that the restrictive covenants violate The Sherman Antitrust Act; (3) the complete recission of the restrictive covenants; and (4) remuneration in the form of 2U paying

to Mr. Hobbi a fine equal to the amount of his lost wages back dated to August 15, 2024 and through his 65th birthday when he becomes eligible for Social Security and pursuant to the allowable fine under the Sherman Act. Lastly, Mr. Hobbi seeks declaration the forum selection clause in 2U, Inc. employment contracts to be unenforceable as it is unreasonable, the product of overreaching, and it effectively deprives past, current, and future employees of 2U, Inc. of their day in court.

## PARTIES, VENUE, JURISDICTION

11.     Plaintiff, Salah Hobbi is an individual residing in New Jersey.

12.     Plaintiff was assigned to work in New York, New York by Defendant, 2U, Inc.

13.     Defendant, 2U, Inc. is a corporation incorporated in Delaware with its headquarters and principal place of business in Lanham, Maryland.

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question); pursuant to 28 U.S.C. § 1367 (supplemental jurisdiction); and this Court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought pursuant to 28 U.S.C. § 2201 (declaratory judgment).

15.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391(b) because Plaintiff resides in this District, the harm occurred in this District, and material parts of the events giving rise to the claim occurred here.

16.     Although the employment agreement between Plaintiff and Defendant purports to require litigation in Delaware, Plaintiff seeks a declaratory judgment declaring the forum selection clause unenforceable as it is unreasonable, the product of overreaching, and would effectively deprive Plaintiff of his day in court. The enforceability of the forum selection clause itself is a justiciable controversy properly before this Court.

## FACTUAL BACKGROUND

17.     Mr. Hobbi, a 61-year-old Arab, Muslim man, was employed as a Lead Instructor with 2U, Inc. working in the Bootcamp[1] division for over six years, where he consistently received positive performance reviews and was highly sought after by clients.

18.     **On May 31, 2019,** Mr. Hobbi received an offer of employment from 2U, Inc. In accepting the position, Mr. Hobbi electronically signed three documents:

    a.  An *Offer Letter* (**Exhibit A**): Dated May 31, 2019, for the position of *Visiting Instructor* with an annual base salary of $150,000 with a start date of June 10, 2019.

    b.  An *Employee Intellectual Property, Non-Competition, And Non-Solicitation Agreement* (**Exhibit B**).

    c.  A *List of Inventions and Original Works of Authorship* (**Exhibit C**).

19.     Sections 4, 5, and 6 of the *Intellectual Property, Non-Competition, And Non-Solicitation Agreement*, demonstrate the following restrictive language:

    ○  4(c). <u>Work For Hire</u>. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others within the scope of and during the period of Employee's employment with 2U) and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. To the extent that any such writings or works of authorship by Employee are not, by operation of law or otherwise, deemed works made for hire, **Employee hereby irrevocably assigns to 2U the ownership of, and all rights (including but not limited to copyright) in, such items, and 2U shall have the right to obtain and hold in its own name all rights of copyrights, copyright registrations and similar protections that may be available with respect to any such writings or works.** (Emphasis Added).

    ○  4(f). <u>Exception to Assignments</u>. Employee understands that the provision of this Agreement requiring assignment of Inventions to 2U does not apply to Inventions that the Employee developed or develops entirely on the Employee's own time without using 2U's equipment, supplies, facility or confidential or trade secret information **unless those same Inventions relate to 2U's business or actual or demonstrably anticipated research or development, or result from any work performed by the Employee for 2U.** (Emphasis Added)

    ○  5(a). <u>No Competition During and After Employment</u>. Given Employee's access and contributions to Confidential Information, the specialized training or education provided by or paid for by 2U, and/or Employee's direct or

---

[1] https://2u.com/about/boot-camps/

indirect access to and/or support of 2U's goodwill and Customer relationships, during Employee's employment with 2U and during the Restricted Period, Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), perform, or assist others to perform, work involving the Business for a Competitor.

o   5(b). <u>Notification of Future Employment</u>. In connection with the termination of Employee's employment with 2U and during the Restricted Period, Employee shall provide 2U with fourteen (14) calendar days' written notice of any new employment with a Competitor to allow 2U an opportunity to obtain written assurances from Employee and Employee's new employer satisfactory to 2U that Employee will not be rendering services which conflict with Employee's obligations in Section 5(a) of this Agreement. If Employee initiates the termination, there shall be, at 2U's sole option, a period of up to fourteen (14) calendar days after Employee gives written notice pursuant to this Section before the termination becomes effective, during which time Employee will provide such transitional services as 2U may request, and 2U will continue Employee's pay so long as Employee satisfactorily provides such services.

o   6. <u>Non-Interference and Non-Solicitation of Customers</u>. During Employee's employment with 2U and for a period of twelve (12) months after the termination of Employee's employment with 2U for any reason (voluntary or involuntary), Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), contact, call upon, solicit business from, render services to, or market services, products, or platforms to any Customer and/or divert or interfere with, or attempt to divert or interfere with, 2U's business or relationship with any Customer.

20.     **On June 10, 2019,** Mr. Hobbi began his employment at 2U, Inc., located in New York, NY in a hybrid role, which ultimately became fully remote. Mr. Hobbi was responsible for delivering bootcamps, improving curricula, and mentoring junior instructors. Thereafter, Mr. Hobbi's role expanded over the years to include assisting the sales team and leading several boot camps across various universities.

21.     **On March 7, 2021,** Mr. Hobbi received a profit-sharing bonus from 2U, Inc. for $18,359.64 and a merit raise of 2% reflecting his successful performance.

22.     **On March 14, 2022,** Mr. Hobbi received a profit-sharing bonus from 2U, Inc. for $14,809.80 and a merit raise of 3% for his continued exemplary performance. Thereafter, on April 1, 2022, Mr. Hobbi's hourly rate was set to $77.66, translating to an annual salary of $161,532.80.

23.    **On April 14, 2023,** Mr. Hobbi received a profit-sharing bonus from 2U, Inc. for $4,161.18. His 2023 performance review rated him as "exceeding expectations."

24.    **On March 24, 2024,** ahead of his annual review, Mr. Hobbi received a *Slack* message from Ms. Urban scheduling a "compensation meeting." Ms. Urban followed up with a message informing that the Compensation Specialist from Human Resources (HR) named Nick would join the meeting, as well. Mr. Hobbi was confused by the notice since a compensation specialist had never attended his annual review meeting in the past. As such, Mr. Hobbi inquired of Ms. Urban, via *Slack*, as to why HR would be joining, and specifically asked if he should be updating his resume. In response he was assured by Ms. Urban that he would not be laid off. When the virtual meeting began, Nick from HR informed Mr. Hobbi that, going forward, he would not be receiving any annual raises. When Mr. Hobbi asked why he would not be receiving any future raises, Nick explained that because of a recent restructuring of pay scales for different roles, *Lead Instructors* were calculated to be making $80,000 annually and because Mr. Hobbi was making double that amount, there would be no need give him further salary increases.

25.    **On March 28, 2024,** 2U, Inc. paid out $5 million in bonuses to the CEO and top Executives.

26.    **On April 12, 2024,** Mr. Hobbi received a *reduced* profit-sharing bonus of $1,659.00, despite 2U, Inc. leadership having received substantial bonuses totaling $5 million.

27.    **On August 15, 2024,** while on a paid time off vacation, Mr. Hobbi was abruptly terminated without prior notice via email which included a severance agreement (**Exhibit D** – Severance Agreement). The severance agreement was absent any reason for Mr. Hobbi's termination but instead included a list of anonymous employees that were part of a Decisional Unit (**Exhibit E** – Decisional Unit), revealing a pattern of discriminatory terminations that disproportionately impacted older employees whereby an employee with the oldest numerical age was selected from the identifiable age brackets of below 40, between 40 and 50, and above 50:

| TITLE | AGE | SELECTED OR NOT SELECTED |
|---|---|---|
| Lead Instructor | 33 | Not Selected |
| Lead Instructor | 34 | Not Selected |
| Lead Instructor | 34 | Not Selected |
| Lead Instructor | 38 | Not selected |
| Lead Instructor | 38 | Not Selected |
| Lead Instructor | 38 | Selected |
| Lead Instructor | 41 | Not Selected |
| Lead Instructor | 42 | Not Selected |
| Lead Instructor | 44 | Not Selected |
| Lead Instructor | 47 | Not Selected |
| Lead Instructor | 48 | Not Selected |
| Lead Instructor | 48 | Selected |
| Lead Instructor | 58 | Not Selected |
| Lead Instructor | 61 | Selected (Mr. Hobbi – Oldest Employee) |

28.     This pattern strongly suggested that termination decisions disproportionately impacted older employees, while younger employees were universally retained. An individual of the oldest age in each small age bracket was terminated, showing a recurring pattern of targeting older workers and strongly suggests age discrimination, in violation of the Age Discrimination in Employment Act (ADEA).

29.     **Despite there being no basis for Mr. Hobbi's termination other than the discriminatory inference, 2U refused to release Mr. Hobbi from his restrictive covenants <u>unless</u> he signed a severance agreement containing a general release of claims and an acknowledgment of no wrongdoing by 2U.**

30.     **Mr. Hobbi thereafter refused to sign the severance agreement, and 2U failed to release the restrictive covenants against him, despite the severance agreement's tacit admission that the non-compete restrictions were unnecessary by offering a waiver of them in exchange for a release of all claims against the Company.**

31.     On or around December 4, 2024, 2U shut down its Boot Camp Division, yet the restrictive covenants in Mr. Hobbi's agreement remained in effect.

32.    Despite actively seeking new employment, Mr. Hobbi remains unemployed, as the restrictive covenants prevent him from securing opportunities in his field.

## FIRST CAUSE OF ACTION

**(Declaratory Judgment - Invalidity of Unenforceable Employment Provisions)**

33.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

34.    This application also seeks invalidation of the other unenforceable provisions in the employment contract, including but not limited to:

- o  **Section 4:** The intellectual property assignment clause impermissibly claims ownership over all work Mr. Hobbi created, including personal projects.

    1.  Section 4(c). <u>Work For Hire</u>. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others within the scope of and during the period of Employee's employment with 2U) and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. **<u>To the extent that any such writings or works of authorship by Employee are not, by operation of law or otherwise, deemed works made for hire, Employee hereby irrevocably assigns to 2U the ownership of, and all rights (including but not limited to copyright) in, such items, and 2U shall have the right to obtain and hold in its own name all rights of copyrights, copyright registrations and similar protections that may be available with respect to any such writings or works.</u>** (Emphasis Added).

    2.  Section 4(f). <u>Exception to Assignments</u>. Employee understands that the provision of this Agreement requiring assignment of Inventions to 2U does not apply to Inventions that the Employee developed or develops entirely on the Employee's own time without using 2U's equipment, supplies, facility or confidential or trade secret information **<u>unless those same Inventions relate to 2U's business or actual or demonstrably anticipated research or development or result from any work performed by the Employee for 2U.</u>** (Emphasis added).

- a.  **Section 5(a):** The non-compete clause is overly broad and lacks a geographic limitation barring Mr. Hobbi from working in his field for six months, despite the Bootcamp division being shut down. Section 5(a) states:

    1.  5(a). <u>No Competition During and After Employment</u>. Given Employee's access and contributions to Confidential Information, the specialized training or education provided by or paid for by 2U, and/or Employee's direct or indirect access to and/or support of 2U's goodwill

and Customer relationships, during Employee's employment with 2U and during the Restricted Period, Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), perform, or assist others to perform, work involving the Business for a Competitor.[2]

b. **Section 6:** The overbroad non-solicitation clause, which prevents Mr. Hobbi from contacting students, clients, or university partners for one year, even if they initiate contact with him.

1. 6. <u>Non-Interference and Non-Solicitation of Customers</u>. During Employee's employment with 2U and for a period of twelve (12) months after the termination of Employee's employment with 2U for any reason (voluntary or involuntary), Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), contact, call upon, solicit business from, render services to, or market services, products, or platforms to any Customer and/or divert or interfere with, or attempt to divert or interfere with, 2U's business or relationship with any Customer.[3]

35. The Maryland Court of Appeals has established a three-pronged test to determine if a non-compete agreement is unlawful.[4] In determining the reasonableness of a restrictive covenant, the test is as follows:

o The restraint is confined within the limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer;

o Does not impose undue hardship on the employee;

o Does not disregard the interests of the public.

---

[2] See <u>Seneca One Fin., Inc. v. Bloshuk</u>, 214 F. Supp. 3d 457, 463 (D. Md. 2016) holding a non-compete provision that did not include a specific geographic area was overbroad.

[3] See <u>Tawney v. Mut. System of Md.</u>, 47 A.2d 372, 379 (Md. 1946) holding that a provision that prohibits an employee from engaging directly or indirectly in any "business competitive" with that of their employers in the Baltimore City area unenforceable.

[4] <u>MacIntosh v. Brunswick Corp.</u>, 215 A.2d 222, 225 (Md. 1965).

10

36.    The restrictive covenants and other provisions in Mr. Hobbi's employment agreement are unenforceable and in violation of New Jersey common law, Maryland contract law, and the Sherman Antitrust Act, 15 U.S.C. § 1, as they are broader than necessary to protect any legitimate business interest.

37.    The intellectual property clause improperly claims ownership of personal projects, violating Maryland contract law.

38.    The severance agreement improperly conditions the release of restrictive covenants on the waiver of legal claims, which courts have found to be coercive and unenforceable.

39.    Given the elimination of the Bootcamp division, 2U has no legitimate reason to enforce any of these provisions.

40.    Plaintiff seeks a judicial declaration that all restrictive covenants, confidentiality agreements, intellectual property claims, and any coercive severance agreements used by 2U are invalid and unenforceable.

   A.   **The Provisions Are More Restrictive Than Necessary To Protect the Legitimate Interest of 2U, Inc.**

41.    Section 4(c) states "To the extent that any such writings or works of authorship by Employee are not, by operation of law or otherwise, deemed works made for hire, Employee hereby irrevocably assigns to 2U the ownership of, and all rights (including but not limited to copyright) in, such items, and 2U shall have the right to obtain and hold in its own name all rights of copyrights, copyrights registrations and similar protections that may be available with respect to any such writings or works."

42.    Section 4(c) violates the first prong by requiring employees to forfeit their ownership and rights to their works to 2U, even if those works did not have any confidential information. By requiring employees to forfeit the ownership of their work, even if there are no legitimate interests of 2U at stake, Section 4(c) violates the first prong.

43.     Section 4(f) states "Employee understands that the provision of this Agreement requiring assignment of Inventions to 2U does not apply to Inventions that the Employee developed or develops entirely on the Employee's own time without using 2U's equipment, supplies, facility or confidential or trade secret information unless those same Inventions relate to 2U's business or actual or demonstrably anticipated research or development or result from any work performed by the Employee for 2U."

44.     Section 4(f) violates the first prong because inventions the develop "or result from any work performed by the Employee for 2U" limits the personal innovations of employees that are created outside of work, even though there will be no impact on 2U's interests.

45.     Thus, Section 4(f) imposes undue control over the employee's personal innovation, which is not essential to protecting 2U's business interests.

46.     Section 5(a) states that "Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employees own benefit or for the benefit of other persons or entities), perform, or assist others to perform, work involving the Business for a Competitor."

47.     Section 5(a) does not state a geographic mile radius that restricts an employee from working for a competitor. In fact, section 5(a) only states "work involving the Business for a Competitor." This statement is overbroad as this statement implies competitors around the entire country.

48.     As such, Section 5(a) violates the first prong.

   **B.  <u>The Provisions Impose Undue Hardship on 2U Employees</u>**

49.     Section 5(a) imposes an undue hardship on 2U employees because it restricts the employee's ability to find employment, even though there is no longer a Bootcamp division within 2U.

50.     By restricting an employee's opportunity to seek employment, in this case Mr. Hobbi, section 5(a) hinders his ability to leverage his skills in the industry and restricts his career mobility.

Additionally, 2U, through this provision, is causing financial harm to their employees as it severely limits their job prospects. As such, the second prong is violated.

51.     Section 4(f) violates the second prong by restricting the creative innovation of employee's post-employment with 2U. The ambiguous language used "demonstrably anticipated research or development" discourages employees from pursuing their own passion projects out of fear of being in violation of the provision.

52.     Section 4(f) also extends 2U's reach beyond employment by restricting employee's ability to create and innovate outside of work hours.  As such, section 4(f) violates the second prong and causes 2U's employee's undue harm.

53.     Section 4(c) violates the second prong and causes undue hardship on the employees.

**C.  <u>The Provisions Are Injurious to The Public Interest</u>**

54.     Section 4(f) is injurious to the public through its vague language of "demonstrably anticipated research or development" giving 2U control over an employee's ideas and creations that may not be related to 2U. This control undermines and stifles creativity.

55.     By limiting creativity and innovation, Section 4(f) limits advancements in the industry and therefore stalls inventions or creations that would otherwise contribute to the progress of the industry.

56.     Section 5(a) violates the third prong by limiting an employee's ability to work within their field. The language utilized in Section 5(a) "perform, or assist others to perform work," regardless of the nature of the work severely limits the employment opportunities of 2U's employees.

57.     Section 6 is injurious to the public by forbidding an employee to converse with any 2U customer, regardless of the nature. This provision harms consumers by reducing the options they have available for assistance.

58.     The determination that a restrictive covenant is reasonable does not require that it violate each prong of the test, however, in this instance, the non-compete language in each of the sections violate all three and is unenforceable as a matter of law.

59.     Accordingly, Mr. Hobbi is entitled to a declaration that each of the sections of the ***Intellectual***

***Property, Non-Competition, And Non-Solicitation Agreement*** are unenforceable as a matter of law.

## SECOND CAUSE OF ACTION

### (Declaratory Relief)

60.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

61.     The restrictive covenants and confidentiality provisions constitute an unlawful restraint of

trade in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

62.     The Sherman Act sets forth:

> **Every contract**, combination in the form of trust or otherwise, or conspiracy,
> **in restraint of trade or commerce among the several States, or with foreign**
> **nations, is hereby declared to be illegal**. Every person who shall make any
> contract or engage in any combination or conspiracy hereby declared to be
> illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be
> punished by fine not exceeding $100,000,000 if a corporation, or, if any other
> person, $1,000,000, or by imprisonment not exceeding 10 years, or by both
> said punishments, in the discretion of the court.[5] (Emphasis added.)

63.     The Supreme Court has recognized that Congress intended only to "outlaw … unreasonable

restraints."[6] In order to state a claim under Section 1, a plaintiff must allege (1) a contract … (2) in

unreasonable restraint of trade or commerce; (3) affects interstate commerce among the States or

foreign nations.[7]

64.     Here, (1) the *Employee Intellectual Property, Non-Competition, and Non-Solicitation*

*Agreement* is a contact; (2) Section 6 of the contract specifically imposes an unreasonable restraint of

trade through its express language of "During Employee's employment with 2U and for a period of

twelve (12) months after the termination of Employee's employment with 2U for any reason (voluntary

or involuntary), Employee shall not, directly or indirectly (on Employee's own or in combination or

---

[5] 15 U.S.C.S. § 1 (LexisNexis, Lexis Advance through Public Law 118-46, approved March 22,
2024, with a gap of Public Law 118-42)
[6] *Texaco Inc. v. Dagher,* 547 U.S. 1, 5, 126 S.Ct. 1276, 164 L.Ed.2d 1 (2006).
[7] 15 U.S.C.S. § 1; *Am. Ad Mgmt., Inc. v. GTE Corp.,* 92 F.3d 781, 788 (9th Circ. 1996).

association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), contact, call upon, solicit business from, render services to, or market services, products, or platforms to any Customer and/or divert or interfere with, or attempt to divert or interfere with, 2U's business or relationship with any Customer; and (3) it restrains commerce among the States by restricting an employee from engaging in business, even if a former customer contacts them specifically. Therefore, Section 6 of the contract violated Section 1 of the Sherman Act.

## THIRD CAUSE OF ACTION

### (Recission)

65.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

66.     Upon information and belief, 2U has engaged in a pattern and practice of imposing the same restrictive covenants and other provisions in Mr. Hobbi's employment agreement on its employees at-large.

67.     For the reasons articulated above the restrictive covenants and other provisions in Mr. Hobbi's employment agreement are (1) unenforceable as a matter of law in the States of New Jersey and Maryland; and (2) violates Section 1 of the Sherman Act, and thus pursuant to the language of the Act, is "declared to be illegal."

68.     Therefore, the Court is compelled to issue an order declaring the restrictive covenants and other provisions in Mr. Hobbi's employment agreement rescinded and void *ab initio*.

## FOURTH CAUSE OF ACTION

69.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

70.     The Employment Agreement between Plaintiff and Defendant includes a forum selection clause requiring that any disputes be brought exclusively in the state or federal courts of Delaware.

71.     That clause is unenforceable under federal common law because:

   o   It is the product of a non-negotiable, adhesive employment contract lacking any meaningful opportunity for Plaintiff to review or reject the provision;

- o It is unreasonable and unjust, as Delaware bears no material relationship to Plaintiff's employment, termination, or ongoing harm;

- o It would effectively deprive Plaintiff — a 61-year-old, unemployed New Jersey resident — of his day in court due to the financial and practical burdens of litigating in Delaware;

- o It would bar or chill enforcement of public rights under the Age Discrimination in Employment Act (ADEA) and Sherman Antitrust Act.

72.    Accordingly, Plaintiff seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that the forum selection clause in the Employment Agreement is unenforceable and that venue is proper in the United States District Court for the District of New Jersey.

## **FIFTH CAUSE OF ACTION**

### **(Fines, Reimbursement of Attorney Fees and Expenses)**

73.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

**WHEREFORE**, the Plaintiff, hereby prays the following relief:

- a. The entry of an Order declaring that the restrictive covenants and Sections 4(c), 4(f), 5(a), and 6 are unenforceable as a matter of law;

- b. The entry of an Order declaring that the restrictive covenants and Sections 4(c), 4(f), 5(a), and 6 violate Section 1 of the Sherman Act, and pursuant to the language of the Act, is illegal";

- c. The entry of an Order declaring rescinding the restrictive covenants and Sections 4(c), 4(f), 5(a), and 6;

- d. The entry of an Order declaring the forum selection clause unenforceable;

- e. The entry of an Order ordering 2U to pay to Mr. Hobbi a fine equal to the number of lost wages back dated to August 15, 2024 and pursuant to the allowable fine under the Sherman Act;

f.  The entry of an Order awarding Mr. Hobbi reasonable attorney fees and expenses, along with

statutory and required enhancements to said attorney fees;

g.  The entry of an Order granting such other relief as may be just and equitable in the discretion

of the Court.

**THE CASTLE FIRM, LLC**
Attorneys for Plaintiff, Salah Hobbi

By:  _____**/s/ Jason Castle**_____

Jason Castle, Esq.
**THE CASTLE FIRM, LLC**
Attorneys for the Plaintiff
50 Park Place, Suite 900
Newark, NJ 07102
T: (201) 371-3368
F: (973) 761-2203

# EXHIBIT A

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661



7900 Harkins Road | Lanham, MD 20706

May 31, 2019
Sal  Hobbi

Sal, we appreciate the time you have spent with us during the interview process.  We are excited about you becoming our next 2Ute. Below are the details of your offer:

Position: Visiting Instructor
Location:  New York, NY
Start Date:  June 10, 2019
Manager: Mark Thompson
Job Classification: Full-Time Salaried

Your regular annual base salary will be $150,000 USD, paid semi-monthly in accordance with 2U's standard payroll practices, and subject to all deductions and withholdings required by law.  Your position is a full-time position and is classified as exempt for wage and hour purposes.

As a full-time employee of 2U, you will be eligible for benefits beginning on your Start Date.  Additionally, you will become eligible to enroll in our employee 401(k) plan immediately upon hire. You are entitled to unlimited PTO in accordance to 2U's policy. Please note, however, that PTO must still be tracked and requires approval from your direct manager.

The following list highlights some of the benefits available to you.  Please note that each is subject to its own terms and conditions as more fully described in the applicable plan/benefit documents that you receive upon starting with 2U.

Tuition Reimbursement
Unlimited Paid-Time Off
Volunteer Time-Off (VTO) (currently 3 days per year)
Benefits: Medical, Dental, Vision
401(k) Plan with 2U match
2U Perks: Company Meeting, Winter Break, 2U Boo, Employee Appreciation Days

Please understand your employment with 2U is "at-will".  This means that either you or 2U may terminate your employment relationship with or without cause, and with or without notice, at any time. This letter does not constitute a contract of employment for any specific period of time, but creates only an "employment at will" relationship.

Lastly, please note that this offer is contingent upon:

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661



Sal Hobbi

a) Verification of your right to work in the United States, as demonstrated by your completion of the I-9 form upon hire and your submission of acceptable documentation (as noted on the I-9 form) verifying your identity and work authorization within three days of your Start Date. A copy of the I-9 Forms List of Acceptable Documents will be sent to you via SilkRoad. On your first day of employment, please bring with you the needed documentation to complete the I-9 form.

b) Satisfactory completion of a background investigation, for which the required notice and consent forms will be sent via our third-party vendor.

c) Your review and acknowledgment of receipt of 2U's Employee Handbook (and any applicable state addenda) and your signing and completing 2U's Confidential Information, Invention Assignment, Work For Hire and Employee Intellectual Property, Non-Competition and Non-Solicitation Agreement which contains a non-compete provision.

This letter, along with the Confidential Information, Invention Assignment, Work For Hire and Employee Intellectual Property, Non-Competition and Non-Solicitation Agreement, contain our complete agreement regarding the terms and conditions of your employment.

We look forward to changing lives while having fun with you. #NOBACKROW

Sincerely,
The Recruiting Team

I accept this offer of employment with 2U and agree to the terms and conditions set forth in this letter.

Date: 05-31-2019 | 2:24 PM PDT    Signature: _____

Sal Hobbi

# EXHIBIT B

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

**EMPLOYEE INTELLECTUAL PROPERTY, NON-COMPETITION, AND
NON-SOLICITATION AGREEMENT**

This Employee Intellectual Property, Non-Competition, and Non-Solicitation Agreement ("Agreement") is made as of <u>June 10, 2019</u> ("Effective Date") by and between 2U, Inc., a Delaware corporation ("2U"), and <u>Sal Hobbi</u> ("Employee").

**RECITAL**

2U is engaged in a highly competitive Business (as defined below). Employees' role and relationship with 2U involves a position of trust and confidence in which Employee will have access to Confidential Information (as defined below), and Employee's activities will directly or indirectly support 2U's business, research and development efforts, relationships with Customers (defined below), and goodwill, all of which are the result of significant investments by 2U and are valuable interests, which, if used or diverted to benefit a Competitor (as defined below), would cause irreparable harm. To protect these and other valuable investments and for good and valuable consideration, including, without limitation, Employee's employment or continued employment with 2U (including through any promotion), specialized training and/or education provided by or paid for by 2U, access and/or contributions to Confidential Information (as defined below), and/or direct or indirect access to and/or support of 2U's goodwill and relationships with Customers (defined below), Employee agrees to the obligations set forth below;

NOW, THEREFORE, incorporating the above recital as though set forth below, intending to be legally bound hereby, and in exchange for good and valuable consideration, the parties agree as follows:

1.    <u>Engagement</u>. To the extent that the terms of 2U's employment of Employee are set forth in any separate employment agreement(s), this Agreement is hereby deemed incorporated therein. Notwithstanding, should any term of any separate agreement between 2U and Employee, including any employment agreement, and this Agreement conflict, the terms of this Agreement shall apply.

2.    <u>Definitions</u>.

(a)    "2U" shall mean 2U, its designees, successors, assigns, officers, directors, employees and/or agents.

(b)    "Business" shall mean all products, technologies, and services in or for the digital education and online program management industries that 2U is now or at any point in time during Employee's employment with 2U engaged in or developing.

(c)    "Competitor" shall mean any person or entity involved in any business that competes, or is intended to compete, with the Business.

(d)    "Confidential Information" shall mean any and all information, data, or knowledge that is treated as confidential by 2U or is not generally known by non-2U personnel, including but not limited to:

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

       (1)    any and all information, data or knowledge disclosed by 2U to Employee or learned by Employee about 2U in connection with Employee's employment with 2U;

       (2)    any and all information, data or knowledge created or developed (in whole or in part) by Employee during Employee's employment with 2U;

       (3)    Customer lists, student lists for 2U's university partners, prospective Customer lists, and prospective student lists for 2U's University partners;

       (4)    actual or prospective student personal information collected by 2U and/or by any Customer;

       (5)    any and all technical data, trade secrets or know how, patents in development, patent applications, processes, formulas, technology, designs, drawings, hardware configuration, software, data compilations, trademarks in development, original works of authorship, business and industry research, business plans, product plans, customer lists and customers, competitive advantages, legal and personnel practices, marketing, finances or other business information, and financial data, whether or not patentable or registrable under copyright or similar laws techniques, that were developed by 2U, by 2U employees, or otherwise for or on 2U's behalf; and

       (6)    any information which 2U obtains from any third party (including but not limited to any Customer) that Employee knows or should know constitutes such third party's confidential information.

Information, data or knowledge shall be considered "Confidential Information" regardless of whether it is written or oral, and if written, regardless of how it was produced or reproduced or whether or not marked or specifically designated as confidential or proprietary. "Confidential Information" shall not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of the Employee or of others who were under confidentiality obligations as to the item or items involved.

(e)    "Customer" shall mean any educational institution (including any person or entity affiliated with any educational institution in a role related to digital education and/or online program management products, technologies, and services) (1) that Employee contacted, solicited business from, promoted or marketed products or services to, rendered any service to, was assigned to, had management responsibilities for, or received commissions, bonuses or incentives, or any other compensation on at any point in time during the last eighteen (18) months of Employee's employment with 2U; and/or (2) that was the subject of Confidential Information to which Employee had access during Employee's employment with 2U.

(f)    "Inventions" shall mean developments, concepts, improvements, designs, discoveries, ideas, whether or not patentable or registrable under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of Employee's employment with 2U.

(g)    "Restricted Period" shall mean six (6) months following the termination of Employee's employment with 2U for any reason (voluntary or involuntary).

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

3.      <u>Confidentiality Obligation</u>.  During and after Employee's employment with 2U, Employee shall hold all Confidential Information in the strictest confidence and shall not use or disclose any Confidential Information, or provide any third party with access to any Confidential Information, except as required in the course of Employee's job responsibilities for 2U, unless either (a) specifically authorized in writing by 2U; or (b) as permitted by law where the disclosure is made (1) in confidence to a government official or to an attorney, either directly or indirectly, solely for the purpose of reporting or investigating a suspected violation of law; (2) in a complaint or other document filed in a lawsuit or other proceeding, so long as any such filing is made under seal; or (3) in a lawsuit or proceeding against an employer for retaliation based on the reporting of a suspected violation of law and/or to an attorney in any such lawsuit so long as any document containing the information is filed under seal and the information is not otherwise disclosed, except pursuant to court order.

4.      <u>Intellectual Property and Work for Hire</u>.

(a)      <u>Intellectual Property Retained and Licensed</u>. Employee has attached hereto, as Exhibit A, a list describing all Inventions, original works of authorship (including any and all computer code), developments, improvements, and trade secrets which were made by Employee prior to the date hereof (collectively referred to as "Prior Intellectual Property"), which belong to Employee or in which Employee has an interest, which relate to 2U's proposed business, products, programs or research and development, and which Employee does not assign to 2U hereunder. If no such list is attached, Employee represents that there are no such Prior Inventions. If Employee incorporates any Prior Intellectual Property into a 2U product, process, method or service, Employee hereby grants to 2U and 2U shall have a nonexclusive, royalty-free, irrevocable, perpetual and worldwide license to make, have made, modify, use and sell such Prior Intellectual Property as part of or in connection with such product, process, method or service.

(b)      <u>Assignment of Inventions</u>. Employee will promptly make full written disclosure of all Inventions to 2U. Employee will hold in trust for the sole right and benefit of 2U, and hereby assigns to 2U (and its successors and assigns), all of Employee's right, title, and interest in and to any and all Inventions, except as provided in Section 4(f) below. Employee understands and agrees that the decision whether or not to commercialize or market any Invention developed by Employee solely or jointly with others is within 2U's sole discretion and for 2U's sole benefit. Employee also agrees that no royalty will be due to Employee as a result of 2U's efforts to commercialize or market any such Invention. Employee waives and quitclaims to 2U any and all claims of any nature whatsoever that Employee now has or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions.

(c)      <u>Work For Hire</u>. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others within the scope of and during the period of Employee's employment with 2U) and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. To the extent that any such writings or works of authorship by Employee are not, by operation of law or otherwise, deemed works made for hire, Employee hereby irrevocably assigns to 2U the ownership of, and all rights (including but not limited to copyright) in, such items, and 2U shall have the right to obtain and hold in its own name all rights of copyrights, copyright registrations and similar protections that may be available with respect to any such writings or works.

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

(d)  <u>Maintenance of Records</u>. Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during the term of Employee's employment with 2U, including, as applicable, notes, sketches, drawings, and any other format that may be specified by 2U.  Employee shall provide such records to 2U as requested by 2U, and such records shall remain the sole property of 2U at all times.

(e)  <u>Patent and Copyright Registrations</u>. Employee and Employee's executors, administrators, and legal representatives will assist 2U, at 2U's expense, in every proper way to secure 2U's rights in the Inventions and any copyrights, patents, or other intellectual property rights relating thereto in any and all countries. Employee agrees to disclose to 2U all pertinent information and with respect to the Inventions. Employee and Employee's executors, administrators, and legal representatives will execute all applications, specifications, oaths, assignments and all other instruments which 2U shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to 2U the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, or other intellectual property rights relating thereto. The foregoing obligations shall continue after the termination, expiration or completion of Employee's employment with 2U for any reason. If 2U is unable because of Employee's mental or physical incapacity or for any other reason to secure Employee's signature to pursue any application for any United States or foreign patents or copyright or trademark registrations covering Inventions or original works of authorship assigned to 2U as above, then Employee hereby irrevocably designates and appoints 2U as Employee's agent and attorney in fact, to act for and in Employee's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patent or copyright or trademark registrations thereon with the same legal force and effect as if executed by Employee.

(f)  <u>Exception to Assignments</u>.  Employee understands that the provision of this Agreement requiring assignment of Inventions to 2U does not apply to Inventions that the Employee developed or develops entirely on the Employee's own time without using 2U's equipment, supplies, facility or confidential or trade secret information unless those same Inventions relate to 2U's business or actual or demonstrably anticipated research or development, or result from any work performed by the Employee for 2U.

5.  <u>Competition and Future Employment</u>.

(a)  <u>No Competition During and After Employment</u>.  Given Employee's access and contributions to Confidential Information, the specialized training or education provided by or paid for by 2U, and/or Employee's direct or indirect access to and/or support of 2U's goodwill and Customer relationships, during Employee's employment with 2U and during the Restricted Period, Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), perform, or assist others to perform, work involving the Business for a Competitor.

(b)  <u>Notification of Future Employment</u>.  In connection with the termination of Employee's employment with 2U and during the Restricted Period, Employee shall provide 2U with fourteen (14) calendar days' written notice of any new employment with a Competitor to allow 2U an opportunity to obtain written assurances from Employee and Employee's new employer satisfactory to 2U that Employee will not be rendering services which conflict with Employee's

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

obligations in Section 5(a) of this Agreement. If Employee initiates the termination, there shall be, at 2U's sole option, a period of up to fourteen (14) calendar days after Employee gives written notice pursuant to this Section before the termination becomes effective, during which time Employee will provide such transitional services as 2U may request, and 2U will continue Employee's pay so long as Employee satisfactorily provides such services.

6.    <u>Non-Interference and Non-Solicitation of Customers</u>.  During Employee's employment with 2U and for a period of twelve (12) months after the termination of Employee's employment with 2U for any reason (voluntary or involuntary), Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), contact, call upon, solicit business from, render services to, or market services, products, or platforms to any Customer and/or divert or interfere with, or attempt to divert or interfere with, 2U's business or relationship with any Customer.

7.    <u>Non-Interference and Non-Solicitation of Employees and Contractors</u>. During Employee's employment and for a period of twelve (12) months after the termination of Employee's employment with 2U for any reason (voluntary or involuntary), Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), (a) solicit, encourage, entice, or induce, or attempt to solicit, encourage, entice, or induce, any employee or contractor who is then or was, during the last twelve (12) months of Employee's employment with 2U, employed by or contracted by 2U to terminate his, her, or its employment or other contractual relationship with 2U for any reason; or (b) offer employment to, hire, or cause to be hired by any entity or person other than 2U any employee or contractor who (1) is then or was, during the last six (6) months of Employee's employment with 2U, employed by or contracted by 2U; and (2) comes to or approaches Employee and/or his/her future employer without Employee's direct or indirect solicitation, involvement, or action.

8.    <u>Returning Company Documents</u>. Employee agrees that, immediately upon the termination of Employee's employment with 2U for any reason (voluntary or involuntary), Employee will deliver to 2U (and will not keep in Employee's possession (including in any physical, electronic, or online/cloud files), recreate or deliver to anyone else) any  and  all 2U  devices, Confidential Information, and any other 2U property, including, but not limited to, records, data, notes, reports, proposals, lists (specifically including, but not limited to, 2U Customer lists and student lists), correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed or obtained by Employee during Employee's employment with 2U or otherwise belonging to 2U, its successors, subsidiaries, parent or assigns, including, without limitation, those records maintained pursuant to Section 4(d) of this Agreement.

9.    <u>Representations</u>. Employee agrees to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. Employee represents that Employee's performance of and under all the terms of this Agreement will not breach any other agreement to keep in confidence proprietary information acquired by Employee in confidence or in trust prior to Employee's engagement with 2U. Employee has not entered into, and Employee agrees not to enter into, any oral or written agreement in conflict herewith.

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

10.    <u>Voluntary Nature of Agreement</u>. EMPLOYEE ACKNOWLEDGES AND AGREES THAT EMPLOYEE IS EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY 2U OR ANYONE ELSE. EMPLOYEE FURTHER ACKNOWLEDGES AND AGREES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND THAT EMPLOYEE HAS ASKED ANY QUESTIONS NEEDED TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT. FINALLY, EMPLOYEE AGREES THAT EMPLOYEE HAS BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

11.    <u>General Provisions</u>.

(a)    <u>Governing Law</u>. This Agreement, and any claim or dispute (whether in contract, tort or otherwise) arising out of or related to this Agreement or the transactions contemplated hereby, will be governed by and construed in accordance with the laws of the State of Delaware without regard to its conflict of law provisions.

(b)    <u>Venue and Consent to Jurisdiction</u>. Any action, suit, or proceeding brought by Employee arising out of, connected with, or related to the subject matter of this Agreement shall be brought exclusively in a state or federal court of Delaware with subject matter jurisdiction.  Any action, suit, or proceeding brought by 2U arising out of, connected with, or related to the subject matter of this Agreement may be brought in a state or federal court of Delaware with subject matter jurisdiction.  Employee consents to personal jurisdiction and venue in the state and federal courts of Delaware in any action, suit, or proceeding arising out of, connected with, or related to the subject matter of this Agreement, waives any objection to venue in those courts, and consents to service of process by United States mail or express courier service in any such action, suit, or proceeding.  Employee irrevocably and unconditionally waives the right to a trial by jury in any action, suit, or proceeding arising out of, connected with, or related to the subject matter of this Agreement or the actions of the parties in the negotiation, administration, performance, or enforcement of this Agreement.

(c)    <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding between 2U and Employee relating to the subject matter herein and supersedes all prior discussions between Employee and 2U. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in Employee's duties, obligations or compensation will not affect the validity or scope of this Agreement.

(d)    <u>Severability</u>. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(e)    <u>Successors, Assigns, and Third-Party Beneficiaries</u>. 2U may transfer, convey, or assign this Agreement and any rights or obligations, in whole or in part, to any existing or future affiliate of 2U or to any third party, including in connection with a merger, sales of assets, sale of stock, or any other form of acquisition or transaction pertaining to all or part of the business of 2U, and Employee consents to such transfers, conveyances, or assignments.  This Agreement shall inure to the benefit of and may be enforced by 2U and any of its existing or future affiliates, including their

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

successors and assigns, and shall be binding upon Employee, Employee's heirs, executors, administrators, successors, assigns, and other legal representatives, and other successors in interest. This Agreement is personal to Employee's employment with 2U and may not be assigned by Employee for any reason.

12.    <u>Specific Relief</u>. The Parties agree that the restrictions outlined in Sections 3, 4, 5, 6, 7, and 8 are reasonable and necessary protections of the immediate interests of 2U and that 2U would not have entered into this Agreement, or provided the consideration herein, without Employee's agreement thereto. Employee agrees and acknowledges that Employee's breach of any of the restrictions outlined in Sections 3, 4, 5, 6, 7, and 8 will cause irreparable harm to 2U and that damages arising out of any such breach may be difficult to determine. Employee therefore agrees and acknowledges that, in addition to all other rights and remedies 2U may have at law and/or in equity, 2U shall be entitled to specific performance and temporary and/or permanent injunctive relief restraining the breach and/or further breach of this Agreement by Employee, by Employee's new Employer, and by any others acting in concert with Employee without the necessity of 2U's proving actual damages or posting a bond. Employee agrees that if Employee breaches any restriction in Sections 5, 6, or 7 of this Agreement, then the restricted periods in those Sections shall all be extended automatically, and courts shall have the power to enforce the post-employment restricted periods in those Sections from the date of the last breach up to a maximum of twenty-four (24) months from the date Employee's employment with 2U terminates. If 2U prevails in any suit under this Agreement, in whole or in part, then Employee shall also be liable for 2U's costs and attorney's fees in connection with the lawsuit and any related legal proceedings. Should any provision in Sections 3, 4, 5, 6, 7, or 8, or any portion thereof, be invalidated or not enforced under applicable law, this shall not affect the validity or enforceability of the remaining portions of any such provision or any other provision in this Agreement and shall not affect the enforcement of this Agreement in any other jurisdiction. Employee further agrees that, to the extent any provision in Sections 3, 4, 5, 6, 7, or 8, or any portion thereof, is unenforceable because it is deemed by a court to be overbroad, the provision shall be reformed and revised to the extent necessary to protect the applicable legitimate business interests of 2U, or otherwise applied and enforced in a more limited manner to the fullest extent permissible under applicable law.

13.    <u>Survival</u>.  The provisions of this Agreement shall survive the termination of Employee's employment, regardless of the reason for termination.

14.    <u>California Employees</u>.

(a)    Sections 11(a) and 11(b) shall not apply with respect to any controversy or claim arising in California, provided in each instance that (1) Employee primarily resided and worked in California (i) during and in connection with Employee's employment with 2U and (ii) at the time Employee entered into this Agreement; and (2) Employee was not individually represented by counsel in negotiating the terms of this Agreement.

(b)    In any controversy arising in California, the post-employment obligations in Sections 5 and 6 and the no-hire obligation in Section 7 shall not apply with respect to services Employee renders in California after termination of employment that do not involve Employee's use or disclosure of Confidential Information, provided in each instance that (1) Employee primarily resided and worked in California (i) during and in connection with Employee's employment with 2U and (ii)

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

at the time that Employee entered into this Agreement; and (2) Employee was not individually represented by legal counsel in negotiating the terms of this Agreement.

15.    <u>Massachusetts Employees</u>.

(a)    If Employee is a resident of the Commonwealth of Massachusetts and has been employed with 2U in the Commonwealth of Massachusetts at the time Employee's employment with 2U terminates and for the thirty (30) calendar days immediately preceding that termination, then (1) this Agreement shall be governed by and interpreted according to the laws of the Commonwealth of Massachusetts, without regard to its conflict of law rules; and (2) any action relating to or arising out of this Agreement shall be brought either in the county of Massachusetts wherein Employee resides or in the superior court or the business litigation session of the superior court of Suffolk County, Massachusetts, or, if subject matter jurisdiction exists, in the United States District Court for the District of Massachusetts, and Employee consents to personal jurisdiction and venue in such courts and to service of process by United States mail or express courier service in any such action.

(b)    Employee acknowledges and agrees that the mutually agreed upon consideration set forth in this Agreement is adequate to satisfy the requirements of Massachusetts law.


EMPLOYEE HAS A RIGHT TO CONSULT, AND IS ADVISED TO CONSULT, WITH COUNSEL PRIOR TO SIGNING THIS AGREEMENT.  EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS HAD AT LEAST FOURTEEN (14) CALENDAR DAYS TO REVIEW ITS TERMS.  EMPLOYEE FURTHER ACKNOWLEDGES HAVING READ THIS AGREEMENT AND HAVING EXECUTED THIS AGREEMENT, AND EMPLOYEE AGREES TO THE TERMS ABOVE AND ACKNOWLEDGES THAT EMPLOYEE INTENDS TO BE LEGALLY BOUND BY THIS AGREEMENT.

*[Remainder of page intentionally left blank]*

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

**AGREED AND ACCEPTED:**

**2U, Inc.**

By: _____

Name:  Rani Hammond

Title:  Chief People Officer

Address:  7900 Harkins Road

Lanham, MD 20706

Date:  May 21, 2019

**Employee**

By: _____

Name:  Sal Hobbi

Address:  82 Pancake Hollow Dr

Wayne, NJ 07470

Date:  05-31-2019 | 2:24 PM PDT

# EXHIBIT C

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

**Exhibit A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

| | Title | Date | Identifying Number or Brief Description |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |

I agree that my inventions or improvements are listed, or I have none.   ☒

Signature of Employee: _____

Print Name of Employee: ___Sal Hobbi_____

Date: ___05-31-2019 | 2:24 PM PDT____

# EXHIBIT D

## SEPARATION AGREEMENT AND GENERAL RELEASE

This SEPARATION AGREEMENT and GENERAL RELEASE (together with any attachment(s) hereto, this "Agreement") is entered into by and between 2U, Inc. ("2U" or the "Company") and Salah Hobbi ("Employee" and, together with the Company, the "Parties") and confirms the agreement that has been reached with Employee in connection with Employee's departure from the Company. The Company and Employee, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and agreed, and intending to be legally bound, hereby agree as follows:

**1.      Termination of Employment; Final Pay; All Compensation Due.**

(a)      Employee's employment with 2U will be or has been terminated on August 15, 2024 (the "Termination Date").  Employee acknowledges that the Termination Date will not be extended for any reason. Employee understands, acknowledges, and agrees that 2U has no obligation whatsoever to reinstate, recall, reemploy, or rehire Employee to any position with the Company. Employee further understands, acknowledges, and agrees that any rehire, reemployment or reengagement of Employee by Company (whether as an employee or independent contractor) after the Termination Date shall result in the immediate cessation, upon the date Employee commences new employment or engagement, of any and all outstanding severance benefits outlined in Section 2 of this Agreement, except for any tuition repayment forgiveness, and that Employee's right to all such outstanding severance benefits shall be forfeited as a result of the rehire, reemployment, or reengagement; provided, however, that Employee agrees that all previously received severance benefits under this Agreement shall be kept by Employee and constitute sufficient consideration for Employee's promises and obligations in this Agreement (specifically including without limitation Employee's general release and waiver of claims) and that all such promises and obligations of Employee remain in full force and effect.

(b)      2U has paid or shall pay to Employee:  (i) Employee's full salary up to and including the Termination Date in accordance with 2U's general payroll practices, subject to such payroll withholdings and deductions as may be required by law; and (ii) all incurred but unreimbursed business expenses through the Termination Date in accordance with Company policy regarding reimbursement of expenses and Employee's compliance therewith.  Employee is entitled to these payments whether or not Employee signs this Agreement. Effective as of the Termination Date and thereafter, Employee shall not be eligible for any grant of equity awards.

(c)      Employee acknowledges and agrees that the consideration described below constitutes the sole and exclusive consideration provided Employee under this Agreement, and that Employee is not entitled to this consideration if Employee does not sign this Agreement.  Employee further acknowledges and agrees that, upon receipt of the payment in Section 1(b) above, Employee will have received all wages, bonuses, compensation, remuneration and all other monies due Employee arising out of,

relating to, or resulting from Employee's employment with the Company, including but not limited to all monies due Employee under any benefit plans established and/or maintained by the Company or any employment-related agreement.

       2.      **<u>Severance Benefit and Other Consideration.</u>**  As a material inducement for Employee to enter into this Agreement, 2U will provide the following consideration set forth in Section 2(a) below (collectively, the "<u>Severance Benefit</u>") to which Employee is not otherwise entitled and/or which is contractually conditioned upon Employee's execution of a release of claims:

       (a)      (i) 2U will pay to Employee severance pay in the total amount of forty-six thousand five hundred ninety-two dollars ($46,592.00), reduced by such withholdings and deductions as may be required by law ("<u>Severance Payment</u>"); and (ii) provided that Employee elects to continue participating in group health insurance coverage under the Consolidated Omnibus Reconciliation Act of 1985 ("<u>COBRA</u>") or similar state law, 2U will pay the full monthly COBRA premiums for Employee's coverage (and Employee's dependents, as applicable) directly to the respective insurance carrier to continue Employee's coverage for three (3) months; <u>provided</u>, <u>however</u>, that 2U's obligation to make such payments shall immediately expire if Employee ceases to be eligible for continuation coverage under COBRA or similar state law, or otherwise terminates such coverage. The Severance Payment above shall be paid in installments in accordance with 2U's standard payroll practices, commencing on 2U's first regular pay date after the Effective Date, as defined in this Agreement. All such installment payments shall be made by direct deposit into Employee's account using the financial institution routing number and account number previously provided by Employee to Company. Additionally, within the timing required by law, Employee will be provided with a separate notice describing Employee's rights and obligations with respect to continued group health insurance coverage under the applicable state and/or federal insurance laws (including COBRA).

The Company shall, at its expense, provide Employee with access to a career transition and outplacement services package valued at $1,000.00, which will be available through Lee Hecht Harrison and which Employee must activate within 90 days of the Termination Date.

       (b)     Employee acknowledges and agrees that the Severance Benefit is in addition to the monies owed to Employee through the Termination Date as set forth in Section 1(b) above, and that in the absence of this Agreement, Employee would not be entitled to, and 2U would not pay, the Severance Benefit provided above.

       (c)     Except as expressly set forth herein, all other rights and benefits of Employee will terminate on the Termination Date.

3.  **General Waiver and Release of Claims.**

(a)      In consideration for the payment of the Severance Benefit, the execution and delivery of this Agreement, and the undertakings provided for herein, none of which is otherwise required, and as a material inducement for 2U to enter into this Agreement, Employee, on behalf of Employee and Employee's heirs, executors, administrators, successors and assigns, hereby irrevocably and unconditionally releases the Company, its subsidiaries and affiliates, and each of their respective shareholders, partners, directors, board of managers, officers, agents, employees, insurers, parent companies, affiliates, subsidiaries, predecessors and successors, assigns, heirs, executors, administrators, attorneys, and anyone acting on any of their behalves (collectively with the Company, the "Company Releasees") of and from any and all actions, causes of action, claims, compensation, costs, demands, damages, debts, expenses, injuries, liabilities, and losses of whatsoever nature, intentional or unintentional or negligent, suspected or unsuspected, fixed or contingent, known or unknown, foreseen or unforeseen (collectively "Claims"), which Employee or Employee's heirs, executors, administrators, successors or assigns ever had, now have or hereafter can, will or may have (either directly, indirectly, derivatively or in any other representative capacity) by reason of any matter, fact or cause whatsoever against the Company Releasees from the beginning of time through the date upon which Employee signs this Agreement, including, but not limited to, any Claims arising out of or relating to Employee's employment with the Company and/or the termination of Employee's employment with the Company, including, but not limited to, Claims under any of the following, each as amended, as applicable:  the Age Discrimination in Employment Act of 1967; the Older Workers Benefit Protection Act; 42 U.S.C. § 1981; the Federal Civil Rights Acts of 1866, 1870, 1871, 1964, 1972, 1988, and 1991; Title VII of the Civil Rights Act of 1964; the National Labor Relations Act; the Labor Management Relations Act, 1947; the Equal Pay Act of 1963; the Rehabilitation Act of 1973; the Americans With Disabilities Act of 1990; the Family and Medical Leave Act of 1993; the Genetic Information Nondiscrimination Act; the Racketeer Influence and Corrupt Organizations Act; the Sarbanes-Oxley Act; the Employee Retirement Income Security Act; to the extent permitted by applicable law, any "whistleblower" or retaliation laws; the Worker Adjustment and Retraining Notification Act; Executive Order 11246; qui tam claims under the False Claims Act; any state, county or local fair employment practices act or other employment-related law, including those specifically set forth on the "Released State Laws List" (which is attached hereto as Exhibit B) for each of the states, counties, and locales where Employee resides and works; and any other local, county, state or federal law. Each of the above-referenced laws specifically includes any amendments and respective implementing regulations; however, the identification of specific law is for purposes of example only, and the omission of any specific law shall not limit the scope of this General Release and Waiver of Claims in any manner. This General Release and Waiver of Claims is intended to be as broad as permitted by applicable law and include, without limitation, Claims: under any and all state, local, or municipal charters, codes, ordinances, or laws; related to salary, bonuses, commissions, stock, stock options, or any other ownership or equity interest in the Company, paid time off of any kind, fringe benefits, expense reimbursements, severance pay, or any other form of compensation;

and, whether statutory, at common law or otherwise, for wrongful termination of employment, retaliation (including whistleblower Claims), breach of contract (implied or express), detrimental reliance, promissory estoppel, constitutional violation, infliction of emotional distress, libel, slander, defamation, assault, battery, false imprisonment, invasion of privacy, fraudulent inducement, fraudulent concealment, fraud, breach of covenant of good faith and fair dealing, misrepresentation, negligence, or any other tort. Employee represents that Employee has no complaints, charges, or lawsuits pending against the Company Releasees.

(b)     The Parties expressly acknowledge and agree that nothing in this Agreement, including without limitation the release and waiver set forth in this Section 3, is intended, or shall be interpreted in a manner, to interfere with or restrict: (1) Employee's right to enforce this Agreement; (2) any right or entitlement that employees are not allowed by applicable law to waive or release, including, but not limited to, Claims for workers' compensation or unemployment compensation benefits; (3) any right Employee has to file a charge or claim, or cooperate or participate in an investigation, or proceeding with any federal, state, or local administrative or government agency (such as the Equal Employment Opportunity Commission, Securities Exchange Commission, National Labor Relations Board, or U.S. Department of Labor), except that Employee waives the right to any recovery, relief, or monetary award in connection with any such charge, claim, investigation, or proceeding, unless prohibited by applicable law (notwithstanding the foregoing, this release and waiver does not limit Employee's right to receive an award for information provided to the SEC); (4) any right Employee has to engage in legally protected activity (such as, for example, concerted protected activity under Section 7 of the National Labor Relations Act, which includes discussions or actions relating to wages, benefits, or other terms and conditions of employment or to labor-related disputes or concerns); and (5) any Claim that arises only after the date on which Employee signs this Agreement.

**4.     Existing and Continuing Obligations**.  Employee understands that the Employee Intellectual Property, Non-Competition, and Non-Solicitation Agreement, signed by Employee, and any subsequent amendment to it (collectively, the "NDA" and attached hereto as Exhibit A), and the post-employment obligations therein remain in full force and effect and will continue to apply as set forth therein after the Termination Date to the maximum extent permitted by applicable law; provided, however, that, as additional consideration and as a material inducement to Employee to enter into this Agreement, the Company agrees to release Employee from any post-employment non-competition obligation set forth in the NDA without impact on or impairment to all of Employee's other obligations under the NDA, except as otherwise required by applicable law.

**5.     2U Property.**     All 2U property, including electronically stored information, in Employee's possession or control has been returned to 2U.  This includes, but is not necessarily limited to, computer hardware and software, corporate credit cards, manuals, customer information, business information (including without limitation all contracts, proposals, agreements, term sheets, etc. and also including unexecuted versions and drafts thereof), any and all confidential and proprietary information, keys and

security passes.  Employee also expressly and specifically agrees and authorizes 2U to deduct from Employee's Severance Payment any amounts for obligations owed by Employee for unpaid corporate credit card balances, costs of unreturned company property such as computers and keys, and other debts and obligations to 2U.

6.    **Non-Disparagement**.  As a material inducement to the Company to enter into this Agreement, Employee agrees not to make any disparaging or derogatory statements, in any manner or form, to any person or entity about the Company, its employees (including without limitation its CEO, Paul S. Lalljie), agents, directors, officers, subsidiaries, affiliates or University partners including, without limitation, the making of any disparaging or derogatory statements to any current or former employee of the Company, to any contractor or vendor of the Company, to any current or prospective University partner(s) of the Company, to any applicant for employment with the Company, and to any member of the print or broadcast media ("print" and "broadcast" to be interpreted with the broadest possible definitions, including online), and/or to otherwise attempt to injure or interfere with the Company's business. Employee's non-disparagement commitment above is expressly limited to statements that are knowingly false or made with reckless disregard for the truth or falsity and/or that maliciously publicly attack the Company's products, services, or partners to the extent unrelated to the terms and conditions of Employee's employment or labor-related disputes or concerns. Nothing in this paragraph (or otherwise in this Agreement) is intended or shall be construed to suggest or imply that Employee cannot provide truthful information in response to a government investigation, a court and/or administrative agency-issued subpoena, or other valid legal process.

7.    **Confidentiality; Limitations on Non-Disclosure Obligation.**  Employee acknowledges that the financial consideration of this Agreement shall remain confidential and Employee shall not disclose that information or the existence and terms of this Agreement to anyone or any entity other than as (a) required by law, (b) as may be necessary to enforce any right or obligation under this Agreement, (c) to Employee's bona fide professional financial consultant or tax advisor or attorney for the sole purposes of obtaining, respectively, financial or legal advice; or (d) to Employee's spouse (the parties in clauses (c) and (d), "Permissible Parties"); provided that the Permissible Parties agree to keep the existence and terms of this Agreement confidential.  Employee understands that none of the provisions of this Agreement, specifically including Section 6 above and this Section 7, shall prevent Employee from discussing or disclosing information about unlawful acts in the workplace, such as harassment or discrimination, wage and hour violations, or sexual assault; acts of retaliation against a person, for example, for reporting or opposing harassment or discrimination in the workplace; any other conduct or employment practices that Employee has reason to believe are unlawful; the existence of a settlement involving the foregoing; information that arose from Employee's general training, knowledge, skills, or experience, regardless of whether gained on the job with the Company or otherwise; information that is readily ascertainable to the public; or information that Employee otherwise has a right to disclose as legally protected conduct under applicable law.

**8.    Cooperation.**  Employee agrees that, upon reasonable notice and without the necessity of the Company obtaining a subpoena or court order, Employee shall provide reasonable cooperation in connection with any suit, action or proceeding (or any appeal from any suit, action or proceeding), and any investigation and/or defense of any claims asserted against the Company or any of its affiliates, that relate to events occurring during the Employee's employment with the Company as to which Employee may have relevant information (including but not limited to furnishing relevant information and materials to the Company or its designee and/or providing testimony at depositions and at trial), provided that the Company agrees to reimburse Employee for out-of-pocket expenses reasonably incurred in connection with any such cooperation, and provided that any such cooperation shall be scheduled to the extent reasonably practicable so as not to unreasonably interfere with Employee's business or personal affairs.

**9.    Governing Law; Jury Trial Waiver.**  This Agreement shall be governed by and construed in accordance with the laws of the State of Maryland, without regard to its conflict of laws rules.  The Parties to this Agreement consent to the exclusive jurisdiction and venue of the state and federal courts of Maryland with respect to any action relating to a claim, dispute or controversy arising out of or in connection with this Agreement, any breach of this Agreement, any interpretation of, or the enforceability of this Agreement.  **In the event of a dispute concerning this Agreement, the Parties agree to waive their right to a trial by jury**.

**10.    Legally Authorized.** Each Party represents that it is competent to enter into this Agreement and has the requisite authority to enter into this Agreement.  No Party has agreed or promised to do or omit to do any act or thing not herein set forth, and the Parties further understand that a purpose of this Agreement is to compromise and terminate all Claims of whatever nature, known or unknown, held by Employee.

**11.    Joint Preparation.**  This Agreement shall be deemed to have been prepared jointly by the Parties.  Any uncertainty or ambiguity existing herein shall not be interpreted against any Party.

**12.    Non-Admission; Complete Defense to All Claims.**  Neither this Agreement, nor the consideration set forth herein, shall in any way be deemed or construed to be an admission by 2U of any act, failure to act, wrongful conduct or liability with respect to Employee, and 2U disclaims any liability to Employee. Employee acknowledges and agrees that this Agreement may be pleaded as a full and complete defense to, and may be used as the basis for an injunction or bar against, any action, suit, or other proceeding which Employee may institute, prosecute, or maintain with respect to any matter, occurrence, or thing covered by this Agreement.

**13.    Section 409A**.  The intent of the Parties is that the payments provided hereunder comply with Section 409A of the Internal Revenue Code of 1986, as amended ("Section 409A"), to the extent subject thereto.  The Company makes no representation that any or all of the payments described in this Agreement will be exempt from or comply with Section 409A and makes no undertaking to preclude Section 409A from applying to any such payment.

14. **Older Workers Benefit Protection Act.** The Parties intend for this Agreement to comply with Section 201 of the Older Workers Benefit Protection Act of 1990. Accordingly, Employee acknowledges and represents as follows:

(a) Employee has read and understands this Agreement and all of its terms, conditions, requirements and obligations; and

(b) By executing this Agreement, Employee does not waive rights or Claims that may arise after the date this Agreement is executed; and

(c) Prior to executing this Agreement, the Company has advised Employee in writing to consult with an attorney of Employee's choosing in connection with this Agreement and has provided Employee with the period of time in subpart (e) below in which to do so, Employee has had the opportunity to consult with an attorney of Employee's choosing in connection with this Agreement, and Employee is fully satisfied that Employee understands the Agreement completely; and

(d) Employee waives such Claims as Employee may have under the Age Discrimination in Employment Act ("ADEA") knowingly and voluntarily in exchange for consideration of value to which Employee is not otherwise entitled; and

(e) Employee has had or has been offered a period of at least forty-five (45) days within which to consider this Agreement and understands and acknowledges that, at Employee's sole option, Employee may (but is not required to) execute this Agreement prior to the expiration of the forty-five (45) day period; and

(f) Employee will have seven (7) calendar days from the date on which Employee signs this Agreement to revoke Employee's consent to the terms of this Agreement. Such revocation must be in writing and must be addressed and sent via facsimile or electronic mail as follows: Vicki Brar, VP, Human Resources, Fax: 240-667-7844, Email: vbrar@2u.com. Notice of such revocation must be received within the seven (7) calendar days referenced above. Provided that Employee does not revoke this Agreement, this Agreement shall become effective on the eighth calendar day after the date on which Employee signs this Agreement ("Effective Date"); and

(g) The attached Schedule A describes the class, unit, or group of employees being offered this severance program.

15. **Miscellaneous**.

(a) This Agreement sets forth the entire agreement of the Parties in respect of Employee's termination of employment and, except as explicitly stated herein, supersedes all prior agreements, promises, covenants, arrangements, communications, representations or warranties, whether oral or written, by either Party or any officer, employee or representative of either Party hereto with respect to such subject matter,

other than as set forth in Section 4 above.  This Agreement shall not be modified or amended except by written agreement of Employee and the Company.

(b)    This Agreement is personal to Employee and Employee may not assign Employee's obligations under it.  This Agreement will inure to the benefit of the Company Releasees.

(c)    No waiver of any one or more of the terms, conditions or obligations of this Agreement, and no partial waiver thereof, shall be construed as a waiver of any succeeding breach of any of such terms, conditions or obligations or of any of the other terms, conditions or obligations of this Agreement.  No failure or delay by either Party at any time to enforce one or more of the terms, conditions or obligations of this Agreement shall constitute a waiver of such terms, conditions or obligations or shall preclude such Party from requiring performance by the other Party at any time.

(d)    The headings of this Agreement are inserted for convenience only and neither constitute a part of this Agreement nor affect in any way the meaning or interpretation of this Agreement.  When a reference in this Agreement is made to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated.

(e)    This Agreement may be executed in one or more counterparts, including emailed, .pdf-ed or telecopied facsimiles, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(f)    Employee agrees that the Company would suffer irreparable harm if Employee were to breach, or threaten to breach, any provision of this Agreement and that the Company would by reason of such breach, or threatened breach, be entitled to injunctive relief in a court of appropriate jurisdiction, without the need to post any bond or other security, and Employee further consents and stipulates to the entry of such injunctive relief in such a court prohibiting Employee from breaching this Agreement. This section shall not, however, diminish the right of the Company to claim and recover damages in addition to injunctive relief.

(g)    In the event that any one or more of the provisions of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.  Moreover, if any one or more of the provisions contained in this Agreement shall be held to be excessively broad as to duration, activity or subject, such provisions shall be construed by limiting and reducing them so as to be enforceable to the maximum extent allowed by applicable law.  Furthermore, a determination in any jurisdiction that this Agreement, in whole or in part, is invalid, illegal or unenforceable shall not in any way affect or impair the validity, legality or enforceability of this Agreement in any other jurisdiction.

(h)    Any payments provided for herein shall be reduced by any amounts required to be withheld by the Company under applicable law then in effect.

**PLEASE READ THIS AGREEMENT VERY CAREFULLY. THIS AGREEMENT INCLUDES A GENERAL RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS, INCLUDING THOSE INVOLVING EMPLOYMENT DISCRIMINATION, AND CAN EFFECTIVELY BE USED TO BAR FUTURE LEGAL ACTION AGAINST 2U AND OTHER INDIVIDUALS AND ENTITIES BY EMPLOYEE FOR CLAIMS ARISING PRIOR TO THE EXECUTION OF THIS AGREEMENT. EMPLOYEE SHOULD CONSULT WITH AN ATTORNEY BEFORE SIGNING THIS AGREEMENT.**

IN WITNESS WHEREOF, intending to be legally bound, the Parties have executed this Agreement on date indicated below.

**Salah Hobbi**                                         **2U, Inc.**

_____          By:_____

Employee Signature

                                                        Name (Printed):_____

_____          Title:_____

Date

                                                        _____

                                                        Date

145614.00233/133050801v.1

## **EXHIBIT A**

Employee Intellectual Property, Non-Competition, and Non-Solicitation Agreement, and
Amendment (If Applicable)

**EXHIBIT B**

**RELEASED STATE LAWS LIST**

**Alabama:** the Alabama Age Discrimination in Employment Act; retaliatory and constructive discharge (Ala. Code § 25-5-11.1); Ala. Code § 25-5-11; Ala. Code § 13A-11-90; and the Clarke-Figures Equal Pay Act (Ala. Code § 25-1-30).

**Arizona**: Arizona Wage Act; Arizona Equal Pay Act; Arizona Employment Protection Act; Arizona Civil Rights Act; Arizona Occupational Health and Safety Act; Arizona Right to Work Act; Arizona Drug Testing of Employees Act; Arizonans With Disabilities Act; Arizona Medical Marijuana Act; Arizona's constructive discharge law (ARS Section 23-1502); Arizona Constitution; Arizona criminal code; and all Arizona state or local whistleblower protection statutes, codes, or regulations.

**Arkansas**: The Arkansas Civil Rights Act, the Arkansas Uniform Contribution Among Tortfeasors Act, the Arkansas Minimum Wage Act, the Arkansas social media privacy law, breach of implied or express contract, defamation, libel, slander, interference with contractual relations, and wrongful termination.

**Connecticut**: the Connecticut Fair Employment Practices Act; the Connecticut Family and Medical Leave Act; the Connecticut Whistleblower Law; the Connecticut Free Speech Law; the anti-retaliation provision of the Connecticut Workers' Compensation Act; and Connecticut's minimum wage and wage payment laws (Conn. Gen. Stat. Ann. §§ 31-58 to 31-76m).

**Delaware**: the Discrimination in Employment Act; the Persons With Disabilities Employment Protections Act; the Delaware Whistleblowers' Protection Act; the Delaware Wage Payment and Collection Act; the Delaware Minimum Wage Act; the Delaware Fair Employment Practices Act; and the Delaware social media law (19 Del. C. § 709A(b)).

**District of Columbia**: the District of Columbia Human Rights Act; the District of Columbia Family and Medical Leave Act; and the District of Columbia Accrued Sick and Safe Leave Act.

**Florida**: the Florida Civil Rights Act; the Florida Whistleblower Protection Act; the Anti-Retaliation Provision of the Florida Workers' Compensation Law; the Florida Minimum Wage Act; the Florida Equal Pay Law; the Florida Omnibus AIDS Act; the Florida Discrimination on the Basis of Sickle Cell Trait Law; the Florida Constitution (including, but not limited to, Section 24 of Article 10); the Florida Fair Housing Act; Miami-Dade County Code, Chapter 11A; the Broward County Human Rights Act; and Palm Beach County Code, Article VI.

**Georgia**: the Georgia Fair Employment Practices Act; the Georgia Equal Pay Act; the Georgia Prohibition of Age Discrimination in Employment Act; the Georgia Equal

Employment for Persons with Disabilities Code; and the Georgia Discriminatory Wage Practices Based on Sex Act.

**Idaho: the Idaho Claims for Wages Act and the Idaho Human Rights Act.**

**Illinois**: the Cook County Human Rights Ordinance; the Chicago Human Rights Ordinance; the Illinois Human Rights Act; the Illinois Right to Privacy in the Workplace Act; the Illinois One Day Rest in Seven Act; the Illinois Whistleblower Act; the Illinois Biometric Information Privacy Act; the Illinois Gender Violence Act; the Illinois Minimum Wage Law; the Illinois Equal Pay Act; and the Illinois Constitution.

**Indiana**: the Indiana Civil Rights Law; the Indiana Age Discrimination Act; the Indiana Employment Discrimination Against Disabled Persons Act; the Indiana Age Bias Law; the Indiana Equal Pay Law; the Indiana Wage Payment and Wage Claims Acts; the Indiana Blacklisting Statute; the Indiana Off Duty Use of Tobacco by Employees Law; the Indiana Occupational Safety and Health Act; the Indiana Bring Your Gun to Work Act; the Indiana Military Family Leave Act; and Marion County, Ind., Exec. Order No. 2, 2005 (Nov. 4, 2005).

**Kansas:** the Kansas Act Against Discrimination; the Kansas Age Discrimination in Employment Act; the Kansas Minimum Wage and Maximum Hours Law; the Kansas Discrimination Against Military Personnel Act; and the Kansas Discrimination Against Employees who are Victims of Domestic Violence or Sexual Assault.

**Maryland**: Title 20 of the State Government Article of the Maryland Code Annotated (including, but not limited to, State Gov't §§ 20-101 to 20-1203).

**Massachusetts:**the Massachusetts Fair Employment Practices Act (M.G.L. Chapter 151B); the Massachusetts Wage Act (M.G.L. Chapter 149, §§ 148 to 150); the Massachusetts minimum fair wage and overtime law (M.G.L. Chapter 151); the Massachusetts Civil Rights Act; the Massachusetts Equal Rights Act; the Massachusetts Equal Pay Act; the Massachusetts Parental Leave Act; and the Massachusetts Noncompetition Agreement Act (M.G.L. Chapter 149, § 24L).

**Michigan**: the Michigan Elliott-Larsen Civil Rights Act; the Michigan Persons with Disabilities Civil Rights Act; the Payment of Wages and Fringe Benefits Act; the Michigan Whistleblowers' Protection Act; the Bullard-Plawecki Employee Right to Know Act; the Michigan Occupational Safety and Health Act; the Michigan Social Security Number Privacy Act; and the Michigan Internet Privacy Protection Act.

**Minnesota**: the Minnesota Human Rights Act; the Minnesota Equal Pay for Equal Work Law; Minn. Stat. Ann. § 181.81; Minn. Stat. Ann. § 176.82, subdiv. 1; the Minnesota whistleblower protection laws (Minn. Stat. Ann. §§ 181.932 and 181.935); the Minnesota family leave law (Minn. Stat. Ann. §§ 181.940 to 181.944); the Minnesota Termination of Sales Representatives Act; and Minn. Stat. Ann. §§ 181.960 to 181.967.

Employee has the right to rescind Employee's release of Employee's rights and remedies under the Minnesota Human Rights Act within 15 calendar days of the date the Agreement is signed by Employee. To be effective, the rescission must be in writing and delivered to the Company (on behalf of the Company Releasees) by hand, electronically, or by mail within the 15-day period. Delivery must be made to the following proper address: Vicki Brar, VP Human Resources, at vbrar@2u.com or 7900 Harkins Road, Lanham, Maryland 20706. If delivered by mail, the rescission must be postmarked within the 15-day period and sent by certified mail return receipt requested.

All revocation/rescission periods under the Agreement (to the extent more than one revocation/rescission period applies to Employee) run concurrently. Notwithstanding anything which may be contrary in the Agreement, no Severance Benefit will be earned or paid unless and until all revocation periods applicable to Employee under the Agreement expire, and provided Employee does not exercise any revocation right.

**Nevada**: any and all claims under Nevada administrative statutory or codified law or regulation dealing with fair employment practices and/or wage and hour laws; violation of the Nevada Fair Employment Practices Act; Nevada's overtime, meal and rest period, and related wage and hour penalty statutes; NRS 608.250 relating to the payment of minimum wage for each hour worked; NRS 613.010, related to inducing a person to change their work location under false pretenses; and NRS 613.210, relating to the "blacklisting" of employees.

**New Hampshire**: The New Hampshire Protective Legislation Law; the New Hampshire Unemployment Compensation Law; the New Hampshire Uniform Trade Secrets Act; the New Hampshire Whistleblowers' Protection Act; the New Hampshire Minimum Wage Act; the New Hampshire Safety and Health of Employees Law; and the New Hampshire Law Against Discrimination.

**New Jersey**: the New Jersey Law Against Discrimination; the New Jersey Conscientious Employee Protection Act; the New Jersey Family Leave Act; the New Jersey Wage Payment Law; the New Jersey Wage and Hour Law; the New Jersey Equal Pay Act; and retaliation claims under the New Jersey Workers' Compensation Law.

**New York**: the New York Constitution; the New York Labor Law; the New York State Executive Law; the New York State Human Rights Law; the New York City Human Rights Law; the New York Civil Rights Law; the New York Wage-Hour Law; the New York Wage Payment Law; the New York Worker Adjustment and Retraining Notification Act; the New York Whistleblower Law; the New York State Correction Law; Section 125 of the New York Worker's Compensation Law; the New York Paid Family Leave Act; the New York State sick leave law (Labor Law 196-b); the New York City Earned Safe and Sick Time Act; and New York City Charter and Administrative Code.

**North Carolina**: North Carolina's Equal Employment Practices Act (N.C. Gen. Stat. §§ 143-422.1 to 143-422.3); the Retaliatory Employment Discrimination Act (N.C. Gen. Stat. §95-240 et seq.); Anti-Blacklisting Act (N.C. Gen. Stat. §14-355 et seq.); the North Carolina Wage and Hour Act (N.C. Gen. Stat. §95-25.1 et seq.); the North Carolina Persons With Disabilities Protection Act (N.C. Gen. Stat. §168A-1 et seq.); the North Carolina discrimination for lawful use of lawful products law (N.C. Gen. Stat. § 95-28.2); the North Carolina leave for parent involvement in schools law (N.C. Gen. Stat. § 95-28.3); the North Carolina controlled substance examination law (N.C. Gen. Stat. §§ 95-230 et. seq.); the North Carolina juror leave law (N.C. Gen. Stat. § 9-32); the North Carolina discrimination against military personnel law (N.C. Gen. Stat. §§ 127B-10 et. seq.); the North Carolina national guard leave law (N.C. Gen. Stat. § 127A-111); and the North Carolina national guard reemployment rights law (N.C. Gen. Stat. §§ 127A-201, et. seq.).

**Ohio**: the Ohio Civil Rights Act; the Ohio Equal Pay Statute; the Ohio Wage Payment Anti-Retaliation Statute; the Ohio Whistleblower Protection Act; the Ohio Workers' Compensation Anti-Retaliation Statute; the Ohio Constitution (Art. II, §§34, 34a and 35); Ohio statutes (R.C. Chapters 4111, 4112, 4121, and 4123); and Ohio Administrative Code (O.A.C. 4121-3-20 et seq.).

**Oklahoma:** the Oklahoma Anti-Discrimination Act; the Standards for Workplace Drug and Alcohol Testing Act; the Medical Marijuana and Patient Protection Act; retaliation in violation of the Oklahoma Administrative Workers' Compensation Act (Okla. Stat. tit. 85A, § 7); retaliation in violation of the Oklahoma Workers' Compensation Act (Okla. Stat. tit. 85, §§ 5 to 7, 341); the Oklahoma Protection of Labor Act; and the Oklahoma Minimum Wage Act.

**Oregon**: the Oregon Equality Act; the Oregon Family Leave Act; the Whistleblower Law; the Oregon Workplace Religious Freedom Act; the Unlawful Discrimination Against Injured Workers Law; the Unlawful Discrimination Against Workers in Uniformed Service Law; the Leave of Absence for State Service Law; the Oregon Military Family Leave Act; the Unlawful Discrimination Against Persons with Disabilities Law; the Initiating or Aiding Administrative, Criminal, or Civil Proceeding Law; the Social Media Accounts in Employment law; the Unlawful Discrimination Based on Pursuit of, or Participation in, Wage Claim; Unlawful Discriminatory Wage Rate Based on Sex; Unlawful Retaliation Based on Complaint of Unequal Pay; and all wage and/or hour claims (Or. Rev. Stat. § 652, et seq.).

**Pennsylvania**: the Pennsylvania Human Relations Act; the Pennsylvania Whistleblower Law; and the Philadelphia Fair Practices Ordinance.

**Rhode Island:** the Rhode Island Fair Employment Practices Act; the Rhode Island Civil Rights Act; the Rhode Island AIDS Law; the Rhode Island Civil Rights of People with Disabilities Law; the Rhode Island Domestic Abuse Bias in Employment Law; the Rhode Island Military Family Leave Act; the Rhode Island Equal Pay Act; the Rhode Island

Whistleblower Protection Act; the Rhode Island Employee Social Media Privacy Act; the Rhode Island Healthy and Safe Families and Workplaces Act; R.I. Gen. Laws § 28-14-19.2; and any other Rhode Island wage and hour laws.

**South Carolina**: the South Carolina Human Affairs Law; S.C. Code Ann. § 37-5-106; S.C. Code Ann. § 41-1-20; S.C. Code Ann. § 41-1-30; S.C. Code Ann. § 41-1-70; S.C. Code Ann. § 41-1-80; S.C. Code Ann. § 41-1-85; and S.C. Code Ann. § 53-1-110.

**Tennessee**: the Tennessee Human Rights Act; the Tennessee Disability Act; and the Tennessee Pregnant Workers Fairness Act.

**Texas**:  the Texas Labor Code (specifically including without limitation the Texas Payday Law; the Texas Anti-Retaliation Act; and Chapter 21 of the Texas Labor Code (Tex. Lab. Code Ann. §§21.001 to 21.556)).

**Utah**: the Utah Antidiscrimination Act; the Utah Employment Relations and Collective Bargaining Act; the Utah Right to Work Law; the Utah Drug and Alcohol Testing Act; the Utah Local Governmental Entity/Drug-Free Workplace Policies Act; the Utah Minimum Wage Act; the Utah Protection of Activities in Private Vehicles Act; the Utah Employment Selection Procedures Act; the Utah Occupational Safety and Health Act; and the Utah Internet Employment Privacy Act.

**Vermont**: the Vermont Fair Employment Practices Act; the Vermont Parental and Family Leave Act; the Vermont State Wage Payment and Work Hour Laws (Vt. Stat. Ann. tit. 21, § 341 et seq. and tit. 21, § 381 et seq.); the Vermont Genetic Testing in Employment Act; and the Vermont Conditions for Employment Law.

**Virginia**: The Virginians with Disabilities Act; the Virginia Human Rights Act; the Virginia Equal Pay Act; the Virginia Genetic Testing Law; the Virginia Occupational Safety and Health Act; the Virginia Minimum Wage Act; the Virginia Payment of Wage Law; the Virginia Overtime Wage Act; the Virginia Right to Work Law; and the Virginia Fraud Against Taxpayers Act.

**Washington**: the Washington Law Against Discrimination; the Wage Payment Act; the Wage Rebate Act; the Industrial Welfare Act; the Washington Equal Pay Opportunity Act; the Washington Fair Chance Act; the Minimum Wage Act; the Paid Sick Leave Act; the Family Care Act; the Domestic Violence Leave Act; the Military Family Leave Act; leave for certain emergency services personnel; and Washington's social media privacy laws.

**SCHEDULE A**

**INFORMATION MADE AVAILABLE PURSUANT TO**

**THE OLDER WORKERS BENEFIT PROTECTION ACT OF 1990**

As you know, the Company is engaging in a reduction in force as part of a reorganization of its business units and operations. The following information is provided in accordance with the Older Workers Benefit Protection Act of 1990, to permit affected employees who are age forty (40) and older to evaluate whether to execute a Separation Agreement and General Release ("Separation Agreement") in return for the receipt of severance benefits in connection with an employment termination program.

(A)    For purposes of this Attachment, the class, unit, or group of employees covered by this reduction in force consists of individuals employed by 2U as Lead Instructors for the Alternative Credentials Segment (the "Decisional Unit").

(B)    All employees in the Decisional Unit who are being laid off are eligible for, and have been selected to receive, the applicable severance benefits.

(C)    All employees who are being laid off are eligible for and being offered the severance benefits set forth in their respective Separation Agreement. However, to receive those severance benefits, the employee must sign the Separation Agreement and return it to the Company no later than forty-five (45) days after receiving the Separation Agreement. Once the employee signs the Separation Agreement, the employee has seven (7) days to revoke it before it will become effective. If the employee revokes the Separation Agreement, the employee will not be eligible for the severance and any other consideration described in the Separation Agreement.

(D)    The Company applied one or more of the following eligibility criteria in determining who in the Decisional Unit would be selected for layoff: economic and business conditions, job skill set and competencies, breadth of experience, job criticality, job performance, tenure and geography.

(E)    The following is a listing of the ages and job titles of employees in the Decisional Unit who were selected for layoff (and offered severance benefits as set forth in their Separation Agreement) and of employees in the Decisional Unit who were not selected for layoff:

| TITLE | AGE | SELECTED OR NOT SELECTED |
|-------|-----|--------------------------|
| Lead Instructor | 33 | Not Selected |
| Lead Instructor | 34 | Not Selected |

| TITLE | AGE | SELECTED OR NOT SELECTED |
|---|---|---|
| Lead Instructor | 34 | Not Selected |
| Lead Instructor | 38 | Selected |
| Lead Instructor | 38 | Not Selected |
| Lead Instructor | 38 | Not Selected |
| Lead Instructor | 41 | Not Selected |
| Lead Instructor | 42 | Not Selected |
| Lead Instructor | 44 | Not Selected |
| Lead Instructor | 47 | Not Selected |
| Lead Instructor | 48 | Selected |
| Lead Instructor | 48 | Not Selected |
| Lead Instructor | 58 | Not Selected |
| Lead Instructor | 61 | Selected |

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

**EMPLOYEE INTELLECTUAL PROPERTY, NON-COMPETITION, AND
NON-SOLICITATION AGREEMENT**

This Employee Intellectual Property, Non-Competition, and Non-Solicitation Agreement ("Agreement") is made as of <u>June 10, 2019</u> ("Effective Date") by and between 2U, Inc., a Delaware corporation ("2U"), and <u>Sal Hobbi</u> ("Employee").

**RECITAL**

2U is engaged in a highly competitive Business (as defined below). Employees' role and relationship with 2U involves a position of trust and confidence in which Employee will have access to Confidential Information (as defined below), and Employee's activities will directly or indirectly support 2U's business, research and development efforts, relationships with Customers (defined below), and goodwill, all of which are the result of significant investments by 2U and are valuable interests, which, if used or diverted to benefit a Competitor (as defined below), would cause irreparable harm. To protect these and other valuable investments and for good and valuable consideration, including, without limitation, Employee's employment or continued employment with 2U (including through any promotion), specialized training and/or education provided by or paid for by 2U, access and/or contributions to Confidential Information (as defined below), and/or direct or indirect access to and/or support of 2U's goodwill and relationships with Customers (defined below), Employee agrees to the obligations set forth below;

NOW, THEREFORE, incorporating the above recital as though set forth below, intending to be legally bound hereby, and in exchange for good and valuable consideration, the parties agree as follows:

1. <u>Engagement</u>. To the extent that the terms of 2U's employment of Employee are set forth in any separate employment agreement(s), this Agreement is hereby deemed incorporated therein. Notwithstanding, should any term of any separate agreement between 2U and Employee, including any employment agreement, and this Agreement conflict, the terms of this Agreement shall apply.

2. <u>Definitions</u>.

(a) "2U" shall mean 2U, its designees, successors, assigns, officers, directors, employees and/or agents.

(b) "Business" shall mean all products, technologies, and services in or for the digital education and online program management industries that 2U is now or at any point in time during Employee's employment with 2U engaged in or developing.

(c) "Competitor" shall mean any person or entity involved in any business that competes, or is intended to compete, with the Business.

(d) "Confidential Information" shall mean any and all information, data, or knowledge that is treated as confidential by 2U or is not generally known by non-2U personnel, including but not limited to:

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

(1)    any and all information, data or knowledge disclosed by 2U to Employee or learned by Employee about 2U in connection with Employee's employment with 2U;

(2)    any and all information, data or knowledge created or developed (in whole or in part) by Employee during Employee's employment with 2U;

(3)    Customer lists, student lists for 2U's university partners, prospective Customer lists, and prospective student lists for 2U's University partners;

(4)    actual or prospective student personal information collected by 2U and/or by any Customer;

(5)    any and all technical data, trade secrets or know how, patents in development, patent applications, processes, formulas, technology, designs, drawings, hardware configuration, software, data compilations, trademarks in development, original works of authorship, business and industry research, business plans, product plans, customer lists and customers, competitive advantages, legal and personnel practices, marketing, finances or other business information, and financial data, whether or not patentable or registrable under copyright or similar laws techniques, that were developed by 2U, by 2U employees, or otherwise for or on 2U's behalf; and

(6)    any information which 2U obtains from any third party (including but not limited to any Customer) that Employee knows or should know constitutes such third party's confidential information.

Information, data or knowledge shall be considered "Confidential Information" regardless of whether it is written or oral, and if written, regardless of how it was produced or reproduced or whether or not marked or specifically designated as confidential or proprietary. "Confidential Information" shall not include any of the foregoing items which have become publicly known and made generally available through no wrongful act of the Employee or of others who were under confidentiality obligations as to the item or items involved.

(e)    "Customer" shall mean any educational institution (including any person or entity affiliated with any educational institution in a role related to digital education and/or online program management products, technologies, and services) (1) that Employee contacted, solicited business from, promoted or marketed products or services to, rendered any service to, was assigned to, had management responsibilities for, or received commissions, bonuses or incentives, or any other compensation on at any point in time during the last eighteen (18) months of Employee's employment with 2U; and/or (2) that was the subject of Confidential Information to which Employee had access during Employee's employment with 2U.

(f)    "Inventions" shall mean developments, concepts, improvements, designs, discoveries, ideas, whether or not patentable or registrable under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of Employee's employment with 2U.

(g)    "Restricted Period" shall mean six (6) months following the termination of Employee's employment with 2U for any reason (voluntary or involuntary).

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

3.      <u>Confidentiality Obligation</u>.  During and after Employee's employment with 2U, Employee shall hold all Confidential Information in the strictest confidence and shall not use or disclose any Confidential Information, or provide any third party with access to any Confidential Information, except as required in the course of Employee's job responsibilities for 2U, unless either (a) specifically authorized in writing by 2U; or (b) as permitted by law where the disclosure is made (1) in confidence to a government official or to an attorney, either directly or indirectly, solely for the purpose of reporting or investigating a suspected violation of law; (2) in a complaint or other document filed in a lawsuit or other proceeding, so long as any such filing is made under seal; or (3) in a lawsuit or proceeding against an employer for retaliation based on the reporting of a suspected violation of law and/or to an attorney in any such lawsuit so long as any document containing the information is filed under seal and the information is not otherwise disclosed, except pursuant to court order.

4.      <u>Intellectual Property and Work for Hire</u>.

(a)      <u>Intellectual Property Retained and Licensed</u>. Employee has attached hereto, as Exhibit A, a list describing all Inventions, original works of authorship (including any and all computer code), developments, improvements, and trade secrets which were made by Employee prior to the date hereof (collectively referred to as "Prior Intellectual Property"), which belong to Employee or in which Employee has an interest, which relate to 2U's proposed business, products, programs or research and development, and which Employee does not assign to 2U hereunder. If no such list is attached, Employee represents that there are no such Prior Inventions. If Employee incorporates any Prior Intellectual Property into a 2U product, process, method or service, Employee hereby grants to 2U and 2U shall have a nonexclusive, royalty-free, irrevocable, perpetual and worldwide license to make, have made, modify, use and sell such Prior Intellectual Property as part of or in connection with such product, process, method or service.

(b)      <u>Assignment of Inventions</u>. Employee will promptly make full written disclosure of all Inventions to 2U. Employee will hold in trust for the sole right and benefit of 2U, and hereby assigns to 2U (and its successors and assigns), all of Employee's right, title, and interest in and to any and all Inventions, except as provided in Section 4(f) below. Employee understands and agrees that the decision whether or not to commercialize or market any Invention developed by Employee solely or jointly with others is within 2U's sole discretion and for 2U's sole benefit. Employee also agrees that no royalty will be due to Employee as a result of 2U's efforts to commercialize or market any such Invention. Employee waives and quitclaims to 2U any and all claims of any nature whatsoever that Employee now has or hereafter may have for infringement of any patent application, patent, or other intellectual property right relating to any Inventions.

(c)      <u>Work For Hire</u>. Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others within the scope of and during the period of Employee's employment with 2U) and which are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. To the extent that any such writings or works of authorship by Employee are not, by operation of law or otherwise, deemed works made for hire, Employee hereby irrevocably assigns to 2U the ownership of, and all rights (including but not limited to copyright) in, such items, and 2U shall have the right to obtain and hold in its own name all rights of copyrights, copyright registrations and similar protections that may be available with respect to any such writings or works.

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

(d)    <u>Maintenance of Records</u>. Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during the term of Employee's employment with 2U, including, as applicable, notes, sketches, drawings, and any other format that may be specified by 2U.  Employee shall provide such records to 2U as requested by 2U, and such records shall remain the sole property of 2U at all times.

(e)    <u>Patent and Copyright Registrations</u>. Employee and Employee's executors, administrators, and legal representatives will assist 2U, at 2U's expense, in every proper way to secure 2U's rights in the Inventions and any copyrights, patents, or other intellectual property rights relating thereto in any and all countries. Employee agrees to disclose to 2U all pertinent information and with respect to the Inventions. Employee and Employee's executors, administrators, and legal representatives will execute all applications, specifications, oaths, assignments and all other instruments which 2U shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to 2U the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, or other intellectual property rights relating thereto. The foregoing obligations shall continue after the termination, expiration or completion of Employee's employment with 2U for any reason. If 2U is unable because of Employee's mental or physical incapacity or for any other reason to secure Employee's signature to pursue any application for any United States or foreign patents or copyright or trademark registrations covering Inventions or original works of authorship assigned to 2U as above, then Employee hereby irrevocably designates and appoints 2U as Employee's agent and attorney in fact, to act for and in Employee's behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of patent or copyright or trademark registrations thereon with the same legal force and effect as if executed by Employee.

(f)    <u>Exception to Assignments</u>.  Employee understands that the provision of this Agreement requiring assignment of Inventions to 2U does not apply to Inventions that the Employee developed or develops entirely on the Employee's own time without using 2U's equipment, supplies, facility or confidential or trade secret information unless those same Inventions relate to 2U's business or actual or demonstrably anticipated research or development, or result from any work performed by the Employee for 2U.

5.    <u>Competition and Future Employment</u>.

(a)    <u>No Competition During and After Employment</u>.  Given Employee's access and contributions to Confidential Information, the specialized training or education provided by or paid for by 2U, and/or Employee's direct or indirect access to and/or support of 2U's goodwill and Customer relationships, during Employee's employment with 2U and during the Restricted Period, Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), perform, or assist others to perform, work involving the Business for a Competitor.

(b)    <u>Notification of Future Employment</u>.  In connection with the termination of Employee's employment with 2U and during the Restricted Period, Employee shall provide 2U with fourteen (14) calendar days' written notice of any new employment with a Competitor to allow 2U an opportunity to obtain written assurances from Employee and Employee's new employer satisfactory to 2U that Employee will not be rendering services which conflict with Employee's

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

obligations in Section 5(a) of this Agreement. If Employee initiates the termination, there shall be, at 2U's sole option, a period of up to fourteen (14) calendar days after Employee gives written notice pursuant to this Section before the termination becomes effective, during which time Employee will provide such transitional services as 2U may request, and 2U will continue Employee's pay so long as Employee satisfactorily provides such services.

6.    <u>Non-Interference and Non-Solicitation of Customers</u>.  During Employee's employment with 2U and for a period of twelve (12) months after the termination of Employee's employment with 2U for any reason (voluntary or involuntary), Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), contact, call upon, solicit business from, render services to, or market services, products, or platforms to any Customer and/or divert or interfere with, or attempt to divert or interfere with, 2U's business or relationship with any Customer.

7.    <u>Non-Interference and Non-Solicitation of Employees and Contractors</u>. During Employee's employment and for a period of twelve (12) months after the termination of Employee's employment with 2U for any reason (voluntary or involuntary), Employee shall not, directly or indirectly (on Employee's own or in combination or association with others, and whether for Employee's own benefit or for the benefit of other persons or entities), (a) solicit, encourage, entice, or induce, or attempt to solicit, encourage, entice, or induce, any employee or contractor who is then or was, during the last twelve (12) months of Employee's employment with 2U, employed by or contracted by 2U to terminate his, her, or its employment or other contractual relationship with 2U for any reason; or (b) offer employment to, hire, or cause to be hired by any entity or person other than 2U any employee or contractor who (1) is then or was, during the last six (6) months of Employee's employment with 2U, employed by or contracted by 2U; and (2) comes to or approaches Employee and/or his/her future employer without Employee's direct or indirect solicitation, involvement, or action.

8.    <u>Returning Company Documents</u>. Employee agrees that, immediately upon the termination of Employee's employment with 2U for any reason (voluntary or involuntary), Employee will deliver to 2U (and will not keep in Employee's possession (including in any physical, electronic, or online/cloud files), recreate or deliver to anyone else) any  and  all 2U  devices, Confidential Information, and any other 2U property, including, but not limited to, records, data, notes, reports, proposals, lists (specifically including, but not limited to, 2U Customer lists and student lists), correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed or obtained by Employee during Employee's employment with 2U or otherwise belonging to 2U, its successors, subsidiaries, parent or assigns, including, without limitation, those records maintained pursuant to Section 4(d) of this Agreement.

9.    <u>Representations</u>. Employee agrees to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. Employee represents that Employee's performance of and under all the terms of this Agreement will not breach any other agreement to keep in confidence proprietary information acquired by Employee in confidence or in trust prior to Employee's engagement with 2U. Employee has not entered into, and Employee agrees not to enter into, any oral or written agreement in conflict herewith.

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

10.    <u>Voluntary Nature of Agreement</u>. EMPLOYEE ACKNOWLEDGES AND AGREES THAT EMPLOYEE IS EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY 2U OR ANYONE ELSE. EMPLOYEE FURTHER ACKNOWLEDGES AND AGREES THAT EMPLOYEE HAS CAREFULLY READ THIS AGREEMENT AND THAT EMPLOYEE HAS ASKED ANY QUESTIONS NEEDED TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT. FINALLY, EMPLOYEE AGREES THAT EMPLOYEE HAS BEEN PROVIDED AN OPPORTUNITY TO SEEK THE ADVICE OF AN ATTORNEY OF EMPLOYEE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

11.    <u>General Provisions</u>.

(a)    <u>Governing Law</u>. This Agreement, and any claim or dispute (whether in contract, tort or otherwise) arising out of or related to this Agreement or the transactions contemplated hereby, will be governed by and construed in accordance with the laws of the State of Delaware without regard to its conflict of law provisions.

(b)    <u>Venue and Consent to Jurisdiction</u>. Any action, suit, or proceeding brought by Employee arising out of, connected with, or related to the subject matter of this Agreement shall be brought exclusively in a state or federal court of Delaware with subject matter jurisdiction.  Any action, suit, or proceeding brought by 2U arising out of, connected with, or related to the subject matter of this Agreement may be brought in a state or federal court of Delaware with subject matter jurisdiction.  Employee consents to personal jurisdiction and venue in the state and federal courts of Delaware in any action, suit, or proceeding arising out of, connected with, or related to the subject matter of this Agreement, waives any objection to venue in those courts, and consents to service of process by United States mail or express courier service in any such action, suit, or proceeding.  Employee irrevocably and unconditionally waives the right to a trial by jury in any action, suit, or proceeding arising out of, connected with, or related to the subject matter of this Agreement or the actions of the parties in the negotiation, administration, performance, or enforcement of this Agreement.

(c)    <u>Entire Agreement</u>. This Agreement sets forth the entire agreement and understanding between 2U and Employee relating to the subject matter herein and supersedes all prior discussions between Employee and 2U. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing signed by the party to be charged. Any subsequent change or changes in Employee's duties, obligations or compensation will not affect the validity or scope of this Agreement.

(d)    <u>Severability</u>. If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

(e)    <u>Successors, Assigns, and Third-Party Beneficiaries</u>. 2U may transfer, convey, or assign this Agreement and any rights or obligations, in whole or in part, to any existing or future affiliate of 2U or to any third party, including in connection with a merger, sales of assets, sale of stock, or any other form of acquisition or transaction pertaining to all or part of the business of 2U, and Employee consents to such transfers, conveyances, or assignments.  This Agreement shall inure to the benefit of and may be enforced by 2U and any of its existing or future affiliates, including their

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

successors and assigns, and shall be binding upon Employee, Employee's heirs, executors, administrators, successors, assigns, and other legal representatives, and other successors in interest. This Agreement is personal to Employee's employment with 2U and may not be assigned by Employee for any reason.

12.    <u>Specific Relief</u>. The Parties agree that the restrictions outlined in Sections 3, 4, 5, 6, 7, and 8 are reasonable and necessary protections of the immediate interests of 2U and that 2U would not have entered into this Agreement, or provided the consideration herein, without Employee's agreement thereto. Employee agrees and acknowledges that Employee's breach of any of the restrictions outlined in Sections 3, 4, 5, 6, 7, and 8 will cause irreparable harm to 2U and that damages arising out of any such breach may be difficult to determine. Employee therefore agrees and acknowledges that, in addition to all other rights and remedies 2U may have at law and/or in equity, 2U shall be entitled to specific performance and temporary and/or permanent injunctive relief restraining the breach and/or further breach of this Agreement by Employee, by Employee's new Employer, and by any others acting in concert with Employee without the necessity of 2U's proving actual damages or posting a bond. Employee agrees that if Employee breaches any restriction in Sections 5, 6, or 7 of this Agreement, then the restricted periods in those Sections shall all be extended automatically, and courts shall have the power to enforce the post-employment restricted periods in those Sections from the date of the last breach up to a maximum of twenty-four (24) months from the date Employee's employment with 2U terminates. If 2U prevails in any suit under this Agreement, in whole or in part, then Employee shall also be liable for 2U's costs and attorney's fees in connection with the lawsuit and any related legal proceedings. Should any provision in Sections 3, 4, 5, 6, 7, or 8, or any portion thereof, be invalidated or not enforced under applicable law, this shall not affect the validity or enforceability of the remaining portions of any such provision or any other provision in this Agreement and shall not affect the enforcement of this Agreement in any other jurisdiction. Employee further agrees that, to the extent any provision in Sections 3, 4, 5, 6, 7, or 8, or any portion thereof, is unenforceable because it is deemed by a court to be overbroad, the provision shall be reformed and revised to the extent necessary to protect the applicable legitimate business interests of 2U, or otherwise applied and enforced in a more limited manner to the fullest extent permissible under applicable law.

13.    <u>Survival</u>.  The provisions of this Agreement shall survive the termination of Employee's employment, regardless of the reason for termination.

14.    <u>California Employees</u>.

(a)    Sections 11(a) and 11(b) shall not apply with respect to any controversy or claim arising in California, provided in each instance that (1) Employee primarily resided and worked in California (i) during and in connection with Employee's employment with 2U and (ii) at the time Employee entered into this Agreement; and (2) Employee was not individually represented by counsel in negotiating the terms of this Agreement.

(b)    In any controversy arising in California, the post-employment obligations in Sections 5 and 6 and the no-hire obligation in Section 7 shall not apply with respect to services Employee renders in California after termination of employment that do not involve Employee's use or disclosure of Confidential Information, provided in each instance that (1) Employee primarily resided and worked in California (i) during and in connection with Employee's employment with 2U and (ii)

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

at the time that Employee entered into this Agreement; and (2) Employee was not individually represented by legal counsel in negotiating the terms of this Agreement.

15.    <u>Massachusetts Employees</u>.

(a)    If Employee is a resident of the Commonwealth of Massachusetts and has been employed with 2U in the Commonwealth of Massachusetts at the time Employee's employment with 2U terminates and for the thirty (30) calendar days immediately preceding that termination, then (1) this Agreement shall be governed by and interpreted according to the laws of the Commonwealth of Massachusetts, without regard to its conflict of law rules; and (2) any action relating to or arising out of this Agreement shall be brought either in the county of Massachusetts wherein Employee resides or in the superior court or the business litigation session of the superior court of Suffolk County, Massachusetts, or, if subject matter jurisdiction exists, in the United States District Court for the District of Massachusetts, and Employee consents to personal jurisdiction and venue in such courts and to service of process by United States mail or express courier service in any such action.

(b)    Employee acknowledges and agrees that the mutually agreed upon consideration set forth in this Agreement is adequate to satisfy the requirements of Massachusetts law.

EMPLOYEE HAS A RIGHT TO CONSULT, AND IS ADVISED TO CONSULT, WITH COUNSEL PRIOR TO SIGNING THIS AGREEMENT.  EMPLOYEE ACKNOWLEDGES THAT EMPLOYEE HAS HAD AT LEAST FOURTEEN (14) CALENDAR DAYS TO REVIEW ITS TERMS.  EMPLOYEE FURTHER ACKNOWLEDGES HAVING READ THIS AGREEMENT AND HAVING EXECUTED THIS AGREEMENT, AND EMPLOYEE AGREES TO THE TERMS ABOVE AND ACKNOWLEDGES THAT EMPLOYEE INTENDS TO BE LEGALLY BOUND BY THIS AGREEMENT.

*[Remainder of page intentionally left blank]*

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

**AGREED AND ACCEPTED:**

**2U, Inc.**

By: _____

Name:  Rani Hammond

Title:  Chief People Officer

Address:  7900 Harkins Road

Lanham, MD 20706

Date:  May 21, 2019

**Employee**

By: _____

Name:  Sal Hobbi

Address:  82 Pancake Hollow Dr

Wayne, NJ 07470

Date:  05-31-2019 | 2:24 PM PDT

DocuSign Envelope ID: 6ADFF48D-0D22-45D8-8F58-D5394D890661

**Exhibit A**

## LIST OF PRIOR INVENTIONS
## AND ORIGINAL WORKS OF AUTHORSHIP

| | Title | Date | Identifying Number or Brief Description |
|---|---|---|---|
| 1. | | | |
| 2. | | | |
| 3. | | | |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |
| 8. | | | |
| 9. | | | |
| 10. | | | |

I agree that my inventions or improvements are listed, or I have none.   ☒

Signature of Employee: _____

Print Name of Employee: ___Sal Hobbi_____

Date: __05-31-2019 | 2:24 PM PDT____



7900 Harkins Road | Lanham, MD 20706

Salah Hobbi

Dear Salah,

This is to serve as confirmation that your last day of employment with 2U as Lead Instructor will be August 15, 2024. Below you will find information and instructions regarding your final pay, benefits, and company equipment as well as transition support information.

**Final Paycheck:**

You will be paid through August 15, 2024 less any applicable taxes or monies owed the company such as the employee portion of insurance benefits. You will receive your last paycheck in accordance with our regular pay cycle schedule or in accordance with local state laws, where applicable. If you have direct deposit, it will be deposited into the bank account(s) on file with Payroll. Otherwise, it will be mailed to you at the address we have on file.

After termination, an email from Workday with your new Workday login credentials will be sent to your personal email address on-file. This Workday portal will be used to update your home address, view your payslips and access electronic W-2s.  If not received, please check your Spam folder for this email. Otherwise, please email hrsharedservices@2U.com to reset your login information.

 All California and Montana employees who have remaining accrued, unused PTO benefits after December 31, 2018 (for example, as carried over under our 2018 PTO policy), which are not fully exhausted before their employment ends, will be paid out for this accrued PTO upon separation as required by applicable law. Any such payout will be made at the 2U employee's final base rate, exclusive of any variable income such as commissions or bonus.

**Timesheets (if applicable)**

To ensure your final paycheck is accurate, please go into Workday to enter all hours worked through your last day of employment. If you no longer have access to Workday and have not submitted your hours, please email your hours to your manager who will enter time on your behalf.

 **Medical, Dental & Vision Benefits:**

If you are enrolled in medical, dental and/or vision insurance through 2U, your coverage will remain active through the last day of the calendar month in which your employment ends. After that point, you will be entitled to continue your group insurance plans through COBRA. See the section below for further details regarding COBRA. For specific questions regarding your medical, dental and/or vision insurance, please reach out to Benefits@2U.com.



7900 Harkins Road | Lanham, MD 20706

**Group Life and Supplemental Life Benefits:**

If you are currently enrolled in 2U's group life or supplemental life insurance coverage, you may be eligible to convert or port your policy to an individual plan. If you have questions, please reach out to Benefits@2U.com.

**Hospital Indemnity and Accident coverage from MetLife**

If you are enrolled in one or both of the MetLife supplemental insurance plans, Hospital Indemnity or Accident coverage plans MetLife will automatically send you a letter and an Election of Continuation Insurance Form, offering them the option to continue coverage. If you want to continue coverage, you can either call or mail the completed form within 31 days from the date of their letter. At that time MetLife will initiate direct billing with you. The rate will remain the same. You may reach out to MetLife Customer Service by calling  800-GET-MET8 should you have questions once you receive the Election of Continuation Insurance Form.

**Flexible Spending Accounts (FSA):**

The healthcare FSA is an employer sponsored plan. If this is something you have elected through 2U, your participation in the plan ends on your last day of employment. You have a 90-day "run out" period from your official employment separation date to submit claims only for eligible plan expenses incurred <u>prior to the separation date</u>. Expenses incurred after the separation date are not eligible.

After your separation from the company, you may reach out to Flores to submit a <u>manual claim</u> for your medical expenses.  Any funds remaining after your 90-day run out period ends will be forfeited. Funds for commuter FSA account forfeit after your last day and cannot be reimbursed due to IRS regulations. For inquiries regarding FSA, you may contact Flores by calling 800-532-3327.

**FSA Transit/Commuter Accounts:**

If you have an FSA for commuter benefits, reimbursements can be submitted for parking expenses that occur up to your last day. For transit, funds must be used via your Flores debit card prior to 5 p.m. ET on your last day or funds will be forfeited. You are able to adjust your transit FSA payroll deduction prior to your last paycheck to avoid forfeiture of FSA Transit funds.  For FSA questions please reach out to Benefits@2U.com.

**HSA (Health Spending Accounts):**

HSA accounts are personal bank accounts and will remain active after your last day. Please make sure to maintain your sign in information for Fidelity HSA account in order to manage your funds. While you will be able to withdraw funds,  please note that you will not be able to deposit funds unless you are actively enrolled in a HDHP either through COBRA or your next employer.



7900 Harkins Road | Lanham, MD 20706

**COBRA Benefit:**

2U will pay the full premium for COBRA medical, dental and vision and EAP benefits for the identified term in your severance agreement.  Our COBRA benefit is administered through Flores, and you will be sent your COBRA documents within two weeks from your last date of coverage.  You will have 60-days after your insurance coverage ends with 2U to enroll in COBRA. Should you have questions regarding COBRA enrollment, you may reach out to Flores at 800-532-3327. Your coverage will be updated retroactively once the enrollment is finalized, which will prevent any coverage gaps.   If you have specific questions regarding COBRA, please reach out to Benefits@2U.com.

**401(k):**

If you are enrolled in the 401(k) plan, your options for how to manage your Fidelity 401(k) funds as you depart 2U depends on the amount of vested funds in your account. You can contact Fidelity at (800) 294-4015 to discuss your options and you may also visit their website at www.netbenefits.com.

**ESPP - Employee Stock Purchasing Program**

If you are enrolled in the ESPP (Employee Stock Purchasing Program) and your employment with 2U ends in the middle of an offering period, any funds that have been deducted through payroll for the current offering period will be returned to you - no additional stock will be purchased through the plan once your employment ends. Any stock that has already been purchased through the Plan, remains with you.

*Please note that the sale of ESPP shares after your termination may generate W-2 income, even if you are not employed during the year in which the sale occurs.  E-Trade will also issue a 1099-B for the sale of ESPP shares.*

**Equity Award Grants:**

If you have received a 2U equity award, your vesting stops immediately upon termination of employment. Please review your equity award agreement(s) for the specific terms and conditions of your award.

**Expense Reimbursement:**

If you have any outstanding expenses, you can submit forms for reimbursement along with your receipts to AP@2U.com.  If you need a copy of the expense reimbursement form, please let us know and we can provide that to you.

**Corporate Credit Card:**

If you have a corporate credit card and you have outstanding business expenses that have not been submitted in Workday (expense report), you or your manager will need to provide receipts along with an explanation of how the charges are business related. Email those receipts with business purpose to AP@2U.com. Those expenses will be processed and approved, and the payment will be made by the company for those approved charges only. If there is a balance remaining, it is your responsibility to satisfy any unpaid amounts that were

**2U**®

7900 Harkins Road | Lanham, MD 20706

either not business related or not submitted for approval. HR will send the notification to Pamela Ingram to immediately cancel  the card with American Express. If there are any questions, please reach out to AP@2U.com.

**Form W-2**:

Please ensure that your personal email and mailing addresses in Workday are up to date for future W-2 delivery.  If you move, please email hrsharedservices@2U.com to receive login information that will allow access into Workday to update and access all personal information.

All W-2s will be mailed and made available online by January 31, 2025 as required by the Internal Revenue Services (IRS).

**What We Need from You: 2U Property (Equipment Return)**

All company equipment needs to be promptly returned to 2U. Items that are in the office will be collected on your last day and should be left on your desk, including your key fob and 2U parking pass, if applicable. For items that are not in the office, Help Desk will send a box with a prepaid shipping label to your home address. We ask that you please ship any items from your home as quickly as possible upon receiving the prepaid shipping label.

*Please delete all company information located on your personal equipment.*

Items to Return (if applicable):

____ Employee ID, Key Fob and/or Office Keys

____ Laptop / Desktop

____ Laptop charger

____ iPad

____ Corporate Cell Phone (if purchased by 2U) and charger

____ Phone

____ Corporate Credit Card

____ Teleworker adapter

____ Monitor

____ Docking Station



7900 Harkins Road | Lanham, MD 20706

_____ Peripherals (keyboard/mouse/trackpad)

_____ Phone Headset

_____ Printer

_____ External Webcam

_____ Any other equipment provided by 2U

_____ Tuition Benefit Signed Promissory Agreement

**Additional Transitional Information/Support:**

**References:**

Experian Verify handles all employment verification and references for current or former employees. Experian Verify verifies only factual information that can be objectively substantiated, such as dates of employment, position title and salary. 2U will not release any information regarding current or former employees without their prior written consent, unless otherwise required by law. You should refer all reference requests to verify.support@experian.com or call (404) 382-5400, option 2.

***Employee Assistance Program (EAP):*** We encourage you to utilize the EAP services available to you. Please see their contact information below:

Phone: (866) 799-2728
Email: answers@HealthAdvocate.com
Website: Health Advocate
Log In: Company Name: 2U, Inc.
*During your first call, you will be assigned a Personal Health Advocate who will begin helping you right away. The first 6 counseling sessions per issue per year are covered under the benefit.*

***Lee Hecht Harrison - Career Transition Services***

We have partnered with Lee Hecht Harrison to provide you with career transition services including access to their dedicated career support team, career coaching, resume and LinkedIn profile development, access to LHH recruiters and more.


Sincerely,

Human Resources

**Division of Unemployment Insurance**

## Instructions
# Claiming Unemployment Benefits



---

| Section 1 |
| --- |

## Notice to Employer

YOU ARE REQUIRED, under section 6 (a) of the Unemployment Compensation Law of New Jersey and under Employment Security Rule N.J.A.C. 12:17-3.1 to complete this form and provide it to each worker at the time of separation from employment (either permanently or temporarily) for any reason.

Employer Name and Address

2U Inc.

7900 Harkins Road

Lanham, MD, 20706

New Jersey Employer Identification # 262-335-939/000

Employer Phone Number  301-892-4350

Work Location *(if different from above address)*

82 Pancake Hollow Dr

Wayne, New Jersey

Date of Separation  08/15/2024

Separation is
◉ Permanent
◯ Temporary - Expected recall date _____

---

| Section 2 |
| --- |

## Notice to Workers

In order to be considered for unemployment insurance benefits, you must file an unemployment claim. No benefits can be paid to you for any week before you actually file your unemployment insurance claim. **Failure to file your claim or delaying the filing could affect your eligibility for benefits. You should always file your claim as soon as possible after becoming unemployed. You will not be considered eligible until your claim is filed.**

When you file the claim, be sure to have available your Social Security number and the complete name, address, and telephone number of each employer that you worked for in the past 18 months.

You may apply for unemployment benefits online 24 hours a day, 7 days a week at *myunemployment.nj.gov* or you may call a Reemployment Call Center (phone numbers below). Reemployment Call Centers are open during regular business hours, Monday through Friday, excluding holidays.

Union City Call Center ......201-601-4100

Freehold Call Center ........732-761-2020

Cumberland Call Center ...856-507-2340

Out-of-State Claims ..........888-795-6672

TTY users can contact the department through New Jersey Relay: 7-1-1

*NOTE*: Please have this form available when you file your unemployment insurance claim.

**Workers who are unemployed due to a vacation shutdown** should apply for unemployment benefits if:

- you are receiving vacation pay in an amount less than your full-time wages

- you have not refused any offer of suitable work for the vacation period, and

- you are ready and willing to work during the vacation period.

---

**New Jersey Department of Labor and Workforce Development**

## U.S. Benefits FAQ

### Healthcare Coverage

#### When do 2U health insurance benefits end?

Your 2U health insurance benefits will continue through the last day of the month in which your employment ends.  For example, if your last day of employment is January 1, then your benefits will continue through 11:59 p.m. on January 31, and then end.

If you have questions, contact the Benefits Team by emailing benefits@2u.com.

### COBRA

#### Can I continue health insurance benefits after my last day of employment?

If you are currently enrolled in 2U's health insurance benefits, you will have the opportunity to enroll in COBRA which allows you to continue your health insurance plans for a period of time.

For employees who are eligible, by signing and returning the Separation Agreement and General Release, 2U will pay the total applicable premium cost of your COBRA directly to the respective insurance carrier for the period of time defined in their Separation Agreement and General Release.

COBRA is one of the options available for continuing healthcare coverage. You also may be eligible to buy an individual plan through the Health Insurance Marketplace (https://www.healthcare.gov/) or you may qualify for a 30-day special enrollment period for another group health plan, such as a plan through a spouse or partner's employer.

If you have questions, contact our COBRA Administrator, Flores, by calling (800) 532-3327 or by visiting their website at www.flores247.com.

#### How do I enroll in COBRA to continue my medical, dental and vision coverage?

A COBRA enrollment packet will be sent to your home address within a few weeks of **your coverage termination date**. You must complete and return the forms within 60 days beginning from the date the election notice is provided or the date you would otherwise lose coverage under your group health plan due to the qualifying event, whichever is later.

Your COBRA coverage start date and premium payments will be retroactive to the first day after your 2U coverage ends.

Typically, COBRA coverage can be maintained for up to 18 months but may be extended to 36 months in special situations. Your COBRA notice will designate how long you are eligible for COBRA as well as other terms and conditions.

COBRA is available for yourself, your spouse or domestic partner and children <u>who are currently enrolled</u> on the 2U's health plans when you terminate from 2U.

**Can benefits be modified under COBRA?**

Benefit plans can be modified only during the COBRA Open Enrollment period. During the initial COBRA election period you can drop coverage that you currently have, but you cannot add or change plans. For instance, if you had vision coverage previously, you can drop that coverage when you enroll for COBRA, but if you are not enrolled in Vision coverage as an active employee, you will not be able to enroll in it through COBRA.

**In lieu of COBRA, how do I enroll in my spouse or partner's employer-provided benefit plans or in a plan through the Health Insurance Marketplace?**

The COBRA enrollment packet you will receive provides evidence of your prior health coverage and the date 2U coverage ended for you and your covered dependents. You will be able to provide this as proof of loss of coverage to enroll in your spouse's or partner's employer's benefit plans or in a plan through the Health Insurance Marketplace (https://www.healthcare.gov/).

Note: We encourage your spouse/partner to contact his/her company benefits department as soon as possible to understand the conditions and timeframes under which coverages can be changed outside the open enrollment window.

**How does the COBRA subsidy work? Are the premiums deducted from my severance payments for COBRA?**

Your current medical, dental and vision and EAP benefits will end on the last day of the month in which your employment ended. If you are eligible and your Separation Agreement provides for COBRA coverage benefits,  2U will pay the full premiums for COBRA medical, dental and vision and EAP benefits for the identified term in that Agreement.  You will be sent your COBRA documents generally **within two weeks from your last date of coverage**.  You must complete the election forms to enroll to obtain any COBRA benefits identified in your Separation Agreement. Your coverage will be updated retroactively once the enrollment is finalized, which will prevent any coverage gaps.

**If I have already met my deductible and out of pocket maximums, do these start over when my COBRA coverage begins?**

No, the deductibles and out of pocket maximums do not restart when you enroll in COBRA coverage.

## Health Savings Accounts (HSA) & Flexible Spending Accounts (FSA)

### What happens with my Health Savings Account (HSA)?

Unlike the funds in your Flexible Spending Account, the money in your HSA remains yours even after your termination date. You can leave the funds in your current HSA, or you can roll the funds over to another HSA provider. If you leave the funds in your current HSA after your termination date, you will be responsible for the administrative fees. Fidelity, our HSA administrator, will mail you information about your account.

If you have questions, contact Fidelity by calling (800) 544-3716. You may login to your account at www.NetBenefits.com. The plan number for the HSA is 87610.

### What happens to my Flexible Spending Accounts (FSAs)?

Payroll deductions end on your last day of employment and will be deducted from your final paycheck. You will have 90 days from your last day of employment to file claims against eligible expenses for Healthcare FSA, Limited Purpose FSA, and Dependent Care FSA incurred through the last day of the month of your last day of employment.

#### Healthcare FSA & Limited Purpose FSA

Your Healthcare FSA and Limited Purpose FSA deductions cannot be discontinued and will continue until your last day of employment or until the plan ceases on December 31, 2024.

If you have money left in your Healthcare FSA or Limited Purpose FSA account, and have not yet incurred claims against this money, you can elect to continue participating through COBRA on an after-tax basis through the end of the plan year.

#### Dependent Care FSA

The 2U Dependent Care FSA follows the rules above with one exception: You may be able to discontinue Dependent Care FSA deductions at the time of notification if you no longer require care for your eligible dependent(s).

To submit claims incurred through your last day of employment for your Healthcare FSA, Limited Purpose FSA, and Dependent Care FSA, please reach out to Flores customer service at (800) 532-3327.

If you have questions about your Flexible Spending Account(s), contact Flores, by calling (800) 532-3327 or by visiting their website at www.flores247.com.

**What happens to my Commuter Account?**

**Unclaimed commuter funds (parking and transit) will be forfeited on your last day of employment.** For transit, funds must be used via your Flores debit card prior to 5 p.m. ET on your last day or funds will be forfeited.  You are able to adjust your transit FSA payroll deduction prior to your last paycheck to avoid forfeiture of FSA Transit funds.

## 401(k)

**What happens to my 2U 401(k) account after my termination date?**

Upon the last day of your employment, the vested funds in your 401(k) account remain yours to keep, and you will continue to have full access to your account via Fidelity or Empower (edX).

Fourteen (14) days after your last day of employment, you may contact Fidelity or Empower directly to initiate a rollover or payout.  Refer to "Special Tax Notice regarding 401(k) Plan Payment" which will be sent to you from the 2U's 401(k) Administrator, Fidelity, for tax information. Please see the plan document or SPD for your specific options.

If you have questions regarding your 2U 401(k) account, contact Fidelity, by calling (800) 294-4015. You may login to your account at www.NetBenefits.com. The plan number for the 2U 401(k) is 53840.

**Can 401(k) contributions be deducted from my severance payments or will all 401(k) deductions stop?**

Severance earnings are not considered eligible compensation, therefore, your contributions to the 401k plan will stop.

**What happens if I have an outstanding 401(k) loan?**

If you had an outstanding 401(k) loan with Fidelity or EmpowerAdministrator Name, you have 90 days from the date your employment ends to begin monthly repayments or repay the loan in full. Please contact Fidelity or EmpowerAdministrator Name before the 90-day period ends to arrange for the monthly repayment option. If payments do not begin within the 90-day period or you do not continue loan repayments according to the repayment schedule, then your loan will be considered a disbursement and you will be subject to penalties and taxes.

If you have questions, contact Fidelity by phone at (800) 294-4015 or via their website at www.NetBenefits.com. You may reach Empower by calling (855) 756-4738.

**How do I initiate a rollover of my 401(k)?**

You initiate a rollover of your 2U 401(k) account balance by calling the Retirements Benefits line at 1-800-294-4015.  The plan number for the 2U 401(k) is 53840.

For prior edX employees, you may initiate a rollover of your edX 401(k) account balance by contacting Empower at (855) 756-4738.


**Life Insurance**

**What happens with my Life Insurance after my termination date?**

Your Life Insurance will end after 11:59 p.m. on your last day of employment.  You will have the option to port or convert your basic life insurance or continue any voluntary supplemental life insurance you may have purchased as an active 2U employee. Please contact the Benefits Team for next steps and instructions on how to submit the Life Insurance Conversion Form by emailing benefits@2u.com within 15 days of your last day of employment, if you want to pursue this option.

If you have questions, contact Hartford by calling (877) 320-0484.


**Accident, Death, and Dismemberment (AD&D), Short-Term Disability (STD) & Long-Term Disability (LTD)**

**What happens with my AD&D benefits and Short- and Long-term Disability after my termination date?**

AD&D coverage and Short-Term and Long-Term Disability will end on your last day of employment and are not transferable to individual policies.


**Hospital & Accident Insurance**

**Can I continue my hospital and/or accident insurance coverage?**

If you are enrolled in one of  the MetLife voluntary insurance plans, Hospital Indemnity or Accident coverage plans, MetLife will automatically send you a letter and an Election of Continuation Insurance Form, offering you the option to continue coverage. If you desire to continue coverage, you can either call or mail the completed form within 31 days from the date printed on the letter. At that time MetLife will initiate direct billing with you. Rates will remain the same.

MetLife Customer Service: (800) GET-MET8


**Critical Illness**

**What happens to my MetLife Critical Illness Plan? Can I continue coverage?**

Your Critical Illness Coverage will end on your last day of employment. You will have the opportunity to port this plan to an individual policy in order to continue your coverage. If you would like to convert your policy, please contact our Critical Illness provider, MetLife, by calling (800) GET-MET8.

## Legal Plans

**What happens to my MetLife Legal Plan? Can I continue coverage?**

Your Legal coverage will end on your last day of employment.  You may reach out to MetLife's Client Service Center at 800.821.6400, Monday-Friday (8am - 8pm ET) to port this plan to an individual policy in order to continue your coverage. A Client Service Center Representative will assist you in the enrollment process. <u>You must enroll within 30 days of your last day of employment.</u> The covered services and exclusions are the same as those under your current plan. Please visit [members.legalplans.com](members.legalplans.com) or call 800.821.6400 for plan details.

## Tuition

**What happens to my Tuition Loan Repayment Obligation?**

As part of the consideration in your Separation Agreement, all tuition obligations will be forgiven.

**Attachments:**
[2024 COBRA Rates](2024 COBRA Rates)



LHH Job Search Essentials Premium Program | 2 Months

# We're ready to help you find exciting job opportunities—
## you wouldn't normally hear about.

There are several proven ways to conduct a successful job search, and we're going to tackle each of them, together.

Think of us as your dedicated career support team giving you access to active jobs, getting you noticed with recruiters and hiring managers, and supplying you with techniques to land an ideal position, faster.

With our decades of experience behind you, you'll have a competitive advantage over other job seekers.

## Get a better job, faster

At LHH, 500,000+ people find new jobs every year with our help—in 65% less time. 80% negotiate equal or better positions.



**Get started now**

**We're here for you, all the way.**

Visit: register.lhh.com
Call: 888.224.4120
Email: careerservices@lhh.com
Text: "Careers" to 315.646.5447
Or scan:



## Your web-based program includes

▶ **Access to expert coaches**—to help you interview effectively, manage your online reputation, and negotiate a new position at a better salary

▶ **CV (or Resume) and LinkedIn® profile development**—from experts dedicated to help you stand out from everyone else

▶ **Daily job leads**—including access to unpublished opportunities that fit your unique career goals

▶ **Priority access to LHH recruiters**—who connect you to great job postings and help you land a new role

▶ **LinkedIn® Learning courses**—access to over 16,000 courses to help you gain new skills, stay sharp, and move your career ahead

▶ **Hundreds of resources**—accessible from our comprehensive knowledge library

Lee Hecht Harrison

© 2022 Lee Hecht Harrison LLC. All rights reserved.



# we make
# healthcare
# **easier**

## Our experts can:

- **Support medical issues**, from common to complex

- **Answer questions** about diagnoses and treatments; research the latest treatment options

- **Find the right** in-network doctors and make appointments

- **Research and arrange** expert second opinions

- **Resolve insurance claims** and billing issues

- **Provide confidential help 24/7** with stress, anxiety, depression, anger, family problems, substance abuse, grief and loss

- **Find local services** for childcare, eldercare and adult day care

- **Research and locate** legal specialists and financial counselors

- **Direct you to** your comprehensive EAP member website

Available at no cost to employees, spouses, dependents, parents and parents-in-law. Completely confidential.

**We're not an insurance company.** West's Health Advocate Solutions is not a direct healthcare provider, and is not affiliated with any insurance company or third party provider.

©2017 Health Advocate    HA-CEM-1610013-4FLY

---

Turn to us—we can help.

**866.799.2728**
Email: answers@HealthAdvocate.com
Web: HealthAdvocate.com/members

Download the app today!

 

**HealthAdvocate**℠

# EXHIBIT E

**SCHEDULE A**

**INFORMATION MADE AVAILABLE PURSUANT TO**

**THE OLDER WORKERS BENEFIT PROTECTION ACT OF 1990**

As you know, the Company is engaging in a reduction in force as part of a reorganization of its business units and operations.  The following information is provided in accordance with the Older Workers Benefit Protection Act of 1990, to permit affected employees who are age forty (40) and older to evaluate whether to execute a Separation Agreement and General Release ("Separation Agreement") in return for the receipt of severance benefits in connection with an employment termination program.

(A)     For purposes of this Attachment, the class, unit, or group of employees covered by this reduction in force consists of individuals employed by 2U as Lead Instructors for the Alternative Credentials Segment (the "Decisional Unit").

(B)     All employees in the Decisional Unit who are being laid off are eligible for, and have been selected to receive, the applicable severance benefits.

(C)     All employees who are being laid off are eligible for and being offered the severance benefits set forth in their respective Separation Agreement. However, to receive those severance benefits, the employee must sign the Separation Agreement and return it to the Company no later than forty-five (45) days after receiving the Separation Agreement. Once the employee signs the Separation Agreement, the employee has seven (7) days to revoke it before it will become effective. If the employee revokes the Separation Agreement, the employee will not be eligible for the severance and any other consideration described in the Separation Agreement.

(D)     The Company applied one or more of the following eligibility criteria in determining who in the Decisional Unit would be selected for layoff: economic and business conditions, job skill set and competencies, breadth of experience, job criticality, job performance, tenure and geography.

(E)     The following is a listing of the ages and job titles of employees in the Decisional Unit who were selected for layoff (and offered severance benefits as set forth in their Separation Agreement) and of employees in the Decisional Unit who were not selected for layoff:

| TITLE | AGE | SELECTED OR NOT SELECTED |
|---|---|---|
| Lead Instructor | 33 | Not Selected |
| Lead Instructor | 34 | Not Selected |

145614.00233/133050801v.1

| TITLE | AGE | SELECTED OR NOT SELECTED |
|---|---|---|
| Lead Instructor | 34 | Not Selected |
| Lead Instructor | 38 | Selected |
| Lead Instructor | 38 | Not Selected |
| Lead Instructor | 38 | Not Selected |
| Lead Instructor | 41 | Not Selected |
| Lead Instructor | 42 | Not Selected |
| Lead Instructor | 44 | Not Selected |
| Lead Instructor | 47 | Not Selected |
| Lead Instructor | 48 | Selected |
| Lead Instructor | 48 | Not Selected |
| Lead Instructor | 58 | Not Selected |
| Lead Instructor | 61 | Selected |