**BLANK ROME LLP**
*A Pennsylvania LLP*
Stephen M. Orlofsky
     New Jersey Resident Partner
Jason E. Reisman, Esquire
300 Carnegie Center, Suite 220
Princeton, NJ 08540
Telephone: (609) 750-7700
Facsimile: (609) 750-7701
Stephen.Orlofsky@BlankRome.com
Jason.Reisman@BlankRome.com
*Attorneys for Defendant*

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALAH HOBBI<br><br>     *Plaintiffs*,<br><br>v.<br><br>2U, INC.<br><br>     *Defendant*. | Civil Action No.: 2:25-cv-02263<br><br>**DECLARATION OF STEPHEN M. ORLOFSKY**<br><br>***Electronically Filed*** |

I, Stephen M. Orlofsky, Esq., of sound mind and full age, certify as follows:

1.     I am an attorney at law admitted to practice before this Court and am a Partner with the law firm of Blank Rome LLP, attorneys for Defendant 2U, LLC.

2.     I submit this Declaration in support of Defendant's Motion to Transfer Pursuant to 28 U.S.C. § 1404(a) Or, In The Alternative, Dismiss Plaintiff's Complaint.

3.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

4.    Attached hereto as **Exhibit A** is a true and correct copy of the *United States District Courts National Judicial Caseload Profiles for the District of Delaware and District of New Jersey*, US COURTS, https://www.uscourts.gov/sites/default/files/2025-02/fcms_na_distprofile1231.2024.pdf (last visited on June 8, 2025).

5.    **Exhibit B** is a true and accurate copy of *Agilent Techs., Inc. v. Kirkland*, No. CIV.A. 3512-VCS, 2010 WL 610725 (Del. Ch. Feb. 18, 2010).

6.    **Exhibit C** is a true and accurate copy of *Argush v. LPL Fin., LLC*, No. CV 13-7821, 2016 WL 11663236 (D.N.J. Aug. 24, 2016).

7.    **Exhibit D** is a true and accurate copy of *Brauser Real Est., LLC v. Meecorp Cap. Markets, LLC*, No. CIV.A.06CV01816(SDW), 2008 WL 324402, at *3 (D.N.J. Feb. 4, 2008), aff'd, 484 F. App'x 654 (3d Cir. 2012).

8.    **Exhibit E** is a true and accurate copy of *Ethicon, Inc. v. Randall*, No. 3:20-cv-13524 (BRM) (ZNQ), 2021 WL 2206106 (D.N.J. May 28, 2021).

9.    **Exhibit F** is a true and accurate copy of *Groeneveld v. Verb Techonology Co., Inc*., No. CV2303766GCJBD, 2024 WL 1253296 (D.N.J. Mar. 25, 2024).

10.    **Exhibit G** is a true and accurate copy of *Jun Zhang v. Gain Cap. Holdings, Inc.,* 2021 WL 2103233 (D.N.J. May 25, 2021).

11.    **Exhibit H** is a true and accurate copy of *Kan-Di-Ki, LLC v. Suer*, No. CV 7937–VCP, 2015 WL 4503210 (Del. Ch. July 22, 2015).

12.    **Exhibit I** is a true and accurate copy of *Lyons Ins. Agency, Inc. v. Wilson*, No. CV 2017-0092-SG, 2018 WL 4677606 (Del. Ch. Sept. 28, 2018).

13.    **Exhibit J** is a true and accurate copy of *Poretskin v. Chanel, Inc*., No. CV2322613SDWMAH, 2024 WL 714232 (D.N.J. Jan. 29, 2024).

14.    **Exhibit K** is a true and accurate copy of *RHIS, Inc. v. Boyce*, No. CIV. A. 18924, 2001 WL 1192203, at *1 (Del. Ch. Sept. 26, 2001).

15.    **Exhibit L** is a true and accurate copy of *Stanton v. Greenstar Recycled Holdings, L.L.C*., No. CIV.A. 10-5658 MLC, 2012 WL 3201370 (D.N.J. Aug. 2, 2012).

Dated: June 16, 2025                              *s/ Stephen M. Orlofsky*
                                                 STEPHEN M. ORLOFSKY

# EXHIBIT A

## U.S. District Court — Judicial Caseload Profile

| DELAWARE | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Dec 31 2019 | Dec 31 2020 | Dec 31 2021 | Dec 31 2022 | Dec 31 2023 | Dec 31 2024 | U.S. | Circuit |
| **Overall Caseload Statistics** | Filings [1] | | 2,619 | 1,937 | 1,993 | 1,819 | 1,651 | 1,625 | | |
| | Terminations | | 2,434 | 2,098 | 2,116 | 2,193 | 1,527 | 1,561 | | |
| | Pending | | 2,582 | 2,484 | 2,401 | 2,078 | 2,237 | 2,338 | | |
| | Percent Change in Total Filings Current Year Over Earlier Year | | -38.0 | -16.1 | -18.5 | -10.7 | -1.6 | | 58 | 3 |
| | Number of Judgeships | | 4 | 4 | 4 | 4 | 4 | 4 | | |
| | Vacant Judgeship Months [2] | | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | 0.0 | | |
| **Actions per Judgeship** | **Filings** | Total | 655 | 484 | 498 | 455 | 413 | 406 | 57 | 4 |
| | | Civil | 616 | 461 | 472 | 426 | 380 | 371 | 32 | 4 |
| | | Criminal Felony | 32 | 21 | 20 | 26 | 28 | 31 | 87 | 5 |
| | | Supervised Release Hearings | 7 | 3 | 7 | 4 | 6 | 5 | 90 | 5 |
| | Pending Cases [2] | | 646 | 621 | 600 | 520 | 559 | 585 | 26 | 3 |
| | Weighted Filings [2] | | 1,115 | 875 | 953 | 775 | 666 | 612 | 18 | 2 |
| | Terminations | | 609 | 525 | 529 | 548 | 382 | 390 | 64 | 3 |
| | Trials Completed | | 21 | 17 | 19 | 23 | 18 | 31 | 8 | 1 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 7.8 | 9.3 | 15.4 | 15.0 | 10.6 | 17.5 | 72 | 2 |
| | | Civil [2] | 5.3 | 6.9 | 7.1 | 8.0 | 8.3 | 9.0 | 64 | 5 |
| | From Filing to Trial [2] (Civil Only) | | 30.9 | 26.5 | 36.5 | 33.7 | 38.0 | 32.3 | 21 | 2 |
| **Other** | Number (and %) of Civil Cases Over 3 Years Old [2] | | 232 9.6 | 288 12.4 | 314 14.2 | 313 16.6 | 327 16.1 | 351 16.6 | 69 | 3 |
| | Average Number of Felony Defendants Filed per Case | | 1.0 | 1.1 | 1.0 | 1.3 | 1.3 | 1.3 | | |
| | Jurors | Avg. Present for Jury Selection | 43.5 | 45.0 | 47.7 | 42.4 | 35.9 | 32.0 | | |
| | | Percent Not Selected or Challenged | 26.2 | 53.8 | 37.0 | 39.1 | 37.4 | 31.8 | | |

| **2024 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense** | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 1,483 | 12 | 10 | 138 | 4 | 10 | 29 | 198 | 91 | 470 | 192 | - | 329 |
| Criminal [1] | 123 | - | 23 | 23 | 23 | 21 | 8 | 8 | - | 2 | - | - | 15 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

## U.S. District Court — Judicial Caseload Profile

**NEW JERSEY**

| | | | 12-Month Periods Ending | | | | | | Numerical Standing Within | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Dec 31 2019 | Dec 31 2020 | Dec 31 2021 | Dec 31 2022 | Dec 31 2023 | Dec 31 2024 | U.S. | Circuit |
| **Overall Caseload Statistics** | | Filings [1] | 27,017 | 23,453 | 23,063 | 9,998 | 25,654 | 13,806 | | |
| | | Terminations | 13,137 | 10,721 | 10,699 | 9,906 | 9,801 | 10,277 | | |
| | | Pending | 38,764 | 51,514 | 63,894 | 63,988 | 79,806 | 83,374 | | |
| | | Percent Change in Total Filings Current Year Over Earlier Year | -48.9 | -41.1 | -40.1 | 38.1 | -46.2 | | 90 | 6 |
| | | Number of Judgeships | 17 | 17 | 17 | 17 | 17 | 17 | | |
| | | Vacant Judgeship Months [2] | 67.5 | 72.0 | 60.5 | 16.5 | 29.6 | 2.6 | | |
| **Actions per Judgeship** | **Filings** | Total | 1,589 | 1,380 | 1,357 | 588 | 1,509 | 812 | 7 | 1 |
| | | Civil | 1,521 | 1,325 | 1,302 | 533 | 1,452 | 762 | 2 | 1 |
| | | Criminal Felony | 57 | 46 | 45 | 43 | 46 | 37 | 80 | 3 |
| | | Supervised Release Hearings | 12 | 8 | 10 | 13 | 11 | 13 | 82 | 3 |
| | | Pending Cases [2] | 2,280 | 3,030 | 3,758 | 3,764 | 4,694 | 4,904 | 2 | 1 |
| | | Weighted Filings [2] | 1,051 | 994 | 1,003 | 478 | 1,131 | 674 | 8 | 1 |
| | | Terminations | 773 | 631 | 629 | 583 | 577 | 605 | 17 | 1 |
| | | Trials Completed | 8 | 3 | 5 | 7 | 6 | 6 | 89 | 5 |
| **Median Time (Months)** | From Filing to Disposition | Criminal Felony | 9.0 | 8.7 | 13.3 | 13.3 | 15.9 | 13.1 | 42 | 1 |
| | | Civil [2] | 9.8 | 10.1 | 8.4 | 9.8 | 7.4 | 8.1 | 47 | 3 |
| | From Filing to Trial [2] (Civil Only) | | 46.3 | - | 43.3 | 52.9 | 50.8 | 60.4 | 52 | 4 |
| **Other** | | Number (and %) of Civil Cases Over 3 Years Old [2] | 806 / 2.1 | 6,849 / 13.7 | 14,041 / 22.5 | 27,140 / 43.5 | 39,651 / 50.6 | 52,524 / 64.0 | 92 | 6 |
| | | Average Number of Felony Defendants Filed per Case | 1.2 | 1.1 | 1.1 | 1.1 | 1.0 | 1.1 | | |
| | Jurors | Avg. Present for Jury Selection | 92.1 | 247.5 | 153.4 | 105.1 | 86.1 | 93.4 | | |
| | | Percent Not Selected or Challenged | 40.5 | 44.8 | 45.9 | 41.9 | 44.4 | 46.9 | | |

| 2024 Civil Case and Criminal Felony Defendant Filings by Nature of Suit and Offense | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | Total | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 12,961 | 366 | 4,839 | 1,062 | 9 | 74 | 410 | 1,018 | 1,199 | 660 | 1,412 | 61 | 1,851 |
| Criminal [1] | 629 | 41 | 180 | 22 | 90 | 181 | 26 | 31 | 1 | 3 | 5 | 15 | 34 |

NOTE: Criminal data in this profile count defendants rather than cases and therefore will not match previously published numbers.

[1] Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings by "Nature of Offense" do not.

[2] See "Explanation of Selected Terms."

# EXHIBIT B

Agilent Technologies, Inc. v. Kirkland, Not Reported in A.2d (2009)

KeyCite Yellow Flag

Distinguished by   Preston Hollow Capital LLC v. Nuveen LLC,   Del.Ch.,
August 13, 2019

2009 WL 119865

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

AGILENT TECHNOLOGIES, INC., Plaintiff,

v.

Joseph J. KIRKLAND, Joseph J. Destefano,
Timothy J. Langlois, and Advanced
Materials Technology, Inc., Defendants.

C.A. No. 3512-VCS.
|
Submitted: Dec. 1, 2008.
|
Decided: Jan. 20, 2009.

West KeySummary

**1**   **Antitrust and Trade
Regulation** 👈 **Particular Cases**

Defendant corporation involved in the
manufacturing of superficially porous
silica microparticles sufficiently pled unfair
competition in its verified amended counterclaim
to withstand plaintiff's motion to strike
and dismiss the counterclaim. The plaintiff
corporation allegedly told potential customers of
the defendant's product that the defendant was
involved in litigation and that the defendant's
product would soon be gone from the market.
Plaintiff also allegedly told a distributor that the
distributor was not permitted to sell defendant's
product and referenced the current litigation as
the reason. Court of Chancery Rule 12(b)(6).

**Attorneys and Law Firms**

Jack B. Blumenfeld, Esquire, Julia Heaney, Esquire, Paul
Saindon, Esquire, Morris, Nichols, Arsht & Tunnell LLP,
Wilmington, DE, for Plaintiff.

Philip A. Rovner, Esquire, Matthew E. Fischer, Esquire,
Timothy R. Dudderar, Esquire, Meghan M. Dougherty,
Esquire, Potter Anderson & Corroon LLP, Wilmington, DE,
for Defendants.

MEMORANDUM OPINION

STRINE, Vice Chancellor.

**I. Introduction**

**\*1**   The backdrop to this claim is the competitive world
of scientific measuring devices, specifically equipment and
materials used for high performance liquid chromatography
("HPLC"). This opinion deals with a counterclaim for unfair
competition, tortious interference with prospective business
relations, and deceptive trade practices that was made in
response to the filing of a lawsuit for misappropriation of
trade secrets.

At the center of both this counterclaim and the underlying
lawsuit are certain superficially porous silica microparticles
developed by defendant and counterclaim-plaintiff Advanced
Materials Technology, Inc. ("AMT") for use in HPLC
and marketed under the brand name "Halo." These "Halo
Particles" are unique for their allegedly unprecedentedly
small size, which confers a number of performance
advantages. Three of the scientists behind the development
of the Halo Particles are former employees of plaintiff and
counterclaim-defendant Agilent Technologies, Inc., which
also makes equipment and particles for use in HPLC and
directly competes with AMT. Or, more accurately, AMT
competes directly with Agilent, a dominant player in the
scientific measurement industry. After the successful debut
of the Halo Particles in the marketplace, Agilent brought
suit against its former employees and AMT, claiming they
had misappropriated proprietary information from Agilent
and used it to develop the Halo Particles. This claim is not
directly at issue on the motion addressed in this decision,
but it is highly relevant because, according to AMT, Agilent
has been using its dispute with AMT as a platform for
spreading misinformation to AMT's potential customers and

distributors, scaring business away from AMT, and clearing the market for Agilent's own products.

After Agilent filed its lawsuit in January 2008, AMT allegedly learned that Agilent representatives had made damaging and supposedly false statements about the long-term availability of AMT's products to potential AMT business partners. AMT claims that these statements were particularly damaging due to the importance of longterm product availability to AMT's potential customers. AMT filed a counterclaim in this action in March 2008 claiming unfair competition, tortious interference with prospective business relations, and violation of the Delaware Deceptive Trade Practices Act (the "Original Counterclaim"), and then amended the Original Counterclaim in July 2008 to allege more incidents of which it became aware (the "Amended Counterclaim").

To factually support its claims, the Amended Counterclaim pleads four specific incidents of purported misconduct: 1) in mid-2007, an Agilent sales representative told a potential customer that the Halo Particles had patent issues; 2) in late 2007, an Agilent employee told a university professor collaborating with AMT that AMT faced intellectual property issues; 3) in mid-2008, an Agilent sales representative told a major distributor that the Halo Particles could not be promoted or sold, referencing this litigation; and 4) in mid-2008, Agilent employees told a potential customer that the Halo Particles would soon be gone from the market due to this litigation.

**\*2** Agilent has moved to strike and dismiss the Amended Counterclaim. In this opinion, I deny Agilent's motion to strike the Amended Counterclaim as improperly filed and its motion to dismiss the Amended Counterclaim for failure to state a claim.

Agilent's motion to strike is based on the fact that AMT's amendment to the Original Counterclaim contained supplemental pleading that required leave of the court to file. Because Agilent has not demonstrated that the supplemental pleading was unreasonably delayed or prejudiced Agilent in any way, I grant that leave now.

Agilent seeks dismissal of AMT's common law claims on the basis that they do not sufficiently plead the elements of unfair competition and tortious interference. I find that, although not all of the incidents AMT complains of constitute actionable conduct, AMT's claims are adequately supported by AMT's allegations that Agilent told a distributor that the

Halo Particles could not be sold and told a potential AMT customer that the Halo Particles would soon be gone from the market. Agilent was free to make the marketplace aware of this litigation and inform customers that AMT faced the uncertainty that the filing of a lawsuit inevitably brings. But, Agilent was not, as it is alleged to have done, free to make factual statements regarding the effect of this litigation that were untrue, such as that this litigation definitively prevented distributors from carrying AMT products or that removal of AMT's products from the marketplace was certain.

Finally, Agilent seeks dismissal of AMT's statutory claim under the Deceptive Trade Practices Act ("DTPA") on the basis that the handful of incidents alleged by AMT do not constitute a pattern of misconduct as required by the statute. I find that AMT's allegations, if true, would indicate that Agilent has engaged in a pattern of misrepresentation. Where wrongful conduct is ongoing, as pled here, dozens of examples are not required to demonstrate a pattern for pleading purposes. Moreover, in a small market like this one, where Agilent is a dominant-and therefore possibly intimidating-player, it is plausible that there are other, as-yet-undiscovered customers and distributors who have been subject to the unlawful sales tactics alleged by AMT.

## II. *Factual Background*

AMT is a three-year-old company that develops and sells particles for use in HPLC, which is a method of separating, identifying, and measuring chemical compounds. HPLC works by moving materials through a column packed with certain particles and measuring the results using HPLC equipment. AMT manufactures and sells HPLC columns packed with superficially porous silica microparticles under the brand-name "Halo." AMT's three founders, Dr. Joseph J. Kirkland, Dr. Joseph J. DeStefano, and Timothy Langlois, are all former employees of Agilent. Agilent is a leader in scientific measuring devices, including HPLC equipment and columns.

The HPLC market is a small but competitive one. AMT estimates the worldwide market to be $500 million, and that the top three companies, which include Agilent, have a combined market share of about 60%. [1] Vendor reputation plays an important role in this market because HPLC applications tend to require a high degree of accuracy and reliability and involve long-term investments in a particular method. For example, AMT primarily sells its columns to

the pharmaceutical industry, where they are used for research and development and quality control of pharmaceutical products. [2] To make their own regulatory approval processes easier, these customers want an HPLC system that will be readily accepted by regulatory agencies and that will be available for the life of their pharmaceutical products. [3]

**\*3** The parties agree that Kirkland and DeStefano have multiple decades of experience and enjoy outstanding reputations in the fields of analytical chemistry and HPLC. In 1989, Kirkland and DeStefano formed Rockland Technologies, Inc., where they worked on superficially porous silica microparticles for use in HPLC. Hewlett-Packard acquired Rockland in 1997 and signed Kirkland and DeStefano on as employees. As part of that transaction, Kirkland and DeStefano signed non-competition agreements (the "Non-Compete Agreements") that expired in 2002, and each signed HP's standard confidentiality agreement, which did not contain a non-compete provision. That same year, Langlois joined HP and also signed a standard HP confidentiality agreement. Then, in 1999, HP spun off Agilent, and Kirkland, DeStefano, and Langlois became Agilent employees. The three scientists signed new confidentiality agreements with Agilent (the "Agilent Confidentiality Agreements"), but Agilent did not extend the term of Kirkland and DeStefano's Non-Compete Agreements, the rights to which were assigned to Agilent in the spin-off.

While at HP and Agilent, Kirkland and DeStefano, along with Langlois, continued their work on superficially porous silica microparticles. One of their ongoing projects was to develop a commercially viable method for producing microparticles less than 3.5 m in diameter. Such particles are desirable because they yield faster and better results than larger particles. But, Kirkland and his colleagues were unable to find solutions to various technical obstacles, and in 2001, Kirkland retired from Agilent without having developed a successful method for producing sub-3.5 m particles.

Kirkland's retirement proved temporary. Four years after Kirkland's departure, in April 2005, DeStefano and Langlois resigned from Agilent and formed AMT with Kirkland. AMT alleges that Agilent was aware that its former employees were launching an HPLC company based on memos sent to Agilent officers and the fact that Agilent sold over $5,000 worth of chromatography equipment to AMT in May and September 2005. [4]

At AMT, the three scientists returned to the problem of manufacturing sub-3.5 m particles. This time their efforts were successful, and they developed a technique for producing particles with the desired characteristics. In October 2006, AMT introduced its sub-3.5 m particles to the market under the name "Halo Fused-Core Particles." The Halo Particles are also the subject of pending U.S. and international patent applications (the "Halo Patents"). According to AMT, the Halo Particles "were rapidly embraced and recognized in the chromatography industry as breakthrough new technology with highly desirable features." [5]

This was an unwelcome development to Agilent, which believes that Kirkland, DeStefano, and Langlois used proprietary information they learned while at Agilent to develop the Halo Particles in violation of the Agilent Confidentiality Agreements. In January 2008, Agilent brought suit in this court alleging that Kirkland, DeStefano, and Langlois had breached the Agilent Confidentiality Agreements and that all of the defendants had misappropriated trade secrets.

**\*4** According to AMT, Agilent had another reason to be upset with the success of the Halo Particles besides the possible theft of its intellectual property. By mid-2007, Agilent had plans to release a sub-3.5 m particle of its own that would directly compete with the Halo Particles. [6] AMT alleges that Agilent, to ensure the success of its own product, embarked on a campaign of disparaging statements against AMT and the Halo Particles in the marketplace. AMT claims that these statements were particularly damaging due to the importance of reputation and long-term viability to its potential customers. [7]

As a result of reports that Agilent was making these comments in the marketplace, AMT filed the Original Counterclaim in March 2008, bringing claims of unfair competition, tortious interference with prospective business relations, and violation of Delaware's Deceptive Trade Practices Act. AMT then filed the Amended Counterclaim in July 2008 to add more specific allegations of the wrongful activities Agilent had engaged in. Agilent has now moved to strike the Amended Counterclaim as improper supplemental pleading and to dismiss the Amended Counterclaim in its entirety for failure to state a claim.

III. *Legal Analysis*

A. *Standard Of Review*

In deciding this motion to dismiss, I apply the familiar standard under Court of Chancery Rule 12(b)(6). To state a claim, a plaintiff "must plead facts that plausibly suggest she will ultimately be entitled to the relief she seeks."[8] In this regard, "the plaintiff is entitled to all reasonable inferences that logically flow from the face of the complaint."[9] "[W]here it appears with 'reasonable certainty' that the plaintiff could not prevail on any set of facts that can be inferred from the pleadings," a motion to dismiss will be granted.[10] In making my determination, I accept all well-plead facts as true and draw all reasonable inferences in the light most favorable to the plaintiff.[11]

B. *Motion To Strike Amended Counterclaim*

Agilent's first attack on AMT's Amended Counterclaim is that it contains supplemental pleading because it refers to events that occurred after the Original Counterclaim was filed, and the Amended Counterclaim was therefore improperly filed without leave of the court. That is in fact so, but Agilent has failed to demonstrate that AMT was not entitled to supplement its Original Counterclaim, so its motion to strike is denied.

Amended and supplemental pleadings are governed by Court of Chancery Rule 15. The defining difference between the two is that supplemental pleadings deal with events that occurred after the pleading to be revised was filed, whereas amendments deal with matters that arose before the filing.[12] Here, two of the eleven paragraphs that were added or materially modified in the Amended Counterclaim relate to events that occurred after the filing of the Original Counterclaim in March 2008. The first alleges that in April 2008, Agilent told a distributor that the distributor could not promote or sell the Halo Particles.[13] The second alleges that in June 2008, Agilent told an HPLC customer that the Halo Particles would soon be gone from the market.[14] These are properly classified as supplemental pleading.

*5 For most purposes, the distinction between amended and supplemental pleadings is minimal.[15] But, a material procedural difference is that amended pleadings may, at times, be filed as a matter of right while supplemental pleadings always require leave of the court.[16] AMT did not seek leave to file its Amended Counterclaim, apparently in belief that it constituted an amendment as a matter of course under Rule 15(a).[17]

Inadvertent inclusion of supplemental pleading in an amendment as a matter of course is not uncommon, and requires this court to consider the supplemental pleading as if it had been brought through a regular Rule 15(d) motion to supplement.[18] Rule 15(d) is a highly permissive standard. As Chancellor Chandler explained in *Parnes v. Bally Entertainment Corp.*:

'As a general rule, leave to amend is freely given ... and there is no apparent reason why the same liberality should not apply to a motion to supplement.' Leave to amend can be denied if plaintiff inexcusably delayed in making its request *and* defendant is prejudiced as a result. This exception to the general rule permitting liberal amendment is narrowly construed.[19]

Agilent has made no attempt to demonstrate that the supplemental pleading was inexcusably delayed or that Agilent was prejudiced by it. Instead, Agilent rests its objections on the argument that AMT's Amended Counterclaim is futile, and this court cannot grant leave to make a futile amendment.[20]

An amendment is futile if it would not survive a Rule 12(b)(6) motion.[21] This type of futility analysis is necessarily in tension with notions of judicial efficiency that seek to limit the number of separate occasions on which a court must consider a matter. Here, AMT has already filed the Amended Counterclaim, the majority of which is comprised of amendments properly made as a matter of course, and Agilent has already raised a 12(b)(6) motion against the Amended Counterclaim as a whole. In this situation, where there merely has been a technical mistake in an otherwise permissible amendment, I see no reason to exclude allegations that are pertinent to matters already before the court. And, as we shall see in the discussion of Agilent's 12(b)(6) motion, the allegations in AMT's supplemental pleading do support claims of unfair competition, tortious interference with prospective business relations, and deceptive trade practices.

Thus, in my view, Agilent has offered no compelling reason why leave to supplement should not be granted to AMT, and I therefore allow all of the revisions in the Amended Counterclaim.

### C. *Unfair Competition And Tortious Interference*

AMT claims that Agilent embarked on a campaign of reputational harm that constitutes unfair competition and tortious interference with prospective business relations. To state a claim for unfair competition, a plaintiff must allege "a reasonable expectancy of entering a valid business relationship, with which the defendant wrongfully interferes, and thereby defeats the plaintiff's legitimate expectancy and causes him harm." [22] Similarly, to state a claim for tortious interference with a prospective business opportunity, a plaintiff must allege: 1) the reasonable probability of a business opportunity; 2) the intentional interference by defendant with that opportunity; 3) proximate causation; and 4) damages. [23] All of these factors "must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner." [24]

**\*6** AMT has alleged four separate interactions between Agilent representatives and potential AMT customers, distributors, and a research partner that it asserts meet these criteria:

26. In or about May 2007, an Agilent sales representative falsely stated to a potential customer at a major multinational company that there were patent issues with respect to AMT's product. The potential customer then inquired with AMT's distributor about the situation and the distributor requested an explanation from AMT. [25]

27. In late-2007, a respected researcher and professor at a prestigious university in Europe was told by an Agilent employee that AMT faced intellectual property issues with respect to its particle technologies. This individual relayed this communication back to AMT and conceded that his conversation with the Agilent employee had caused him to be uncertain about AMT's products and how to handle his relationship with AMT, and he further questioned whether his relationship with AMT could even continue. Prior to Agilent's interference, AMT had been discussing a collaborative relationship with this researcher. However, as a result of Agilent's conduct, this researcher

ceased communications with AMT regarding new product development activities and no technical interactions have occurred between AMT and this researcher since Agilent's wrongful conduct. [26]

28. In or about April 2008, an Agilent sales representative told another significant distributor of HPLC products that the distributor was not permitted to promote or sell AMT's Halo® product and referenced this litigation, which Agilent had recently brought against AMT. Agilent's false statements and wrongful conduct resulted in reduced sales of AMT's product and a reluctance on the part of distributors to promote it. [27]

29. Also, in June 2008, Agilent again attempted to poison the HPLC marketplace for AMT's products at a meeting between Agilent employees and a potential customer of HPLC columns. This particular customer had tested columns with AMT's Halo® particles and was planning to develop a method using such columns. Agilent's employees told this potential customer that because AMT's Halo® product would soon be gone from the market due to this lawsuit, the customer should instead use Agilent's similar product. Upon hearing this falsehood from Agilent, this potential customer placed the development of its method using Halo® columns on hold. [28]

For the reasons stated below, I find that Paragraphs 28 and 29 sufficiently support claims for unfair competition and tortious interference with prospective business relations, and I therefore deny Agilent's motion to dismiss these claims. Because I find that only Paragraphs 28 and 29 sufficiently plead acts of unfair competition and tortious interference, I focus most of my analysis on them.

Paragraphs 28 and 29 allege that Agilent representatives made misleading statements regarding the effect of this litigation on the availability of the Halo Particles to a potential customer and a potential distributor. Agilent argues that Paragraphs 28 and 29 do not support AMT's claims because they fail to identify: 1) a reasonable business expectancy; 2) wrongful conduct by Agilent; and 3) damages proximately caused by Agilent's conduct. I address each of these arguments in turn.

### 1. *Reasonable Probability Of Business Opportunity*

**\*7** Both parties agree that to plead a reasonable probability of a business opportunity, AMT must "identif[y] a specific party who was prepared to enter into a business relationship

but was dissuaded from doing so by the defendant" and cannot rely on generalized allegations of harm. [29] They disagree about whether this means the Amended Counterclaim must identify the specific party by name.

Under Agilent's reading of the identification requirement, AMT must supply the names of its potential business affiliates because terms like "potential customer" or "significant distributor" could refer to any party and are tantamount to generalized allegations of harm. But, Agilent has offered no authority for the proposition that a party is only identified if it is named. Agilent has cited cases indicating the specific party is generally identified by name, but these cases do not suggest that the specific party *must* be named. [30] In fact, in one of the cases Agilent cites, *Kelly-Springfield,* it appears the court accepted allegations of both named and unnamed prospective business relations . [31]

Moreover, AMT's allegations are not the type of vague statements about unknown customers that courts usually reject. [32] Instead, AMT has pled the alleged incidents in enough detail-including dates and, in the case of the potential customer, the detail that "[t]his particular customer had tested columns with AMT's Halo particles" [33] -that I can reasonably infer that specific parties were involved. This level of descriptiveness is enough to support a claim that "specific prospective business relations" existed, [34] and AMT is not required to go further and name the parties involved in the Amended Counterclaim.

Agilent also argues that AMT has not adequately alleged that it had a reasonable probability of engaging in business with the unnamed parties in Paragraphs 28 and 29. To be reasonably probable, a business opportunity must be "something more than a mere hope or the innate optimism of the salesman" [35] or a "mere perception of a prospective business relationship." [36]

Paragraph 28 refers to a "significant HPLC distributor." Given the relatively small size of the HPLC market and limited number of manufacturers in it, one would expect a "significant" distributor to be aware of and highly interested in a product like the Halo Particles, which at the time they were released were apparently the only HPLC particles that offered certain desirable characteristics associated with their size. [37] Moreover, Agilent's own behavior belies the likelihood that the distributor would do business with AMT.

Agilent, a comparative giant in the HPLC field, would have little reason to talk about the offerings of a small company like AMT with a distributor unless Agilent, recognizing that the Halo Particles were a possible substitute for its own products, wanted to discourage the distributor from making the Halo Particles available to customers.

**8** Paragraph 29 offers an even stronger case for a reasonably probable opportunity. AMT claims that Agilent made false statements to a "potential customer of HPLC [products]." [38] This potential customer had allegedly tested the Halo Particles for use in its projects, suggesting the customer had a serious interest in the product.

Thus, the circumstances alleged in Paragraphs 28 and 29 give rise to a reasonable inference that AMT had a justifiable expectation of business with the unnamed parties.

## 2. *Wrongful Conduct*

Agilent next argues that the alleged statements in Paragraphs 28 and 29 were not wrongful and cannot be the basis of an unfair competition or tortious interference claim for that reason. An alleged interference in a prospective business relationship is only actionable if it is wrongful. [39] Agilent claims that its alleged statements were not wrongful because they constitute truthful opinions protected by the First Amendment under the standards set out in *Moldea v. New York Times Co.* [40] Under *Moldea,* a statement of fact, or a statement of opinion that implies an assertion of fact, is generally actionable, whereas a pure statement of opinion is not. [41] Thus, the determinative question here is how to classify Agilent's alleged statements.

At argument, Agilent conceded that the alleged statement in Paragraph 28-that the distributor "was not permitted to promote or sell AMT's Halo product"-could be read as a statement of fact or opinion. [42] Because I must give AMT the benefit of all reasonable inferences, I read this as an actionable statement of fact.

Similarly, I give AMT the benefit of the reasonable inference that the statement alleged in Paragraph 29-that "AMT's Halo product would soon be gone from the market due to this lawsuit"-involved a factual assertion. Agilent argues that this was a constitutionally protected statement of opinion about the outcome of this litigation. But, under the *Moldea* standard

that Agilent relies on, a statement of opinion is still actionable if it "impl[ies] an assertion of objective fact." [43]  At this stage in the proceedings, I cannot rule out the reasonable possibility that Agilent's alleged statement, in the context it was made, implied that there had been a definitive ruling in this case that would soon be implemented by an injunction requiring the Halo Particles' commercial withdrawal, which would have involved a factual assertion.

On this point, it is useful to contrast the allegations in Paragraphs 28 and 29 with those in Paragraphs 26 and 27, which I find fail to plead wrongful conduct and therefore do not constitute acts of unfair competition or tortious interference. Paragraphs 26 and 27 both allege that Agilent representatives told potential AMT business partners that the Halo Particles had patent issues in 2007, before Agilent commenced this litigation. Specifically, AMT alleges that Agilent representatives told a potential AMT customer that the Halo Particles had "patent issues," and told a European professor who was collaborating on research with AMT that the Halo Particles had "intellectual property issues." [44] As noted earlier, claims for unfair competition and tortious interference must necessarily be balanced against a party's legitimate right to compete. [45]  In regard to the allegations in Paragraph 28 and 29, that balance falls in favor of AMT because the alleged statements purportedly contained misrepresentations of fact, which are not legitimate vehicles of competition. In regard to Paragraphs 26 and 27, the balance is reversed. Agilent allegedly told certain parties that the Halo Particles have "patent issues." This phrase does not convey a factual assertion like, "the Halo Patents have been deemed invalid." It does convey that a threat of litigation surrounded the Halo Particles, but there is nothing untrue about that. Agilent believed its rights were infringed by the Halo Patents, and it was free to share that view with the marketplace. It may be that uncertainty about AMT's intellectual property has a detrimental effect on its ability to compete, but that is simply a reality of doing business in a market concerned about the long-term availability of products.

**\*9** Despite the infirmity of Paragraphs 26 and 27, AMT has still sufficiently pled wrongful conduct on the basis of the statements alleged in Paragraphs 28 and 29. And, although not individually rising to an actionable level, Paragraphs 26 and 27 lend support to the overall inference flowing from the Amended Counterclaim that Agilent consciously marketed its own products by casting doubt and uncertainty on AMT's Halo Particles.

### 3. *Damages*

Finally, Agilent claims that Paragraphs 28 and 29 fail to plead facts indicating that the alleged business relationships were actually damaged, or that the damage was caused by Agilent's conduct. To prevail at trial, AMT must show that Agilent's wrongful conduct was the proximate cause of harm to AMT. [46]  Now, AMT must simply plead facts that plausibly support an inference of commercial harm.

In Paragraph 28, AMT states that an Agilent representative told a specific distributor that it could not sell the Halo Particles, and this "resulted in reduced sales of AMT's product and a reluctance on the part of distributors to promote it." [47] This stops short of making the clearly sufficient claim that Agilent's statement caused the distributor who heard it to change its relationship with AMT. Nevertheless, it still gives rise to a reasonable inference that Agilent's statement caused the alleged harm of reduced sales and distributor reluctance to sell AMT products. For starters, it is reasonable to believe that if Agilent made this statement to one distributor, it made it to others who have not yet been discovered, perhaps because they are reluctant to come forward and antagonize one of their major suppliers. Read together, Paragraphs 26 through 29 imply that Agilent representatives employed a conscious strategy to market Agilent's products by, in part, convincing buyers and distributors not to purchase AMT products. It is therefore plausible that the tactic of saying that the Halo Particles could not be distributed was used with other distributors. Agilent's argument that AMT has not pled a reasonably probable business opportunity with these other distributors is unavailing. As discussed earlier, given the pled facts regarding the nature of the industry, the uniqueness of the Halo Particles, and especially the allegation that Agilent sales representatives felt it necessary or desirable as a sales tactic to suggest to customers that they could not buy the Halo Particles or would soon have no further ability to buy the Halo Particles, it is highly plausible that other distributors were aware of the Halo Particles and had a strong interest in distributing them. [48]

Agilent also challenges the sufficiency of the harm alleged in Paragraph 29. In this Paragraph, the issue is not one of causation, but rather the question of whether AMT was actually harmed. AMT alleges that a potential customer who had been testing a method for using the Halo Particles "placed the development of its method using Halo [Particles]

on hold." [49]  Agilent's argument that a development project being placed "on hold" causes no harm or only speculative harm is not sustainable. There is no requirement that a business relationship be definitively terminated for there to be interference. Rather, wrongful conduct is "unfair action on the part of defendant by which he prevents plaintiff from legitimately earning revenue." [50]  A derailed opportunity to bring in business exposes a party to lost cash flow immediately and the risk that the potential customer will find another deal in the meantime, leaving the party with permanently lost revenue. Thus, when the derailment is caused by the wrongful acts of others, the harm is compensable.

\* \* \*

**\*10**  In sum, AMT has adequately pled all of the elements required to make out claims for unfair competition and tortious interference with prospective business relations with regard to its allegations that Agilent representatives misrepresented the status and legal effect of this litigation to potential AMT customers. AMT's pleading barely passes muster, a reality that suggests that AMT may have difficulty ultimately prevailing on its Counterclaim. But, that assessment does not alter AMT's legal right to proceed to discovery on a well-pled complaint. [51]

### D. Deceptive Trade Practices Act

In addition to its common law claims, AMT has brought a statutory claim under Delaware's Deceptive Trade Practices Act. The DTPA prohibits "disparage[ment] of the goods, services or business of another by false or misleading representations of fact," committed "in the course of a business, vocation, or occupation." [52]

Because the DTPA is meant to address " 'patterns of deceptive conduct,' not isolated incidents," [53] relief under the statute is dependent on the plaintiff's entitlement to injunctive relief. [54] "[A] claim for injunctive relief must be supported by the allegation of facts that create a reasonable apprehension of a future wrong." [55] Agilent argues that the specific incidents alleged by AMT are isolated and do not constitute a pattern of misconduct that would entitle AMT to relief. That argument is unpersuasive.

As discussed above, AMT has pled two incidents involving purported factual misrepresentations made by Agilent, namely the allegations of Paragraphs 28 and 29 of the Amended Counterclaim. When read in context with other supporting facts in the Amended Counterclaim, Paragraphs 28 and 29 provide a strong enough basis from which to infer a pattern of misconduct. [56]  As noted earlier, the reasonable import of the incidents described in Paragraphs 28 and 29 is that Agilent representatives embarked on a sales strategy that involved trash talking AMT to potential customers and distributors, and may have used this strategy with parties that will be revealed through discovery. Paragraphs 26 and 27, although not independently stating a claim of unfair competition or tortious interference, buttress the inference that disparaging comments by Agilent representatives may have been frequent.

Agilent's argument that the alleged misconduct is not ongoing because it is linked to this litigation is misplaced. Agilent essentially argues that all of its alleged misrepresentations were about this litigation, so the need for injunctive relief will be mooted when this litigation is resolved. But, whether the alleged misconduct may end at a fixed point in the future does not alter the fact that it may be ongoing now, and a post-trial injunction issued by this court might be justified during the pendency of later appellate proceedings. The cases Agilent relies on involved conduct that had clearly ended years before the DTPA claim was brought. [57]  Here, the alleged misrepresentations were ongoing to the point that they occurred *after* the filing of the Original Counterclaim. The fact that a party chooses to make an inherently time-limited matter like litigation the subject of its misrepresentations does not give it a free pass to spread falsehoods during the entire pendency of that matter. AMT had a basis when it filed its Amended Counterclaim for a "reasonable apprehension" that the alleged misrepresentations would be ongoing, at least until there was a final determination in this case, and AMT may therefore bring a claim under the DTPA.

### V. Conclusion

**\*11**  For the foregoing reasons, Agilent's Motion to Strike and Dismiss AMT's Verified Amended Counterclaim is denied. IT IS SO ORDERED.

Agilent Technologies, Inc. v. Kirkland, Not Reported in A.2d (2009)

**All Citations**

Not Reported in A.2d, 2009 WL 119865

---

### Footnotes

1       Verified Amended Counterclaim ("Am.Countercl.") ¶ 21.

2       Am. Countercl. ¶ 22.

3       Am. Countercl. ¶¶ 22-23.

4       Am. Countercl. ¶¶ 12-13.

5       Am. Countercl. ¶ 17.

6       Am. Countercl. ¶ 31. AMT also claims that, because the Halo Particles allowed customers to perform chromatography on standard equipment at speeds previously only available on specialized equipment, the Halo Particles posed a "very significant threat" to Agilent's sales of this specialized equipment. Am. Countercl. ¶ 20.

7       Am. Countercl. ¶¶ 22-24.

8       *Desimone v. Barrows,* 924 A.2d 908, 929 (Del.Ch.2007).

9       *Malpiede v. Townson,* 780 A.2d 1075, 1083 (Del.2001).

10      *In re Paxson Commc'n Corp. S'holders Litig.,* 2001 WL 812028, at *3 (Del.Ch. July 12, 2001) (citing *Solomon v. Pathe Commc'ns Corp.,* 672 A.2d 35, 38 (Del.1996).

11      *Haber v. Bell,* 465 A.2d 353, 357 (Del.Ch.1983).

12      *See* Ct. Ch. R. 15(d); *Cal. Pub. Employees' Ret. Sys. v. Coulter,* 2004 WL 1238443, at *7 (Del.Ch. May 26, 2004).

13      Am. Countercl. ¶ 28.

14      Am. Countercl. ¶ 29.

15      *See* 6A CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE ("WRIGHT & MILLER") § 1504 (2008).

16      *See* Ct. Ch. R. 15(a); Ct. Ch. R. 15(d).

17      When the Amended Counterclaim was filed in July 2008, Agilent had not yet filed any pleadings responsive to the Original Counterclaim. *See* Ct. Ch. R. 15(a) ("A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served....").

18      *See* 6A WRIGHT & MILLER § 1504.

---

19    2000 WL 193112, at * 2 (Del.Ch. Feb.8, 2000) (quoting *Citron v. Lindner,* 1985 WL 44689, at *1 (Del.Ch. Nov.14, 1985)) (citations omitted).

20    *See Cartanza v. Lebeau,* 2006 WL 903541, at *2 (Del.Ch. Apr.3, 2006) ("A court will not grant a motion to amend ... if the amendment would be futile.").

21    *Id.*

22    *Rypac Packaging Mach. Inc. v. Poges,* 2000 WL 567895, at *8 (Del.Ch. May 1, 2000).

23    *DeBonaventura v. Nationwide Mut. Ins. Co.,* 419 A.2d 942, 947 (Del.Ch.1980).

24    *Id.*

25    Am. Countercl. ¶ 26.

26    Am. Countercl. ¶ 27.

27    Am. Countercl. ¶ 28.

28    Am. Countercl. ¶ 29.

29    AMT Ans. Br. at 12-13 (citing *Lipson v. Anesthesia Servs. P .A.,* 790 A.2d 1261 (Del.Super.2001); *Kelly-Springfield Tire Co. v. D'Ambro,* 408 Pa.Super. 301, 596 A.2d 867 (Pa.Super.1991)); Agilent Rep. Br. at 4.

30    *See, e.g., Lipson,* 790 A.2d at 1284-86; *Kelly-Springfield,* 596 A.2d at 309.

31    *Kelly-Springfield,* 596 A.2d at 309 ("Appellant further averred that potential buyers, including National Life Insurance Co., had expressed interest but had been deterred by the pending legal action commenced by Stradley, Ronon. These averments, we conclude, were sufficient to demonstrate the existence of prospective contractual relations.").

32    *See, e.g., Wolk v. Teledyne Indus., Inc.,* 475 F.Supp.2d 491, 513 (E.D.Pa.2007) ("Nowhere in his complaint, or in his response to these defendants' motions to dismiss, has Wolk specified one prospective contract with which these defendants intentionally interfered."); *Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 79 (S.D.N.Y.1995) ("Counterplaintiffs' allegations are too vague to support a finding that they would have executed specific contracts but for interference by counterdefendants.").

33    Am. Countercl. ¶ 29.

34    *Lipson,* 790 A.2d at 1285.

35    *Wolk,* 475 F.Supp.2d at 512.

36    *Lipson,* 790 A.2d at 1285 (internal quotation omitted).

37    *See* Am. Countercl. ¶ 17 ("[The Halo Particles had] highly desirable features such as unusually high chromatographic efficiency not yet obtained with commercial particles.").

38    Am. Countercl. ¶ 29.

39    *Int'l Bus. Mach. Corp. v. Comdisco, Inc.,* 1993 WL 259102, at *21 (Del.Super. June 30, 1993) ("Only wrongful interferences will satisfy the tort, as some interferences are seen as justified or privileged under the aegis of competition."); *see also* RESTATEMENT (SECOND) OF TORTS § 767 cmt. c.

40    15 F.3d 1137 (D.C.Cir.1994). Other courts addressing similar unfair competition claims have also recognized that truthful statements are not actionable. *See, e.g., Int'l City Mgmt. Ass'n Ret. Corp. v. Watkins,* 726 F.Supp. 1, 6 (D.D.C.1989). (stating, in a case involving disclosure of ongoing litigation to one of the parties' customers,"[o]ne competitor is free to communicate truthful information about another competitor to a third person"); *C.R. Bard, Inc. v. Wordtronics Corp.,* 235 N.J.Super. 168, 561 A.2d 694, 697 (N.J.Super. Ct. Law Div.1989) ("It is not improper to give truthful information to a customer about someone else's product, and this is so even if the purpose is to interfere with an existing or prospective contractual relationship."); *see also* RESTATEMENT (SECOND) OF TORTS § 772 cmt. b. ("There is of course no liability for interference with a contract or with a prospective contractual relation on the part of one who merely gives truthful information to another.").

41    *Moldea,* 15 F.3d at 1144-45 (D.C.Cir.1994).

42    Tr. at 47-48.

43    *Moldea,* 15 F.3d at 1144.

44    Am. Countercl. ¶¶ 26-27.

45    *See DeBonaventura,* 419 A.2d at 947 (noting that elements of a tortious interference claim "must be considered in light of a defendant's privilege to compete or protect his business interests in a fair and lawful manner").

46    *Rypac,* 2000 WL 567895, at *8; *DeBonaventura,* 419 A.2d at 947.

47    Am. Countercl. ¶ 18.

48    By Agilent's own admission, "[t]his is a small enough industry that ... if [something] was happening, we'd all be hearing about it." Tr. at 53.

49    Am. Countercl. ¶ 29.

50    *EDIX Media Group, Inc. v. Mahani,* 2006 WL 3742595, at *11 (Del.Ch. Dec.12, 2006).

51    *See Bell Atlantic v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that recovery is very remote and unlikely." (internal quotation omitted)).

52    *EDIX Media Group,* 2006 WL 3742595, at * 12 (citing 6 *Del. C.* §§ 2532(a)(8), 2532(a)).

53    *Id.* (quoting *Grand Ventures, Inc. v. Whaley,* 662 A.2d 655, 661 (Del.Super.1992)).

54    *State ex rel. Brady v. Pettinaro Enters.,* 870 A.2d 513, 53 (Del.Ch.2005) ("[T]he failure of a party to be able to state a claim for injunctive relief at the time the suit is brought is fatal to claims under the Deceptive Trade Practices Act.").

55    *Id.* at 536.

56    *See State ex rel. Brady v. Fallon,* 1998 WL 283438, at *6 (Del.Super.Feb.27, 1998) (finding DTPA violation where attorney general presented two examples of violative trade practices at auto mechanic's shop).

57    *See, e.g., Pettinaro,* 870 A.2d at 536 (misleading conduct ceased five years before claim was brought); *Dionisi v. DeCampli,* 1995 WL 398536, at *14 (Del.Ch. June 28, 1995) (wrongful conduct ceased eight years before claim was brought).

---

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   12

# EXHIBIT C

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 21 of 164 PageID: 150

Argush v. LPL Financial, LLC, Not Reported in Fed. Supp. (2016)

2016 WL 7424260
Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

Lee ARGUSH, Plaintiff,

v.

LPL FINANCIAL, LLC, LP L Holdings Inc.,
Andrew Putterman, and Fortigent, LLC, Defendants.

Alan Gavornik, Plaintiff,

v.

LPL Financial, LLC, LP L Holdings Inc., Andrew
Putterman, and Fortigent, LLC, Defendants.

Nicholas Martnello, Plaintiff,

v.

LPL Financial, LLC, LP L Holdings Inc., Andrew
Putterman, and Fortigent, LLC, Defendants.

Civ. Nos. 13-7821, 14-955 (consolidated for pretrial
purposes), 14-956 (consolidated for pretrial purposes)

|

Signed 12/23/2016

**Attorneys and Law Firms**

Charles Allen Yuen, Robert E. Levy, Scarinci Hollenbeck
LLC, Lyndhurst, NJ, Joel N. Kreizman, Scarinci &
Hollenbeck, LLC, Red Bank, NJ, for Plaintiff.

Jennine Disomma, Saiber LLC, Florham Park, NJ, Geri L.
Albin, Jakob Benjamin Halpern, Saiber LLC, Newark, NJ, for
Defendants.

**OPINION**

THOMPSON, U.S.D.J.

**INTRODUCTION**

*1 This matter is before the Court upon multiple motions.
Two of the three plaintiffs in the above-captioned cases
consolidated for pretrial purposes, Alan Gavornik and
Nicholas Marinello (collectively "Gavornik and Marinello"),
have each moved for partial summary judgment on liability.
(Civ. No. 14-955, ECF No. 33; Civ. No. 14-956, ECF No.
33). Defendants LPL Financial, LLC ("LPL Financial") and
LPL Holdings, Inc. ("LPL Holdings") (collectively "LPL"

or "Defendants") oppose both motions. (Civ. No. 14-955,
ECF No. 44; Civ. No. 14-956, ECF No. 43). Plaintiff Lee
Argush ("Argush") has not moved for summary judgment.
Defendants have moved for partial summary judgment
on Counts Two and Three of Gavornik and Marinello's
respective complaints. (Civ. No. 13-7821, ECF No. 92).
Gavornik and Marinello oppose Defendants' motions. (Civ.
No. 13-7821, ECF No. 114). Defendants have also moved
for partial summary judgment on Counts Three and Seven of
Argush's Complaint. (Civ. No. 13-7821, ECF No. 91). Argush
opposes Defendants' motion. (Civ. No. 13-7821, ECF No.
112). The Court will address all of the parties' motions in
this omnibus opinion. The Court has decided the motions
based on the written submissions of the parties and a hearing
held on October 20, 2016. For the reasons stated herein,
Plaintiffs Gavornik and Marinello's motions will be denied
and Defendants' motions will be denied.

**BACKGROUND**

This case arises out of an employment dispute between
the three named Plaintiffs and Defendant LPL Financial.
Plaintiffs Argush, Gavornik and Marinello (collectively
"Plaintiffs") are former employees of LPL Financial. LPL
Holdings is the parent company of LPL Financial. All three
Plaintiffs had their employment terminated by LPL Financial
in 2013. The main issue is whether each of the three Plaintiffs
were validly terminated "for cause."

Prior to June 2011, Plaintiffs were directors and senior
officers of Concord Wealth Management Group ("Concord").
At that time, Concord was jointly owned by American Capital
Acquisition Partners, LLC ("ACAP") and Financial Services
Partners Fund I, LLC ("Financial Services") (collectively
"Sellers"). Plaintiffs were the sole members and owners of
ACAP. In June 2011, Concord, through its parent entity,
was acquired by LPL Holdings. The terms of LPL Holdings'
acquisition of Concord were set out in a document called the
Stock Purchase Agreement ("SPA").

Beginning in June 2011, Plaintiffs became employed by LPL
Financial. Both prior to and following the acquisition of
Concord by LPL Holdings, Plaintiffs were physically based in
an office in Matawan, New Jersey. The Plaintiffs individually
executed multiple documents concerning their employment
relationship with LPL Financial including Employment
Agreements, Stock Option Agreements, and the SPA. The
SPA contained a Delaware choice of law provision, while

the Employment Agreements contained no choice of law provision.

Under the employment agreements, in the event Plaintiffs were terminated, Plaintiffs were to receive certain benefits including salary, stock options, and a pro rata bonus for the year of termination. If Plaintiffs were terminated for cause, Plaintiffs would not receive some of these benefits. The definition of termination "for cause" that governed the employment relationship between the individual Plaintiffs and LPL Financial was contained in the SPA. Under the SPA, termination for "cause" is defined as follows:

> **\*2** (1) failure to substantially perform such Person's duties as an employee of LPL (other than as a result of a permanent disability) for a period of ninety (90) days following notice to LPL to such Person of such failure; (2) fraud, embezzlement, dishonesty or theft in connection with such Person's duties; (3) an act or acts constituting a felony, a violation of any federal or state securities or banking law or a misdemeanor involving moral turpitude; *(4) willful misfeasance, willful misconduct, or gross negligence in connection with such Person's duties or an act or omission which is injurious to the financial condition or business reputation of LPL*; or (5) breach of this Section 6.09.

(Civ. No. 14-955, ECF No. 33-3, Levy Decl. Ex. A.) (emphasis added).

### I. Plaintiffs Gavornik and Marinello

LPL Financial terminated Plaintiffs Gavornik and Marinello on December 27, 2013. LPL Financial claims that it validly terminated Gavornik and Marinello "for cause" because they "obstructed LPL in obtaining indemnification payments to which LPL was contractually entitled from an entity they controlled." (Civ. No. 14-956, ECF No. 43, Defs.' Opp'n. Br. at 1).

During May 2013, Defendants allege that LPL Holdings started to make written demands for indemnification on Gavornik and Marinello. (Civ. No. 14-956, ECF No. 43-1, Defs.' Resp. to Pls.' Statement of Undisputed Material Facts ("Defs.' Resp.") at ¶ 15). Defendants claim that the indemnification demands related to money paid by LPL for legal services that ACAP was contractually obligated to pay under an indemnification provision in the SPA. (Civ. No. 14-956, ECF No. 43, Defs.' Opp'n. Br. at 1-2). The parties agree that Gavornik and Marinello, together with Argush, owned ACAP. (Civ. No. 14-955, ECF No. 48-1, Pls.' Resp. to Defs.' Resp. Statement of Additional Undisputed Material Facts at ¶ 1). Defendants allege that ACAP was required to indemnify LPL and that Gavornik and Marinello obstructed LPL in obtaining the indemnification payments (Civ. No. 14-956, ECF No. 43, Defs.' Opp'n. Br. at 1). Gavornik and Marinello argue that while ACAP may have had indemnity obligations under the SPA, Gavornik and Marinello were not individually obligated to indemnify LPL. (Civ. No. 14-956, ECF No. 33-2, Pls.' Mot. at 2-3).

Defendants allege that multiple written communications were sent to Gavornik and Marinello requesting that the outstanding monies be reimbursed, yet no payment was made. (*Id.* at 2). Shortly thereafter, LPL Financial terminated Plaintiffs Gavornik and Marinello on December 27, 2013.

### II. Plaintiff Argush

Plaintiff Argush was terminated roughly four months earlier, and on a different basis, than Gavornik and Marinello. Argush was terminated on August 6, 2013. (Civ. No. 13-7821, ECF No. 121-1, Defs.' Resp. to Pl.'s SUMF at ¶ 116). LPL Financial claims that it validly terminated Argush for cause because Argush "willfully and repeatedly violated LPL's written directive to him to work remotely." (Civ. No. 13-7821, ECF No. 91-1, Defs.' Mot. at 1).

On July 30, 2013, Argush had a meeting with Andrew Putterman, his direct supervisor ("Putterman"), Anna Orsenigo, a Vice President of Human Resources of LPL Financial ("Orsenigo") and Gavornik ("July 30th Meeting"). (Civ. No. 13-7821, ECF No. 112-1, Pl.'s Resp. to Defs.' SUMF at ¶ 44). At that meeting, Argush alleges that Putterman orally communicated to him that he was permitted to continue to come into the office to work until LPL Financial could set up Argush with the capability to work remotely. (Civ. No. 13-7821, ECF No. 112, Pl.'s Opp'n. Br. at 2).

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 23 of 164 PageID: 152

Argush v. LPL Financial, LLC, Not Reported in Fed. Supp. (2016)

**\*3** LPL Financial maintains that notwithstanding any alleged oral communication at the July 30th meeting, LPL Financial sent Argush four clear written directives after the July 30th meeting instructing Argush that he was not to report to the office to work without first receiving advance permission. LPL Financial further alleges that Argush disregarded its written directives continued to report to the office on August 1st, 2nd, 5th, 6th, and 7th. (Civ. No. 13-7821, ECF No. 121-1, Defs.' Reply SUMF at ¶¶ 52, 55, 58, 61). LPL Financial claims that it terminated Argush's employment on August 6th via email. (*Id.* at ¶¶ 62, 64; Civ. No. 13-7821, ECF No. 91-3, DiSomma Decl. Ex. 19). In essence, LPL Financial claims that, as a result of Argush's failing to abide by its clear directives, it validly terminated Argush "for cause" pursuant to Section 6.09 of the SPA due to Argush's "willful misfeasance, willful misconduct, or gross negligence in connection with such Person's duties or an act or omission which is injurious to the financial condition or business reputation of LPL." (*Id.* at ¶¶ 62, 63).

### III. Procedural History

*Argush v. LPL Financial, et al.* is the lead case, which was removed from Superior Court of New Jersey, Law Division, Monmouth County, to this Court in December 2013. (Civ. No. 13-7821, ECF No. 1). *Gavornik v. LPL Financial, et. al.* and *Marinello v. LPL Financial, et. al.* (Civ. No. 14-956) were both filed in this Court in February 2014. (Civ. No. 14-955, ECF No. 1; Civ. No, 14-956, ECF No. 1). The three cases have been consolidated for pretrial purposes. (*See* Civ. No. 13-7821, ECF No. 27). On August 5, 2014, this Court granted in part Defendants' motion to dismiss in each of the three cases. [1] (Civ. No. 13-7821, ECF No. 22; Civ. No. 14-955, ECF No. 20; Civ. No. 14-956, ECF No. 20). Additionally, on August 24, 2016 this Court granted Defendants' Motion to Dismiss Count Four of Plaintiffs' Respective Complaints, which sought a declaratory judgment that Plaintiffs' restrictive covenants were null and void. (Civ. No. 13-7821, ECF No. 110). As a result, in each case, Plaintiff has two remaining claims against Defendants: Breach of Employment Agreement and Breach of Contract.

Currently before the Court are five motions for summary judgment in these consolidated cases: (1) Plaintiff Gavornik's Motion for Partial Summary Judgment on Liability (Civ. No. 14-; 955, ECF No. 33); (2) Plaintiff Marinello's Motion for Partial Summary Judgment on Liability (Civ. No. 14-956, ECF No. 33); (3) Defendants' Motion for Summary Judgment on Counts Two and Three of Plaintiff Gavornik and Plaintiff Marinello's Respective Complaints (Civ. No. 13-7821, ECF No. 92); (4) Defendants' Motion for Summary Judgment on Count Four of All Plaintiffs' Respective Complaints (Civ. No. 13-7821, ECF No. 94); [2] (5) Defendants' Motion for Summary Judgment on Counts Three and Seven of Plaintiff Argush's Complaint (Civ. No. 13-7821, ECF No. 91). The third Plaintiff in these consolidated cases, Argush, did not move for summary judgment.

### LEGAL STANDARD

Summary judgment is appropriate if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In deciding a motion for summary judgment, a district court considers the facts drawn from "the pleadings, the discovery and disclosure materials, and any affidavits" and must "view the inferences to be drawn from the underlying facts in the light most favorable to the party opposing the motion." Fed. R. Civ. P. 56(c); *Curley v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002) (internal quotations omitted). In resolving a motion for summary judgment, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986). More precisely, summary judgment should be granted if the evidence available would not support a jury verdict in favor of the nonmoving party. *Id.* at 248-49. The Court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### ANALYSIS

### I. Plaintiff Gavornik and Plaintiff Marinello's Summary Judgment Motions

**\*4** Initially, the Court notes that Gavornik and Marinello submitted virtually identical motions for summary judgment on liability. Therefore, the Court will address both Plaintiffs' motions in this section. Gavornik and Marinello each have two remaining claims in this case: Breach of Employment Agreement and Breach of Contract. (*See* Civ. No. 14-955, ECF Nos. 20-21; Civ. No. 14-956, ECF Nos. 20-21). Both Plaintiffs move for partial summary judgment on liability on

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 24 of 164 PageID: 153

Argush v. LPL Financial, LLC, Not Reported in Fed. Supp. (2016)

these claims. There are two main issues that the Court must address: (1) what law applies to this dispute and (2) whether LPL Financial's termination of the Plaintiffs constitutes a Breach of Contract or Breach of Employment Agreement.

### a. Choice of Law Analysis

The first issue that the Court must address is what law applies to the present dispute. Defendants argue that Delaware law should apply, while Gavornik and Marinello appear to argue that New Jersey law applies. (Civ. No. 14-956, ECF No. 43, Defs.' Opp'n. Br. at 16 n. 9 *citing* Civ. No. 13-7821, ECF No. 92-1, Defs.' Opp'n. Br. at 17–18; Civ. No. 14-955, ECF No. 33-1). A federal court sitting in diversity applies the forum state's choice of law rules to determine what substantive law applies. *See Klaxon Co. v. Stentor Elec. Mfg.*, 313 U.S. 487, 496–98 (1941); *see also Lebegern v. Forman*, 471 F.3d 424, 428 (3d Cir. 2006) (noting "[a]s this was a diversity case filed in New Jersey, New Jersey choice of law rules govern"). New Jersey choice of law principles require a Court to first determine if there is an actual conflict between two potentially applicable laws. If there is no conflict, then because a New Jersey court would apply its own law in such a case, a federal court sitting in diversity must also apply New Jersey law. *Lebegern*, 471 F.3d at 428. Here, while Defendants argue that Delaware law should apply, Defendants concede that there is no relevant conflict between Delaware law and New Jersey law. (Civ. No. 14-956, ECF No. 43, Defs.' Opp'n. Br. at 16 n. 9). Therefore, the choice of law inquiry ends there, and New Jersey law applies to the dispute.

### b. Counts Two and Three: Breach of Employment Agreement and Breach of Contract

In order to state a claim for breach of contract in New Jersey, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot, Inc.*, 507 F.3d 188, 204 (3d Cir. 2007). The main issue that the Court must address with respect to the alleged breach of contract here is whether LPL Financial validly terminated each Plaintiff "for cause." Under New Jersey law, a termination is considered "for cause" if the termination is "based on facts that are (1) supported by substantial evidence and (2) are reasonably believed by the employer to be true and also (3) is not for an arbitrary, capricious, or illegal reason," *Spano v. JP Morgan Chase Bank*, 2011 WL 6934837, at *6 (D.N.J. Dec. 30, 2011) (quoting *Maietta v. United Parcel Serv.*, 749 F. Supp. 1344, 1363 (D.N.J. 1990)).

Here, the parties agree that the definition of termination for "cause" was contained in the SPA. In relevant part, Section 6.09 of the SPA defines "cause" as "willful misfeasance, willful misconduct, or gross negligence in connection with such Person's duties or an act or omission which is injurious to the financial condition or business reputation of LPL." (Civ. No. 14-955, ECF No. 33-3, Levy Decl. Ex. A). Defendants allege that Gavornik and Marinello were terminated as a result of their performing an "act or omission which is injurious to the financial condition or business reputation of LPL." (Civ. No. 14-956, ECF No. 43-1, Defendants' Resp. at ¶ 41). Specifically, Defendants claim that Gavornik and Marinello were terminated "for cause" for failing to abide by their indemnification obligations in the SPA which required Plaintiffs to indemnify LPL for certain legal fees paid by LPL. (Civ. No. 14-956, ECF No. 43, Defs.' Opp'n Br. at 1-2).

**\*5** The relevant indemnification provision in the SPA[3] specifically refers to the indemnification obligations of the "Sellers" for the purposes of that agreement. Under the SPA, the "Sellers" were ACAP and Financial Services. (Civ. No. 14-956, ECF No. 43-1, "Defs.' Resp." at ¶ 17). Gavornik and Marinello were two of the three owners and members of ACAP. (*Id.* at ¶ 1).

Gavornik and Marinello argue that they had no obligation to personally indemnify LPL and that their "reasonable refusal to pay an obligation not owed cannot be an 'act or omission which is injurious to the financial condition or business reputation of LPL.' " (Civ. No. 14-955, ECF No. 48, Pl.'s Reply Br. at 8). Gavornik and Marinello also argue that LPL's financial condition was not injured by any act or omission of Gavornik and Marinello because $500,000 of the purchase price paid by LPL to acquire Concord was set aside in an escrow account to secure the debt supposedly in issue. (*Id.* at 2–3). As a result, Gavornik and Marinello claim that they did not commit an act or omission injurious to the financial condition or business reputation of LPL, and therefore, LPL Financial lacked cause to terminate their employment. Defendants argue that ACAP could only act through the Plaintiffs, and as a result, Gavornik and Marinello had an obligation to indemnify or cause ACAP to indemnify LPL. (Civ. No. 14-956, ECF No. 43, Defs.' Opp'n. Br. at 2). Defendants claim that this failure to cause LPL Holdings to be indemnified was a valid ground for terminating Plaintiffs for cause.

The Court is persuaded that there is a genuine factual dispute as to whether Gavornik and Marinello had an obligation to indemnify LPL, or cause LPL to be indemnified, under the SPA. The Court is similarly persuaded that a genuine factual dispute exists as to whether Gavornik and Marinello had the ability to cause ACAP to fulfill its indemnification obligation under the SPA, or whether unanimous consent of all three members of ACAP would be required. Therefore, material questions of fact still remain as to whether Gavornik and Marinello committed acts or omissions which were injurious to the financial condition or business reputation of LPL and whether Gavornik and Marinello were validly terminated for cause. Gavornik and Marinello have not sufficiently demonstrated that LPL Financial is liable for breach of contract and Gavornik and Marinello's motions for partial summary judgment on liability must be denied.

## II. Defendants' Summary Judgment Motions on Counts Two and Three of Plaintiff Gavornik and Marinello's Respective Complaints

**\*6** Defendants move for summary judgment on Counts Two and Three of Gavornik and Marinello's respective complaints, the same counts just discussed in the previous section analyzing Gavornik and Marinello's summary judgment motions. (Civ. No. 13-7821, ECF No. 92). On Defendants' Motion for Summary Judgment, the parties make very similar arguments to those which were made on Gavornik and Marinello's motions for partial summary judgment on liability. The Court is persuaded that the same factual issues that precluded Gavornik and Marinello from prevailing on their motions also preclude Defendants from prevailing on their motion for summary judgment. Therefore, for the reasons discussed in the preceding section, Defendants' motions for summary judgment on counts two and three of Gavornik and Marinello's respective complaints are denied.

## III. Defendants' Summary Judgment Motion on Counts Three and Seven of Plaintiff Argush's Complaint

### a. Choice of Law Analysis

As noted the Background section of this Opinion, the facts relating to Plaintiff Argush's claims are distinct. To reiterate, the Court must first address what law applies here. Argush argues that New Jersey law should apply, while Defendants argue that Delaware law should apply. (ECF No. 91-1, Pl.'s Br. at 11–12; ECF No. 11.2, Defs.' Opp. Br, at 24–28). As discussed *supra* in Section I(a) of the Analysis Section of this Opinion, if there is no conflict between two potentially

applicable laws, and a New Jersey court would apply its own law, a federal court sitting in diversity must also apply New Jersey law. *Lebegern*, 471 F.3d at 428. Here, the parties agree that there is no relevant conflict between Delaware law and New Jersey law. (ECF No. 91-1, Pl.'s Br. at 11 n.5; ECF No. 112, Defs.' Opp. Br, at 24), Therefore, the choice of law inquiry ends there, and New Jersey law applies to the dispute.

### b. Counts Three and Seven: Breach of Contract and Breach of Employment Agreement

Argush's Corrected Amended Complaint contains two separate breach of contract claims. Defendants argue that no breach occurred because Argush was terminated for cause, and thus, Argush cannot prevail on his breach of contract claims. Argush argues that genuine issues of material fact remain as to whether or not Argush was validly terminated for cause, and Defendants' summary judgment motion must be denied. In order to state a claim for breach of contract in New Jersey, a plaintiff must allege "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot, Inc.*, 507 F.3d 188, 204 (3d Cir. 2007).

When the alleged contractual breach consists of termination without cause, a Court must determine whether just cause existed at the time of termination. In New Jersey, "[a] discharge for just cause is defined as one that is 'based on facts that are (1) supported by substantial evidence and (2) are reasonably believed by the employer to be true and also (3) is not for any arbitrary, capricious, or illegal reason.' " *Spano v. JP Morgan Chase Bank, N.A.*, 2011 WL 6934837 at *6 (D.N.J. Dec. 30, 2011) (quoting *Maietta v. United Parcel Serv., Inc.*, 749 F. Supp. 1344, 1363 (D.N.J. 1990)).

Here, the parties agree that the definition of termination for "cause" was contained in the SPA. In relevant part, Section 6.09 of the SPA defines "cause" as "willful misfeasance, willful misconduct, or gross negligence in connection with such Person's duties." (Civ. No. 13-7821, ECF No. 112-1, Pl.'s Resp. to Defs.' SUMF at ¶ 13); Additionally, it is undisputed that the Offer Letter signed by both parties included a provision that defined Argush's employment as "at-will" and permitted LPL Financial to modify Argush's work responsibilities.[4] (*Id.* at ¶ 19). It is also undisputed that on July 30, 2013, Argush had a meeting with Andrew Putterman, his direct supervisor ("Putterman"), Anna Orsenigo, a Vice President of Human Resources of LPL

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 26 of 164 PageID: 155

Argush v. LPL Financial, LLC, Not Reported in Fed. Supp. (2016)

Financial ("Orsenigo"), and Plaintiff Gavornik ("July 30th Meeting"). (Civ. No. 13-7821, ECF No. 112-1, Pl.'s Resp. to Defs.' SUMF at ¶ 44).

**\*7** Defendants argue that Argush was validly terminated with cause as a result of his engaging in willful malfeasance and misconduct. Specifically, Defendants argue that Argush violated four separate written directives [5] instructing Argush to work remotely and also that he should not report to the office to work without first receiving advance permission, including one directive sent on August 5th by his direct supervisor, Putterman. (Civ. No. 13-7821, Defs.' Br., ECF No. 91-1 at 16). Defendants claim that these written directives were an exercise of the right afforded to LPL Financial in the Employment Agreement to modify Argush's work responsibilities. (*Id.* at ¶ 13). Essentially, Defendants argue that Argush was validly terminated for cause on August 6th for engaging in willful malfeasance and misconduct by violating these directives and reporting to the office on August 1st, 2nd, 5th and 6th.

Argush argues that, at the July 30th meeting, he received oral permission to continue to report to the office from his direct supervisor, Putterman, and that the aforementioned written directives contradicted this oral permission. Argush claims that Putterman granted him permission to continue to report to the office until LPL Financial could adequately set up capabilities for Argush to work remotely. (Civ. No. 13-7821, Pl. Opp'n. Br., ECF No. 112 at 2). Argush supports this claim with his own deposition testimony (Civ. No. 13-7821, ECF No. 91-3, DiSomma Decl. Ex. 6 (Argush Dep. Tr.) at 277:17-277:21) and with deposition testimony of Plaintiff Gavornik (Civ. No. 13-7821, ECF No. 91-3, DiSomma Decl. Ex. 8 (Gavornik Dep. Tr. at 209:12-209:21)). Considering these two distinct narratives, the Court is persuaded that there

exist genuine issues of material fact as to whether Argush had permission to report to the office on August 1st, 2nd, and 5th and whether his reporting to the office on those days constituted willful misconduct or malfeasance sufficient to terminate him for cause.

Argush also argues that he did not receive the August 5th email from Putterman until after he arrived at the office on the morning of August 6th. (Civ. No. 13-7821, Pl. Opp'n. Br., ECF No. 112 at 2). Whether or not Argush received and was aware of the only written directive issued by his direct supervisor instructing him not to report to the office similarly is a factual dispute that is not appropriate for resolution on this record.

Viewing the evidence in the light most favorable to the non-moving party, the Court is persuaded that genuine issues of material fact remain as to whether Argush's conduct constituted willful misconduct or malfeasance and whether Argush was validly terminated for cause. These types of factual disputes can be only resolved at trial. As a result, Defendants' Motion for Summary Judgment on Counts Three and Seven of Argush's Complaint will be denied.

## CONCLUSION

For the foregoing reasons, Plaintiff Gavornik and Marinello's motions for summary judgment will be denied and Defendants' motions for summary judgment will be denied. An appropriate order will follow.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 7424260

---

## Footnotes

1    The Court dismissed each of the Plaintiffs' claims for: (1) violation of the Conscientious Employee Protection Act ("CEPA"); and (2) tortious interference. The Court also dismissed Plaintiff Argush's claims for breach of the covenant of good faith and fair dealing and conversion.

2    As a result of this Court's dismissal of Count Four of Plaintiffs' respective complaints (*See* Civ. No. 13-7821, ECF No. 110), this motion is now moot.

3    In relevant part, the provision reads:

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 27 of 164 PageID: 156

Argush v. LPL Financial, LLC, Not Reported in Fed. Supp. (2016)

Section 10.01. Indemnification by the Sellers.

(a) Indemnification. Subject to the limitations and other provisions set forth in this ARTICLE X, from and after the Closing, each Seller shall jointly and severally indemnify and hold harmless Buyer [LPL] and its Affiliates (including, following the Closing, each Acquired Company), and the Representatives, Affiliates, successors and assigns of each of the foregoing Persons (each, a "Buyer Indemnified Person"), from, against and in respect of any and all Actions, Liabilities, Governmental Orders, Encumbrances, losses, damages, bonds, dues, assessments, fines, penalties, Taxes, fees, costs (including costs of investigation, defense and enforcement of this Agreement), expenses or amounts paid in settlement (in each case, including reasonable attorneys' and experts' fees and expenses), whether or not involving a Third Party Claim (collectively, "Losses"), incurred or suffered by Buyer Indemnified Persons or any of them as a result of, arising out of or relating to, directly or indirectly:

...

(v) the facts related to the SEC Review; or

(vi) the Third Party Claim identified on Schedule 10.01 (a)(vi) (which Third Party Claim will be subject to the provisions of Section 10.04); provided, however, that Buyer agrees to reimburse Sellers for 50% of any Losses arising out of the Third Party Claim identified on Schedule 10.01(a)(vi) up to a maximum reimbursement of one hundred thousand dollars ($100,000), such amount to be payable upon final resolution or settlement of the Third Party Claim.

(Civ. No. 14-955, ECF No. 48-1, Pls.' Resp. to Defs.' Resp. Statement of Additional Undisputed Material Facts at ¶ 16).

4    The relevant text of this provision reads: "If you accept our offer, your employment with LPL Financial will be "at-will." This means your employment is not for any specific period of time and can be terminated by you at any time for any reason. Likewise, LPL Financial may terminate the employment relationship at any time, with or without "Cause" or advance notice. In addition, LPL Financial reserves the right to modify your position, duties or reporting relationship to meet business needs and to use discretion in deciding on appropriate discipline. No such modification or exercise of discretion shall be treated as termination without "Cause." Any change to the at-will employment relationship must be by a specific, written agreement signed by you and the LPL Financial President. Any obligation to pay severance, if any, on account of a termination by the Company without "Cause" hereunder shall not change the nature of your employment as "at-will." (*Id.* at ¶ 19).

5    The written directives consisted of four documents: (1) a July 30th Memorandum from Orsenigo; (2) a July 31st email from Orsenigo; (3) an August 2nd email from another Vice President of Human Resources of LPL Financial, Ron McGuire ("McGuire"); and (4) an August 5th email from Putterman. (Civ. No. 13-7821, Defs.' Mot., ECF No. 91-1 at 12-16).

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT D

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 29 of 164 PageID: 158

Brauser Real Estate, LLC v. Meecorp Capital Markets, LLC, Not Reported in F.Supp.2d...

2008 WL 324402

Only the Westlaw citation is currently available.

NOT FOR PUBLICATION

United States District Court, D. New Jersey.

BRAUSER REAL ESTATE, LLC, Plaintiff,

v.

MEECORP CAPITAL MARKETS, LLC,

Michael Edrei and Daniel Edrei, Defendants.

Civil Action No. 06–cv–01816 (SDW).

|

Feb. 4, 2008.

**Attorneys and Law Firms**

Frank M. Graziadei, Lincoln Park, NJ, for Plaintiff.

Daniel Seth Eichorn, Schiffman, Abraham, Kaufman & Ritter, PC, Robert L. Ritter, Schiffman, Berger, Abraham, Hackensack, NJ, for Defendants.

**OPINION**

WIGENTON, District Judge.

**\*1** Before the Court is Meecorp Capital Markets, LLC ("Meecorp"), Michael Edrei and Daniel Edrei's (collectively "Defendants") motion for partial summary judgment ("Motion") pursuant to Federal Rule of Civil Procedure 56(c). Defendants also filed a counterclaim ("Counterclaim") against plaintiff Brauser Real Estate, LLC ("Plaintiff") for breach of contract. Plaintiff filed opposition to the Motion and made a cross-motion for partial summary judgment ("Cross–Motion") requesting the following: (1) dismissal of Defendants' Counterclaim with prejudice; or, alternatively, (2) dismissal of the portion of Defendants' Counterclaim which seeks to recover a loan exit fee ("Exit Fee") and interest; and, alternatively, (3) leave to amend the Amended Complaint. The Court decides this matter upon having considered the parties' submissions and oral arguments on November 19, 2007. For the reasons discussed below, the Court grants Defendants' Motion and grants in part and denies in part Plaintiff's Cross–Motion.

**Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332, as the parties have diversity of citizenship and the amount in controversy exceeds $75,000.

**Background**

Plaintiff is a Florida limited liability company with a principal place of business in Broward County, Florida. (Pl.'s Opp'n. at 2.) In 2003, Plaintiff sought financing for the development of a thirty-two acre commercial property in Broward County, Florida (the "Property"). Defendant Meecorp, a New Jersey limited liability company with a principal place of business in Fort Lee, New Jersey, is a lender that provides loans to commercial borrowers. (Defs.' Mem. at 3.) Plaintiff claims that Meecorp approached Plaintiff with an interest in providing financing. [1] Plaintiff also claims that Meecorp's Managing Director, Michael Edrei ("M.Edrei"), and Managing Member/Director, Daniel Edrei ("D.Edrei") negotiated a loan with Plaintiff.

On or about October 10, 2003, Meecorp presented Plaintiff with a "Letter of Interest/Term Sheet" for a proposed "Construction/Bridge" revolving loan in the amount of $28,000,000 ("Letter of Interest"). The Letter of Interest required Plaintiff to provide Meecorp with a non-refundable application fee of $25,000 ("Application Fee") in exchange for a draft loan commitment. Plaintiff paid the Application Fee. [2] (Pl.'s Opp'n at 4.)

On or about November 18, 2003, Defendant Meecorp delivered a loan commitment ("Loan Commitment") to Plaintiff. [3] Pursuant to the Loan Commitment, Meecorp would loan Plaintiff up to $20,000,000 with a first mortgage lien on the Property as collateral. (Loan Commitment at 1–2.) Additionally, a non-refundable commitment fee ("Commitment Fee") of three percent of the total $20,000,000 amount was required, with one percent to be paid upon signing, and the balance due at closing. [4] (Pl.'s Opp'n at 4–5.) In December 2003, Plaintiff executed the Loan Commitment and paid $200,000. (Brauser Aff.¶ 8.)

**\*2** On June 7, 2004, Defendants sent a letter requesting Plaintiff close the loan after over two months of postponement. (Defs.' Mem. at 5.) The loan did not close and Plaintiff subsequently requested that the $225,000 it paid in fees (i.e., $25,000 Application Fee plus $200,000 of the Commitment Fee) be refunded, claiming the Loan Commitment was illegal. (Pl.'s Am. Compl. ¶¶ 52, 53.) On November 30, 2005, after Meecorp refused to refund the fees,

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 30 of 164 PageID: 159

Brauser Real Estate, LLC v. Meecorp Capital Markets, LLC, Not Reported in F.Supp.2d...

Plaintiff filed suit in the Circuit Court of the Seventeenth Judicial Circuit in Florida. Plaintiff asserted the following five counts against Defendants: violation of the Loan Broker Act, Fla. Stat. § 687.14 *et seq.* ("Florida's LBA") (Count I); restitution against Meecorp (Count II); unjust enrichment against Meecorp (Count III); rescission (Count IV); and violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA") (Count V). (*See* Pl.'s Compl.)

On December 27, 2005, Defendants removed the case to the United States District Court for the Southern District of Florida. (Defs.' Mot. to Transfer.) On March 9, 2006, Plaintiff amended its Complaint to add the following additional counts against Defendants: violation of Chapter 494, Fla. Stat. (requiring mortgage brokers to be licensed in the State of Florida) (Count VI); and violation of Chapter 494, Fla. Stat. (requiring mortgage lenders to be licensed in the State of Florida) (Count VII). (Pl.'s Am. Compl. at 12–13.) In response, Defendants filed the Counterclaim on March 23, 2006, asserting Plaintiff was in breach of the contract.[5] (Defs.' Answer at 11.) The case was transferred in its entirety to this Court on April 11, 2006 because, as the Florida Court held, the "claims fell within the broad language" of the Loan Commitment's New Jersey forum selection clause. (Order for Transfer at 6.) On April 30, 2007, Defendants filed the Motion, seeking to dismiss Plaintiff's Amended Complaint with prejudice.

**Legal Standard**

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute is genuine if a reasonable jury could return a verdict for the nonmovant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett,* 477 U.S. 317, 318 (1986).

Once the moving party meets the initial burden, the burden then shifts to the nonmovant who must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Shields v. Zuccarini,* 254 F.3d 476, 481 (3d Cir.2001). The court may not weigh the evidence and determine the truth of the matter; rather, the court must determine whether there is a genuine issue as to a material fact. *Anderson,* 477 U.S. at 249. In doing so, the court must construe the facts and inferences in the light most favorable to the nonmoving party. *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 520 (1991).

**Discussion**

**\*3** The parties disagree as to the validity and enforcement of the Loan Commitment. To resolve this dispute, the Court must first address the choice-of-law issue and determine the validity of the Loan Commitment as an enforceable contract. The Court will then discuss whether the Loan Commitment supersedes previous documents signed by the parties, specifically the Letter of Interest. Next, the Court will analyze Plaintiff's claims for rescission, restitution and unjust enrichment in association with the Loan Commitment and Defendants' Counterclaim. Finally, the Court will address Plaintiff's assertion of a claim under the New Jersey Consumer Fraud Act, or in the alternative, Plaintiff's request to amend the Amended Complaint.

*A. Contract Validity and Governing Law*

Defendants assert that pursuant to the Loan Commitment, the parties chose New Jersey law to govern their contract and that selection should be enforced. (Loan Commitment at 5; Defs.' Reply Br. at 17.) Defendants argue that because New Jersey law, not Florida law, applies to the Loan Commitment, "the claims set forth in [Plaintiff's] complaint, which are based solely on Florida statutes, fail as a matter of law." (Defs.' Mem. at 2.) Plaintiff argues that despite the New Jersey choice-of-law provision, the illegality and unenforceability of the Loan Commitment and Letter of Interest should be assessed pursuant to Florida law. (Pl.'s Opp'n at 11–18.) For the reasons set forth below, the Court determines that New Jersey law governs the contract and related non-contract issues in this matter.

*1. Contract Language*

The Court will enforce the terms of a contract that is unambiguous on its face. *Statewide Realty Co. v. Fidelity Mgmt. & Research Co., Inc.,* 259 N.J.Super. 59, 68 (1992). Further, courts in this jurisdiction have repeatedly honored choice-of-law provisions that explicitly state a particular

governing law without regard to conflicts of law. *See Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 159 (3d Cir.1999).

In this instance, the parties clearly selected New Jersey law to govern the Loan Commitment. Specifically, the Loan Commitment provides, "[t]his commitment will be governed by and construed in accordance with *the laws of the State of New Jersey* without regard to the principles of conflict of laws thereof." (Loan Commitment at 5) (emphais added). Thus, the parties' intention that New Jersey law would apply to the executed Loan Commitment is clear and unambiguous. As Defendants correctly assert, "[t]he language throughout the Loan Commitment unambiguously reveals the parties mutual intent to have New Jersey law and only New Jersey law, apply to the subject claims." (Defs.' Reply Br. at 1.) Therefore, based on the contract language alone, and without engaging in a choice-of-law analysis, New Jersey law would govern.

### 2. Choice–of–Law Analysis

Plaintiff claims that Defendants violated two specific Florida Statutes: (1) the Mortgage Brokerage Act, Chapter 494, Fla. Stat., requiring mortgage brokers and mortgage lenders to be licensed in the State of Florida and, (2) LBA § 687.14, *et seq.,* prohibiting any loan broker from collecting advance fees from a borrower to provide services. (Pl.'s Am. Compl. at 4, 10, 12.) Because of the Loan Commitment's alleged illegality, Plaintiff urges the Court to engage in a choice-of-law analysis pursuant to Restatement (Second) of Conflict of Laws § 202 (1971) ("Restatement"). [6] Under this analysis, Plaintiff argues that the Loan Commitment is illegal and therefore cannot be enforced as Defendants engaged in unlicensed mortgage brokerage and prohibited lending and collection of advance fees under Florida law. (Pl.'s Opp'n at 10–17.) New Jersey law does not have similar statutes for licensing mortgage lenders and prohibiting the collection of advanced fees.

 **\*4**  Defendants maintain that "even if the Florida statutes were violated by Meecorp, the New Jersey choice-of-law provisions [govern] and the Loan Commitment should still be enforced." (Defs.' Reply Br. at 17; Defs.' Supp. at 1–4, Ex. A.) Thus, Defendants contest a section 202 analysis by the Court, asserting that "when the parties have made a choice of law, even if there is an issue of illegality, the court is to look to [section] 187 of the [Restatement]." For the reasons set forth below, the Court agrees that section 187 of the Restatement is the appropriate choice-of-law analysis in the instant matter.

In determining whether a choice-of-law provision in a contract is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Homa v. Am. Express Co.,* 496 F.Supp.2d 440, 447 (D.N.J.2007). New Jersey generally gives effect to contracting parties' choice-of-law clauses unless they conflict with New Jersey public policy. *See Kalman Floor Co., Inc. v. Joseph Muscarelle, Inc.,* 196 N.J. Super 481 (1984); *Citibank v. Errico,* 251 N.J.Super. 236 (1991). In this instance, giving effect to the choice-of-law provision contained in the Loan Commitment would not conflict with the public policy of New Jersey.

New Jersey's choice-of-law rules is similar to those set forth in section 187 of the Restatement. *Homa v. Am. Express Co.,* 496 F.Supp.2d at 447. A choice-of-law provision will therefore govern unless

> "(1) ... the state chosen has no substantial relationship to the parties or the transaction [and there is no other reasonable basis for the parties' choice]; or (2) application of the law chosen would conflict with a *fundamental public policy* of a state having a *greater interest* in a determination of a particular issue and [the law] of such state would be applicable in the absence of the choice of law provision under the governmental-interest analysis."

*Id.* (citing *Prudential Ins. Col. of Am. v. Nelson,* 11 F.Supp.2d 572, 578 (D.N.J.1998); Restatement (Second) of Conflict of Law § 187(2)(a) (emphasis added).

The Court is satisfied that New Jersey, the state expressly chosen to govern the Loan Commitment, has a substantial relationship to the parties or the transaction. First, Defendant is a New Jersey limited liability company with a principal place of business in Fort Lee, New Jersey. (Defs.' Mem. at 3.) Second, the parties' intention that New Jersey law apply to the executed Loan Commitment is clear and unambiguous. As mentioned, the Loan Commitment provides that it "will be governed by and construed in accordance with the laws of the State of New Jersey without regard to the principles of conflict of laws thereof." (Loan Commitment at 5.) Further,

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 32 of 164 PageID: 161

Brauser Real Estate, LLC v. Meecorp Capital Markets, LLC, Not Reported in F.Supp.2d...

the language in the Loan Commitment shows the parties' mutual intent to have New Jersey law apply to the subject claims. (Defs.' Reply Br. at 1.) Finally, although it is disputed whether Defendants went to Florida to negotiate the terms of the Loan Commitment, the parties' submissions do show that the Loan Commitment was prepared in New Jersey and the money to be loaned would come from New Jersey. (Pl.'s Statement of Facts at 2.) Thus, the first prong of the section 187 analysis is satisfied and the New Jersey choice-of-law provision in the Loan Commitment cannot be rendered unenforceable on the ground that New Jersey has no substantial relationship in this matter.

**\*5** Further, the New Jersey choice-of-law provision in the Loan Commitment can be rendered unenforceable under the second prong of the section 187 analysis. The second prong requires the Court to determine whether the law chosen, New Jersey, conflicts with "a fundamental public policy of a state having a *greater interest* in a determination of a particular issue and [whether the law] of such state would be applicable in the absence of the choice of law provision under the governmental-interest analysis." *Homa,* 496 F.Supp. at 447 (emphasis added); *see also* Restatement (Second) of Conflict of Laws § 187(2)(b). Florida indeed has an interest in this matter, as the Plaintiff is in Florida and the subject Property or collateral for the loan is in Florida. However, the Court does not find Florida to have a greater interest or materially greater interest than New Jersey. As stated, Meecorp is a New Jersey limited liability company and has its principal place of business in New Jersey, the Loan Commitment was generated in New Jersey, the funds would have been generated from New Jersey and the parties intended for New Jersey law to govern the Loan Commitment as clearly and unambiguously set forth in the Loan Commitment.

Even assuming Florida had a greater interest in this matter, this Court cannot find that "application of the law of the chosen state [New Jersey] would be contrary to a *fundamental policy* of a state which has a *materially greater interest.*" Restatement (Second) of Conflicts of Law § 187(2)(b) (emphasis added). Although Defendants' actions appear to have been in violation of Florida law, Plaintiff has failed to show that such conduct would render the Loan Commitment unenforceable or impact the validity of the negotiated loan if it had closed. Even the basis of Plaintiff's argument, the Florida Mortgage Brokerage Act, specifically provides that "[f]ailure to comply with provisions of ss. 494.001–494.0077 *does not affect the validity or enforceability of any mortgage*

*loan.*" Mortgage Brokerage Act, Chapter 494.0022, Fla. Stat. (emphasis added). [7]

As New Jersey law was selected by the parties, New Jersey has a substantial relationship to the parties and the transaction, and because the application of New Jersey law is in accord with the requirements of section 187(2) of the Restatement, the Court finds that the New Jersey choice-of-law provision should be enforced and that the Loan Commitment is a valid and enforceable contract. Given that the New Jersey choice-of-law provision in the Loan Commitment is valid and enforceable, the Court need not engage in a section 202 analysis as urged by Plaintiff. *See* Restatement (Second) of Conflicts of Law § 202(1) ("The effect of illegality upon a contract is determined by the law selected *by application of the rules of §§ 187–188.*") (emphasis added); *see also* Restatement (Second) of Conflicts of Law § 202 cmt. a ("Under the rule of this Section, questions involving the effect of illegality upon a contract are *determined by the law chosen by the parties, if they have made an effective choice.*") (emphasis added). [8] As such, Plaintiff's Florida-based claims in Counts I, V, VI and VII are dismissed as a matter of law. [9] The Court's application of New Jersey law to the remaining counts is discussed below.

### B. The Loan Commitment Supersedes All Previous Documents

**\*6** As the Loan Commitment is a valid contract, its terms should be enforced unless shown otherwise. *See* Atlantic City Racing Ass'n v. Sonic Financial Corp., 90 F.Supp.2d 497, 506 (D.N.J.2000) ("If the terms of a contract are clear the court will enforce them as written."). Defendants argue that the Loan Commitment contains clear language sufficient to supersede all prior documents, including the Letter of Interest. (Defs.' Reply Br. at 31.) Specifically, Defendants contend that the Loan Commitment's choice-of-law provision specifies the application of New Jersey law and should apply to the terms of the Letter of Interest because the two documents "are interrelated and should not be construed under separate law." (Defs.' Reply Br. at 31.) Plaintiff argues that "[t]here is no choice of law provision in either the original or the revised Letter of Interest ... [t]hus, there is no basis for finding that New Jersey Law is applicable to the Letters of Interest ." [10] (Pl.'s Opp'n at 6.)

Generally, where not inconsistent, two interrelated documents for the same transaction are interpreted together. "An integrated writing must be construed as a whole and all

writings forming a part of the same transaction are interpreted together." *Graybar Elec. Co. v. Continental Cas. Co.,* 50 N.J.Super. 289, 294 (App.Div.1958) (citations omitted); *see also Curtis–Warner Corp. v.. Thirkettle,* 99 N.J. Eq. 806, 817 (N.J. Ch.1926) (citations omitted) (noting that an "executed contract supersedes all prior negotiations and agreements where the last contract covers the whole subject embraced in the prior one").

In the instant matter, the Loan Commitment clearly sets forth integration language to support an understanding that its terms supersede all prior documents relating to the loan. As the opening paragraph of the Loan Commitment states, "This supersedes all previous communications and correspondence." (Loan Commitment at 1 .) The signature page also provides, in the Complete Agreement clause, "This Commitment ... supersedes all prior proposals, negotiations, agreements, and understanding relating to such subject matter." (Loan Commitment, Sched. B. ¶ 17); *See also* Williston on Contracts § 33:21 (4th ed.) (2007) (noting that the presence of an integration or merger clause tends to "establish the intent of the parties that the writing shall be an integration of their agreement").

Additionally, the Letter of Interest itself states "[i]n no way should this be considered a firm loan commitment" and, referencing the Application Fee, states that "unless the terms contained herein are not contained in the draft commitment," the fee is non-refundable. (Letter of Interest at 1–2.) This language indicates that by executing the Letter of Interest, the parties ultimately intended the terms of the Letter of Interest to be integrated with those in the Loan Commitment.

For the reasons discussed above, the Court concludes that the Loan Commitment supersedes the Letter of Interest and New Jersey law governs all claims arising from the Loan Commitment. Furthermore, the choice-of-law provision in the Loan Commitment can govern the asserted claims arising out of the agreement, including non-contract claims. [11] *See Crescent Intern., Inc. v. Avatar Communities, Inc.,* 857 F.2d 943 (3d Cir.1988) (discussing the applicability of a forum selection and choice-of-law clause to related non-contract claims).

## C. Plaintiff's Claims for Rescission, Unjust Enrichment and Restitution

**\*7** As the Letter of Interest is superseded by the Loan Commitment, the Loan Commitment's terms govern the

transaction. Plaintiff paid Defendants a $25,000 Application Fee under the Letter of Interest and $200,000 of the Commitment Fee pursuant to the Loan Commitment. (Pl.'s Am. Compl. ¶¶ 10, 15.) Plaintiff contends that, based on Florida law, the Letter of Interest and Loan Commitment were "illegal contracts." (Pl.'s Am. Compl. ¶¶ 56, 60.) As such, Plaintiff filed a claim for rescission, arguing the contracts are void and unenforceable. (Pl.'s Am. Compl. ¶ 60.) Further, Plaintiff asserts that even under New Jersey law, Meecorp has been unjustly enriched and Plaintiff is entitled to restitution for the fees paid. (Pl.'s Am. Compl. ¶¶ 49, 51.) The Court will address each of these claims below.

### 1. Rescission (Count IV)

Rescission is the unilateral unmaking of a contract due to one party's material breach of the contract. *See Young Travelers Day Camps, Inc. v. Felsen,* 118 N.J.Super. 304, 310 (D.N.J.1972). New Jersey courts have long held that rescission is an equitable remedy and should not be exercised when there is an adequate remedy at law. *Walter v. Holiday Inns, Inc.,* 784 F.Supp. 1159, 1166 (D.N.J.1992) (citations omitted). Allowing rescission of a contract is discretionary and only available in limited circumstances where there is either consent, "original invalidity, fraud, failure of consideration or a material breach or default." *Hilton Hotels Corp. v. Piper Co.,* 214 N.J.Super. 328, 336 (Ch. Div.1986) (citations omitted). "A court must be able to return the parties to the 'ground upon which they originally stood' " in order to impose rescission. *Id.* at 336 (citations omitted).

As already established by the Court, the Loan Commitment is a valid and enforceable contract and supersedes the Letter of Interest. Plaintiff has not indicated Defendants' failure to meet a material obligation specified in the Loan Commitment. Additionally, if the loan had closed, the mortgage loan would have been enforceable. As such, Plaintiff has not established a claim for rescission, Count IV, is dismissed.

### 2. Unjust Enrichment (Count III) and Restitution (Count II)

Plaintiff bases its claims for unjust enrichment and restitution on two alternate grounds: (1) the fees were acquired illegally and through illegal documents under Florida law; or (2) if New Jersey law applies, the loan did not close and was never funded. (Pl.'s Opp'n at 21.) As such, Plaintiff argues that it should be refunded the $25,000 Application Fee and $200,000 of Commitment Fee as restitution either under Florida or New Jersey law. (Pl.'s Am. Compl. ¶¶ 49, 51.)

A claim for "unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Callano v. Oakwood Park Homes Corp.,* 91 N .J.Super. 105, 108 (App.Div.1966). To establish an unjust enrichment claim, a plaintiff must show that "it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.,* 135 N.J. 539, 554 (1994), *aff'd,* 186 N.J. 46 (2006) (citations omitted). Thus, it is the plaintiff's "conferral of a benefit on defendant which forms the basis of an unjust enrichment claim." *Eli Lilly & Co. v. Roussel Corp.,* 23 F.Supp.2d 460, 496 (D.N.J.1998). One receiving an unjust benefit is liable to make restitution to the innocent party. *See generally id.*

 **\*8** Plaintiff's claims of unjust enrichment and restitution under Florida law fail as a matter of law.[12] As discussed, New Jersey law governs the Loan Commitment and the Letter of Interest. Therefore, the Court will proceed with the unjust enrichment and restitution analysis solely under New Jersey law.

The parties agree that under New Jersey law, no statute exists prohibiting Defendants collection of an advance payment in the form of an Application or Commitment Fee. (Defs.' Mem. at 5; Pl.'s Opp'n at 11.) However, Plaintiff contends that "[u]nder New Jersey law, parties to a frustrated contract may claim relief in the form of restitution to the extent that their performance under the contract has benefitted the other." (Pl.'s Opp'n at 22.) Plaintiff therefore bases its argument that Defendants were unjustly enriched on the fact that the loan did not close, Plaintiff did not receive any benefit from its payment of fees, and claims that as a result, Plaintiff should be entitled to restitution. (Pl.'s Opp'n at 21.)

Plaintiff's assertions fail to satisfy a claim for unjust enrichment and restitution because the $225,000 in collected fees were earned by and specifically contracted for by the Defendants at the time the Letter of Interest and the Loan Commitment were executed, respectively. (*See* Letter of Interest at 1–2; Loan Commitment at 4, 6.) As such, Plaintiff cannot maintain that it bestowed a benefit on Defendants in the form of the Application Fee and the $200,000 of the Commitment Fee, or that retention of such benefit is unjust because the loan never closed. (Pl.'s Opp'n at 21.) Even though the parties appear to disagree on the reason the loan did not close,[13] Defendants performed under the

Letter of Interest by providing the Loan Commitment and were prepared to close the loan. The Letter of Interest clearly provides that the Application Fee of $25,000 was for the preparation of a Loan Commitment draft, which Defendants provided. (Letter of Interest at 1–2.) Defendants' performance of the action, for which Plaintiff had paid and contracted, defeats Plaintiff's claim for unjust enrichment and restitution of the Application Fee.

Plaintiff's execution of, and payment pursuant to, the Loan Commitment is a clear indication of its agreement to the contract's terms and its intent to proceed with the loan. Defendants state that they were prepared to perform under the Loan Commitment and required $200,000 at the signing of the Loan Commitment. Therefore, Plaintiff did not confer a benefit on the Defendants that exceeded Defendants' rights under the contracts and is not entitled to restitution for the fees paid ($225,000). As such, the Court finds that Defendants were not unjustly enriched by either the Application Fee of $25,000 or the Commitment Fee of $200,000. Accordingly, Counts II and III are dismissed.

*D. Defendants' Counterclaim for Breach of Contract* [14]
Defendants filed a Counterclaim for breach of contract seeking to recover the following: (1) the Exit Fee of $1.8 million; (2) one year's prepaid interest of $2.6 million; and (3) the balance of the unpaid portion of the Commitment Fee (i.e., $400,000). (Defs.' Answer to Am. Compl. at 11.) Plaintiff filed a Cross–Motion seeking to dismiss "(I) ... [D]efendants' Counterclaim in its entirety; (ii) or, alternatively, dismissing that portion of [D]efendants' Counterclaim which seeks to recover a loan 'Exit Fee' of $1.8 million and one year's prepaid interest of $2.6 million on a loan that was never made or funded" and/or leave to amend the Amended Complaint. (Pl.'s Opp'n at 1.)

 **\*9** The issues of fact raised are not material and do not preclude summary judgment in this matter. As the Loan Commitment is a valid contract, the Court will strictly construe the language of the Loan Commitment and decide whether Defendants' Counterclaim should be dismissed as a matter of law. For the following reasons, the Court grants Plaintiff's motion for partial summary judgment to dismiss Defendants' Counterclaim as to the Exit Fee of $1.8 million, the one-year prepaid interest of $2.6 million; however, Plaintiff is obligated to pay Defendants the remaining balance of $400,000 for the Commitment Fee.

"The interpretation of a contract is a matter of law for the court." *Atlantic City Racing Ass'n v. Sonic Fin. Corp.,* 90 F.Supp.2d 497, 506 (D.N.J.2000) (citing *Fastenberg v. Prudential Ins. Co. of Amer.,* 309 N.J.Super. 415 (App.Div.1998). "The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them." *Id.* (quoting *Karl's Sales and Service, Inc. v. Gimbel Bros., Inc.,* 592 A.2d 647, 650 (App.Div.1991)). Where the terms of a contract are clear, " 'the court must enforce those terms as written.' " *Id.* (citation omitted). "Where ambiguities appear in the contract, they are to be strictly construed against the drafter." *See id.* Accordingly, "the court cannot undertake to rewrite a contract 'merely because one might conclude that it [would] have been functionally desirable to draft it differently.' " *Id.* (citation omitted).

Defendants claim that its "entitlement to an exit fee and pre-paid interest are clearly described in the [Loan Commitment]. The damages as alleged are proper." (Defs.' Reply Br. at 34.) The Court, however, in applying the aforesaid principles of contract construction and interpretation, disagrees with this contention. With respect to an Exit Fee, the Loan Commitment merely states, "Nine percent (9%) of the Loan Amount. To be included in the Loan Amount and paid at the maturity of the Loan." (Loan Commitment at 3.) With respect to prepaid interest, the Loan Commitment provides, "Interest at a rate of Thirteen percent (13%) per annum during the first year, prepaid in advance...." (Loan Commitment at 3.) However, it is ambiguous whether Meecorp, as the drafter, intended for the Exit Fee and one year's prepaid interest to be due upon signing of the Loan Commitment, or due upon the actual closing of the loan. Such ambiguity will be construed against Defendants.

Meecorp, a sophisticated entity, drafted the Loan Commitment and could easily have included remedial language with respect to the Exit Fee and prepaid interest in the event the loan did not close. Defendants did not include such language and the Court will not reconstruct a better agreement for Defendants.[15] As such, the portion of Defendants' Counterclaim seeking the Exit Fee and prepaid interest fails as a matter of law. Further, in the interest of equity, as the loan did not close, the Court will not force Plaintiff to pay for services that Defendants did not have to provide. Accordingly, the Court finds that the portion of Defendants' Counterclaim regarding the Exit Fee and prepaid interest will be dismissed.

**\*10** With respect to the portion of Defendants' Counterclaim seeking the remaining $400,000 in Commitment Fee, Defendants argue that the $600,000 Commitment Fee was required for Plaintiff to effectuate the Loan Commitment, with $200,000 due upon its signing. (Loan Commitment at 4.) Again, the Court will review the language of the Loan Commitment to determine if additional fees of $400,000 are owed to Meecorp.

The Acceptance of Commitment clause states,

> "The commitment and all of its terms and conditions will become effective only upon delivery to this office of a signed copy of this commitment duly accepted by the Borrower, accompanied with the commitment fee installment in the amount of Six Hundred Thousand Dollars ($600,000) which is *non-refundable and earned* for, among other things, the commitment to provide funds and due diligence expenses."

(Loan Commitment at 4) (emphasis added). The payment of the Commitment Fee for a total of $600,000 was not conditioned on the loan closing, rather the remaining $400,000 was *deferred* to the time of closing. Although the closing did not take place, the $400,000 in Commitment Fee was already earned upon the signing of the Loan Commitment. Therefore, the Court finds that Plaintiff is obligated to pay the remaining $400,000 balance of the Commitment Fee.

No additional costs or attorneys' fees will be awarded in this matter.

*E. Plaintiff's New Jersey Consumer Fraud Act Claim and Request to Amend Complaint*

Plaintiff argues that it has asserted a claim under the New Jersey Consumer Fraud Act ("NJCFA") in Count V of its Amended Complaint. (Pl.'s Opp'n at 25).[16] Plaintiff further argues that if this Court questions whether Plaintiff has adequately stated a claim for relief under the NJCFA in its Amended Complaint, it should grant Plaintiff leave to amend

Brauser Real Estate, LLC v. Meecorp Capital Markets, LLC, Not Reported in F.Supp.2d...

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 36 of 164 PageID: 165

its pleading in order to properly assert such a claim. [17] (Pl.'s Opp'n at 25.)

To state a claim under the NJCFA, Plaintiff must allege the following: (1) violation of the NJCFA by Defendants' unlawful conduct; (2) an ascertainable loss on the part of the Plaintiff; and (3) a causal relationship between Defendants' unlawful conduct and Plaintiff's ascertainable loss. *New Jersey Citizen Action v. Schering–Plough Corp.,* 367 N.J.Super. 8, 12 (App.Div.2003); *Szczubelek v. Cendant Mortgage Corp.,* 215 F.R.D. 107, 125 (D.N.J .2003). Federal Rule of Civil Procedure 15(a) provides that leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). A general presumption exists in favor of allowing a party to amend its pleadings. *Boileau v. Bethlehem Steel Corp.,* 730 F.2d 929, 938 (3d Cir.1984), *cert. denied,* 469 U.S. 871 (1984). Leave to amend a complaint should be granted freely in the absence of undue delay or bad faith on the part of the movant as long as the amendment would not be futile and the opposing party would not suffer undue prejudice. *Adams v. Gould Inc.,* 739 F.2d 858, 864 (3d Cir.1984), *cert. denied,* 469 U.S. 1122 (1985).

**\*11** In the instant matter, Plaintiff has failed to state a claim under the NJCFA. Plaintiff couches the basis of its claim for fraud, unconscionability and ascertainable loss on actions deemed illegal under Florida statutes. [18] (Pl.'s Opp'n at 25.) Plaintiff has not identified a New Jersey statute requiring mortgage lenders and/or brokers to be licensed, or a prohibition on the collection of advance fees in a commercial loan. (Pl.'s Am. Compl. ¶¶ 62–76.) As such, Plaintiff has not alleged unlawful conduct under New Jersey law or shown that, given leave to amend, it could state such a claim. Plaintiff has not provided a proposed amendment for the amended complaint and the informally proposed amendment, articulated in Plaintiff's papers, would be futile. For these reasons, Count V is dismissed and leave to amend the Amended Complaint is denied.

**Conclusion**

For the foregoing reasons, the Court grants Defendants' Motion, and grants in part and denies in part Plaintiff's Cross–Motion.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 324402

---

## Footnotes

1    Meecorp disagrees with this assertion, claiming that it was contacted by Plaintiff who had an interest in securing a commercial loan for the Property. (Defs.' Mem. at 3.)

2    "On or about October 31, 2003, Defendants issued a 'Revised Letter of Interest/Term Sheet' which decreased the proposed loan amount to eighteen million dollars ($18,000,000) but did not change anything regarding the requirement of a non-refundable ... $25,000 fee before Meecorp would provide [Plaintiff] with a draft commitment." (Pl.'s Opp'n at 4.)

3    Defendants argue that it is an "undisputed fact" that the negotiation and preparation of the Letter of Interest and the Loan Commitment took place in New Jersey. (Defs.' Reply Br. at 3–4; M. Edrei Second Aff. ¶ 5; and D. Edrei Aff. ¶ 11.) However, Plaintiff claims that Defendants came to Broward County, Florida to negotiate the terms of the Loan Commitment. (Pl.'s Opp'n at 4.)

4    Meecorp required only $200,000 of the Commitment Fee at signing and the remaining $400,000 at closing, for a total of $600,000. (Loan Commitment at 6.)

5    Defendants Counterclaim for breach of contract is premised on Plaintiff's alleged failure to comply with the terms of the Loan Commitment. (Defs.' Answer to Am. Compl. at 11.) Defendants claim they suffered

damages, including the following: (1) Exit Fee of $1.8 million; (2) one year of interest totaling $2.6 million; and (3) $400,000 unpaid balance of the Commitment Fee. (Defs.' Answer to Am. Compl. at 11; Pl.'s Opp'n at 26.)

6    Section 202 provides: "(1) The effect of illegality upon a contract is determined by the law selected by application of the rules of §§ 187–188.(2) When performance is illegal in the place of performance, the contract will *usually* be denied enforcement." Restatement (Second) of Conflict of Laws § 202 (emphasis added).

7    In fact, the Florida District Court has found in favor of Defendant Meecorp on the exact claims in *Morris Development Group, LLC v. Meecorp Capital Markets, LLC,* No. 8–03–cv–1431–T–26TGW, slip op. 11 (Sept. 8, 2004). In *Morris Development,* the court held that, "[i]t simply cannot be said that the policy against the collection of an advanced fee by a 'loan broker' as defined in section 687.14(4) is so fundamental to Florida's legal system that it warrants the status of an exception to one's freedom to contract." *Id.* at 11 (citing *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours and Co.,* 761 So.2d 306, 311 (Fla.2000) (discussing factors in determining whether a public policy exception to the right to contract should be recognized in Florida)).

8    Further, even if the Court undertook a section 202 analysis the following is true: 1) performance in Florida may be illegal, but even under Florida law the contract would not be void and unenforceable. *See Morris Development,* Case No. 8–03–cv–1431–T–26TGW at 11; and 2) the section 202 analysis would still incorporate section 187.

9    In its Amended Complaint, Plaintiff asserts Counts I, V, VI and VII against Meecorp and M. Edrei and D. Edrei, acting in their individual capacities as agents of Meecorp. (*See generally* Pl.'s Am. Compl.) Plaintiff claims to have alleged "sufficient facts to support a finding that both individuals were acting on behalf of Meecorp for the purpose of soliciting a borrower and they may have individual liability under the Florida Loan Broker Act." (Pl.'s Br. Opp'n at 10.) The Court has determined the Loan Commitment to be valid and enforceable under New Jersey law, and consequently dismissed Counts I, V, VI and VII. As to Defendants M. Edrei and D. Edrei's individual liability, these individuals acted in their official capacities and New Jersey law would apply to the claims against them. Plaintiff's claims against these individual Defendants are based on Florida law. (*See* Pl.'s Br. Opp'n at 10 .) As such, the claims against the individual Defendants cannot survive upon application of New Jersey law.

10    Plaintiff's argument relies on the decision in *Morris Development,* in which the court found that the Letter of Interest did not contain a choice-of-law provision to govern the payment of the advanced fee. *Morris Development,* Case No. 8–03–cv–1431–T–26TGW at 3.

11    Plaintiff assert that the contractual choice-of-law provision in the Loan Commitment does not apply to Counts I, V, VI and VII as they are not contract claims. (Pl.'s Opp'n at 23.) The Court finds that these issues arise from the Loan Commitment and are intimately related to the contract.

12    Plaintiff relies heavily on the decision in *Morris Development.* In *Morris Development,* the Florida District Court held that New Jersey law did not apply to the letter of interest because: (1) the letter did not contain a choice-of-law forum; (2) the loan commitment, by its terms, did not supersede the letter of interest; and (3) the advance fee (application fee) of $20,000, was paid before the loan commitment issued. (Pl.'s Opp'n at 7–8); *Morris Development,* No. 8–03–cv–1431–T–26TGW at 3. As such, the *Morris Development* court found the advance fee in violation of Florida law and denied Defendants' request for summary judgment on these advanced fees of $20,000. *Id.*

13    Defendants argue that they did not issue the loan because Plaintiff's failure to reach an agreement with the seller of the Property and obtain title rendered them unable to meet their obligations under the Loan Commitment. (Defs.' Reply Br. at 7; M. Edrei Second Aff. ¶ 8; Brauser Aff. ¶ 9.) During oral argument on November 19, 2007, Plaintiff informed the Court that while it had in fact secured the Property (Tr. 10:20–

2), it never closed the Loan Commitment because the loan was procured through illegal means and illegal documents (Tr. 12:6–13) and the amount of the loan kept changing depending on the appraised value of the Property. (Tr. 11:1–6.) The Court notes that the appraisal value of the Property was determined by the Defendants. (Tr. 11:7–8.)

14    Defendants also have a third-party claim against Gerald Brauser for liability as a guarantor. (*See* Defs' Answer at 11.)

15    The Court also notes that the Loan Commitment's limitation of damages clause does not provide much instruction on whether the fees in question are due upon signing, or due upon closing. (*See* Loan Commitment at 6.) The limitations of damages applies solely to Defendants' liability in the event the loan does not close; the agreement generally, and the limitations on damages clause specifically, does not provide for Plaintiff's continued liabilities or obligations in the event the loan does not close.

16    The Court notes that contrary to Plaintiff's belief that it has asserted a claim under the NJCFA in Count V of its Amended Complaint, Count V only asserts a violation of Fla. Stat. § 501.20, *et seq.* (Pl.'s Am. Compl., ¶¶ 62–76.) Furthermore, this Court does not find any reference to the NJCFA in Plaintiff's Amended Complaint, and will not infer that Plaintiff intended to state such a claim without having clearly done so.

17    Plaintiff did not make a formal motion to amend and did not provide a proposed amended complaint.

18    Plaintiff argues that it suffered an ascertainable loss of $225,000 based on Defendants' alleged violation of Florida statutes for unconscionable practices and the collection of advance fees.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT E

2021 WL 2206106
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

ETHICON, INC. and Medical Device
Business Sports, Inc., Plaintiffs,

v.

Brandon RANDALL, Defendant.

Case No. 3:20-cv-13524 (BRM) (ZNQ)
|
Signed 05/28/2021

**Attorneys and Law Firms**

For Plaintiffs ETHICON, INC. and MEDICAL DEVICE
BUSINESS SPORTS, INC.: Adrienne C. Rogove, Michael
Ray Darbee, Stephen M. Orlofsky, Blank, Rome LLP,
Princeton, NJ.

For Defendant Brandon Randall: Audrey O. Anyaele, Maron
Marvel Bradley Anderson & Tardy, LLC, Jersey City, NJ.

**OPINION**

BRIAN R. MARTINOTTI, United States District Judge

**\*1** Before this Court is Defendant Brandon Randall's
("Randall") Motion to Stay All Proceedings and Transfer
Venue to the United States District Court for the District
Court of Massachusetts. (ECF No. 23.) Plaintiffs Ethicon,
Inc. ("Ethicon") and Medical Device Business Services,
Inc. ("DePuy Synthes") (together with Ethicon, "Plaintiffs")
opposed Randall's Motion and filed a Cross Motion to Enjoin
Proceedings in the District of Massachusetts. (ECF No. 41.)
Also before the Court is Plaintiffs' Motion for Preliminary
Injunction. (ECF No. 2.) Randall opposed Plaintiffs' Motion
for Preliminary Injunction. (ECF No. 29.) Plaintiffs filed a
Reply in support of their Motion for Preliminary Injunction.
(ECF No. 35.) Randall filed a Sur-Reply in opposition to
Plaintiffs' Motion for Preliminary Injunction. (ECF No. 42.)
Randall also filed a Reply in support of his Motion to
Stay All Proceedings and Transfer Venue, and in opposition
to Plaintiffs' Cross Motion to Enjoin Proceedings. (ECF
No. 44.) Having reviewed the parties' submissions filed in
connection with the motions and having declined to hold
oral argument pursuant to Federal Rule of Civil Procedure

78(b), for the reasons set forth below and for good cause
having been shown, Randall's Motion to Stay All Proceedings
and Transfer Venue to Massachusetts is **DENIED**, and
Plaintiffs' Cross Motion to Enjoin Proceedings in the District
of Massachusetts and Motion for Preliminary Injunction are
**GRANTED**.

**I. BACKGROUND**

**A. Factual Background**
Ethicon and DePuy Synthes are two entities within the J&J
Family of Companies (individually and/or collectively, the
"Company"), which is comprised of over 260 companies and
together operates one of the world's largest and most diverse
medical device, pharmaceutical and consumer products
companies. (ECF No. 1 ¶ 11.) Ethicon and DePuy Synthes are
two key businesses within J&J's Medical Devices Business
("JJMDB") and, as wholly owned subsidiaries of J&J, are
part of the Company. (*Id.* ¶ 12.) Ethicon is a New Jersey
corporation, and primarily focuses on developing and creating
innovative products and medical devices for use in surgery.
(*Id.* ¶¶ 6, 14.) DePuy Synthes is an Indiana corporation, and
focuses on implants and instrumentation for use in orthopedic
surgery for the repair and healing of the musculoskeletal
system. (*Id.* ¶¶ 7, 13.)

Randall is a Massachusetts resident. (*Id.* ¶ 8.) In September
2003, Randall joined Synthes, Inc. (ECF No. 29 at 6.)
In 2012, DePuy acquired Synthes, Inc. to become DePuy
Synthes, where Randall worked in various roles for the
next seven years. (*Id.*) In June 2017, Randall accepted a
position as the Senior Director, Research and Development
Strategy and Business Operations for orthopedics with DePuy
Synthes. (*Id.* at 7.) In connection with the Senior Director
position, Randall executed an Employee Secrecy, Intellectual
Property, Non-Competition and Non-Solicitation Agreement
(the "Agreement"). (*Id.*)

The Agreement contains a forum selection and choice of law
clause, which provides:

> **\*2** This AGREEMENT will be
> governed by and interpreted according
> to the laws of the State of New
> Jersey, without regard to its conflict
> of law rules. Any action relating to
> or arising out of this AGREEMENT
> may be brought in the courts of the

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 41 of 164 PageID: 170

State of New Jersey or in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both such courts.

(ECF No. 1, Ex. A ¶ 6.1.) The Agreement defines "COMPETITOR" as:

> any person or entity including, but not limited to, you or anyone acting on your behalf, that is engaged or preparing to be engaged in research, development, production, manufacturing, marketing or selling of, or consulting on, any product, process, technology, machine, invention, or service in existence or under development that resembles, competes with, may now or in the future compete with, can by substituted for or can be marketed as a substitute for any product, process, technology, machine, invention or service of any COMPANY that is in existence or that is, was, or is planned to be under development.

(*Id.*, Ex. A ¶ 3.6.) The Agreement defines "CONFIDENTIAL INFORMATION" as:

> product development, product performance, product know-how, product specifications, techniques, drawings, prints, designs, and tolerances; regulatory strategies, clinical trials and investigations; manufacturing, engineering, logistics, and quality systems and related processes, data and techniques; information systems, computer programs, software, and hardware configurations; business, financial, operating, sales and marketing plans and strategies; inventions,

> ideas, discoveries, improvements, innovations and intellectual property strategies; pricing and pricing strategies, forecasts, contract and bidding details, financial data, models and analyses, sales volume, sales data and analyses; customer, business partner and vendor relationships and arrangements; personnel data and compensation; human resources strategies and goals, recruitment methods and plans; and training methods and procedures.

(*Id.*, Ex. A ¶ 2.1.) A non-compete provision in the Agreement states:

> Except as provided in Section 3.3 below, you agree that, for a period of eighteen (18) months after the termination of your employment within the COMPANY (whether voluntary or involuntary), you will not directly or indirectly perform, or assist others to perform, work for a COMPETITOR in a position or in any geographical location in which you could disadvantage the COMPANY or advantage the COMPETITOR through (a) your disclosure or use of CONFIDENTIAL INFORMATION and/or (b) your use of the COMPANY's CUSTOMER relationships and goodwill.

(*Id.*, Ex. A ¶ 3.2.) Section 3.3, which provides an exception to Section 3.2, sets forth the preconditions Randall must satisfy before working for a competitor of Plaintiffs:

> After the termination of your employment within the COMPANY, you may work for a COMPETITOR provided that (a) the competitor has a DIVERSIFIED BUSINESS; (b) the role you seek to perform is not a role

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 42 of 164 PageID: 171

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

in which the COMPETITOR could benefit from the CONFIDENTIAL INFORMATION to which you had access during the last two (2) years of your employment within the COMPANY; and (c) before you accept the position and begin work for the COMPETITOR, the COMPANY is provided, and has accepted as satisfactory to it, written assurances from both you and the COMPETITOR that you will not be rendering any services which conflict with the obligations in this AGREEMENT.

**\*3** (*Id.*, Ex. A ¶ 3.3.) Section 3.4 describes a required procedure upon an employee's voluntary resignation:

In the event of a voluntary termination of your employment from the COMPANY, including a resignation, you agree to notify your EMPLOYER in writing at least fourteen (14) days before your anticipated last day of employment. You also agree during the eighteen (18) months after your employment ends to provide your EMPLOYER with fourteen (14) days' written notice of any new employment or any change in position with a COMPETITOR before assuming the new role to allow for the opportunity to obtain written assurances satisfactory to the COMPANY from you and from the COMPETITOR that you will not be rendering services which conflict with the obligations in this AGREEMENT.

(*Id.*, Ex. A ¶ 3.4.) Section 5.1 provides the remedies for a breach of the Agreement:

You agree and acknowledge that your breach of the covenants contained in this AGREEMENT will cause irreparable harm to the COMPANY and that damages arising out of a breach may be difficult to determine. You therefore agree and acknowledge that, in addition to all other remedies provided at law or by equity, the COMPANY shall be entitled to specific performance and temporary and/or permanent injunctive relief, from any court of competent jurisdiction restraining the breach or further breaches from you, your new employer or others acting in concert with you, without the necessity of the COMPANY proving actual damages or posting of a bond.

(*Id.*, Ex. A ¶ 5.1.)

Randall's position with DePuy Synthes ended in October 2019, when he joined Ethicon as its Senior Director for Integration Programs, Robotics and Digital Solutions. (ECF No. 29 at 13.) On August 31, 2020, Randall announced his resignation from Ethicon, and accepted a position of Vice President R&D, Robotics and Surgical Enablers ("Head of Robotics") with Smith & Nephew plc ("Smith & Nephew"). (*Id.* at 14.) Plaintiffs claim they and Smith & Nephew are both developing innovative and key enabling technologies for state-of-the-art medical device systems involving robotics, navigation, augmented reality, and visualization including in the areas of wound closure, trauma, orthopedic, and joint reconstruction surgery. (ECF No. 1 ¶ 3.) As a result, Plaintiffs now seek an injunction to prevent irreparable harm as a result of the impending threat by Randall to assume the Head of Robotics position with Smith & Nephew in breach of the Agreement, because, *inter alia*, Randall allegedly had access to competitively critical trade secret and confidential information of Plaintiffs directly related to this Head of Robotics position, with which he could significantly disadvantage Plaintiffs by his use or disclosure of such confidential information. (*Id.* ¶ 1.)

### B. Procedural History

On September 29, 2020, Plaintiffs filed a Complaint against Randall for breach of contract in this Court (*id.*), along with an Order to Show Cause with Temporary Restraints seeking a Temporary Restraining Order and Preliminary Injunction to

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 43 of 164 PageID: 172

*Ethicon, Inc. v. Randall*, Not Reported in Fed. Supp. (2021)

enjoin Randall from directly or indirectly performing work for Smith & Nephew in any position in which he could disadvantage Plaintiffs or advantage Smith & Nephew or any other competitor of the Company by the disclosure or use of confidential information to which he had access while employed with Plaintiffs, or taking any action to disturb the status quo (ECF No. 2). On October 5, 2020, the Court entered into a Temporary Restraining Order by consent ("Consent Injunction"), in which Randall agreed to refrain from working for Smith & Nephew as its Head of Robotics or in any other position that would require him to breach his obligations under the Agreement until the day of the evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction. [1] (ECF No. 14.) On October 17, 2020, Randall filed a declaratory judgment action against Plaintiffs in the District Court for the District of Massachusetts seeking to have the Agreement declared void and unenforceable (the "Massachusetts Lawsuit"). *Randall v. Ethicon, Inc. et al*, No. 1:20-cv-11870 (D. Mass. filed Oct. 17, 2020). On October 19, 2020, Randall filed a Motion to Stay All Proceedings and Transfer Venue to Massachusetts. (ECF No. 23.) On October 27, 2020, Randall opposed Plaintiffs' Motion for Preliminary Injunction. (ECF No. 29.) On October 30, 2020, Plaintiffs filed a Reply in support of their Motion for Preliminary Injunction (ECF No. 35), opposed Randall's Motion to Transfer and filed a Cross Motion to Enjoin Proceedings in Massachusetts (ECF No. 41). On November 6, 2020, Randall filed a Sur-Reply in opposition to Plaintiffs' Motion for Preliminary Injunction. (ECF No. 42.) On November 9, 2020, Randall filed a Reply in support of his Motion to Stay All Proceedings and Transfer Venue, and in opposition to Plaintiffs' Cross Motion to Enjoin Proceedings. (ECF No. 44.)

## II. LEGAL STANDARDS

### A. Motion to Transfer

**\*4** A motion to transfer venue is governed by 28 U.S.C. § 1404(a), which states: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." In deciding a motion to transfer, the Court must first determine whether the alternative forum is a proper venue. *Fernandes v. Deutsche Bank Nat'l Trust Co.*, 157 F. Supp. 3d 383, 389 (D.N.J. 2015); *see* 28 U.S.C. § 1391. Venue is appropriate in:

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b).

When a plaintiff has laid a proper venue, "[t]he decision whether to transfer falls in the sound discretion of the trial court." *Park Inn Int'l, L.L.C. v. Mody Enters., Inc.*, 105 F. Supp. 2d 370, 377 (D.N.J. 2000). However, "the burden of establishing the need for transfer ... rests with the movant." *Jumara v. State Farm Ins.*, 55 F.3d 873, 879 (3d Cir. 1995).

The Court must consider three factors when determining whether to grant a transfer under § 1404(a): (1) the convenience of the parties; (2) the convenience of the witnesses; and (3) the interests of justice. *Liggett Grp., Inc. v. R.J. Reynolds Tobacco Co.*, 102 F. Supp. 2d 518, 526 (D.N.J. 2000) (citing 28 U.S.C. § 1404(a); *Jumara*, 55 F.3d at 879). These factors are not exclusive and must be applied through a "flexible and individualized analysis ... made on the unique facts presented in each case." *Id.* at 527 (citations omitted). The first two factors have been refined into a non-exhaustive list of private and public interests that courts should consider. *See Jumara*, 55 F.3d at 879–80.

The private interests a court should consider include: (1) plaintiff's forum preference as manifested in the original choice; (2) the defendant's preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties as indicated by their relative physical and financial condition; (5) the convenience of the witnesses — but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the location of books and records

(similarly limited to the extent that the files could not be produced in the alternative forum). *Danka Funding, L.L.C. v. Page, Scrantom, Sprouse, Tucker & Ford, P.C.*, 21 F. Supp. 2d 465, 474 (D.N.J. 1998) (citing *Jumara*, 55 F.3d at 879). The public interests a court should consider include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.* (citing *Jumara*, 55 F.3d at 879–80).

### B. Preliminary Injunction

"Preliminary injunctive relief is an 'extraordinary remedy, which should be granted only in limited circumstances." *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citing *Novartis Consumer Health, Inc. v. Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002)). The primary purpose of preliminary injunctive relief is "maintenance of the status quo until a decision on the merits of a case is rendered." *Acierno v. New Castle Cty.*, 40 F.3d 645, 647 (3d Cir. 1994).

**\*5** In order to obtain a temporary restraining order or preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured ... if relief is not granted .... [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. Cty. of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (citing *Del. River Auth. v. Transamerican Trailer Transp., Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors." *Id.* at 179. "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program*, 42 F.3d 1421, 1427 (3d Cir. 1994); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate."). "A district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact without first holding an evidentiary hearing." *Scanvec Amiable, Ltd. v. Chang*, 80 F. App'x 171, 176 (3d Cir. 2003) (citations omitted); *see also Elliott v. Kiesewetter*, 98 F.3d 47, 53 (3d Cir. 1996) (citing *Prof'l Plan Exam'rs of N.J., Inc. v. Lefante*, 750 F.2d 282, 288 (3d Cir. 1984)) ("A district court cannot issue a preliminary injunction that depends upon the resolution of disputed issues of fact unless the court first holds an evidentiary hearing."). "In contrast, an injunction may issue on the basis of affidavits and other documentary evidence 'if the facts are undisputed and the relevant factual issues are resolved.' " *Id.* (citing *Bradley v. Pittsburgh Bd. of Educ.*, 910 F.2d 1172, 1175 (3d Cir. 1990)). A court must weigh each of the four factors to determine whether Plaintiffs have, by a clear showing, carried their burden of persuasion. *See Am. Tel. & Tel. Co. v. Winback Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (requiring a district court to weigh all four factors prior to granting injunctive relief).

### III. DECISION

### A. New Jersey Law Governs the Agreement

Randall maintains Massachusetts law should govern his dispute with Plaintiffs. (ECF No. 29 at 17.) He claims the choice of law clause in the Agreement is inoperative, because New Jersey has no relevance to this dispute, and all facts, circumstances and occurrences underlying this litigation occurred in Massachusetts. (*Id.*) Plaintiffs argue New Jersey law should apply, because the choice of law clause in the Agreement is valid. (ECF No. 35 at 39.) Plaintiffs contend a conflict of law analysis is not necessary here, because there is no actual conflict between relevant New Jersey law and Massachusetts law when the Agreement was executed. (*Id.*) Plaintiffs claim, even under a conflict of law analysis, New Jersey law should apply. (*Id.*) The court agrees.

**\*6** "Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities*, 518 U.S. 415, 427 (1996). "In cases in which their jurisdiction depends upon diversity of citizenship, Federal courts must follow conflict of laws rules prevailing in the states in which they sit." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494 (1941). "In evaluating whether a contractual choice-of-law clause is enforceable, federal courts sitting in diversity apply the choice-of-law rules of the forum state." *Homa v. American Express Co.*, 558 F.3d 225, 227 (3d Cir. 2009) (citations omitted). Here, the case is based on diversity jurisdiction, and the Court sits in New Jersey. (ECF No. 1 ¶ 9.) Therefore, the Court applies federal procedural rules and the New Jersey choice of law rules in deciding whether the Agreement's choice of law provision is enforceable.

"The Court will enforce the terms of a contract that is unambiguous on its face." *Brauser Real Estate, LLC v. Meecorp Capital Mkts., LLC*, Civ. A. No. 06-1816, 2008 WL 324402, at \*3, 2008 U.S. Dist. LEXIS 8000, at \*9 (D.N.J. Feb. 4, 2008) (citing *Statewide Realty Co. v. Fidelty Mgmt. & Research Co., Inc.*, 611 A.2d 158 (N.J. 1992)). "[C]ourts in [the Third Circuit] have repeatedly honored choice-of-law provisions that explicitly state a particular governing law without regard to conflicts of law." *Id.* (citing *Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 159 (3d Cir. 1999)). Here, Section 6.1 of the Agreement explicitly states "[t]his AGREEMENT will be governed by and interpreted according to the laws of the State of New Jersey, *without regard to its conflict of law rules*." (ECF No. 1, Ex. A. ¶ 6.1.) This shows the parties' clear and unambiguous intention to apply New Jersey law to the Agreements. Therefore, the Agreement's plain language indicates New Jersey law should govern.

A choice-of-law analysis leads to the same conclusion. In New Jersey, a choice of law clause will be upheld, unless:

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issues and which would be the state of the applicable law in the absence of an effective choice of law by the parties.

*Instructional Sys., Inc. v. Comput. Curriculum Corp.*, 614 A.2d 124, 133 (N.J. 1992) (citing Restatement (Second) of Conflicts of Laws § 187 (1969)). As for the first prong, Ethicon is a New Jersey corporation, and Plaintiffs' ultimate parent company J&J is also a New Jersey corporation. (ECF No. 41 at 39.) Therefore, the Court cannot conclude New Jersey has no substantial relationship to the parties or no reasonable basis for the parties' choice. As for the second prong, the parties do not identify and the Court does not discern any meaningful difference in the relevant public policies between New Jersey and Massachusetts. On the contrary, at the time the Agreement was executed, New Jersey law and Massachusetts law were substantially similar on the enforceability of noncompetition covenants. *Russomano v. Novo Nordisk Inc.*, 960 F.3d 48, 53 (1st Cir. 2020) (finding that "the states' laws are substantially similar" between New Jersey and Massachusetts on the enforceability of a "confidentiality and non-compete agreement" signed in 2015); *DePuy Spine, Inc. v. Stryker Biotech, LLC*, Civ. A. No. 98013, 2007 WL 1418507, at \*4 n.3, 2007 Mass. Super. LEXIS 260, at \*9 n.3 (Mass. Sup. Ct. Apr. 17, 2007) (citations omitted) (finding "no significant difference between the law of New Jersey and that of Massachusetts on the" enforceability of noncompetition covenants or agreements). The Massachusetts Noncompetition Agreement Act ("MNCA"), which represents a change of Massachusetts policy on "the requirements for an employee noncompetition agreement to be enforceable," "only applies to employee noncompetition agreements entered into on or after October 1, 2018." *Nuvasive, Inc. v. Day*, 954 F.3d 439, 444 (1st Cir. 2020) (citations omitted). The MNCA therefore does not affect the Agreement, which was entered into in 2017. (ECF No. 29 at 7.) Though Randall alleges there is a material change in his employment with Plaintiffs in October 2019, which occurred after the effective date of the MNCA (ECF No. 44 at 20), such a change in employment is irrelevant here, because it does not give rise to a new agreement to which the MNCA is applicable, and nothing in the record suggests Randall and Plaintiffs entered into a new non-compete agreement after the MNCA took effect. Therefore, the Court finds no basis to invalidate the Agreement's choice of law provision.

**\*7** Accordingly, the Court concludes New Jersey law governs the Agreement.

### B. The Court Denies Randall's Motion to Transfer

**1. Randall Did Not Forfeit His Right to Challenge Venue**

Plaintiffs contend Randall has forfeited the right to challenge venue (1) because of the Agreement's forum selection clause, (2) by not having previously filed a motion to dismiss pursuant to Section 1406(a) or Fed. R. Civ. P. 12(b)(3), and (3) through his voluntary, continuous participation in litigating this action, including agreeing to the Consent Injunction and conducting discovery. (ECF No. 41 at 31–33.) Randall counters his brief participation in this lawsuit does not preclude transfer. (ECF No. 44 at 33.) The Court agrees.

**a. The Agreement's Forum Selection Clause Does Not Constitute a Waiver**

"There is no doubt that venue is waivable, 'even when premised on a forum-selection clause.' " *Corsentino v. Meyer's RV Ctrs. LLC*, Civ. A. No. 20-03287, 2020 WL 4199744, at *3, 2020 U.S. Dist. LEXIS 128745, at *6 (D.N.J. July 22, 2020) (citations omitted). However, "[a] party's assent to a permissive forum selection clause has been found not to constitute a waiver of a party's right to claim a transferee forum as their preferred, convenient forum." *Deputy Synthes Sales, Inc. v. Gill*, Civ. A. No. 13-04474, 2013 WL 5816328, *7, 2013 U.S. Dist. LEXIS 154825, *20 (D.N.J. Oct. 29, 2013) (citations omitted). Here, by using the word "may," the plain language [2] of Section 6.1 of the Agreement indicates it is a permissive forum selection clause. *Id.* at *2, 2013 WL 5816328 at *5–6 (finding the same forum selection clause to be permissive). Therefore, by signing the Agreement, Randall does not waive his right to challenge venue.

**b. Randall Need Not File a Motion to Dismiss Before Challenging Venue**

Plaintiffs provide no legal authority for their argument that Randall must file a motion to dismiss before challenging venue. Such an "absence of authority is fatal to [Plaintiffs'] argument." *Hilburn v. State Dep't of Corr.*, Civ. A. No. 7-6064, 2012 WL 3133890, at *29, 2012 U.S. Dist. LEXIS 106536, at *91 (D.N.J. July 31, 2012); *see also Rosemoor Suites, LLC v. Harleysville Lake States Ins. Co.*, 444 F. Supp. 3d 902, 907 n.5 (N.D. Ill. 2020) ("[T]he court must conclude that [the plaintiff] has waived an argument by failing to develop it adequately and by citing no legal authority."); *Clay*

*v. Holy Cross Hosp.*, 253 F.3d 1000, 1002 n.1 (7th Cir. 2001) (citing *Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1057 n.5 (7th Cir. 2000)) ("[A]rguments that are unsupported by pertinent authority[ ] are waived."). Moreover, courts in this District have granted a motion to transfer when the movant had not previously filed a motion to dismiss. *See, e.g., Deputy Synthes*, 2013 WL 5816328, 2013 U.S. Dist. LEXIS 154825; *Ramada Worldwide v. Bellmark Sarasota Airport*, Civ. A. No. 05-2309, 2006 WL 1675067, 2006 U.S. Dist. LEXIS 96543 (D.N.J. June 15, 2006). Therefore, Randall need not file a motion to dismiss before filing his motion to transfer.

**c. Randall Does Not Waive His Right to Challenge Venue by Actively Litigating This Case**

**\*8** A defendant may waive its right to challenge venue "by actively litigating the suit." *Koninklijke Philips N.V. v. ASUSTeK Comput. Inc.*, Civ. A. No. 15-1125, 2017 WL 3055517, at *2, 2017 U.S. Dist. LEXIS 111889, at *7 (D. Del. July 19, 2017) (citing *United States v. Ziegler Bolt & Parts Co.*, 111 F.3d 878, 882 (Fed. Cir. 1997)). However, "[a] motion to transfer venue is not deemed to have been waived if not raised in an initial response to the complaint." *Tatum v. Chrysler Grp., LLC*, Civ. A. No. 10-4269, 2011 WL 6306551, at *5, 2011 U.S. Dist. LEXIS 113503, at *14 (D.N.J. Oct. 3, 2011) (citations omitted). "[A] motion to transfer venue could have been made even after a motion to dismiss had been denied." *Id.* (citing *Ins. Co. of N. Am. v. Ozean/Stinnes-Linien*, 367 F.2d 224, 227 (5th Cir. 1966)). The early stage of a case speaks against finding a waiver of the right to challenge venue. *Infinity Comput. Prods. v. OKI Data Ams., Inc.*, Civ. A. No. 12-6797, 2018 WL 1035793, at *7, 2018 U.S. Dist. LEXIS 29231, at *18–19 (E.D. Pa. Feb. 23, 2018) (declining to "find forfeiture of the improper venue arguments" when the cases "[we]re still in their very early stages").

Here, Randall filed the motion to transfer approximately 20 days after commencing this litigation. By the time of filing, Randall had only participated in preparing the Consent Injunction and some discovery, and did not file an answer or any other motion. Courts in this District have declined to find a waiver of the right to challenge venue when the case was at a much later stage. *See, e.g., Tatum*, 2011 WL 6306551, at *5, 2011 U.S. Dist. LEXIS 113503, at *14–15 (finding "the fact that [d]efendant first filed its [m]otion to [t]ransfer [v]enue nine months after the filing of the original [c]omplaint d[id] not waive its ability to seek" venue transfer); *Dibsie v. Gulf Stream Coach, Inc.*, Civ. A. No. 07-5798, 2008 WL 2230658,

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 47 of 164 PageID: 176

at *4-5, 8 n.6, 2008 U.S. Dist. LEXIS 41652, at *13–14, 27 n.6 (D.N.J. May 28, 2008) (declining to find a waiver when the defendant litigated the case for more than two months, and had filed an answer, asserted cross-claims, participated in an initial scheduling conference, prepared initial disclosures, agreed to appear at a scheduling conference, and commenced discovery); *Staats v. Robinson Helicopter Co.*, 1989 WL 16071, at *3, 1989 U.S. Dist. LEXIS 1781, at *10–11 (D.N.J. Feb. 22, 1989) (declining to find the defendant waived its right to seek venue transfer, despite a "five-month period between the removal of this action" and the defendant's filing of a motion to transfer). Therefore, the Court declines to find Randall waived his ability to challenge venue due to his participation in the litigation.

### 2. The First-Filed Rule Disfavors Transfer

Plaintiffs argue the first-filed rule establishes this Court to be the proper venue, and the parallel and second-filed Massachusetts Lawsuit should be enjoined. (ECF No. 41 at 24.) Randall counters the first-filed rule does not unilaterally mandate that the first court must retain the first action and enjoin the subsequent one. (ECF No. 44 at 35.) The Court finds the first-filed rule weighs in favor of Plaintiffs, but it is not dispositive.

The applicability of the first-filed rule is a procedural question. *Chavez v. Dole Food Co.*, 836 F.3d 205, 210 (3d Cir. 2016). Therefore, federal law governs. *See Gasperini*, 518 U.S. at 427 (holding that federal courts sitting in diversity should apply federal procedural law). Under the first-filed rule, a district court has the discretion to "enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *Spellman v. Express Dynamics, LLC*, 150 F. Supp. 3d 378, 386 (D.N.J. 2015) (citing *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988)). The rule could also be the basis to deny a motion to transfer to a second-filed forum. *See Allianz Life Ins. Co. of N. Am. v. Estate of Bleich*, Civ. A. No. 08-668, 2008 WL 4852683, at *6, 2008 U.S. Dist. LEXIS 90720, at *17 (D.N.J. Nov. 6, 2008) ("[I]n consideration of the applicability of the first-to-file rule, [d]efendants' motion [to transfer] is denied."); *Am. Soc'y for Testing & Materials v. Corrpro Cos.*, 254 F. Supp. 2d 578, 581 (E.D. Pa. 2003) (denying the defendants' motion to transfer because of the first-filed rule). "[T]he rule's primary purpose is to avoid burdening the federal judiciary and to prevent the judicial

embarrassment of conflicting judgments." *E.E.O.C*, 850 F.2d at 977 (citations omitted).

**\*9** There are several exceptions to the first-filed rule, including: (1) rare or extraordinary circumstances; (2) inequitable conduct; (3) bad faith; (4) forum shopping; (5) the subsequently filed action further develops the case; and (6) the first party initiated suit in one forum in anticipation of the other party's imminent suit in a less favorable forum. *Id.* Also, "the presence of a single forum selection clause," which "does not permit" commencing a lawsuit in the first-filed forum, "will almost always render the first-to-file rule inapplicable." *Chemetall US Inc. v. Laflamme*, 2016 WL 1162751, at *3, 2016 U.S. Dist. LEXIS 38590, at *9–10 (D.N.J. Mar. 8, 2014) (citing *Samuels v. Medytox Sols., Inc.*, Civ. A. No. 13-7212, 2014 WL 4441943, at *10, 2014 U.S. Dist. LEXIS 125525, at *30 (D.N.J. Sept. 8, 2014)).

Here, the first-filed rule is applicable. First, the Massachusetts Lawsuit was filed later than this action. Second, the two actions involve the same issues. Randall is seeking to have the Agreement declared void and unenforceable in the Massachusetts Lawsuit (ECF No. 23-1 at 2), and Plaintiffs are attempting to enforce the Agreements here (ECF No. 1 ¶ 1). Third, the two actions involve the same parties. Randall filed a declaratory judgment action against Ethicon and DePuy Synthes in the Massachusetts Lawsuit (ECF No. 23-1 at 2), which are the same parties involved here. Fourth, the Court does not discern and neither party argues any exception to the first-filed rule is applicable. Therefore, this Court has the power to deny Randall's Motion to Stay All Proceedings and Transfer Venue to Massachusetts, and grant Plaintiffs' Cross Motion to Enjoin Proceedings in Massachusetts.

Also, the first-filed rule weighs against transfer here, because this District is the first-filed forum. "[T]he 'first-to-file' rule provides that priority is generally given to the first-filed suit 'absent a showing that the balance of inconvenience favors transfer or unless there are special circumstances which justify giving priority to the second suit.' " *Samuels*, 2014 WL 4441943, at *10, 2014 U.S. Dist. LEXIS 125525, at *30 (citing *Ricoh Co. v. Honeywell, Inc.*, 817 F. Supp. 473, 487 (D.N.J. 1993)); *see also Todd Shipyards Corp. v. Cunard Line, Ltd.*, 708 F. Supp. 1440, 1447 (D.N.J. 1989) (citing *Fort Howard Paper Co. v. William D. Witter, Inc.*, 787 F.2d 784, 790 (2d Cir. 1986)) ("[A]bsent special circumstances, the prior pending action has priority in venue."). Courts in this Circuit consider the first-filed rule along with the public and private interest factors in the motion to transfer inquiry, and

find the first-to-file rule, when applicable, weighs in favor of trying the case in the first-filed forum. *See, e.g., Diaz-Lebel v. TD Bank USA, N.A.,* Civ. A. No. 17-1611, 2017 WL 5451747, at *5, 2017 U.S. Dist. LEXIS 187823, at *13–14 (D.N.J. Nov. 14, 2017) ("The ... action pending in the District of Minnesota was filed more than one year before [p]laintiff filed suit in this District .... Since it appears this [c]ourt and the District of Minnesota have concurrent jurisdiction over a substantially-similar class action, the first-to-file rule ... weighs in favor of transfer to the District of Minnesota."); *Synthes, Inc. v. Knapp,* 978 F. Supp. 2d 450, 463 (E.D. Pa. 2013) ("[T]he public and private interests favor transferring this action to the [first-filed forum]. The first-filed rule also counsels in favor of transfer because there are no exceptions justifying departure from the rule."); *Gielata v. Heckmann,* Civ. A. No. 10-378, 2010 WL 3940815, at *2 & n.92, 2010 U.S. Dist. LEXIS 106674, at *20 & n.92 (D. Del. Oct. 6, 2010) (denying the defendant's motion to transfer, because "[t]he private and public interest factors d[id] not strongly weigh in favor of transfer," and "the first filed rule ... weigh[ed] against transfer"); *Armstrong World Indus. v. Congoleum Corp.,* Civ. A. No. 09-3618, 2009 WL 10739028, at *3, 2009 U.S. Dist. LEXIS 152915, at *10–11 (E.D. Pa. Dec. 29, 2009) (rejecting the defendant's argument that " 'first-filed rule would not control' the transfer analysis in this case," and finding the "case satisfie[d] the parameters and goals of the first-filed rule and should be transferred to the District of Delaware"); *Devorris,* 2007 WL 1875816, at *7, 2007 U.S. Dist. LEXIS 46638, at *19 ("[T]he first-filed rule can be considered as one factor in the more general transfer analysis under § 1404(a).").

**\*10** However, "[t]he first-filed rule is not a hard-and-fast rule; rather, the Section 1404 factors must also be considered." *In re Complaint of Weeks Marine, Inc.,* Civ. A. No. 16-1463, 2016 WL 3410166, at *3, 2016 U.S. Dist. LEXIS 77808, at *10 (D.N.J. June 14, 2016); *see also Ivy-Dry, Inc. v. Zanfel Labs., Inc.,* Civ. A. No. 08-4942, 2009 WL 1851028, at *3, 2009 U.S. Dist. LEXIS 53307, at *8–9 (D.N.J. June 24, 2009) ("In addition to the first-filed rule, on a motion to transfer or dismiss, a court must take into account the same factors as those used in a motion to transfer pursuant to 28 U.S.C. § 1404(a)."); *Devorris v. Cummings Inc.,* Civ. A. No. 06-183, 2007 WL 1875816, at *7, 2007 U.S. Dist. LEXIS 46638, at *19 (W.D. Pa. June 26, 2007) (citing *Zimmer Enters., Inc. v. Atlandia Imps., Inc.,* 478 F. Supp. 2d 983, 989–90 (S.D. Ohio 2007)) ("[A] finding that the first-filed rule is applicable does not preclude a transfer to the forum where the second action was filed. The inquiries are separate and distinct, and the former does not control the

latter."). Therefore, before making the final decision on the motion to transfer, the Court must conduct a Section 1404(a) analysis.

### 3. The Court Denies Randall's Motion to Transfer Pursuant to 28 U.S.C. § 1404(a)

#### a. The District of Massachusetts Is a Proper Venue

"In deciding a motion to transfer under § 1404(a), the court must first determine whether the alternative forum is a proper venue, *i.e.*, a district wherein the action 'might have been brought.' " *Jacobs v. Cider Mill Farms,* Civ. A. No. 99-2832, 1999 WL 1418878, at *2, 1999 U.S. Dist. LEXIS 21296, at *4–5 (D.N.J. Oct. 25, 1999). A venue is proper if it is "a judicial district where any defendant resides, if all defendants reside in the same State." 28 U.S.C. § 1391(b)(1). "If venue in the requested district is proper, then the Court must analyze a series of private and public factors to determine whether 'on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.' " *Virag, S.R.L. v. Sony Comput. Entm't Am. LLC,* Civ. A. No. 14-4786, 2015 WL 1469745, at *3, 2015 U.S. Dist. LEXIS 39910, at *8–9 (D.N.J. Mar. 30, 2015) (citing *Jumara,* 55 F.3d at 879). Here, the sole defendant, Randall, currently is, and was at all times material hereto, a Massachusetts resident. (ECF No. 23-1 at 3.) Therefore, the District of Massachusetts is a proper venue, and the Court will proceed with the analysis of the private and public interest factors.

#### b. The Agreement's Forum Selection Clause Disfavors Transfer, But Will Not Render the Private Interest Factors Irrelevant

Plaintiffs argue, because of the Agreement's forum selection clause, this Court should disregard the parties' private interests, and only consider the public interest factors. (ECF No. 41 at 37.) Randall counters, because the forum selection clause here is permissive, the traditional § 1404 analysis should apply in its entirety. (ECF No. 44 at 22.) The Court finds the permissive forum selection clause undercuts but does not negate the weight of private interest factors.

When an exclusive forum selection clause is present, a court evaluating a defendant's § 1404(a) motion to transfer

"should not consider arguments about the parties' private interests," and "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 64 (2013). "Even if *Atlantic Marine* does not apply with full force to permissive forum selection clauses, the rationale supporting the Supreme Court's decision is persuasive." *ADP, LLC v. Lynch*, Civ. A. No. 16-1111, 2016 WL 3574328, at *6, 2016 U.S. Dist. LEXIS 85636, at *19 (D.N.J. June 30, 2016) (citations omitted); *see also Networld Communs., Corp. v. Croat. Airlines, D.D.*, Civ. A. No. 13-4770, 2014 WL 4724625, at *4-5 n.5, 2014 U.S. Dist. LEXIS 133078, at *13–14 n.5 (D.N.J. Sept. 23, 2014) (citing *Aamco Transmissions, Inc. v. Romano*, 42 F. Supp. 3d 700, 713 (E.D. Pa. 2014)) ("*Atlantic Marine* supports the proposition that a permissive forum selection clause's presence nonetheless undercuts certain private interest arguments (*e.g.*, the forum would be inconvenient for parties or witnesses)."); *Radian Guar., Inc. v. Bolen*, 18 F. Supp. 3d 635, 651 (E.D. Pa. 2014) ("[T]he existence of a forum selection clause of any kind significantly undercuts any argument that the preselected forum is inconvenient for the parties or their witnesses."). "Even though less deference is accorded to ... a permissive forum selection clause," the defendants who seek venue transfer " 'must still prove that the private and public balancing factors outweigh the plaintiff's choice of forum, and the [c]ourt must find that the balances are more than merely "tipped" in favor of the defendants.' " *Networld Communs.*, 2014 WL 4724625, at *5, 2014 U.S. Dist. LEXIS 133078, at *14–15 (citing *Kroger, Inc. v. O'Donnell*, Civ. A. No. 07-3091, 2007 WL 3232586, at *4, 2007 U.S. Dist. LEXIS 80551, at *9 (D.N.J. Oct. 31, 2007)). "That is because even under a traditional 1404(a) analysis, the plaintiff's choice of forum should seldom be disturbed." *Lynch*, 2016 WL 3574328, at *6, 2016 U.S. Dist. LEXIS 85636, at *19 (citing *Yang v. Odom*, 409 F.Supp.2d 599, 604 (D.N.J. 2006)); *see also Asphalt Paving Sys., Inc. v. Gannon*, Civ. A. No. 14-5518, 2015 WL 3648739, at *3, 2015 U.S. Dist. LEXIS 75615, at *8–9 (D.N.J. June 11, 2015) (citing *Atl. Marine*, 134 S. Ct. at 583) ("Cognizant of the fact that the forum selection clause in this case is not mandatory, the [c]ourt nonetheless finds the policy underlying *Atlantic Marine* instructive. When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations.").

**\*11** Here, the Agreement's forum selection clause is permissive. Therefore, it undercuts but does not negate the weight of private interest factors. Randall must prove the

private and public balancing factors outweigh the forum selection clause, tipping significantly in its favor.

### c. Private Interest Factors Favor Transfer

Randall argues the District of Massachusetts is the most appropriate venue. (ECF No. 23-1 at 3.) First, Randall insists the core facts of this dispute occurred in Massachusetts, because Randall is a Massachusetts resident, and the events giving rise to this litigation occurred in Massachusetts. (*Id.*) In particular, Randall signed the Agreement, worked for, and resigned from Plaintiffs in Massachusetts. (*Id.*) Randall asserts Plaintiffs' forum choice therefore should be given less weight. (*Id.* at 4.) Second, Randall claims New Jersey has no relevance to this dispute even though Ethicon is headquartered in New Jersey, because DePuy Synthes, rather than Ethicon, is a named party to the Agreement, and DePuy Synthes is an Indiana corporation. (*Id.*) Third, Randall contends Massachusetts is a more convenient forum for the parties. (*Id.* at 6.) Randall maintains it is inconvenient for Randall, an unemployed individual with no connections to New Jersey, to travel to New Jersey for the proceedings, while Plaintiffs have business operations and are accustomed to litigating cases in Massachusetts. (*Id.*) Fourth, Randall argues the location of the relevant documents weighs in favor of the case being transferred to Massachusetts, because the Agreement, a seminal document here, was delivered to and executed by Randall in Massachusetts, and Plaintiffs will bear no burden by producing relevant documents in Massachusetts. (*Id.* at 7.) Fifth, Randall alleges the District of Massachusetts is the most convenient forum for all of the witnesses. (ECF No. 44 at 20.)

Plaintiffs claim the private interest factors weigh against transfer. (ECF No. 41 at 42.) First, Plaintiffs stress New Jersey is Plaintiffs' chosen forum and the designated forum in the Agreement. (*Id.*) Second, Plaintiffs assert Randall has submitted to this Court's jurisdiction and venue through the Consent Injunction and his participation in proceedings and discovery in this Court. (*Id.*) Third, Plaintiffs maintain the events giving rise to their claim, as well as the relevant evidence and defenses, are centered in New Jersey. (*Id.*) Fourth, Plaintiffs insist New Jersey is a more convenient forum for the parties, because New Jersey is the home of Ethicon and its parent J&J, and the parties have completed expedited discovery, including depositions of Randall and necessary witnesses, thereby eliminating any inconvenience to Randall. (*Id.* at 42–43.) Plaintiffs assert any allegation of

inconvenience is minimized given the parties' ability (and past practice) to utilize remote tools to conduct discovery and participate in court proceedings. (*Id.* at 43.) Fifth, Plaintiffs allege the witnesses with knowledge or information pertaining to their claim and any defenses to it reside and work outside of Massachusetts, including the key witnesses who work with J&J, four of whom have been deposed by Randall. (*Id.*) Sixth, Plaintiffs argue the relevant documents are located, collected, and produced in New Jersey. (*Id.*) The Court finds the private interest factors favor transfer.

**\*12**  First, the factor for where the claim arose favors transfer. "[T]his factor involves a consideration of which forum constitutes the center of gravity of the dispute, its events, and transactions." *Rosen v. Lieberman*, Civ. A. No. 16-7341, 2018 U.S. Dist. LEXIS 181005, at \*12 (D.N.J. Oct. 18, 2018) (citations and internal quotations omitted). "The center of gravity analysis is a fact sensitive inquiry that seeks to identify the forum in which the operative facts giving rise to the litigation occurred." *Allied Old English, Inc. v. Uwajimaya, Inc.*, Civ. A. No. 11-1239, 2012 WL 3564172, at \*4, 2012 U.S. Dist. LEXIS 116261, at \*11 (D.N.J. Aug. 16, 2012) (citations omitted). "The 'locus of the alleged culpable conduct' determines the place where the claim arose." *Id.* (citing *Van Cauwenberghe v. Biard*, 486 U.S. 517, 529 (1988)). "When the dispute involves a contract, a court should consider where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred." *Depuy Synthes*, 2013 WL 5816328, at \*8, 2013 U.S. Dist. LEXIS 154825, \*22; *see also Rosen*, 2018 U.S. Dist. LEXIS 181005, at \*13 (citing *Frato v. Swing Staging. Inc.*, Civ. A. No. 10-5198, 2011 WL 3625064, at \*4 (D.N.J. Aug. 17, 2011)) ("In contract actions, 'the factors determining where the claim arose include where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred.' "); *Domtar AI, Inc. v. J.D. Irving, Ltd.*, Civ. A. No. 14-0727, 2014 WL 1679713, at \*5, 2014 U.S. Dist. LEXIS 58380, at \*16 (E.D. Pa. April 25, 2014) (finding that the factor for where the claim arose favored transferring the case to Georgia, where most of the events giving rise to the contract claim occurred, including the employment agreement's negotiation, execution, and performance, and the defendant's resignation announcement).

Here, Randall executed the Agreement, announced resignation from Plaintiffs and accepted an offer from Smith & Nephew in Massachusetts. (ECF No. 23-1 at 5.) Also, Randall performed the Agreement primarily in Massachusetts, where Randall's positions with Plaintiffs were based. (*Id.*) Plaintiffs' allegation that some events giving rise to their contract claim and certain relevant evidence are centered in New Jersey—(1) the subject of this dispute (*i.e.*, Plaintiffs' confidential information) was administered and managed in New Jersey, and (2) a part of Randall's performance of the Agreement occurred in New Jersey, because he was required to and actually travelled to New Jersey during his employment with Plaintiffs (ECF No. 41 at 22, 40)—does not change the fact that a substantial portion of the central facts of this contract dispute occurred in Massachusetts. More importantly, the center of gravity here is in Massachusetts, where the alleged culpable conduct of Randall, *i.e.*, leaving Plaintiffs to work for a competitor, occurred. Therefore, the factor concerning where the claim arose favors Randall.

Second, the factor for the plaintiff's choice of forum disfavors a transfer, but it is not of significant weight here. "Generally, unless the defendant can show that the inconvenience to the parties strongly favors another forum, plaintiff's choice of forum should prevail." *Ponzio v. Mercedes-Benz USA, LLC*, 447 F. Supp. 3d 194, 219 (D.N.J. 2020) (citing *Shutte v. Armco Steel Corp.*, 431 F.2d 22, 25 (3d Cir. 1970)). However, because the central facts of this dispute occurred in Massachusetts, the Court should give significantly less deference to Plaintiffs' choice of forum. *Depuy Synthes*, 2013 WL 5816328, at \*7, 2013 U.S. Dist. LEXIS 154825, \*15 (citations omitted) ("Where the operative facts of a lawsuit occur outside the forum selected by the plaintiff, that choice is entitled to less deference."); *Santi v. Nat'l Bus. Records Mgmt., LLC*, 722 F. Supp. 2d 602, 607 (D.N.J. 2010) (citations omitted) ("[C]ourts give substantially less weight to a plaintiff's forum choice when the dispute at the heart of a lawsuit occurred almost entirely in another state.").

Third, the factor for the defendant's choice of forum favors a transfer, because Randall seeks to transfer this case to Massachusetts. Here, this factor should be given more weight, because less deference is afforded to Plaintiffs' choice of forum. *Virag*, 2015 WL 1469745, at \*6, 2015 U.S. Dist. LEXIS 39910, at \*16 (citing *N. Am. Dental Wholesalers, Inc. v. Danaher Corp.*, Civ. A. No. 11-247, 2011 WL 3606866, at \*5 (E.D. Pa. Aug. 15, 2011)) ("[B]ecause less deference is afforded to [p]laintiff's choice of forum, [d]efendant's choice of forum should be given more weight.").

**\*13**  Fourth, the factor for the convenience of the parties is neutral. This factor requires the court to examine "the

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 51 of 164 PageID: 180

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

convenience of the parties as indicated by their relative physical and financial condition." *Partners of Mass., LLC v. Fantasia*, Civ. A. No. 15-7960, 2016 WL 7476355, at *8, 2016 U.S. Dist. LEXIS 179898, at *22 (D.N.J. Dec. 28, 2016) (citing *Jumara*, 55 F.3d at 879). In this regard, Randall alleges it would be far easier for Plaintiffs to litigate this matter in Massachusetts, where they have business operations, than it would be for Randall to litigate in New Jersey, where he has no connection. (ECF No. 23-1 at 6.) These facts weigh in favor of transfer. *See ADP v. Capote*, Civ. A. No. 15-1355, 2015 WL 13447655, at *5, 2015 U.S. Dist. LEXIS 191019, at *12 (D.N.J. July 28, 2015) (finding that it was far more convenient for the individual dependent who lived in Texas and minimally detrimental to the plaintiff company to transfer the case to Texas, where the plaintiff had a substantial presence).

However, "any travel between [New Jersey and Massachusetts], geographically close by and connected by highways, rail, and air transport as they are, will be no more burdensome than the visits [the plaintiff employee] made during his employment." *Partners of Mass.*, 2016 WL 7476355, at *8, 2016 U.S. Dist. LEXIS 179898, at *23 (finding the factor for the convenience of the parties to be neutral). Also, the "physical presence" in a courtroom is not required to afford a party "a fair opportunity to litigate," and "the availability of technology [ ] can eliminate or lessen any need" of the party to travel to the forum. *Lomax v. Meracord LLC*, Civ. A. No. 13-1945, 2013 WL 5674249, at *5, 2013 U.S. Dist. LEXIS 148555, at *14–15 (D.N.J. Oct. 16, 2013). Therefore, any alleged inconvenience of Randall is minimized by the geographical proximity between Massachusetts and New Jersey, and the parties' ability (and past practice) to utilize remote tools to conduct discovery and litigate. *See Partners of Mass.*, 2016 WL 7476355, at *8, 2016 U.S. Dist. LEXIS 179898, at *23 (finding the geographical proximity between New Jersey and Massachusetts undercut the defendant's alleged inconvenience in traveling from Massachusetts to New Jersey to defend the lawsuit); *id.* (declining to find the plaintiff's "personal circumstances," including "her health and age," "render[ed] the Western District of Washington a forum so seriously inconvenient as to be unreasonable" to the plaintiff as a New Jersey resident, who could have her " 'day in court' without ever setting foot in a courtroom," because "the availability of technology [could] eliminate or lessen any need for" the plaintiff to travel to that forum); *Celgene Corp. v. Abrika Pharms., Inc.*, Civ. A. No. 06-5818, 2007 WL 1456156, at *5, 2007 U.S. Dist. LEXIS 36202, at *15 (D.N.J. May 15, 2007) ("Given

the proximity of this [c]ourt and the District of Delaware court, there is no reason to believe that transferring the case would be more convenient for the parties or the witnesses, or that transfer would provide easier access to evidence."). Moreover, the COVID-19 pandemic has moved most of court proceedings online, so that the parties need not be physically present in the forum for these proceedings. Accordingly, the Court finds this factor neutral.

Fifth, the factor for the convenience of the witnesses is neutral. This factor must be considered "only to the extent that the witnesses may actually be unavailable for trial in one of the fora." *Danka*, 21 F. Supp. 2d at 474 (citing *Jumara*, 55 F.3d at 879). A district court can subpoena "a person to attend a trial, hearing, or deposition" anywhere "within 100 miles" of where that person lives or works. Fed. R. Civ. P. 45(c)(1)(A). Also, a district court has statewide subpoena power over "a party or a party's officer" in states where it lives or works. Fed. R. Civ. P. 45(c)(1)(B)(i). Similarly, non-party witnesses can be "commanded to attend a trial" in the state where they live or work, so long as their attendance would not require them to "incur substantial expense." Fed. R. Civ. P. 45(c)(1)(B)(ii). Here, neither party has demonstrated any witness would actually be unavailable for trial. Randall identifies five non-party witnesses the parties may call, and three of them are out of the subpoena power of this Court and a Massachusetts court, because the three witnesses live or work in Ohio, California, and Indiana. (ECF No. 44 at 17–19.) Therefore, the factor for the convenience of witnesses is "neutral," because "no matter in which forum this case proceeds, certain witnesses, if unavailable for trial, would be out of the court's subpoena power." *Crowe v. Johnson & Johnson*, Civ. A. No. 15-6305, 2021 WL 1611245, at *3, 2021 U.S. Dist. LEXIS 79713, at *8–9 (D.N.J. Apr. 26, 2021); *accord, Rouse v. Harley-Davidson, Inc.*, Civ. A. No. 20-528, 2021 WL 254065, at *4-5, 2021 U.S. Dist. LEXIS 13723, at *14–15 (M.D. Pa. Jan. 26, 2021).

**\*14** Sixth, the factor for the location of books and records is neutral and of little weight. This factor is only relevant "to the extent that the files could not be produced in the alternative forum." *Danka*, 21 F. Supp. 2d at 474 (citing *Jumara*, 55 F.3d at 879). "[W]hen documents can be transported and/or easily photocopied, their location is entitled to little weight." *Santi*, 722 F. Supp. 2d at 608 (citing *Clark v. Burger King Corp.*, 255 F. Supp. 2d 334, 339 (D.N.J. 2003)). "[T]he technological advances of recent years have significantly reduced the weight of [this factor] in the balance of convenience analysis." *Partners of Mass.*, 2016 WL 7476355, at *9, 2016 U.S.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 52 of 164 PageID: 181

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

Dist. LEXIS 179898, at *24 (citing *Lomanno v. Black*, 285 F. Supp. 2d 637, 647 (E.D. Pa. 2003)). Here, neither party has "indicated that relevant books and records will not be available in New Jersey," *id.* at *23 (finding the factor for the location of books and records to be neutral), or "suggested that the transportation, if necessary, of the relevant documents to either forum would be unduly burdensome or expensive." *Allied Old English*, 2012 WL 3564172, at *6, 2012 U.S. Dist. LEXIS 116261, at *19 (citing *Fasano v. Coast Cutlery Co.*, Civ. A. No. 11-3977, 2012 WL 1715233, at *5 (D.N.J. May 15, 2012)) ("[T]he private factor regarding the location of the relevant documents is a neutral factor."). Therefore, this factor is neutral.

In sum up: (1) the factor for where the claim arose favors transfer; (2) the factor for the plaintiff's choice of forum, which is entitled to significantly less deference here, disfavors transfer; (3) the factor for defendant's choice of forum, which is given more weight here, favors transfer; (4) the other three factors are neutral. However, the Agreement's permissive forum selection clause disfavors transfer. Therefore, though two of the six private factors favor transfer, their weight in the motion to transfer analysis is significantly undercut by the Agreement's forum selection clause.

**d. Public Interest Factors Are Neutral**

Randall alleges Plaintiffs sue Randall in New Jersey in order to inconvenience and disadvantage him as an individual defendant, and therefore equity and fundamental fairness mandate transferring this case to the District of Massachusetts. (ECF No. 23-1 at 7.) Randall argues Massachusetts has an interest in adjudicating matters, as here, arising in and involving residents of Massachusetts. (*Id.*) Randall asserts the factor for the enforceability of the judgment favors transfer, because any judgment rendered against Randall ultimately must be enforced against him in Massachusetts. (ECF No. 44 at 30.) Plaintiffs maintain the public interest factors do not favor Randall, claiming Randall has not shown there is less court congestion in the District of Massachusetts than in this District. (ECF No. 41 at 39.) Plaintiffs also contend New Jersey has a local interest here, because (1) Ethicon and its parent company J&J are based in New Jersey, where Plaintiffs' central decision-making occurs; (2) the subject of this dispute (*i.e.*, Plaintiffs' confidential information) is managed in New Jersey; and (3) New Jersey has an interest in enforcing its laws that govern

the Agreement. (*Id.* at 39–40.) The Court finds the six public interest factors are neutral.

First, the factor for the enforceability of the judgment is neutral. "[T]he public interest in the enforceability of the judgment is not concerned with the convenience with which the parties may obtain a judgment; rather, this factor concerns whether a judgment is capable of being enforced at all." *In re Howmedica Osteonics Corp.*, 867 F.3d 390, 406 n.10 (3d Cir. 2017) (citing *Bhatnagar v. Surrendra Overseas Ltd.*, 52 F.3d 1220, 1225 n.3 (3d Cir. 1995)). "[I]t is unlikely that there would be any significant difference in the difficulty of enforcing a judgment rendered by one federal forum or the other." *Id.* at 410 (citing 1 James Moore et al., *Moore's Manual: Federal Practice and Procedure*, § 7.81[3][b] (2017)). Therefore, "[e]nforceability of the judgment does not favor either forum because the ultimate judgment will be enforceable in both states." *Gourmet Video, Inc. v. Alpha Blue Archives, Inc.*, Civ. A. No. 08-2158, 2008 WL 4755350, at *8, 2008 U.S. Dist. LEXIS 87645, at *24 (D.N.J. Oct. 29, 2008) (citing *Yocham v. Novartis Pharms. Corp.*, 565 F.Supp.2d 554, 559 (D.N.J. 2008)).

**\*15** Second, the factor for practical considerations that could make the trial easy, expeditious, or inexpensive disfavors transfer. "One practical consideration that supports transfer is efficiency." *Metro. Life Ins. Co. v. Bank One, N.A.*, Civ. A. No. 03-2784, 2012 WL 4464026, at *7, 2012 U.S. Dist. LEXIS 137119, at *21 (D.N.J. Sept. 25, 2012). "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Id.* (citing *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960)). The relevant time for this practical consideration inquiry is "the time of the transfer motion." *Abbott Labs. v. Roxane Labs., Inc.*, Civ. A. No. 12-457, 2013 WL 2322770, at *23, 2013 U.S. Dist. LEXIS 74316, at *80 (D. Del. May 28, 2013); *see also Uniloc United States v. Huawei Device United States*, Civ. A. No. 17-736, 2018 WL 7138384, at *5, 2018 U.S. Dist. LEXIS 234545, at *14 (E.D. Tex. Sept. 6, 2018) ("[T]ransfer must be viewed at the time of filing."). By the time Randall filed his Motion to Transfer, Plaintiffs had not been served and no answer or motion had been filed in the Massachusetts Lawsuit. *Randall v. Ethicon, Inc. et al*, No. 1:20-cv-11870 (D. Mass. filed Oct. 17, 2020). At the same time, the parties here had commenced discovery and agreed upon the Consent Injunction. To conserve judicial resources, it is better to have one consolidated trial in this Court. *See Samuels*, 2014 WL

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 53 of 164 PageID: 182

*Ethicon, Inc. v. Randall*, Not Reported in Fed. Supp. (2021)

4441943, at *11, 2014 U.S. Dist. LEXIS 125525, at *32 ("Defendants cannot use their own lawsuit, filed well after [p]laintiff filed the instant action, in support of the argument that this case should be transferred in the name of judicial efficiency."); *Depuy Synthes*, 2013 WL 5816328, *7, 2013 U.S. Dist. LEXIS 154825, *20 (supporting transfer from New Jersey, where the case was still at an early stage, to Washington, where the case was filed first, had gone through discovery and had a trial date set).

Also, "potential delays caused by witnesses needing to travel may be considered" for the practical consideration inquiry. *Kane v. Ollie's Bargain Outlet Holdings, Inc.*, Civ. A. No. 18-3475, 2018 WL 6168085, at *5, 2018 U.S. Dist. LEXIS 199168, at *14 (D.N.J. Nov. 26, 2018). "[T]he likelihood that parties, documents, and witnesses will have to be transported from one forum to another regardless of where this case is litigated means that 'practical considerations that could make the trial easy, expeditious, or inexpensive' do not favor either forum." *Yocham*, 565 F. Supp. 2d at 559 (citing *Jumara*, 55 F.3d at 879); *see also Gourmet Video*, 2008 WL 4755350, at *8, 2008 U.S. Dist. LEXIS 87645, at *24 ("Practical considerations also do not favor either forum because both parties have witnesses and records located in their home states."). As discussed in Part III.B.3.c, *supra*, the parties, potential witnesses, and relevant documents here are located in both New Jersey and Massachusetts. There is a likelihood, though diminished by the availability of online tools for litigation, that the parties, witnesses, and documents will need to be transferred from one forum to another regardless of where this case is litigated. Therefore, this consideration is neutral.

Third, the factor relating to administrative difficulty and court congestion favors transfer. "Regarding the administrative difficulties associated with proceeding in either District, the Court is required to evaluate this factor in light of the relative docket congestion of the fora." *Hytera Communs. Corp. v. Motorola Sols., Inc.*, Civ. A. No. 17-12445, 2018 WL 7108018, at *11, 2018 U.S. Dist. LEXIS 207162, at *33 (D.N.J. Dec. 6, 2018). Plaintiffs cite the federal court management statistics through June 30, 2020, and point out that civil cases in New Jersey have a shorter median time (9.8 months) from filing to disposition than those in Massachusetts (11.0 months), which suggests a higher level of court congestions in Massachusetts. (ECF No. 41 at 39.) However, Randall claims the same set of statistics also shows the civil cases in New Jersey have a longer median time (39.4 months) from filing to trial than those in Massachusetts (32.0

months), which points to an opposite conclusion.[3] (ECF No. 44 at 31.) Randall further asserts, for the 12-month period ending June 30, 2020, the number of filings and pending cases per judgeship is much higher in the District of New Jersey (1,069 civil filings and 2,514 pending cases per judgeship) than the District of Massachusetts (217 civil filings and are 364 pending cases per judgeship).[4] (*Id.*) Taken together, the data regarding docket congestion weigh in favor of transfer.

**\*16** Also, transfer is favored when the transferee court experiences a lower level of judicial emergency. *See Tu v. C.H. Robinson Worldwide, Inc.*, Civ. A. No. 19-16561, 2020 WL 3496930, at *5, 2020 U.S. Dist. LEXIS 113772, at *14 (D.N.J. June 29, 2020) (finding that the factor for administrative difficulty "weigh[ed] in favor of transfer" from the District of New Jersey to the District of Minnesota, because of the "six judicial emergencies within the District of New Jersey"); *Mehta v. Angell Energy*, Civ. A. No. 18-2319, 2019 WL 4750142, at *8, 2019 U.S. Dist. LEXIS 171612, at *23–24 (D.N.J. Sept. 30, 2019) (finding that the analysis of "the relative administrative difficulty weigh[ed] heavily in favor of transfer," because "the District of New Jersey [wa]s ... experiencing a judicial emergency and lack[ed] six District Judges," while "[t]he District of Minnesota, on the other hand, ha[d] a full complement of District Judges"). The most recent federal court management statistics shows the District of New Jersey lacks six District Judges, though four District Judges have been nominated; while the District of Massachusetts lacks two District Judges, and one District Judge has been nominated.[5] Therefore, the consideration of judicial emergency also favors transfer.

Fourth, the factor for the local interest in deciding local controversies at home favors transfer. As discussed in Part III.B.3.c, *supra*, the alleged culpable conduct of Randall took place in Massachusetts, which therefore has a strong public interest in adjudicating the dispute. *Melone v. Boeing Co.*, Civ. A. No. 07-1192, 2008 WL 877974, at *4, 2008 U.S. Dist. LEXIS 25367, at *11–12 (D.N.J. Mar. 28, 2008) (finding that "Washington ha[d] a strong local interest in this lawsuit as opposed to New Jersey," because "he alleged culpable conduct occurred in Washington"); *Cancer Genetics, Inc. v. Kreatech Biotechnology, B.V.*, Civ. A. No. 07-273, 2007 WL 4365328, at *6, 2007 U.S. Dist. LEXIS 90857, at *17 (D.N.J. Dec. 11, 2007) (citing *Hoffer v. InfoSpace.com, Inc.*, 102 F. Supp. 2d 556, 576 (D.N.J. 2000)) ("Typically, when a substantial amount of the alleged culpable conduct occurred in the chosen forum, that court favors retaining jurisdiction as a matter of local interest."); *Ricoh*, 817 F. Supp. at 486

(citations omitted) ("Because Minnesota is the locus of the majority of alleged culpable conduct, Minnesota has a strong public interest in adjudicating this dispute.").

Plaintiffs claim New Jersey has a local interest here in protecting in-state businesses like Ethicon. (ECF No. 41 at 39.) But Massachusetts also has a local interest in protecting its in-state residents like Randall. *See Maliki v. Holy Redeemer Hosp.*, Civ. A. No. 15-1591, 2016 WL 4161094, at *3, 2016 U.S. Dist. LEXIS 103169, at *6 (D.N.J. Aug. 5, 2016) ("New Jersey also has an interest in protecting its residents."). "[W]hen both states have an interest in protecting its citizens, courts in this District have found the balance to tip in favor of the State that was found to be the center of gravity of the actions giving rise to the litigation," which, in this case, is Massachusetts. *Allied Old English*, 2012 WL 3564172, at *7, 2012 U.S. Dist. LEXIS 116261, at *22 (citations omitted); *see also Prime Hookah, Inc. v. MK Distribs., Inc.*, Civ. A. No. 19-7283, 2020 WL 563524, at *6-7, 2020 U.S. Dist. LEXIS 18707, at *18–19 (D.N.J. Feb. 5, 2020) (concluding that Massachusetts' interest was more substantial, because the alleged wrongful acts occurred there and the plaintiff did not contend it could not prosecute its claims in Massachusetts, even though New Jersey had an interest in providing a forum for a business operating there to vindicate its rights); *Lucent Techs. v. DiCon Fiberoptics, Inc.*, Civ. A. No. 05-2534, 2006 WL 2290522, at *2, 2006 U.S. Dist. LEXIS 58283, at *15 (D.N.J. Aug. 8, 2006) (concluding "the local interest in deciding local controversies locally weigh[ed] in favor of trying this matter in California, and not in New Jersey," even though the plaintiff "ha[d] its headquarters in New Jersey," because "most of the conduct relevant to this action occurred either in California or Massachusetts").

 **\*17**  Plaintiffs also contend New Jersey has a strong interest in ensuring noncompetition agreements subject to its laws, like the Agreement here, are enforced. (ECF No. 41 at 40.) Indeed, the fact that the contract in dispute is governed by the law of a state may support finding that state's interest in resolving the dispute. *See Allianz*, 2008 WL 4852683, at *6, 2008 U.S. Dist. LEXIS 90720, at *17 ("[T]he [p]olicy appears to have been issued pursuant to New Jersey law, [which is] a fact that bears on the local interest in deciding the matter."); *Cancer Genetics*, 2007 WL 4365328, at *6, 2007 U.S. Dist. LEXIS 90857, at *17 (finding that New York "ha[d] a strong local interest in this case," in part because "[t]he parties ... consented to be governed by New York law"). But, even so, Massachusetts has a greater local interest in deciding this case, because the accused wrongful conduct

occurred there, and the Court has no reason to find the District of Massachusetts would be unable to faithfully apply New Jersey law. *See Kane v. Stoll*, Civ. A. No. 14-3748, 2014 WL 2926211, at *4, 2014 U.S. Dist. LEXIS 87488, at *10–11 (D.N.J. June 27, 2014) (finding "[t]here [wa]s more of a local interest to have this matter decided in California ... even assuming New Jersey law applie[d]," because the claim arose in California and "the District Court in California [wa]s fully capable of applying settled New Jersey law"). In conclusion, this factor favors transfer.

Fifth, the public policy factor is neutral. As explained in Part III.A, *supra*, the applicable public policies affecting the Agreement's enforceability are similar between New Jersey and Massachusetts.

Sixth, the factor for the trial judge's familiarity with the applicable state law weighs against transfer. "The focus of this factor is whether judges in one of the districts would have greater familiarity with the applicable state law, particularly in diversity cases." *Rosen*, 2018 U.S. Dist. LEXIS 181005, at *26 (citing *Jumara*, 55 F.3d at 879). Here, if the case were to be transferred to Massachusetts, the same New Jersey choice of law rule would apply, since a transferee court applies the choice of law principles of the transferor forum. *Ferens v. John Deere Co.*, 494 U.S. 516, 524–25 (1990) (citing *Van Dusen v. Barrack*, 376 U.S. 612, 639 (1964)) ("[T]he choice-of-law rules should not change following a transfer initiated by a defendant. Transfers initiated by a plaintiff involve some different considerations, but lead to the same result."). As explained in Part III.A, *supra*, New Jersey law governs the Agreement under New Jersey choice of law rules. Therefore, if the case is transferred to Massachusetts, New Jersey law will still govern the Agreement.

"Common sense suggests that a New Jersey court would be better suited to address [the plaintiff's New Jersey state law] claims, but this assumption is not necessarily true." *Tu*, 2020 WL 3496930, at *5, 2020 U.S. Dist. LEXIS 113772, at *16. However, even though a court might have to apply and is less familiar with another jurisdiction's law, it does not necessarily warrant transferring the case to that jurisdiction, because a court "is regularly called upon to apply the law of other jurisdictions." *Bachmann Software & Servs. v. Intouch Grp., Inc.*, Civ. A. No. 08-2025, 2008 WL 2875680, at *17, 2008 U.S. Dist. LEXIS 55719, at *48 (D.N.J. July 21, 2008) ("[T]he fact that California law governs at least a part of this dispute does not warrant the transfer of this case to California."). Here, Plaintiffs' breach of contract claim is

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 55 of 164 PageID: 184

based on common law. As explained in Part III.A, *supra*, New Jersey law and Massachusetts law are substantially similar on the enforceability of noncompetition covenants, which indicates "this factor is essentially neutral." *FerraTex, Inc. v. U.S. Sewer & Drain, Inc.*, 121 F. Supp. 3d 432, 443 (D.N.J. 2015) (noting that nothing in the record suggested the relevant legal principles, *i.e.*, the law governing contract and quasi-contractual/equitable principles, differed significantly between New Jersey and Pennsylvania). Nevertheless, "to the extent there is any benefit to be gained by the District of New Jersey's familiarity with the New Jersey law at issue, this factor weighs against transfer." *Id.*; *see also Capote*, 2015 WL 13447655, at *6-7, 2015 U.S. Dist. LEXIS 191019, at *16 (finding this factor weighed against transferring a breach of restrictive covenant case to Texas, when neither party explained how Texas and New Jersey would apply different legal standards in the context of restrictive covenants, and the contract law did not differ significantly between Texas and New Jersey).

**\*18**  In sum: (1) the factor for practical considerations disfavors transfer; (2) the factor relating to administrative difficulty and court congestion favors transfer, (3) the factor for the state's local interest favors transfer; (4) the factor for the trial judge's familiarity with the applicable state law weighs against transfer; and (5) the other two factors are neutral. On balance, the public interest factors are neutral.

### e. The Court Denies Randall's Motion to Transfer After Balancing the Above Considerations and Factors

In balancing the private interest and the public interest factors, a district court has "broad discretion to determine, on an individualized, case-by-case basis, whether convenience and fairness considerations weigh in favor of transfer." *Riess v. Target Corp.*, Civ. A. No. 10-737, 2010 WL 2403349, at *2, 2010 U.S. Dist. LEXIS 59033, at *4 (D.N.J. June 15, 2010) (citing *Jumara*, 55 F.3d at 883). "[T]he defendant bears the burden of persuasion and must tip the balance 'strongly' in its favor." *Id.* (citing *EVCO Tech. & Dev. Co. v. Precision Shooting Equip., Inc.*, 379 F. Supp. 2d 728, 730 (E.D.N Pa 2005)). Here, the private interest factors favor transfer, but their weight is significantly weakened by the Agreement's forum selection clause, the public interest factors are neutral, and the first-filed rule disfavors transfer. Therefore, Randall has "failed to meet [his] burden to establish why transfer pursuant to 28 U.S.C. § 1404 is warranted, and in consideration of the applicability of the

first-to-file rule, [his] motion is denied." *Allianz*, 2008 WL 4852683, at *6, 2008 U.S. Dist. LEXIS 90720, at *18. Accordingly, the Court denies Randall's Motion to Transfer to Massachusetts, and grants Plaintiffs' Cross Motion to Enjoin Proceedings in Massachusetts.

### C. The Court Grants Plaintiffs' Motion for Preliminary Injunction

#### 1. Plaintiffs Have Demonstrated a Reasonable Likelihood of Success

To state a claim for breach of contract, a party must allege: "(1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Touzot v. ROM Dev. Corp.*, Civ. A. No. 15-6289, 2016 WL 1688089, at *7, 2016 U.S. Dist. LEXIS 55766, at *19–20 (D.N.J. Apr. 26, 2016) (citing *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007)). Here, the Court finds Plaintiffs have demonstrated a likelihood of success against Randall on the breach of contract claim.

#### a. A Contract Exists Between Plaintiffs and Randall

Randall argues no contract exists between Randall and Ethicon, because Ethicon is not a party to the Agreement. (ECF No. 29 at 18.) Plaintiffs insist Ethicon can enforce the Agreement, because (1) the Agreement can be assigned to any entity within the Company under Section 6.4 of the Agreement, and (2) Ethicon can enforce the Agreement as an express beneficiary. (ECF No. 35 at 41.) Randall counters, even if the Agreement is assignable, it is not actually assigned to Ethicon, who therefore cannot enforce the Agreement. (ECF No. 42 at 8.) The Court finds Ethicon is entitled to enforce the Agreement.

"Courts have recognized the right of a third-party beneficiary to enforce a contract." *Lakowitz v. Brown*, Civ. A. No. A-2799-12T4, 2014 WL 1239137, at *3, 2014 N.J. Super. Unpub. LEXIS 672, at *7 (N.J. Super. Ct. App. Div. Mar. 27, 2014) (citing *Drewen v. Bank of Manhattan Co.*, 155 A.2d 529, 532 (N.J. 1959)). The test to determine third-party beneficiary status is "whether the parties to the contract intended others to benefit from the existence of the contract." *City of Perth Amboy v. Interstate Indus. Corp.*, Civ. A. No. A-0778-14T4, 2017 WL 2152738, at *10, 2017 N.J. Super.

Unpub. LEXIS 1209, at *27 (N.J. Super. Ct. App. Div. May 17, 2017) (citing *Broadway Maint. Corp. v. Rutgers, State Univ.*, 447 A.2d 906, 909 (N.J. 1982)). Here, the Agreement "establishes certain obligations during and after" Randall's employment, which applies to Randall's current position and "any position of trust and confidence" that Randall "may hold (whether by promotion, transfer or assignment) within" the Company. (ECF No. 1, Ex. A at 29.) The Agreement expressly designates each Company as "an express third-party beneficiary of" the Agreement. (*Id.*, Ex. A ¶ 6.3.) Therefore, the parties to the Agreement expressly intended Ethicon—a Company and therefore a designated third-party beneficiary—to receive the benefit of holding Randall responsible for his obligations under the Agreement. This allows Ethicon to enforce the Agreement. The Court in turn need not address the issue of assignment.

**\*19**  Accordingly, the Court concludes there is a contract between Plaintiffs and Randall, and Ethicon is entitled to enforce the Agreement as a third-party beneficiary.

### b. The Agreement Is Valid

Plaintiffs maintain the Agreement is valid, for several reasons. First, Plaintiffs contend the Agreement is reasonably necessary to protect their legitimate business interest in their confidential information. (ECF No. 2-4 at 25–26.) Plaintiffs point out, during Randall's employment with Plaintiffs, he had access to such confidential information that should not be disclosed to a competitor. (ECF No. 35 at 20.) Second, Plaintiffs argue enforcing the Agreement would not cause Randall undue hardship, because: (1) Randall voluntarily terminated his employment, and therefore any hardship that ensued is self-imposed; (2) Plaintiffs have offered to continue to pay Randall his base salary pending the determination of Plaintiffs' application for a preliminary injunction, and Addendum A of the Agreement provides for additional payments if Randall is unable to find other comparable employment; and (3) Randall can work anywhere so long as he does not work for a Plaintiffs' competitor where he may use or disclose Plaintiffs' confidential information to Plaintiffs' detriment. (ECF No. 2-4 at 29–31.) Third, Plaintiffs contend enforcing the Agreement would not impair the public interest, because the Agreement is narrowly tailored, and its enforcement would merely promote business stability and certainty. (*Id.* at 31–32.) Fourth, Plaintiffs state the scope of the prohibited activities under the Agreement is not unreasonably broad, because the prohibition relates only

to the positions Randall held in the last two years of employment. (ECF No. 35 at 42.) Plaintiffs also assert the eighteen-month restriction period is not unreasonably long, because it is standard in the industry and shorter than a typical strategic development life cycle of two to three years. (*Id.* at 43–44.)

Randall insists the Agreement is unreasonable. (ECF No. 29 at 22.) First, Randall contends the Agreement does not protect Plaintiffs' legitimate interest in any confidential information, because (1) Plaintiffs have not specifically identified any relevant confidential information, and (2) Plaintiffs' sole purpose is to stifle competition by preventing Randall from joining Smith & Nephew. (*Id.* at 23, 26.) Second, Randall argues his resignation from Plaintiffs was not all voluntary, but out of a legitimate concern of job instability in light of recent restructurings and reductions that Plaintiffs went through. (*Id.* at 35–36.) Randall claims Plaintiffs did try to retain him by exploring other opportunities within J&J, but never extended to him a formal offer for a new position. (*Id.* at 28–29.) With no job actually offered to him, Randall considered it risky to stay with Plaintiffs as opposed to joining Smith & Nephew. (*Id.* at 30.) Third, Randall points out Plaintiffs' offer to pay him basic salary cannot eliminate his undue hardship, because the offer only provides Randall security until the Court resolves Plaintiffs' Motion for Preliminary Injunction. (*Id.* at 36.) After that, Randall alleges he would not be entitled to payments under Addendum A of the Agreement, because of his voluntary resignation. (*Id.* at 37.) Fourth, Randall maintains the Agreement imposes unreasonably broad geographic and duration limitations, and its scope of prohibited activities could cover the entire medical device field and Randall's usage of his knowledge, skill, and expertise, to obtain gainful employment in general. (*Id.* at 38–41.) The Court disagrees.

**\*20**  "A non-compete agreement is enforceable if it satisfies the test for reasonableness," known as the *Karlin* test or the *Solari/Whitmyer* test. *Comet Mgmt. Co. v. Wooten*, Civ. A. No. A-1892-17T1, 2020 WL 897973, at *5, 2020 N.J. Super. Unpub. LEXIS 390, at *15 (N.J. Super. Ct. App. Div. Feb. 25, 2020) (citations omitted). The test "requires the court to determine whether: '(1) the restrictive covenant was necessary to protect the employer's legitimate interests in enforcement, (2) whether it would cause undue hardship to the employee, and (3) whether it would be injurious to the public.' " *Id.* (citing *Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005)). "Courts should also consider three other factors 'in determining whether the restrictive

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 57 of 164 PageID: 186

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

covenant is overbroad: its duration, the geographic limits, and the scope of activities prohibited.' " *Id.* (citing *More*, 869 A.2d at 897). "Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests." *Id.* (citing *More*, 869 A.2d at 897). The Court finds the Agreement meets the test for reasonableness.

As for the first prong, the employer's legitimate interest includes "the protection of trade secrets or proprietary information," "customer relationships," and any other "highly specialized, current information not generally known in the industry, created and stimulated by the environment furnished by the employer, to which the employee has been exposed and enriched solely due to his employment." *ADP, LLC v. Kusins*, 215 A.3d 924, 943 (N.J. Super. Ct. App. Div. 2019) (citations omitted). An employer has no legitimate interest in "preventing competition," *id.* (citing *Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577, 581 (N.J. 1971)), or "preventing an employee from working at a competitor simply because such work would necessarily entail the use of general understanding of the industry." *ADP, LLC v. Lynch*, Civ. A. No. 16-1111, 2020 WL 1922590, at *16, 2020 U.S. Dist. LEXIS 69603, at *49 (D.N.J. Apr. 21, 2020) (citing *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 892 (N.J. 1988)).

Here, Plaintiffs have described a number of particular instances where Randall, due to his employment with Plaintiffs, was exposed to specific confidential information about Plaintiffs' development of their robotics and the digital surgery ecosystem. Plaintiffs have run a number of confidential and sensitive projects that Randall was allowed to participate in only after getting special clearance: (1) Randall was directly involved in the acquisition and assessment of the Orthopedics robotic technology that underlies the VELYS system;[6] (2) Randall performed the due diligence on the acquisition of Verb Surgical, whose technologies form the foundation of the digital surgery ecosystem of JJMDB; (3) Randall participated in Project Manhattan, which was designed to evaluate different digital surgery assets acquired or originally developed by JJMDB, and to determine JJMDB's strategy going forward; (4) Randall was directly involved in a project to develop an organizational working model and workstream for the DePuy Synthes franchise for the development of the orthopedics digital strategy; and (5) Randall participated in Project Voltron, which involved confidential meetings and presentations to develop and implement J&J's "Digital Surgery Workforce Strategy" and compensation framework. (ECF No. 35 at 10–11, 18–19,

28–29.) In addition, Plaintiffs refer to a list of confidential documents, which Randall allegedly had access to due to his employment with Plaintiffs: (1) Randall worked with the JJMDB's Chief Information Officer Larry Jones on a strategic presentation, which covered sensitive and secret information about the entire digital and robotics strategy for the JJMDB; (2) Randall received a "Digital Surgery Platform Update," which contained sensitive and confidential information about JJMDB's digital surgery platform; (3) Randall sent regular confidential updates to J&J's high-level executives about the status of development activity concerning robotic and digital surgery; (4) during the meetings of a leadership team dedicated to the development of the Cross-Digital Surgery Platform, Randall was exposed to two presentation slides, which contained confidential details of various aspects of the platform's strategic initiatives and development plans; (5) Randall incorporated in some slides and emails J&J's product development pipeline of enabling technologies and robotic products; and (6) Randall regularly received briefings concerning the financial performance of JJMDB's robotic and digital surgery ecosystem "Digital, Inc." (*Id.* at 21–27.) In his deposition, Randall did not dispute his prior exposure to some of the above projects and documents; instead, Randall admitted they were confidential and should not be shared with a competitor. (*Id.* at 21–24, 26, 28–29; ECF No. 37-1 at 118, 124–26, 130, 135, 144–46, 148, 150–54, 157–58, 160.) Therefore, Plaintiffs have at least identified some confidential information that Randall was exposed to solely due to his employment with Plaintiffs. The Court finds Plaintiffs has a legitimate interest in the protection of such information.

**\*21** As for the second prong on the undue hardship to the employee, the "inquiry requires the court to determine the likelihood of the employee finding other work in his or her field, and the burden the restriction places on the employee." *More*, 869 A.2d at 898 (citing *Karlin v. Weinberg*, 390 A.2d 1161, 1169 (N.J. 1978)). "Where a court finds a covenant overbroad, the court tailors the covenant's restrictions through the process of blue penciling rather than holding them to be void *per se.*" *Sandhills Glob., Inc. v. Garafola*, Civ. A. No. 19-20669, 2020 WL 1821422, at *10, 2020 U.S. Dist. LEXIS 65553, at *25 (D.N.J. Apr. 10, 2020) (citing *ADP, LLC v. Rafferty*, 923 F.3d 113, 125–26 (3d Cir. 2019)). "[A] court will consider whether a covenant's duration, geographic limits, and scope of activities must be 'narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests.' " *Id.* at *25–26 (citing *More*, 869 A.2d at 897). "[T]he reasonableness of the duration and scope of the agreement must be analyzed in view of the specific facts

presented in each case." *Manhattan Assocs. v. Ruderman*, Civ. A. No. 05-3928, 2005 WL 2290297, at *4, 2005 U.S. Dist. LEXIS 45132, at *10 (D.N.J. Sept. 20, 2005) (citations omitted).

The following analysis of the Agreement's duration and geographic limits, as well as its scope of restricted activities, indicates the Agreement does not impose overbroad restrictions on Randall.

Regarding duration, "[a] non-compete covenant may not extend beyond the temporal point when the secret information has become obsolete." *Truong, LLC v. Tran*, Civ. A. No. A-5752-11T1, 2013 WL 85368, at *9, 2013 N.J. Super. Unpub. LEXIS 64, at *24 (N.J. Super. Ct. App. Div. Jan. 9, 2013) (citing *EarthWeb, Inc. v. Schlack*, 71 F. Supp. 2d 299, 313 (S.D.N.Y. 1999)). "A covenant also may not extend beyond the period in which the former employee could independently replicate the protected information, so long as any research and development cost savings are adequately addressed in awarded damages or injunctive relief." *Id.* (citing *Raven v. A. Klein & Co., Inc.*, 478 A.2d 1208, 1212 (N.J. Super. Ct. App. Div. 1984)). Here, Randall alleges Larry Jones admitted any threat of harm posed by Randall working for a competitor would dissipate and become stale after twelve to fourteen months, and therefore the Agreement's restriction period of eighteen months is unreasonably long. (ECF No. 29 at 53.) However, Larry Jones only made a general estimation that, if Plaintiffs obtained a competitor's secret strategies, it would help Plaintiffs achieve certain competitive advantage over the competitor in the next twelve to fourteen months. (ECF No. 2-1 ¶ 9.) In other words, Larry Jones's estimation is based on a general hypothetical concerning a competitor's secret information, rather than the relevant specific facts of Plaintiffs or Randall, without which the Court cannot conduct an undue hardship inquiry. *See Pierson v. Med. Health Ctrs., P.A.*, 869 A.2d 901, 904 (N.J. 2005) ("We continue to adhere to the case-by-case approach for determining whether a restrictive covenant in a post-employment contract is unreasonable and unenforceable."). Therefore, the alleged admission of Larry Jones is not what Randall claims it to be, and cannot show the Agreement's restriction period is unreasonably long. On the contrary, Plaintiffs allege the life cycle of secrecy for the type of proprietary information involved in Plaintiffs' R&D exceeds eighteen months. (ECF No. 35 at 43–44.) For example, the full VELYS launch is contemplated through 2022. (*Id.* at 44.) Therefore, Plaintiffs have demonstrated a rational basis for imposing an eighteen-month restriction period. Moreover,

it is unlikely that a restriction period of eighteen months is unreasonably long for a restrictive covenant under New Jersey law. *See Touzot*, 2016 WL 1688089, at *10, 2016 U.S. Dist. LEXIS 55766, at *33 (citations omitted) ("[T]he duration of the restrictions—two years—has ... been found to be reasonable under New Jersey law."). Accordingly, the Court finds the duration of the Agreement's restriction on Randall is reasonable.

 **\*22** Regarding geographic scope, "technological advances are a factor that could increasingly affect the reasonableness of geographic limitations." *Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204, 225 (D.N.J. 2008). "In this Information Age, a *per se* rule against broad geographic restrictions would seem hopelessly antiquated." *Id.* (citing *Victaulic Co. v. Tieman*, 499 F.3d 227, 237 (3d Cir. 2007)); *see also Ruderman*, 2005 WL 2290297, at *4, 2005 U.S. Dist. LEXIS 45132, at *10 ("[A] lack of a geographic limitation is not *per se* unreasonable.") (citing *Ivy Mar Co., Inc. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 559 (E.D.N.Y. 1995)). If the relevant industry "involves a world-wide market," and the employer "focuses upon a very narrow specialized niche within which separable geographic zones are indistinguishable," it is not unreasonable for the employer to impose a worldwide noncompetition restriction on the employee. *Mansol Indus. v. Singh*, Civ. A. No. 96-2065, 1996 U.S. Dist. LEXIS 22823, at *33 (D.N.J. Sept. 24, 1996). Here, Plaintiffs operate globally in the medical device industry. (ECF No. 2-4 at 10.) Smith & Nephew also operates globally and regards DePuy Synthes as one of its three major competitors in the fields of orthopedics and sports medicine. [7] Accordingly, because the technological advances in this information age justify broad geographic restrictions, and because the relevant market here is specialized and involves only a few major players that compete globally, the Court finds it reasonable for the Agreement not to have geographical limitations.

Regarding restricted activities, " 'the likelihood of the employee finding other work in his or her field' is an important consideration." *Sunbelt Rentals, Inc. v. Love*, Civ. A. No. 20-17611, 2021 WL 82370, at *18, 2021 U.S. Dist. LEXIS 4587, at *49 (D.N.J. Jan. 11, 2021) (citing *More*, 869 A.2d at 898). Also, "if the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play." *Id.* (citing *More*, 869 A.2d at 898). Here, the Agreement does not preclude Randall from working in the entire medical device field, and does not completely prohibit Randall from joining a competitor. Though J&J

operates in a diversity of medical device, pharmaceutical and consumer products areas, it does not mean Randall cannot work for any other company that somehow overlaps with J&J's area of business. This is because the Agreement only prohibits Randall from working for a competitor that may benefit from Randall's use of Plaintiffs' confidential information, which Randall had exposure to in the last two years of his employment with Plaintiffs. (ECF No. 35 at 42–43.) Therefore, the Agreement's restrictions, though "relatively broad, insofar as they restrict [Randall] from working with a direct competitor of" Plaintiffs, "do allow for some flexibility, such as working for a competitor in a non-competitive role." *Sunbelt*, 2021 WL 82370, at *19, 2021 U.S. Dist. LEXIS 4587, at *49. "[W]hile [Randall] may not be able to perform any job that he wishes to perform, his quandary is limited." *Id*. at *19, 2021 U.S. Dist. LEXIS 4587, at *49–50. Also, as discussed below, Randall "voluntarily resigned from [Plaintiffs], thereby bringing any hardships upon himself." *Id*. at *19, 2021 U.S. Dist. LEXIS 4587, at *50. "As such, the Court finds that the scope of activities prohibited by the [Agreement] is reasonable." *Id.*

Having concluded the restrictions imposed by the Agreement are not overbroad, the Court turns to the voluntariness of Randall's resignation. In the undue hardship inquiry, "the reason for the termination of the parties' relationship is also relevant." *More*, 869 A.2d at 898. Employees who "voluntarily left [their employer] to join a direct competitor ... cannot assert their termination as a hardship for [a court's] consideration." *Kusins*, 215 A.3d at 947 (citing *id.*); *see also Heartland Payment Sys., LLC v. Volrath*, Civ. A. No. 17-5323, 2017 WL 6803519, at *6, 2017 U.S. Dist. LEXIS 213648, at *19 (D.N.J. Dec. 30, 2017) (citations omitted) ("If an employee did roll the dice by voluntarily quitting in order to work for a competitor, the employee 'cannot self-generate hardship by arguing that he may be terminated [from new employment] because this gamble did not turn out as planned.' "); *Ethicon, Inc. v. Angelini*, Civ. A. No. 16-1124, 2016 WL 9244726, at *4, 2016 U.S. Dist. LEXIS 138085, at *13 (M.D. Fla. Sept. 22, 2016), *vacated on other grounds*, 687 F. App'x 859 (11th Cir. 2017) (citations omitted) ("New Jersey is reluctant to find a hardship where the employee voluntarily separates in pursuit of better compensation."). An employee "voluntarily left her position with" the employer, when the employer, "even after the [employee's] tendering of her resignation, sought to persuade [the employee] to remain in [the employer's] employ." *Angelini*, 2016 WL 9244726, at *4, 2016 U.S. Dist. LEXIS 138085, at *14 (applying New Jersey law to a noncompete agreement that Ethicon sought to

enforce). In contrast, "where the employer causes the parties to separate," enforcement of the covenant may cause undue hardship on the employee "in that the employee has not, by his conduct, contributed to it." *More*, 869 A.2d at 898. For example, if an employee's resignation was prompted by a "reasonable uncertainty of future job security" caused by the employer, such as significant layoffs of other employees, then the court may find enforcing the restrictive covenant will impose undue hardship on the employee, *Marinelli v. Medco Health Sols., Inc.*, 951 F. Supp. 2d 303, 321–22 (D. Conn. 2013) (analyzing the enforceability of a noncompete clause under New Jersey law), though such an uncertainty "does not guarantee a finding of an undue burden in such a situation." *Synthes, Inc. v. Gregoris*, 228 F. Supp. 3d 421, 431 (E.D. Pa. 2017) (applying New Jersey law to a noncompete agreement that Depuy Synthes sought to enforce).

**\*23** Here, Randall concedes "he voluntarily resigned his employment with Ethicon." (ECF No. 29 at 37.) Also, nothing in the record shows Plaintiffs caused Randall to resign. On the contrary, Plaintiffs, upon hearing Randall's intent to resign, tried to retain Randall by exploring other opportunities for him within J&J, because Randall was seen as a talented individual that J&J wanted to keep. (ECF No. 35 at 40.) For example, Plaintiffs offered Randall a position of Senior Director of Operations within the Company. (ECF No. 37-5 at 90.) Plaintiffs' failure to extend a former offer to Randall does not render Randall's resignation involuntary, because it does not indicate an unwillingness of Plaintiffs to retain Randall. Instead, it was likely due to the rather short timeframe that Randall left with Plaintiffs to make a formal offer. After declining Smith & Nephew's initial approach to him in early 2020, Randall renewed discussions with Smith & Nephew about a potential position in late July 2020, and the discussions continued through August 2020. (ECF No. 37-1 at 75.) Around August 21, 2020, Randall informed his manager, Celine Martin, of his considerations for a role with Smith & Nephew. (No. 37-4 at 41, 138.) Soon after that, Celine Martin exchanged by email with some other J&J executives on Randall's possible resignation from his position, and by Thursday, August 27, 2020, they together identified several potential alternative positions within the Company for Randall to choose from. (ECF No. 37-26.) Before Celine Martin and her colleagues could finalize a formal offer for Randall, on the next Monday, August 31, 2020, Randall announced his resignation from Ethicon. (ECF No. 29 at 14.) Speaking of the failure to extend a formal offer, Celine Martin said she "was not in a position to do it that

fast" (ECF No. 37-4 at 138), which the Court finds was a rational explanation based on undisputed facts in the record.

Also, Randall's resignation was not out of a concern for job instability, like the employee's concern in *Marinelli. Marinelli* is distinguishable, because the employee in *Marinelli* (1) was not persuaded by his employer to remain in its employ after announcing his intent to resign; (2) had a concern for job security, which was caused by not only the significant layoffs in his office, but also the short time window within which the employer guaranteed significant severance benefits;[8] and (3) had his fear of job security further confirmed by the significant salary reductions reported by the employer after the employee's resignation. *Marinelli*, 951 F. Supp. 2d at 312, 321–22. Compared with the employee in *Marinelli*, Randall has much weaker grounds to allege a reasonable uncertainty of job security, because (1) Plaintiffs tried to retain Randall after he announced the intent to resign, and (2) nothing in the record indicates actual significant reductions of salary and benefits in Randall's previous office or branch at Plaintiffs around the time of his resignation. Therefore, the Court finds Randall resigned from Plaintiffs voluntarily to join Smith & Nephew, which, as illustrated in Part III.C.1.c, *infra*, is a direct competitor of Plaintiffs. As a result, the Court declines to find undue hardship on Randall.

As for third prong, the court "must consider whether enforcement of the [restrictive covenant] causes harm to the public." *Kusins*, 215 A.3d at 947. As discussed in Part III.C.4, *infra*, the Court does not discern any injurious effect to the public that weighs against enforcing the Agreement.

Accordingly, the Court finds the Agreement valid.

### c. Randall Likely Has Breached
### or Will Breach the Agreement

Randall denies having breached the Agreement, because he has not started working at Smith & Nephew, and there is no evidence showing he has disclosed Plaintiffs' confidential information and trade secrets to Smith & Nephew. (ECF No. 29 at 42–43.) Randall maintains Plaintiffs cannot enforce the Agreement, because they have not shown the risk that Randall will disclose or use Plaintiffs' confidential information at Smith & Nephew. (*Id.* at 44.) Randall alleges any confidential information that he may have regarding DePuy Synthes has become stale after he left DePuy Synthes in October 2019, and his employment with Ethicon does not conflict or overlap

with his new position at Smith & Nephew. (*Id.* at 46.) Plaintiffs contend, unless enjoined, Randall will breach the plain language of the Agreement. (ECF 4-2 at 32.) Plaintiffs also point to several specific instances of breach that Randall already completed preceding his departure from J&J. (ECF No. 34 at 32–33.) The Court agrees.

"Proof of previous violations [by the employee] is not required to grant injunctive relief; [the employer] need only show a likelihood that [the employee] will, in the future, violate the restrictive covenant." *Heartland Payment*, 2017 WL 6803519, at *8, 2017 U.S. Dist. LEXIS 213648, at *22–23. "While 'past actions cannot be remedied through injunctive relief, such facts can be considered as to the strength of [the plaintiff employer's] proof.' " *Id.* at *8, 2021 U.S. Dist. LEXIS 4587, at *23. Therefore, even if Randall did not breach the Agreement, it does not preclude granting a preliminary injunction here. Moreover, the proofs of Randall's past breaches of the Agreement, if any, will support Plaintiffs' application for preliminary injunction.

**\*24** Here, Randall likely violated Section 2.4 of the Agreement, which prohibits an employee from retaining any confidential information of the Company upon terminating the employment without permission. (ECF No. 1, Ex. A ¶ 2.4.) On August 20, 2020, Randall forwarded to his personal email an email containing salary, bonus, and long-term incentive information for key managerial positions within the Company. (ECF No. 34 at 32.) Randall concedes the above information is confidential, should not be shared with a competitor, and was sent to his personal email without Plaintiffs' permission. (ECF No. 37-1 at 93–95.)

Also, Randall likely violated Section 3.4 of the Agreement, which requires an employee who voluntarily resigns to notify the employer in writing of the employee's departure at least fourteen days before the anticipated last day of employment; and also requires the employee or the competitor that the employee will join to provide written assurances satisfactory to Plaintiffs within fourteen days before the employee assumes a new role with the competitor. (ECF No. 1, Ex. A ¶ 3.4.) First, Randall does not allege having sent any written notification of his resignation to Plaintiffs at least fourteen days before his last day at Plaintiffs. Randall states, before his official resignation, he had a phone conversation with Celine Martin about his considerations of a potential role at Smith & Nephew. (ECF No. 37-1 at 91.) But a phone conversation does not suffice as a writing. On August 31, 2020, Randall sent to Celine Martin his resignation email, where he anticipated

September 11, 2020, as his last day at the Company. (ECF No. 37-27 at 2.) Though the email is in writing, it was not sent within fourteen days before Randall's anticipated last day of employment. Second, neither Randall nor Smith & Nephew alleges any written assurance was actually sent to Plaintiffs. Randall admits he is not aware of any written assurance provided by Plaintiffs. (ECF No. 37-1 at 92.)

Randall likely will violate Section 3.2, which prohibits an employee, within eighteen months after his or her resignation, from working for a competitor in a way that may benefit the competitor by using or disclosing the Company's confidential information. (ECF No. 1, Ex. A ¶ 3.2.) First, Smith & Nephew is a direct competitor of Plaintiffs. Randall does not dispute Smith & Nephew is a competitor of DePuy Synthes, but maintains Ethicon does not compete with Smith & Nephew. [9] (ECF No. 29 at 53.) The Court finds Ethicon is also a competitor of Smith & Nephew, because Smith & Nephew is developing advanced technologies in robotics and digital surgery, and Ethicon is doing the same. On the one hand, Randall concedes Ethicon is to be integrated into "a newly combined Robotics and Digital Solutions organization" and leveraged "to accelerate the development of a differentiated surgical robotic platform and digital solutions." (ECF No. 37-1 at 48, 196.) Also, DePuy Synthes and Ethicon are jointly developing innovative digital data analytical ecosystems to support robotic products. (ECF No. 2-4 at 8.) On the other hand, the Head of Robotics position that Randall intends to take at Smith & Nephew involves the responsibility of driving the overall strategy of Smith & Nephew's digital surgery ecosystem and leading the development of robotic technologies. (ECF No. 37-9 at 4.) Second, as discussed in Part III.C.1.b, *supra*, Randall was exposed to a significant amount of specific confidential information relating to Plaintiffs' robotic and digital surgery development during his employment with Plaintiffs. Third, there is a substantial overlap of job responsibilities between Randall's positions at Plaintiffs and Smith & Nephew, which suggests the confidential information Randall had exposure to while working for Plaintiffs likely will benefit his future work with Smith & Nephew. Like Randall's previous role at Plaintiffs, [10] Randall's Head of Robotics position at Smith & Nephew also involves a leadership role in developing a robotics and digital surgery ecosystem. Moreover, Plaintiffs point out Randall intends to work at Smith & Nephew's R&D Center in Pittsburgh, which is dedicated to Smith & Nephew's robotic and digital surgery development. (ECF No. 35 at 34.) Fourth, Randall does not meet the exception to Section 3.2 as "provided in Section 3.3." (ECF No.

1, Ex. A ¶ 3.2.) Section 3.3 allows Randall to work for a competitor if several requirements are met. (*Id.*, Ex. A ¶ 3.3.) One of the requirements is that Randall or the competitor shall provide written assurances to Plaintiffs to indicate Randall will not render services to the competitor in conflict with Randall's obligations under the Agreement. (*Id*.) As previously discussed, neither Randall nor Smith & Nephew alleges to have sent Plaintiffs such written assurances. Therefore, unless enjoined, Randall likely will violate Section 3.2 by benefiting Smith & Nephew with Plaintiffs' confidential information in an area where Smith & Nephew and Plaintiffs directly compete.

**\*25** Accordingly, the Court concludes Plaintiffs have demonstrated a reasonable likelihood that Randall has breached the Agreement, and, unless enjoined, will breach the Agreement.

### d. Plaintiffs, Having Performed Their Contractual Obligations, Will Likely Suffer Damages Due to Randall's Breach

The Court finds Plaintiffs have demonstrated a reasonable likelihood of success on the remaining two elements of a breach of contract claim. First, Randall's likely disclosure or use of Plaintiffs' confidential information to the benefit of Smith & Nephew can cause damages to Plaintiff's revenue and goodwill. *See Scholastic Funding Grp., LLC v. Kimble, Civ. A. No. 07-557, 2007 WL 1231795, at \*7, 2007 U.S. Dist. LEXIS 30333, at \*19 (D.N.J. Apr. 24, 2007)* ("[H]aving [the employer's] direct competitor gain access to its confidential business information will likely result in lower revenues, thus causing damages."). Second, Plaintiffs have performed their own obligations under the Agreement by hiring Randall, who concedes his employment with DePuy Synthes served as the consideration for Randall to execute the Agreement. (ECF No. 29 at 19.) Therefore, Plaintiffs have shown a reasonable likelihood that Plaintiffs, having performed their own contractual obligations, will sustain damages due to Randall's breach.

Accordingly, Plaintiffs have established a likelihood of success on the merits of the breach of contract claim against Randall.

Case 2:25-cv-02263-WJM-MAH   Document 5-2   Filed 06/16/25   Page 62 of 164 PageID: 191

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

### 2. Plaintiffs Will Suffer Irreparable Harm Without a Preliminary Injunction

"Harm is considered 'irreparable' if it is not redressable by money damages later, in the ordinary course of litigation." *ADP, LLC v. Olson*, Civ. A. No. 20-3312, 2020 WL 6305554, at *12, 2020 U.S. Dist. LEXIS 200635, at *35 (D.N.J. Oct. 28, 2020) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989)). "Injunctive relief is also appropriate because of the practical difficulties in establishing causation and damages." *Menasha Packaging Co., LLC v. Pratt Indus., Inc.*, Civ. A. No. 17-75, 2017 WL 639634, at *10, 2017 U.S. Dist. LEXIS 22318, at *28 (D.N.J. Feb. 15, 2017) (citations omitted). The movant for a preliminary injunction "has the burden of proving a 'clear showing of immediate irreparable harm' absent injunctive relief." *Id.* (citing *ECRI v. McGraw-Hill Inc.*, 809 F.2d 223, 225 (3d Cir. 1987)). Here, Plaintiffs have met this burden.

### a. Randall's Acknowledgement in the Agreement Is Not Sufficient to Prove Irreparable Harm

Plaintiffs state Randall has acknowledged in Section 5.1 of the Agreement that any violation of the Agreement causes Plaintiffs irreparable harm, which warrants the imposition of temporary and/or permanent injunctive relief. (ECF No. 2-4 at 33.) Plaintiffs suggest, by accepting the Head of Robotics position with Smith & Nephew, Randall breaches the Agreement, and therefore automatically causes Plaintiffs irreparable harm. (*Id.*) The Court disagrees.

Randall's acknowledgement in the Agreement is not dispositive in the irreparable harm inquiry, because "a contractual provision simply cannot act as a substitute for a finding by this Court that determines whether a preliminary injunction is proper." *AV Sols., LLC v. Keystone Enter. Servs., LLC*, Civ. A. No. 11-3503, 2011 WL 2971222, at *3, 2011 U.S. Dist. LEXIS 78882, at *8 (D.N.J. July 19, 2011) (citing *Laidlaw, Inc. v. Student Transp. of Am., Inc.*, 20 F. Supp. 2d 727, 758 (D.N.J. 1998)). The Court "must make its own determination of whether there has been irreparable harm." *Menasha*, 2017 WL 639634, at *10, 2017 U.S. Dist. LEXIS 22318, at *26 (citing *Laidlaw*, 20 F. Supp. 2d at 766).

### b. Randall's Alleged Compromising of Confidential Information Relating to Plaintiffs' Businesses May Establish Irreparable Harm

**\*26** Plaintiffs state, unless immediately enjoined, Randall will join Smith & Nephew in a top executive and R&D position in direct violation of the Agreement, causing Plaintiffs to suffer irreparable harm by compromising confidential information relating to Plaintiffs' businesses. (ECF No. 2-4 at 32–35.) Plaintiffs claim it would be impossible for Randall to perform his duties at Smith & Nephew without a significant risk of using or disclosing Plaintiffs' confidential information. (ECF No. 35 at 35.) Randall counters Plaintiffs fail to establish immediate irreparable injury. (ECF No. 29 at 47.) Randall regards Plaintiffs' assertion of irreparable injury as mere conjecture, because no evidence shows Randall actually will disclose Plaintiffs' confidential information to Smith & Nephew or how Smith & Nephew will benefit from Randall's disclosure. (*Id.* at 48–49.) On the contrary, Randall testified under oath that he would not, and his new position would not require him, to disclose any confidential information to Smith & Nephew. (ECF No. 42 at 4.) Moreover, Randall alleges he entered into an agreement with Smith & Nephew that prohibited Randall from disclosing Plaintiffs' confidential information to Smith & Nephew. (*Id.*) The Court disagrees.

"[T]he disclosure of confidential and proprietary information ... may be the basis for a finding of irreparable harm." *Laidlaw*, 20 F. Supp. 2d at 766 (citations omitted). "In the context of non-competition agreements, irreparable injury may be shown if the former employee may avail himself of sensitive product strategies both as to development and marketing, which may be of extreme value to the competitor." *ADP, LLC v. Jacobs*, Civ. A. No. 15-3710, 2015 WL 4670805, at *7, 2015 U.S. Dist. LEXIS 103207, *17 (D.N.J. Aug. 5, 2015) (citations and internal quotations omitted). "Where a party is in possession of another party's confidential information and is poised to use or disclose such information, there is a likelihood of irreparable harm." *Jackson Hewitt Inc. v. Cline*, Civ. A. No. 14-6931, 2015 WL 6687545, at *4, 2015 U.S. Dist. LEXIS 147167, at *12 (D.N.J. Oct. 29, 2015) (citations omitted). "[A]n imminent possibility of disclosure of confidential information is sufficient to support a finding of irreparable harm." *Chemetall*, 2016 U.S. Dist. LEXIS 38590, at *53–54 (citations omitted).

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 63 of 164 PageID: 192

As discussed in Part. III.C.1.b, *supra*, Randall, during his employment with Plaintiffs, was exposed to Plaintiffs' confidential information concerning business strategies, product pipeline, financial condition, internal organization, and acquisition. Such confidential information relates to Plaintiffs' robotic and digital surgery business, an area where Smith & Nephew, as discussed in Part. III.C.1.c, *supra*, directly competes with Plaintiffs and intends Randall to take a leadership role. Therefore, though Randall has not started working for Smith & Nephew, Randall's use of Plaintiffs' confidential information in his capacity for Smith & Nephew is imminent and inevitable. *See Jacobs*, 2015 WL 4670805, at *7-8 2015 U.S. Dist. LEXIS 103207, at *17–18 (finding an imminent threat of disclosure of the plaintiff's trade secrets, given the defendant's taking of a similar position with a direct competitor of the plaintiff and significant prior exposure to the plaintiff's proprietary information); *Strom*, 621 F. Supp. 2d at 229–30 (concluding that the defendant employee's use of his former employer's (*i.e.*, the plaintiff) confidential information in his capacity for a new employer was potentially inevitable, though the defendant had not started working for the new employer, because: (1) the new employer was a direct competitor of the plaintiff; (2) the defendant significantly involved and participated in the plaintiff's strategic business decisions; and (3) the defendant knew the plaintiff's strategies for its New Jersey branches).

Randall's promise not to use Plaintiffs' confidential information while working for Smith & Nephew does not change the conclusion. Even if a former employee swore "he would not disclose any confidential information while working for the competitor, and the competitor also directed the employee not to disclose any confidential information," a court may find irreparable harm to the former employer. *Heartland Payment*, 2017 WL 6803519, at *8, 2017 U.S. Dist. LEXIS 213648, at *24 (citing *Fres-co Sys. USA v. Hawkins*, 690 F. App'x 72 (3d Cir. 2017)); *see also Babn Techs. Corp. v. Bruno*, 1998 WL 720171, at *6, 1998 U.S. Dist. LEXIS 13591, at *21 (E.D. Pa. Aug. 28, 1998) (finding that "it [wa]s virtually inconceivable for [the defendant employee] to avoid utilizing confidential information ... that he learned at" the plaintiff employer, despite the defendant's "benign intent not to divulge purposefully any confidential information of" the plaintiff). This is because the former employee who begins serving a competitor may have "changed loyalties," and may be willing to disclose the former employer's confidential information or "allow the information to influence his actions while working for the competitor to the detriment of" the former employer. *Heartland Payment*,

2017 WL 6803519, at *8, 2017 U.S. Dist. LEXIS 213648, at *24 (citing *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 174 (3d Cir. 2015)); *see also Synthes*, 228 F. Supp. 3d at 441 (citing *Angelini*, 2016 WL 9244726, at *6, 2016 U.S. Dist. LEXIS 138085, at *20) (finding that it "strain[ed] credulity to think" the former employee, while working for his new employer, "w[ould] be able to perform tasks and make strategic recommendations," which "substantial[ly] overlap[ed]" with his duties while working for the former employer, "without relying on" the former employer's confidential information).

**\*27** Therefore, without a preliminary injunction, Plaintiffs will likely suffer irreparable harm to their business due the imminent possibility of Randall's disclosure of their confidential information.

### 3. Balancing of Hardships Favors Issuing a Preliminary Injunction

Plaintiffs maintain the balance of equities weighs in their favor. (ECF No. 2-4 at 36.) Plaintiffs insist they would suffer great hardships without a preliminary injunction, because their confidential information will be in the hands of a direct competitor. (*Id.*) Plaintiffs argue any harm to Randall caused by an injunction will be minimal, because (1) the restrictions in the Agreement are reasonable and temporary; (2) even if an injunction is issued, Smith & Nephew will honor its offer and financial commitment to Randall, who would make more money than he did with Plaintiffs; and (3) Plaintiffs have offered Randall options to stay with the Company and offered to pay his salary during the pendency of these injunction proceedings, which Randall rejected. (*Id.*; ECF No. 35 at 44.) Randall argues Plaintiffs will not suffer nearly as much harm as Randall will suffer if Plaintiffs' motion is denied. (ECF No. 29 at 53.) The Court disagrees.

In balancing the hardships, a court must ensure "the injunction does not harm the defendants more than denial of the injunction would harm the plaintiff." *Jackson*, 2015 WL 6687545, at *4, 2015 U.S. Dist. LEXIS 147167, at *13 (citing *Strom*, 621 F. Supp. 2d at 230). A court must "analyze whether the defendants will suffer irreparable harm if the preliminary injunction is granted," and "should not consider financial damages when deciding whether to grant an injunction." *Strom*, 621 F. Supp. 2d at 230 (citing *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 727–28 (3d Cir. 2004)). Here, Randall is unlikely to sustain severe hardships if a

Case 2:25-cv-02263-WJM-MAH Document 5-2 Filed 06/16/25 Page 64 of 164 PageID: 193

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

preliminary injunction is granted. Randall can always work for a non-competitor. Also, the injunction will not prohibit Randall from working for a competitor, so long as he satisfies the requirements in Section 3.3 of the Agreement. After a reasonable restriction period of eighteen months ends, Randall may work for a competitor in the fullest capacity. Any hardship Randall may sustain as a result of the preliminary injunction is lessened by (1) Smith & Nephew's expectation to honor its offer to Randall, including making payment to Randall during the injunction (ECF No. 37-6 at 63), and (2) Plaintiffs' offer [11] to keep Randall within the Company (ECF No. 35 at 44). In comparison, without a preliminary injunction, Plaintiffs would sustain a much severer hardship, *i.e.*, the imminent threat of having a direct competitor using and benefiting from their confidential information. Therefore, a preliminary injunction will not harm Randall more than denial of the injunction would harm Plaintiffs.

Moreover, in deciding the balance of equities, "courts are not sympathetic to employees who bring hardships upon themselves." *Heartland Payment*, 2017 WL 6803519, at *9, 2017 U.S. Dist. LEXIS 213648, at *25–26. "The 'injury a defendant might suffer if an injunction were imposed may be discounted by the fact that the defendant brought that injury upon itself.' " *Strom*, 621 F. Supp. 2d at 230 (citing *Kos Pharms.*, 369 F.3d at 728). Here, Randall brought hardships upon himself in two ways. First, he voluntarily chose to leave Plaintiffs to go to a direct competitor. *Menasha*, 2017 WL 639634, at *11, 2017 U.S. Dist. LEXIS 22318, at *30 (citing *HR Staffing Consultants*, 627 F. App'x at 173) ("[T]he [i]ndividual [d]efendants themselves voluntarily chose to leave [the plaintiff employer] to go to a direct competitor, thus they 'brought any hardship upon [themselves].' "). Second, Randall likely willfully breached Section 2.4 of the Agreement. [12] *Heartland Payment*, 2017 WL 6803519, at *9, 2017 U.S. Dist. LEXIS 213648, at *26 (citing *HR Staffing Consultants*, 627 F. App'x at 174) ("[W]hen the defendant 'willfully breach[ed] a valid restrictive covenant, the harm to [him] is a predictable consequence of [his] willful breach and ... is not the type of harm from which we seek to protect [him].' "). This further weakens Randall's allegation of hardships resulting from a preliminary injunction.

**\*28** "One other factor ... in the balance of hardships analysis is the 'goal[ ] of the preliminary injunction analysis [of] maintaining the status quo, defined as the last peaceable, noncontested status of the parties.' " *Kos Pharms.*, 369 F.3d at 729 (citing *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 192 (3d Cir. 1990)). Once Randall

starts working for Smith & Nephew in the absence of a preliminary injunction, Plaintiffs' confidential information may "potentially be disclosed, an injury which cannot later be undone." *Payroll Assocs., LLC v. Adaptasoft, Inc.*, Civ. A. No. 12-6375, 2012 WL 12888566, at *2, 2012 U.S. Dist. LEXIS 199290, at *7 (D.N.J. Oct. 23, 2012). "As such, a preliminary injunction is necessary under these circumstances to temporarily maintain the status quo." *Id.*

In conclusion, the Court finds the balancing of hardships weighs in Plaintiffs' favor.

### 4. A Preliminary Injunction Will Not Disserve the Public Interest

Plaintiffs claim the injunctive relief they seek serves the public interest by ensuring businesses are able to protect their legitimate interests in their confidential information. (ECF No. 2-4 at 37.) Randall contends, while the concern for protecting confidential information is understandable, the public interest is not served by issuing an injunction that fails to reasonably protect an employer's legitimate interests, creates an undue burden for the employee, and leaves the public to suffer from judicial nurturing of such naked restraints on competition. (ECF No. 29 at 53–54.) The Court disagrees.

The public interest factor "instructs courts to consider the fact that 'enforcement of the restriction should not cause harm to the public.' " *ADP, LLC v. Pittman*, Civ. A. No. 19-16237, 2019 WL 5304148, at *17, 2019 U.S. Dist. LEXIS 181274, at *50–51 (D.N.J. Oct. 18, 2019) (citing *More*, 869 A.2d at 898). Here, the Court discerns no major public component involved in a preliminary injunction, because nothing in the record indicates enforcing the Agreement may diminish the rights of the public to have free access to a particular type of good or service. *See id.* at *17, 2019 U.S. Dist. LEXIS 181274, at *51 (concluding that the case "contain[ed] no major public component," because "the imposition of restrictive covenants here create[d] no injury to the rights of the public to have free access to the advice of professionals licensed by the State, as it may do in the context of physicians and accountants"); *ADP, LLC v. Trueira*, Civ. A. No. 18-3666, 2019 WL 5304435, at *16, 2019 U.S. Dist. LEXIS 181537, at *44 (D.N.J. Oct. 18, 2019) (recognizing only two professions, *i.e.*, psychologists and attorneys, "for which a client's freedom to choose or the 'uniquely personal' nature of the relationship militate against enforcing any restrictive covenant") (citations omitted); *HR*

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 65 of 164 PageID: 194

Ethicon, Inc. v. Randall, Not Reported in Fed. Supp. (2021)

*Staffing Consultants, LLC v. Butts*, Civ. A. No. 15-3155, 2015 WL 3492609, at *13, 2015 U.S. Dist. LEXIS 71220, at *37 (D.N.J. May 29, 2015), *aff'd*, 627 F. App'x 168 (3d Cir. 2015) (identifying "two significant public interest factors a court should consider" in granting a preliminary injunction, including "the demand for the services rendered by the employee" and "the likelihood that those services could be provided by other [employees] already practicing in the area") (citing *Karlin*, 390 A.2d at 1169–70).

Further, "[j]udicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships." *Scholastic Funding*, 2007 WL 1231795, at *12, 2007 U.S. Dist. LEXIS 30333, at *33 (citing *Wright Med. Tech., Inc. v. Somers*, 37 F.Supp.2d 673, 684 (D.N.J. 1999)); *see also Strom*, 621 F. Supp. 2d at 230 ("[E]nforcing reasonable terms of an employment agreement is within the public interest."). The public also has an interest in ensuring "confidential business information is protected," because "unfair competition through the use of confidential and proprietary information is discouraged." *Money Mktg. v. Silver Aspen, Inc.*, Civ. A. No. 06-1414, 2006 WL 8457663, at *5, 2006 U.S. Dist. LEXIS 105652,

at *15 (D.N.J. June 8, 2006) (citations omitted). Here, the Agreement imposes reasonable restrictions on an employee to protect the employer's legitimate interests in its confidential information. In this regard, enforcing the Agreement serves the public interest. Therefore, the Court finds the public interest factor favors Plaintiffs.

**\*29** Accordingly, the Court finds Plaintiffs have satisfied the four elements of the standard for issuing a preliminary injunction.

### IV. CONCLUSION

For the reasons set forth above, Randall's Motion to Stay All Proceedings and Transfer Venue to the District of Massachusetts is **DENIED**, and Plaintiffs' Cross Motion to Enjoin Proceedings in the District of Massachusetts and Motion for a Preliminary Injunction are **GRANTED**. An appropriate order follows.

### All Citations

Not Reported in Fed. Supp., 2021 WL 2206106

---

### Footnotes

1    The Court did not hold an evidentiary hearing, because, as illustrated below, there is no disputed issue of material fact that must be resolved in such a hearing before issuing the preliminary injunction. Because the Court decides to grant the preliminary injunction in favor of Plaintiffs, the Consent Injunction is transformed into a preliminary injunction.

2    "Any action relating to or arising out of the Agreement *may* be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey." (ECF No. 1, Ex. A ¶ 6.1.)

3    The most recent federal court management statistics shows the civil cases in New Jersey have a longer median time (10.1 months) from filing to disposition than those in Massachusetts (9.1 months), though the median time from filing to trial for New Jersey's civil cases is unavailable. National Judicial Caseload Profile, United States Courts, (December 2020), *available at* https://www.uscourts.gov/sites/default/files/data_tables/ fcms_na_distprofile1231.2020.pdf. This supports the finding that the District of New Jersey is experiencing a higher level of court congestion.

4    The most recent federal court management statistics shows the caseload per judgement is still much higher in the District of New Jersey (1,325 civil filings and 3,030 pending cases per judgeship) than the District of Massachusetts (208 civil filings and are 379 pending cases per judgeship). National Judicial Caseload Profile,

United States Courts, (December 2020), *available at* https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2020.pdf.

5    Current Judicial Vacancies, United States Courts, (May 24, 2021), *available at* https://www.uscourts.gov/judges-judicial-vacancies/current-judicial-vacancies.

6    VELYS is J&J's proprietary digital surgery platform under development. *Creating a System of Connected Technologies to Transform the Future of Orthopaedic Surgery through VELYS™ Digital Surgery*, J&J Medical Devices (Dec. 9, 2019), https://www.jnjmedicaldevices.com/en-US/news-events/creating-system-connected-technologies-transform-future-orthopaedic-surgery.

7    Smith & Nephew, Annual Report 2019 9, 15 (2020), *available at* https://www.smith-nephew.com/global/assets/pdf/corporate/annual%20report%202019%20interactive-1.pdf.

8    The employer in *Marinelli* had significant layoffs after being acquired in April 2012, and its management had guaranteed significant severance benefits until April 2013.

9    Randall refers to certain alleged admissions of Larry Jones and Celine Martin that Smith & Nephew does not compete with Ethicon. (ECF No. 29 at 53.) However, these alleged admissions are not what Randall claims them to be. Larry Jones only meant Smith & Nephew did not compete with Ethicon on a specific product, *i.e.*, Ethicon's iPlatform. (ECF No. 32 at 125.) Celine Martin stated she was not concerned with Randall joining Smith & Nephew, based on the information Randall provided to her pertaining to the scope of his work with Ethicon. (ECF No. 37-4 at 43.) Celine Martin stressed her comments on Randall's departure were made in the context of a conversation that was very partial and lacked extreme substance. (*Id.* at 43–44.) Therefore, neither Larry Jones nor Celine Martin claimed there was no competition between Smith & Nephew and Ethicon.

10    Randall's resume submitted to Smith & Nephew, LinkedIn profile, and internal performance evaluation at J&J indicate Randall's leadership role in building the Company's robotics and digital surgery ecosystem. (ECF No. 2-4 at 12–15.)

11    The Court will not consider Plaintiffs' offer to pay Randall pending the court proceedings or under Addendum A of the Agreement, because it relates to Randall's financial damages as opposed to irreparable harm.

12    Section 2.4 prohibits an employee from retaining any confidential information of the Company upon terminating the employment without permission. (ECF No. 1, Ex. A ¶ 2.4.) Randall admitted the Company information he sent to his personal email address before his departure was confidential and should not be disclosed to a competitor, knew this was a violation of the Company's policy regarding distribution of confidential Company information to a personal email account, and knew he did not have permission to do so. (ECF No. 37-1 at 95–96.)

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT F

Groeneveld v. Verb Technology Company, Inc., Slip Copy (2024)

2024 WL 1253296
Only the Westlaw citation is currently available.

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

Michael GROENEVELD, Plaintiff,

v.

VERB TECHONOLOGY
COMPANY, INC., et al., Defendants.

Civil Action No. 23-03766 (GC) (JBD)
|
Signed March 25, 2024

**Attorneys and Law Firms**

Daniel T. Silverman, Costello & Mains PC, Mt. Laurel, NJ, for Plaintiff.

Jay J. Freireich, Freireich L.L.C., Florham Park, NJ, for Defendants Verb Technology Company, Inc., Rory Cutaia, Salman Khan.

**OPINION**

CASTNER, United States District Judge

**\*1** **THIS MATTER** comes before the Court upon Defendants Verb Technology Company, Inc., Rory Cutaia, and Salman Khan's joint Motion to Transfer Venue to the United States District Court for the Central District of California, Western Division, or, in the Alternative, to Compel Arbitration or to Dismiss for Lack of Personal Jurisdiction. (ECF No. 9.) Plaintiff Michael Groeneveld opposed, and Defendants replied. (ECF Nos. 10 & 11.) The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Federal Rule of Civil Procedure ("Rule") 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, Defendants' motion to transfer is **GRANTED**. The case shall be transferred to the Central District of California, Western Division.

**I. BACKGROUND**

This case involves unpaid wages. Plaintiff Groeneveld filed the Complaint in New Jersey Superior Court, Monmouth County, against Defendants Verb Technology, Cutaia, and

Khan as well as several other unidentified individuals. (ECF No. 1-3.)

Plaintiff (resident of New Jersey) was employed at Verb Technology (incorporated in Nevada) as the Senior Vice President of Global Sales from September 7, 2021, to November 8, 2022. (*Id.* ¶¶ 1-2, 6.) Cutaia, Chief Executive Officer of Verb Technology, and Khan, Executive Vice President and then-interim Chief Financial Officer, were Plaintiff's superiors. [1] (*Id.* ¶¶ 7-8.)

Plaintiff alleges that his offer letter from Verb Technology promised annual performance bonuses ranging from $100,000.00 to $190,000.00, conditioned on Plaintiff's achievement of certain to-be-defined performance objectives. (*Id.* ¶¶ 9-15.) During Plaintiff's employment, Cutaia and Khan allegedly "agreed that [Plaintiff] was entitled to three quarters of a full year bonus, $142,500," and Plaintiff then achieved objectives "entitling him to further compensation." (*Id.* ¶¶ 21-24.) Despite Cutaia and Khan acknowledging that Plaintiff was owed said bonuses, Plaintiff was discharged from Verb Technology on November 8, 2022, and he has not been paid "any of the performance-based compensation." (*Id.* ¶¶ 25-31.)

Plaintiff asserts causes of action under the New Jersey Wage Payment Law, N.J. Stat. Ann. § 34:11-4.1, *et seq.,* and for breach of contract, unjust enrichment, *quantum meruit,* as well as promissory estoppel. (*Id.* ¶¶ 39-48.)

On July 13, 2023, Defendants removed the case to this Court based on diversity jurisdiction under 28 U.S.C. § 1332. (ECF No. 1.) They proceeded to file, on August 23, 2023, a joint motion to transfer venue to the United States District Court for the Central District of California, Western Division, pursuant to 28 U.S.C. § 1404(a); to compel arbitration pursuant to Rule 12(b)(6); and to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). (ECF No. 9.) Plaintiff opposed, and Defendants replied. (ECF Nos. 10 & 11.)

**II. LEGAL STANDARD**

**\*2** "Under 28 U.S.C. § 1404(a), a district court may transfer a civil action to another district where the case might have been brought, or to which the parties have consented, for the convenience of the parties and witnesses and in the interest of justice." *In re McGraw-Hill Glob. Educ. Holdings LLC,* 909 F.3d 48, 57 (3d Cir. 2018). The party moving to transfer "bears the burden of persuasion." *Id.*

On a § 1404(a) motion, a court must consider the three factors "enumerated under the statute—convenience of the parties, convenience of the witnesses, and the interests of justice—along with all other relevant private and public factors." *Id.* Private factors "include the 'plaintiff's forum preference as manifested in the original choice'; 'the defendant's preference'; 'whether the claim arose elsewhere'; 'the convenience of the parties as indicated by their relative physical and financial condition'; 'the convenience of the witnesses'; and 'the location of books and records,' as well as 'all other practical problems that make trial of a case easy, expeditious and inexpensive.' " *In re: Howmedica Osteonics Corp,* 867 F.3d 390, 402 (3d Cir. 2017) (citations omitted). Public factors "include 'the enforceability of the judgment'; 'the relative administrative difficulty in the two fora resulting from court congestion'; 'the local interest in deciding local controversies at home'; 'the public policies of the fora'; and 'the familiarity of the trial judge with the applicable state law in diversity cases.' " *Id.* (citation omitted). A court must ultimately decide, "on balance, whether the litigation would 'more conveniently proceed and the interests of justice be better served by transfer to a different forum.' " *In re McGraw-Hill,* 909 F.3d at 57 (quoting *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir. 1995)).

When a forum-selection clause is at issue, "a motion to transfer under § 1404(a) is the appropriate procedural mechanism to enforce a forum-selection clause." *Peck v. Jayco, Inc.,* 665 F. Supp. 3d 607, 612 (D.N.J. 2023). The § 1404(a) analysis must be adjusted in three ways, however, when a forum-selection clause exists: "district courts (1) must give no weight to the forum preferred by 'the party defying the forum-selection clause'; (2) must deem the private interests to 'weigh entirely in favor of the preselected forum' because the parties agreed to the preselected forum and thereby waived the right to challenge it as inconvenient; and (3) must proceed to analyze only public interests." *In re: Howmedica,* 867 F.3d at 402 (quoting *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas,* 571 U.S. 49, 62-65 (2013)).

And when "both contracting and non-contracting parties are found in the same case," a court must "consider in sequence: (1) the forum-selection clauses, (2) the private and public interests relevant to non-contracting parties, (3) threshold issues related to severance, and (4) which transfer decision most promotes efficiency while minimizing prejudice to non-contracting parties' private interests." *Id.* at 403-04; *see also Peck,* 665 F. Supp. 3d at 612.

## III. DISCUSSION

### A. SEQUENCING OF MOTIONS

When faced, as here, with competing bases to dispose of a case, a district court "has leeway 'to choose among threshold grounds for denying audience to a case on the merits.' " *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.,* 549 U.S. 422, 423 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 585 (1999)). The United States Court of Appeals for the Third Circuit has clarified, however, that it is preferable to resolve "disputes over venue and jurisdiction" before "resolving a dispute over arbitrability." *Castillero v. Xtend Healthcare, LLC,* Civ. No. 22-02099, 2023 WL 8253049, at *10 (D.N.J. Nov. 29, 2023) (quoting *Reading Health Sys. v. Bear Stearns & Co.,* 900 F.3d 87, 95-96 (3d Cir. 2018)). Accordingly, the Court will first examine Defendants' motion to transfer venue.[2] *See Reading Health Sys.,* 900 F.3d at 95 ("Venue disputes involve only a threshold determination 'that the merits should [or should not] be adjudicated elsewhere.' " (quoting *Sinochem Int'l Co.,* 549 U.S. at 432)).

### B. MOTION TO TRANSFER

**\*3** Defendants seek to transfer this case to the United States District Court for the Central District of California, arguing that Plaintiff's employment agreement with Verb Technology "contain[ed] a forum selection clause designating state or federal court located in Los Angeles County, California for any action arising out of or related to Plaintiff's employment with the Company." (ECF No. 9-1 at 8.) They submit that Plaintiff's employment-related claims "fall squarely within the scope of the forum selection clause," and the case must therefore be transferred. (*Id.* at 10.)

Plaintiff responds by arguing that the arbitration provision in his employment agreement is unenforceable under New Jersey law, and because the "forum selection clause [is] contained within the same paragraph" as the arbitration provision, the forum-selection clause should also be deemed "void." (ECF No. 10 at 5 (no citations omitted).) Plaintiff also argues that because the employment agreement is with Verb Technology, not with Cutaia and Khan, these individuals should not be allowed to enforce the forum-selection clause against him. (*Id.* at 5-6.)

Having carefully reviewed the parties' arguments and submissions, the Court finds that this case should be

Groeneveld v. Verb Technology Company, Inc., Slip Copy (2024)

transferred to the Central District of California. Plaintiff has failed to present a compelling reason to not enforce the forum-selection clause with Verb Technology. And because the two non-signatories to the agreement—Cutaia and Khan—support the motion, transfer would not prejudice them and is in the interest of justice.

### *1. THE FORUM SELECTION CLAUSE*

The United States Supreme Court has emphasized that "[w]hen parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations." *Atl. Marine*, 571 U.S. at 66. Thus, "[i]n all but the most unusual cases, ... 'the interest of justice' is served by holding parties to their bargain." *Id.* The Third Circuit has similarly concluded that when parties have agreed to a forum-selection clause, "claims concerning those parties should be litigated in the fora designated by the clauses." *In re: Howmedica*, 867 F.3d at 404. Accordingly, forum-selection clauses "are 'prima facie valid and should be enforced unless enforcement is shown by the resisting party to be unreasonable under the circumstances.' " [3] *Foster v. Chesapeake Ins. Co.*, 933 F.2d 1207, 1219 (3d Cir. 1991) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)).

A party may overcome the presumptive validity of a forum-selection clause by making "a 'strong showing' that the clause is 'unreasonable.' " *Cadaput Graphic Sys., Inc. v. Tektronix, Inc.*, 98 F. Supp. 2d 560, 564 (D.N.J. 2000) (citation omitted). For such a clause to be found unreasonable, the party objecting to it must demonstrate "(1) that it is the result of fraud or overreaching; (2) that enforcement would violate strong public policy of the forum; or (3) that enforcement would ... result in jurisdiction so seriously inconvenient as to be unreasonable." *Kilduff v. Jayco, Inc.*, Civ. No. 23-00470, 2023 WL 3361187, at *3 (E.D. Pa. May 10, 2023) (quoting *Polytek Dev. Corp.*, 532 F. Supp. 3d at 248).

**\*4** Here, the forum selection is contained in an August 2, 2021 employment agreement entered into by Verb Technology and Plaintiff. (ECF No. 9-11 at 1-13.) The thirteen-page agreement is signed by Defendant Khan in his role as Executive Vice President of the company as well as by Plaintiff. (*Id.* at 3.) In the same font size and color as other text therein, the tenth and eleventh pages of the agreement read in relevant part:

18. **Mutual Arbitration Agreement.** The Company AND ITS AFFILIATES AND SUBSIDIARIES (TOGETHER, THE "COMPANY") AND I AGREE THAT ANY DISPUTE arising out of or related to my recruitment to or employment with the Company, including the termination of that relationship and any allegations of unfair or discriminatory treatment arising under state or federal law or otherwise and whether asserted against the Company or its current or former employees or affiliates, **SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION**, in Los Angeles, California (unless the arbitrator orders otherwise), in accordance with the Model Employment Dispute Resolution Rules of the American Arbitration Association (which appear at http://www.adr.org/employment). The Company and I irrevocably submit to the exclusive jurisdiction of any state or federal court located in Los Angeles County, California over any suit, action or proceeding arising out of or relating to or concerning the employment relationship that is not otherwise arbitrated or resolved according to the preceding sentence. This includes any suit, action or proceeding to compel arbitration or to enforce an arbitration award. Notwithstanding the foregoing, nothing herein shall preclude the Company from bringing any action or proceeding in any other court for the purpose of enforcing the provisions of the agreement to arbitrate.

[(*Id.* at 10-11 (emphases in original).)]

By its plain terms, the agreement sets forth that employment-related disputes between Verb Technology and Plaintiff are to be submitted to arbitration in California. And for any claims "not otherwise arbitrated," the agreement directs that they are subject "to the exclusive jurisdiction of any state or federal court located in Los Angeles County, California." (*Id.*)

In opposing the motion to transfer, Plaintiff does not assert that the employment agreement was the result of fraud, that enforcement of the forum-selection clause would violate strong public policy, or that jurisdiction in California is so seriously inconvenient as to be unreasonable. (ECF No. 10 at 5-6.) Plaintiff's main argument is that because the arbitration provision is allegedly unenforceable, the Court should simply presume that the forum-selection clause is also unenforceable. (*Id.*) Plaintiff does not cite any authority in support of such a conclusion.

Plaintiff's challenge to the arbitration provision centers on his argument that it is deficient under New Jersey law because

it "does not disclose that Plaintiff is forgoing the right to a jury trial." (*Id.* at 4-5.) Even if the Court were to accept Plaintiff's argument as to the arbitration provision, Plaintiff has not demonstrated that it impacts the enforceability of the forum-selection clause. The employment agreement provides for exclusive jurisdiction in California, even for matters not subject to arbitration. Moreover, the agreement provides that "[i]f any provision ... is determined to be void ..., that provision shall be severed ... and the other provisions shall remain in full force and effect." (ECF No. 9-11 at 10.) As such, because there is a valid forum-selection clause that Plaintiff has not meaningfully challenged or shown to be unreasonable, the Court finds it enforceable and will next analyze the public-interest factors as they relate to Verb Technology's transfer motion. *See Kilduff*, 2023 WL 3361187, at \*4 ("[W]hen a forum selection clause comes into play, a district court need only consider the public interest factors, because the private interest factors 'weigh entirely in favor of the preselected forum.' " (citation omitted)).

\*5  This is not one of the "rare[ ]" and "unusual cases" where the public factors defeat transfer. *See Atl. Marine*, 571 U.S. at 64 ("Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases."). The majority of public factors are either neutral or favor transfer.

As to the enforceability of any judgment, this factor is neutral. The parties do not dispute that a judgment would be equally enforceable in California and New Jersey.

As to court congestion, this factor favors transfer. The District of New Jersey is known to have a heavy case load and "one of the largest total number of filings recorded in the country." *Lapidow v. San Antonio Marriott Rivercenter*, Civ. No. 23-00805, 2024 WL 863426, at \*4 (D.N.J. Feb. 29, 2024) (quoting *Guarino v. W. Union Co.*, Civ. No. 20-5793, 2021 WL 3286640, at \*10 (D.N.J. Aug. 2, 2021)). Indeed, publicly available data indicates that there are far more civil cases pending in the District of New Jersey than in the Central District of California. *See* WEBSITE OF THE U.S. DISTRICT COURTS, *Civil Federal Judicial Caseload Statistics (March 31, 2023)*, available at https://www.uscourts.gov/statistics/table/c/federal-judicial-caseload-statistics/2023/03/31 (last visited March 22, 2024).

As to the local interest, this factor favors retention. Plaintiff is a resident of New Jersey, and Verb Technology's states of

citizenship are Nevada and Utah. [4] (ECF No. 3 at 1-2.) While New Jersey, Nevada, and Utah all have an interest in deciding a case involving their residents, California does not have the same local interest here.

As to the public policies of the fora, this factor favors transfer. As other districts courts have recognized, "New Jersey public policy strongly favors the enforcement of forum-selection provisions." *Peck*, 665 F. Supp. 3d at 615; *see also Mancuso v. L'Oreal USA, Inc.*, Civ. No. 20-5701, 2021 WL 365228, at \*6 (D.N.J. Feb. 1, 2021) ("[T]he fifth factor weighs strongly in favor of enforcing the forum selection clause because of New Jersey ... public policy in favor of enforcing contractual provisions, including forum selection clauses."). There also appears to be no general California public policy against enforcing forum-selection clauses. *See In re: Howmedica*, 867 F.3d at 410 ("[B]oth California and New Jersey lack any public policy against enforcing forum-selection clauses."). At minimum, Plaintiff does not argue and does not cite authority that enforcement in this case would be inconsistent with public policy.

Finally, as to the familiarity of the trial judge with applicable state law, even assuming New Jersey law applies and this factor favors retention, it is insufficient to defeat transfer. While it is preferable that a diversity case be decided by the court familiar with the applicable state law, "district courts are frequently called upon to interpret and apply the law of a state other than that in which they sit." *Bensalem Lodging Assocs., LLC v. Holiday Hosp. Franchising, LLC*, 575 F. Supp. 3d 532, 541 (E.D. Pa. 2021); *see also Booth v. Citizens Bank, N.A.*, Civ. No. 22-5276, 2023 WL 3916275, at \*6 (D.N.J. June 9, 2023) ("[T]he sixth factor is neutral because, although this Court may have more familiarity with the NJLAD, we have 'full faith in the judges of the District of [Rhode Island] to properly apply' it." (citation omitted)); *DiMarco v. Coates*, Civ. No. 19-1559, 2020 WL 5593767, at \*3 (D.N.J. Sept. 18, 2020) ("[S]ince federal courts are generally well-equipped to apply the laws of other states and frequently do so in diversity cases, the Court finds that familiarity of the trial judge with applicable state law is a neutral factor in this instance.").

\*6  Ultimately, nothing in the public-interest analysis strongly militates in favor of the Court retaining jurisdiction, and "a valid forum-selection clause [should be] given controlling weight in all but the most exceptional cases." *Atl. Marine*, 571 U.S. at 63 (citation omitted). Transfer of Plaintiff's claims against Verb Technology is therefore appropriate under § 1404(a).

Groeneveld v. Verb Technology Company, Inc., Slip Copy (2024)

### 2. THE NON-CONTRACTING PARTIES

Because Cutaia and Khan are not individual parties to Plaintiff's employment agreement, the question becomes whether Plaintiff's claims against these two non-contracting parties should also be transferred to the Central District of California or should be severed and retained here in New Jersey. [5] *See In re: Howmedica*, 867 F.3d at 404-05.

The parties dispute whether Cutaia and Khan can enforce the forum-selection clause as third-party beneficiaries to the employment agreement. Defendants argue that the agreement covers claims "asserted against the Company or its current or former employees," which indicates that Verb Technology and Plaintiff intended to "provid[e] the individual Defendants the right to enforce the forum selection clause[.]" (ECF No. 9-1 at 9-10.) Plaintiff insists, however, that under New Jersey law "only signatories to an agreement are entitled to enforce a forum selection clause." [6] (ECF No. 10 at 5-6.)

**\*7** The primary case relied on by Plaintiff is *Zydus Worldwide DMCC v. Teva API Inc.*, wherein the district court surveyed New Jersey case law and concluded that "absent third-party beneficiary status, a non-signatory is not within the scope of an agreement's forum selection clause." 461 F. Supp. 3d 119, 133-36 (D.N.J. 2020) (McNulty, J.). The *Zydus* court noted that federal courts in this District "have bound non-signatories to forum selection clauses in diversity cases —repeatedly, ... and in no uncertain terms," but the court discounted this federal case law because earlier courts had seemingly "applied federal common law standards" instead of trying to predict "how the New Jersey Supreme Court would decide the issue." *Id.* at 134.

Turning to New Jersey's intermediate appellate courts, the *Zydus* court found the precedent on a non-signatory's right to enforce a forum-selection clause "concededly thin, and to some degree ... confounded by other issues, such as arbitration and the entire controversy doctrine." *Id.* Still, the court thought such case law to be the "best guide," and two conclusions were reached: (1) "New Jersey ... contract law, as is common, permits a third-party beneficiary to enforce a contractual provision," and (2) other theories of non-signatory enforcement, such as the " 'global transaction' exception or ... 'closely related' exception" have not been generally accepted in New Jersey when applied to forum-selection clauses. *Id.* at 133 (collecting cases).

Accepting the *Zydus* court's reasoning, Cutaia and Khan may only enforce the employment agreement's forum-selection clause against Plaintiff if they are determined to be third-party beneficiaries of that agreement. And the Court finds them to be such beneficiaries who are permitted to enforce the forum-selection clause.

New Jersey's courts have long recognized that third-party beneficiaries can bind others and be bound, under the appropriate circumstances, to agreements they did not sign. In *Brooklawn v. Brooklawn Housing Corporation*, for example, New Jersey's Court of Errors and Appeals explained that third-party beneficiaries are generally split between those who have a right of action under a contract and those who are "incidental" beneficiaries and have no right to enforce. 11 A.2d 83, 85 (N.J. E. & A. 1940). The Court wrote that "[t]he determining factor as to the rights of a third[-]party beneficiary is the intention of the parties who actually made the contract .... Thus, the real test is whether the contracting parties intended that a third party should receive a benefit which might be enforced in the courts; and the fact that such a benefit exists, or that the third party is named, is merely evidence of this intention." *Id.* Similarly, in *Broadway Maintenance Corporation v. Rutgers, State University*, the New Jersey Supreme Court clarified that "[t]he contractual intent to recognize a right to performance in the third person is the key .... This is a fact-sensitive issue and in each case the court must examine the terms and conditions of the agreement to determine whether the non-party to the contract was an intended or incidental beneficiary." 447 A.2d 906, 909 (N.J. 1982).

In accordance with these principles, New Jersey courts have found enforceable third-party beneficiary status in instances when a "substantial nexus exist[ed] between the subject matter of ... [an] agreement and the claim raised," when a third-party claim was "essentially derivative" of a claim covered by an agreement, or when it was "clear" that the parties to an agreement intended that a third-party benefit from a contract. *See, e.g.*, *Hojnowski ex rel. Hojnowski v. Vans Skate* Park, 868 A.2d 1087, 1092 (N.J. Super. Ct. App. Div. 2005), *aff'd sub nom.*, 901 A.2d 381 (N.J. 2006); *Jansen v. Salomon Smith Barney, Inc.*, 776 A.2d 816, 819 (N.J. Super. Ct. App. Div. 2001).

**\*8** Here, the employment agreement between Verb Technology and Plaintiff, signed by Khan on behalf of the company, evinces the parties' clear intent for Cutaia and

Khan to be third-party beneficiaries of the forum-selection clause, not merely "incidental" beneficiaries. The agreement sets forth that any dispute "arising out of or related to [Plaintiff's] ... employment with the Company, including the termination of that relationship ... whether asserted against the Company or its *current or former employees*" will be resolved in arbitration in Los Angeles, California. (ECF No. 9-11 at 10 (emphasis added).) For any disputes not brought in arbitration, the agreement directs that "[t]he Company and [Plaintiff] irrevocably submit to the exclusive jurisdiction of any state or federal court located in Los Angeles County, California over any suit, action or proceeding arising out of or relating to or concerning the employment relationship." (*Id.* at 10-11.) This plain language clearly contemplates that employment-related disputes between Plaintiff and Verb Technology and its other employees, such as Cutaia and Khan, would be either arbitrated or litigated in California. Cutaia and Khan are thus intended third-party beneficiaries, and they may enforce the forum-selection clause against Plaintiff.

In addition, all of Plaintiff's claims against Cutaia and Khan have a substantial nexus in and are largely (if not wholly) derivative of the claims that Plaintiff is asserting against Verb Technology. The Complaint does not differentiate between the three for purposes of liability and treats them identically. In essence, Plaintiff's claims against the individual Defendants are predicated on the deal reached between him and the company, which relationship was subject to a valid and enforceable forum-selection clause. Therefore, for the same reasons that transfer to California of Plaintiff's claims against Verb Technology is appropriate under § 1404(a), transfer of Plaintiff's claims against Cutaia and Khan is also appropriate.

In any event, because the private and public-interest factors also tilt in favor of transfer of the claims against Cutaia and Khan, those claims would be subject to transfer to the Central District of California even if the individual Defendants were found not to be third-party beneficiaries.

As to the private factors, all but one either support transfer or are neutral. *First*, although Plaintiff seeks to maintain this action in New Jersey, he entered into a forum-selection clause with Verb Technology to have any employment-related claims litigated in California, and he cannot now rescind his agreement and express a different venue preference. *See Peck*, 665 F. Supp. 3d at 616. *Second*, both Cutaia and Khan support the transfer to California, so this factor also weighs in favor of transfer. *See id. Third*, even if New Jersey bears a

closer connection to the events and transactions underpinning Plaintiff's claims than California, New Jersey's interest is not controlling. Defendants attest that Verb Technology has no offices in New Jersey, is not registered to do business in New Jersey, does not have any New Jersey customers, and Defendants do not own any property in New Jersey. (ECF No. 9-10 at 1-2.) The only connection to New Jersey appears to be Plaintiff's residency there, and this does not defeat the other factors favoring transfer. *See, e.g.*, *Lord v. Accenture LLP*, Civ. No. 21-08646, 2021 WL 5980339, at *6 (D.N.J. Dec. 17, 2021) ("The only real interest that New Jersey has in this dispute is th[e] fact that Plaintiff is a resident of New Jersey, who happened to work out of her home for several months in 2020 when she was employed by Defendant. This interest is not particularly significant.").

*Fourth*, the Central District of California is more convenient for three of the four parties, with Khan living in California. *See Peck*, 665 F. Supp. 3d at 616 ("The fourth factor also supports transfer because the Northern District of Indiana is a more convenient forum for three of the four parties in this matter ...."). *Fifth and sixth*, because the parties do not identify any witness or records that may be unavailable for trial in either fora, this factor is neutral. *See Lord*, 2021 WL 5980339, at *5 ("The fifth and sixth factors are neutral—there is no evidence that any relevant witnesses, books, or records would be unavailable in New York."); *Lapidow*, 2024 WL 863426, at *3 (same). *And seventh*, because no party has raised any other potential practical problems with a trial in either fora, this factor is neutral as well. *Peck*, 665 F. Supp. 3d at 616.

**\*9** As to the public-interest factors, the analysis is the same for Cutaia and Khan as it was for Verb Technology above, with one exception. Because Defendant Khan is a resident of California and Plaintiff is a resident of New Jersey, the local interest factor is neutral as to them. Both fora have an interest in resolving an employment-related dispute involving their residents.

Consequently, because the private and public factors tilt in favor of transfer of the claims against Defendants, this case will be transferred to the Central District of California, Western Division, and the Court need not proceed to determine if any claims should be severed and retained in New Jersey. *See In re: Howmedica*, 867 F.3d at 404 ("If, at this juncture, the Step One and Step Two analyses point to the same forum, then the court should allow the case to proceed in that forum, ... and the transfer inquiry ends there.").

*Groeneveld v. Verb Techonology Company, Inc., Slip Copy (2024)*

## IV. CONCLUSION

For the reasons set forth above, and other good cause shown, Defendants' Motion to Transfer Venue (ECF No. 9) is **GRANTED**. An appropriate Order follows.

**All Citations**

Slip Copy, 2024 WL 1253296

---

**Footnotes**

1    The Complaint alleges that Cutaia and Khan are residents of Utah, but an August 23, 2023 declaration from Cutaia, sworn under penalty of perjury, attests that he is a resident of Nevada and Khan is a resident of California. (ECF No. 9-10 at 1-2.)

2    "[T]he Third Circuit has previously held that a court need not reach a conclusion regarding personal jurisdiction prior to effecting a § 1404(a) transfer of an action to another district court." *Carcanague v. DuPont De Nemours, Inc.*, Civ. No. 19-18181, 2020 WL 7481597, at *3 (D.N.J. Dec. 18, 2020) (citations omitted).

3    "Federal law, not state law, is applied to the validity of a forum selection clause in a federal diversity action." *Polytek Dev. Corp. v. 'Doc' Johnson Enterprises*, 532 F. Supp. 3d 243, 248 (E.D. Pa. 2021). In contrast, courts "look to state law in determining *scope*—whether the claims and parties involved in a particular dispute are subject to the particular forum selection clause at hand." *Moran v. Moran*, Civ. No. 22-1298, 2022 WL 16822010, at *2 (D.N.J. Nov. 8, 2022) (emphasis in original).

4    Although the allegations to date are insufficient for the Court to conclude that either Plaintiff or Verb Technology would be subject to personal jurisdiction in California based on a minimum contacts analysis, the forum-selection clause operates as a form of consent that "provides an independent basis for personal jurisdiction. *See Canon Fin. Servs., Inc. v. Direct Impressions, Inc.*, Civ. No. 23-167, 2023 WL 6140689, at *4 (D.N.J. Sept. 20, 2023) ("Such a manifestation of consent has long included forum selection clauses." (collecting cases)).

5    Defendants represent that Khan is a resident of California, so personal jurisdiction over him in California would appear to be proper. (ECF No. 9-10 at 1.) In contrast, Cutaia represents that he is a resident of Utah. (*Id.*) Nevertheless, because Cutaia joined in the motion to transfer and consents to transfer to California without indicating an intent to contest personal jurisdiction if the case is so transferred, this defense is waived. *See, e.g.*, *Grande v. Knauf Gips KG & Knauf New Bldg. Sys. (Tianjin) Co.*, Civ. No. 21-3287, 2022 WL 5434325, at *3 (S.D. Tex. June 23, 2022) ("The parties consented to the transfer and therefore to this Court's exercise of jurisdiction over them."); *Real Est. Sols. Today LLC. v. Scifo*, Civ. No. 20-4512, 2021 WL 486896, at *7 n.6 (D.N.J. Feb. 10, 2021) ("[P]ersonal jurisdiction is waivable, and based on Defendants' motion, in the alternative, to transfer this action, ... it is apparent that [Defendant] consents to the exercise of personal jurisdiction over him in New York."); *ECB USA, Inc. v. Savencia, S.A.*, Civ. No. 19-731, 2020 WL 5369076, at *2 (D. Del. Sept. 8, 2020) ("By consenting to transfer under Section 1404(a), a defendant waives any argument that the transferee district is not one where the action 'might have been brought' and, therefore, also impliedly waives any argument that the transferee district does not have personal jurisdiction over the defendant."); *Lockett v. Pinnacle Ent., Inc.*, Civ. No. 19-00358, 2019 WL 4296492, at *5 (W.D. Mo. Sept. 10, 2019) ("[C]onsenting to a transferee court means that the party is consenting to venue and personal jurisdiction in that court."); *cf. Ragner Tech. Corp. v. Berardi*, 287 F. Supp. 3d 541, 549 (D.N.J. 2018) (finding that defendants preserved objection to personal jurisdiction in transferee court where they asserted that transferee did not have jurisdiction and that defendants intended to challenge it).

6    Because Plaintiff's claims are brought under New Jersey law, this Court is sitting in diversity, and both parties brief the scope of the forum-selection clause under New Jersey law, the Court will presume at this time that New Jersey law applies. *See, e.g.,* *Argabright v. Rheem Mfg. Co.*, 201 F. Supp. 3d 578, 591 n.5 (D.N.J. 2016) ("Since Plaintiffs have made their allegations under New Jersey law and both parties have briefed the sufficiency of the claims under New Jersey law, the Court will, for purposes of deciding the present motion to dismiss, apply New Jersey law to determine whether Plaintiffs have succeeded in stating plausible claims for relief.").

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT G

Case 2:25-cv-02263-WJM-MAH   Document 5-2   Filed 06/16/25   Page 77 of 164 PageID: 206

Jun Zhang v. Gain Capital Holdings, Inc., Not Reported in Fed. Supp. (2021)

2021 WL 2103233
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

JUN ZHANG, a.k.a., June Zhang, individually and
on behalf of all others similarly situated, Plaintiff,

v.

GAIN CAPITAL HOLDINGS, INC.,

a Delaware corporation, Defendant.

Case No. 3:20-cv-09426 (BRM) (TJB)

|

Signed 05/25/2021

**Attorneys and Law Firms**

For Plaintiff Jun Zhang, a.k.a., June Zhang, individually and
on behalf of all others similarly situated: Bin Xue, Xue &
Associates, P.C., New York, NY.

For Defendant Gain Capital Holdings, Inc., a Delaware
corporation: Michael M. Rosensaft, Katten, Muchin,
Rosenman, LLP, New York, NY.

**OPINION**

Martinotti, United States District Judge

**\*1** Before this Court is Defendant Gain Capital Holdings,
Inc.'s ("GCH") Motion to Dismiss pursuant to the doctrine of
*forum non conveniens* (ECF No. 17) and its Motion to Dismiss
Plaintiff Jun Zhang's ("Plaintiff") Complaint for failure to
state a claim pursuant to Federal Rule of Civil Procedure
12(b)(6) (ECF No. 18). Plaintiff opposed both Motions (ECF
Nos. 24, 25) and GCH replied to both oppositions (ECF Nos.
26, 27). Having reviewed the parties' submissions filed in
connection with the Motions and having declined to hold oral
argument pursuant to Federal Rule of Civil Procedure 78(b),
for the reasons set forth below and for good cause having been
shown, GCH's Motion to Dismiss pursuant to the doctrine
of *forum non conveniens* is **GRANTED** and its Motion to
Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)
is **DENIED AS MOOT**.

**I. BACKGROUND**

**A. Factual Background**

GCH is a "global provider of trading services and solutions"
with customers located in over 180 countries. (ECF No.
1 ¶ 5.) GCH's shares are traded on the New York Stock
Exchange and it has offices in New York, Illinois, Ohio, the
United Kingdom, Japan, Australia, China, U.A.E., Poland,
and Singapore. (*Id.*) It uses a global digital trading platform
that can be accessed through the internet and mobile devices.
(*Id.*) Its retail customers are composed of "self-directed
traders" who execute trades on their own behalf. (*Id.*) In 2018,
these self-directed traders represented approximately 99.7%
of GCH's retail trading volume. (*Id.*) Trades are executed
through GCH's GAIN Trader proprietary trading platform.
(*Id.* ¶ 6.) GCH has several operating subsidies, including a
Cayman Islands company named Gain Global Market, Inc.
("GGMI"). (*Id.* ¶ 7.)

Plaintiff is a self-directed trader who has been using GCH's
GAIN Trader platform to trade derivatives of commodity
futures since 2017. (*Id.* ¶ 8.) When Plaintiff opened his
account through GCH's website, forex.com, he had to fill in
his personal information and set up a username and password.
(*Id.*) Plaintiff does not remember signing any contract for
opening the account, and the entire process took him only a
few minutes. (*Id.*) Plaintiff alleges GCH's website included
advertisements boasting "five-minute account opening." (*Id.*)
To Plaintiff's understanding, GCH's platform allows its users
to buy and sell futures derivatives offered by GCH—it is
not an agent which buys and sells futures on behalf of
the users. (*Id.* ¶ 9.) GCH also hedges on its customers'
trading activities to generate profits in both up and down
markets, so "in the investment terminology," GCH is an
investment dealer instead of a broker, "as far as Plaintiff is
concerned." (*Id.*) Plaintiff understands the deposit account he
opened with GCH is a trust account (the "Trust Account")
that entrusts GCH "to manage and to debit or credit Plaintiff
according to his trading activities on the platform." (*Id.*)
After opening his account, Plaintiff received an email from
cn.support@forex.com informing Plaintiff he had completed
his account opening but needed to deposit funds into his
account before he started trading. (*Id.* ¶ 10.) The email
included a statement regarding GCH being the owner of
forex.com located at "135 US Hway 202/206, Bedminster NJ,
07921," which is the address of GCH. (*Id.* ¶ 11.) The owner
of the New York bank account to which the Trust Account
money was wired was shown to have a physical address at
the same address. (*Id.* ¶ 12.) Since activating his account
and depositing the funds necessary to begin trading, Plaintiff
"made innumerable deposits and withdrawals from the Trust
Account, all under GCH's management." (*Id.* ¶ 13.)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 78 of 164 PageID: 207

Jun Zhang v. Gain Capital Holdings, Inc., Not Reported in Fed. Supp. (2021)

**\*2**  One of Plaintiff's major trading activities using GCH's platform concerns a futures contract named "US_OIL" with a Chinese name literally meaning U.S. Crude Oil. (*Id.* ¶ 14.) US_OIL trades crude oil futures through commodity future exchanges in the United States, which are primarily exchanges controlled by the Chicago Mercantile Exchange Group ("CME Group"). (*Id.*) The US_OIL monthly contracts closely track the monthly futures contracts of the U.S. crude oil benchmark—West Texas Intermediate ("WTI")—which are administered by the CME Group. (*Id.*) On Plaintiff's information and belief, the US_OIL contracts are crude oil futures derivative products that GCH offered through its trading platform, forex.com, at all relevant times to non-U.S. residents including Chinese residents like Plaintiff. (*Id.* ¶ 15.)

For the US_OIL trading, GCH provides its customers with real time quotes from the CME Group for WTI and other oil-related futures in the United States, and general research and guidance for the U.S. oil market. (*Id.* ¶ 16.) By allowing Plaintiff and other customers to buy and sell US_OIL as a derivative of the WTI futures of the CME Group, Plaintiff alleges GCH has been acting as Plaintiff's investment dealer and advisor for U.S.-based investments. (*Id.*)

Plaintiff alleges this action arose from the negative pricing of WTI futures. (*Id.* ¶ 17.) On April 3, 2020, the CME Group announced to its CME Globex and Market Data customers that effective April 5, 2020, futures and options including crude oil "will be flagged as eligible to trade at negative prices." (*Id.*) Historically, negative pricing for commodity trading has existed for many years, but the CME Group did not allow it until April 5, 2020. (*Id.*) On April 8, 2020, CME Group published an advisory notice which stated, in relevant part, that if major energy prices continued to fall towards zero in the following months, CME Clearing had a tested plan to support the possibility of negative options and enable markets to continue to function normally. (*Id.* ¶ 18.) The notice specifically mentioned WTI Crude Oil futures, RBOB Gasoline futures, and Heating Oil futures for possible negative pricing. (*Id.*)

On April 15, 2020, CME Group sent a memorandum to all clearing member firms under the subject "Testing opportunities in CME's 'News Release' environment for negative prices and strikes for certain NYMEX energy contracts." (*Id.* ¶ 19.) The memorandum stated, "Support for zero or negative futures and/or strike prices is standard throughout CME systems." (*Id.*) It also stated, "Effective

immediately, firms wishing to test such negative futures and/or strike prices in their systems may utilize CME's 'News Release' testing environments." (*Id.*)

On April 20, 2020, the day the WTI May 2020 contracts were set to expire, their prices dropped into the negatives, reaching -$40.32 per barrel at its lowest point, and closing at -$37.63 per barrel. (*Id.* ¶ 20.) However, GCH's US_OIL contract pricing remained in the positives, with the lowest price shown as $0.01 per barrel and the closing price at $0.05 per barrel. (*Id.*) On the same day, approximately twenty-two minutes before the closing of U.S. crude oil trading, GCH's US_OIL trading halted, "thus dissociating the derivative from its underlying WTI future contracts." (*Id.*) On April 21, 2020, GCH's platform showed the settlement pricing of US_OIL for the May contracts as $0.01. (*Id.* ¶ 21.) On April 23, 2020, Plaintiff received an email from GCH announcing that Plaintiff's US_OIL account had been assessed an "adjustment" of -$143,032.00 due to the negative pricing of WTI's May 2020 contract and that GCH had withdrawn that adjustment amount from Plaintiff's Trust Account. (*Id.* ¶ 22.) After inquiring about the adjustment with GCH's customer service, Plaintiff was told the adjustment was a decision made by GCH's trading platform management. (*Id.*)

**\*3**  Plaintiff complained several times to GCH and as part of this complaint process, "[GCH] sent Plaintiff and its other customers a contract which Plaintiff allegedly executed by opening an account on GCH's forex.com platform." (*Id.* ¶ 25.) According to Plaintiff, this was the first time Plaintiff had ever heard of such a contract. (*Id.*) Plaintiff then complained to the National Futures Association ("NFA"), the regulatory group for the futures trading industry based in Chicago and New York, which stated that the US_OIL trading on GCH's platform was conducted by GCH's subsidiary, GGMI. (*Id.* ¶ 26.) GCH is a member of the NFA, but GGMI is not. (*Id.*) Plaintiff alleges this was the first time he was made aware of GGMI being the market maker for US_OIL and of "the artificial distinction between GCH and GGMI." (*Id.*)

On July 24, 2020, Plaintiff filed a three-count putative class action Complaint alleging breach of fiduciary duty (Count I); negligence (Count II); and consumer fraud under N.J. Stat. Ann. §§ 56:8-1, *et seq.* (Count III). (ECF No. 1.) On October 2, 2020, GCH filed two Motions: (1) a Motion to Dismiss pursuant to the doctrine of *forum non conveniens* (ECF No. 17); and (2) a Motion to Dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6)

(ECF No. 18). On November 6, 2020, Plaintiff opposed both Motions (ECF Nos. 24, 25) and on November 24, 2020, GCH replied to both oppositions (ECF Nos. 26, 27).

## II. LEGAL STANDARD

*Forum non conveniens* "requires a decision whether a case 'should be adjudicated elsewhere,' *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007), and 'is the proper mechanism for enforcing a forum selection clause,' *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 180 (3d Cir. 2017)." *Meridian Consulting I Corp., Inc. v. Eurotec Can. Ltd.*, Civ. A. No. 1922197, 2021 WL 689132, at *9 (D.N.J. Feb. 22, 2021). "A district court therefore may dispose of an action by a *forum non conveniens* dismissal ... when considerations of convenience, fairness, and judicial economy so warrant." *Sinochem Int'l Co.*, 549 U.S. at 432. When no forum selection clause is present, a district court must consider the following factors in applying the doctrine of *forum non conveniens*:

> (1) the amount of deference to be afforded to plaintiffs' choice of forum; (2) the availability of an adequate alternative forum where defendants are amenable to process and plaintiffs' claims are cognizable; (3) relevant 'private interest' factors affecting the convenience of the litigants; and (4) relevant 'public interest' factors affecting the convenience of the forum.

*Collins*, 874 F.3d at 186 (quoting *Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013)). However, when a forum selection clause exists, the analysis changes. *See Atl. Marine Const. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 63 (2013). The plaintiff's choice of forum "merits no weight," *id.*, and the court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.* at 64. "Therefore, under *Atlantic Marine*, the remaining factors for the Court to consider are (i) the availability of an adequate alternative forum where [GCH] is amenable to process and Plaintiff's claims are cognizable, and (ii) public interest factors." *Hage v. Am. Bd. of Obstetrics & Gynecology*, Civ. A. No. 19-21198, 2020 WL 3056442, at

*4 (D.N.J. June 9, 2020). "[T]he party resisting application of a forum selection clause ... bears a heavy burden under *Atlantic Marine*" of establishing the forum selection clause should not be enforced. *Collins*, 874 F.3d at 186–87.

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*." *Atl. Marine*, 571 U.S. at 60. "Section 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system." *Id.* But "[f]or the remaining set of cases calling for a nonfederal[, meaning state or foreign,] forum, § 1404(a) has no application, but the residual doctrine of *forum non conveniens* 'has continuing application in federal courts.' " *Id.* at 60–61 (quoting *Sinochem*, 549 U.S. at 430). The forum selection clause here, if applicable, points to the Cayman Islands, a foreign forum, so the Court must apply the doctrine of *forum non conveniens*. *See id.* (noting that "courts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." (citing *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 37 (1988))).

## III. DECISION

**\*4** GCH asserts when Plaintiff opened his trading accounts on forex.com, he assented to the Customer Agreement, which contains a forum selection clause. (ECF No. 17-1 at 1.) This forum selection clause provides the courts of the Cayman Islands will have "exclusive jurisdiction" over any claim arising under the Customer Agreement. (*Id.*) GCH makes two arguments in relation to the forum selection clause: (1) the forum selection clause is enforceable and (2) the forum selection clause applies to this action. (ECF No. 17-1 at 10–16.) Because of both these arguments, GCH submits the doctrine of *forum non conveniens* justifies dismissal of this action. (*Id.* at 16–17.) The Court will address each of GCH's main arguments in turn.

### A. The Forum Selection Clause's Enforceability

GCH argues the forum selection clause applies to this action because Plaintiff had reasonable notice of the clause and affirmatively assented to the Customer Agreement containing the clause. (*Id.* at 10.) GCH also argues Plaintiff cannot demonstrate the forum selection clause is unreasonable. (*Id.* at 11.) Plaintiff argues the Customer Agreement did not provide adequate notice of the clause because it does not qualify as enforceable clickwrap. (ECF No. 24 at 15.)

*Jun Zhang v. Gain Capital Holdings, Inc., Not Reported in Fed. Supp. (2021)*

Online agreements, such as this one, "are generally presented in one of two forms: clickwrap agreements and browsewrap agreements." *Mucciariello v. Viator, Inc.*, Civ. A. No. 18-14444, 2019 WL 4727896, at *3 (D.N.J. Sept. 27, 2019) (citations omitted). "A clickwrap agreement requires a computer user to affirmatively manifest her assent to the terms of contract." *ADP, LLC v. Lynch*, Civ. A. No. 2:16-01053, 2016 WL 3574328, at *4 (D.N.J. June 30, 2016), *aff'd*, 678 F. App'x 77 (3d Cir. 2017). Clickwrap agreements satisfy that requirement "by informing the user that taking such action will comprise her assent to the displayed terms." *Id.* (citing *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007)). Importantly, "clickwrap agreements are routinely upheld." *Mucciariello*, 2019 WL 4727896, at *3; *see also Liberty Syndicates at Lloyd's v. Walnut Advisory Corp.*, Civ. A. No. 09-1343, 2011 WL 5825777, at *4 (D.N.J. Nov. 16, 2011) ("Generally, courts have enforced forum selection clauses in clickwrap agreements, finding that the clickwrap agreement, which collects all of the terms of the agreement in a single dialog box and then requires the user to affirmatively accept the agreement before proceeding, makes every term equally visible."). Alternatively, "browsewrap agreements are not automatically deemed valid." *Mucciariello*, 2019 WL 4727896, at *3; *see also Liberty Syndicates at Lloyd's*, 2011 WL 5825777, at *4 (noting that "courts have only enforced the forum selection clauses in browsewrap agreements when the specifics surrounding agreement revealed either that the user knew or should have known about the existence of the terms and conditions that contained the forum selection clause"). However, for both of these agreements, "[t]he central issue ... is whether or not the forum selection clause is 'immediately visible.' " *Liberty Syndicates at Lloyd's*, 2011 WL 5825777, at *4.

Here, GCH argues "Plaintiff had reasonable notice of the Customer Agreement and its forum selection clause ... because three different hyperlinks gave Plaintiff notice of the Customer Agreement." (ECF No. 17-1 at 8.) Further, GCH argues "[a]fter Plaintiff saw all three of those links, he affirmatively agreed to be bound by the Customer Agreement when he clicked the checkbox directly below two of those links." (*Id.* at 8–9 (citing Xu Decl. (ECF No. 17-2) ¶¶ 8–9, 16–17).) Therefore, GCH asserts the Customer Agreement and its provisions, including the forum selection clause, are enforceable clickwrap. In opposition, Plaintiff argues the Customer Agreement is not clickwrap because the Customer Agreement interface "does not provide a button to click to agree to [ ] terms and conditions hyperlinked next to the

button." (ECF No. 24 at 15.) Plaintiff asserts the Customer Agreement "is more like a sign-in wrap where the text next to the button does not require the consumer to agree to a hyperlinked 'terms of use' " because "instead, the consumer is presented with a 'statement' in a grey box and is asked to click a button next to the sentence 'I have read and agree to the statement above.' " (*Id.* at 15–16.)

**\*5** In contrast to clickwrap agreements, sign-in wraps do not "require the user to click on a box showing acceptance of the 'terms of use' in order to continue." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 399 (E.D.N.Y. 2015). Instead, "the website is designed so that a user is notified of the existence and applicability of the site's 'terms of use' when proceeding through the website's sign-in or login process." *Id.*

In *Berkson*, the court reviewed two agreements. The first agreement at issue arose from Berkson's alleged purchase of in-flight Wi-Fi on an American Airlines flight through Gogo, the Wi-Fi provider. If a user were to visit Gogo's webpage and purchase Wi-Fi services during the time Berkson did, they were "confronted with two sign-in buttons on the Gogo webpage." *Id.* at 373. One sign-in button stood entirely by itself in the upper right-hand corner of the webpage, with no language requiring a consumer to agree to "terms of use." *Id.* at 374. Another sign-in button was located in the bottom left-hand corner of the webpage. *Id.* Above this button, the website warns the user "By clicking 'Sign in' I agree to the 'terms of use' and 'privacy policy.' " *Id.* The court emphasized the "terms of use" and "privacy policy" appeared in lowercase font considerably smaller than the "all caps 'SIGN IN' button," and appeared to be hyperlinked. *Id.* Additionally, clicking on the "SIGN IN" button did not display either the "terms of use" or "privacy policy." *Id.*

The court also reviewed a second instance where a consumer could be bound by Gogo's terms. If a consumer were to create an account to access Gogo's services, they would be led to a page that stated: "By clicking 'NEXT' I agree to the *terms of use* and *privacy policy*." *Id.* at 375. The "terms of use" and "privacy policy" were hyperlinked but could only be accessed by clicking the links—clicking on the "NEXT" button would not present either set of terms to the user. *Id.* Classifying the agreement format as "sign-in wrap," the *Berkson* court found Gogo "did not make an effort to draw Berkson's attention to its 'terms of use.' " *Id.* at 404. Ultimately, the court found Berkson was not bound by the agreement's terms because the "hyperlink to the 'terms of use' was not in large font, all caps, or in bold" and the "terms of use" were not "accessible from

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 81 of 164 PageID: 210

Jun Zhang v. Gain Capital Holdings, Inc., Not Reported in Fed. Supp. (2021)

multiple locations on the webpage," while the "SIGN IN" button was "very user-friendly and obvious, appearing in all caps, in a clearly delineated box in both the upper right hand and the lower left hand corners of the homepage." *Id.* In other words, "[t]he importance of the 'terms of use' was obscured by the physical manifestation of assent, in this case clicking the 'SIGN IN' button, expected of a consumer seeking to purchase in-flight Wi–Fi." *Id.*

The Customer Agreement at issue here arises when a customer applies to open an account through forex.com. Plaintiff provides excerpts of the final page of the account application. [1] (ECF No. 24 at 16.) The portion of the account application Plaintiff attacks provides as follows:

> By selecting the option, I confirm that all the information supplied in this application is correct to my knowledge, and that [I] have read, understood, and agreed to be bound by the terms of the customer agreement. I understand that foreign exchange trading and margin trading of contract for difference involve high risks and thus do not suit every investor. I have read and understood all the information provided to me, including the risk warning notice contained in the customer agreement's attachment 1.

**\*6** (*Id.*) Importantly, on the application, the above text is in black, while the words "customer agreement" appear in blue, underlined, and hyperlinked text. (ECF No. 24 at 16; ECF No. 17-2 ¶ 12; ECF No. 24-5.) That is, within the three-sentence body of black text, there are two blue hyperlinks referencing the Customer Agreement. These hyperlinks, if clicked, would lead a consumer to the Customer Agreement, which contains the forum selection clause. (ECF No. 17-2 ¶ 14). Additionally, the text is presented in a light-grey box along with a check box next to the text "I have read and agree to the statement above." (ECF No. 24-5.) Below that, outside of the grey box, there are two additional check boxes. (*Id.*) If the first box is checked, the customer agrees to receive "news and promotion information" from forex.com. (*Id.*) If the second box is checked, the customer agrees to "receive relevant information or services from affiliates of

forex.com and third parties." (*Id.*) The text next to the second box, according to the untranslated, original version of the webpage's screenshot, also contains a blue hyperlink to the privacy agreement. (*Id.*) Underneath the two check boxes outside the grey box is a large green button with the word "submit" to complete the application process. (*Id.*) If an applicant does not check the box next to the text "I have read and agree to the statement above," the application will not be submitted, and the webpage will display a message in red italicized font that states, "You must agree to all terms in order to open an actual account." (ECF No. 17-1 at 7.)

Plaintiff asserts "[t]he two links for 'customer agreement' are almost in the same color as the background blue color, even less visible than the black letter texts." (*Id.* at 16.) Further, "[t]here is no prominent button that says 'I Agree' next to the link for the contract," which the *Berkson* court earmarked as a feature of a valid clickwrap agreement. (*Id.*) Lastly, "[t]he links are also much further away from the prominent button than the invalid sign-in wraps in *Berkson* which display the links right above the buttons." (*Id.*)

The Court disagrees with Plaintiff. The words "customer agreement" are blue and underlined—the words stand out from the rest of the words in the text box, which are all black and not underlined. While there is no "I agree" button next to the link for the contract, courts in this district have enforced agreements with similar features as the Customer Agreement here. *See Mucciariello*, 2019 WL 4727896, at *4; *see also Manopla v. Raymours Furniture Co., Inc.,* Civ. A. No. 3:17-7649, 2018 WL 3201800, at *4 (D.N.J. June 29, 2018) (finding plaintiff had reasonable notice of a forum selection clause when she checked a box stating "I have read and agreed to the Official Rules" and a hyperlink "signaled by blue ink" told "a user that clicking the words 'Click Here' would send a user to a different page" containing the forum selection clause). In *Mucciariello*, the plaintiff "was required to provide her personal and billing information, before clicking on the 'Book Now' icon to confirm her purchase." *Id.* Underneath the "Book Now" icon, the webpage contained the message "by clicking Book Now and making a reservation, I acknowledge that I have read and agree to be bound by [the] ... Terms and Conditions." *Id.* (internal citations omitted). In finding the plaintiff had reasonable notice of the hyperlinked "Terms and Conditions," which contained a forum selection clause, the court relied on the existence of the message affirming the plaintiff had read the "Terms and Conditions" and the presentation of the "Terms and Conditions" on the webpage, which, as here, "were highlighted in blue, in

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 82 of 164 PageID: 211

Jun Zhang v. Gain Capital Holdings, Inc., Not Reported in Fed. Supp. (2021)

contrast to the surrounding black text" since "that language clearly appeared as a hyperlink that immediately directed the user" to the "Terms and Conditions." *Id.* When a user is "required to take affirmative action to manifest assent and [is] informed that such action will comprise their assent to the displayed terms," that agreement is an enforceable clickwrap agreement. *James v. Glob. Tel*Link Corp.*, Civ. A. No. 13-4989, 2016 WL 589676, at *7 (D.N.J. Feb. 11, 2016), *aff'd sub nom. James v. Glob. TelLink Corp*, 852 F.3d 262 (3d Cir. 2017); *see also Davis v. Dell, Inc.*, Civ. A. No. 07-630, 2007 WL 4623030, at *4 (D.N.J. Dec. 28, 2007), *aff'd*, Civ. A. No. 07-630, 2008 WL 3843837 (D.N.J. Aug. 15, 2008) (providing that clickwrap agreements appear " 'on an internet webpage and require[ ] that a user consent to any terms or conditions by clicking on a dialog box on the screen in order to proceed with the internet transaction.' " (quoting *Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 236 (E.D. Pa. 2007))). This affirmative assent can come through checking a box for the terms of service when setting up an account over the Internet, as Plaintiff did here. *See James*, 2016 WL 589676, at *7; *Davis*, 2007 WL 4623030, at *4 (holding that, under New Jersey law, "when a party uses his computer to click on a button signifying his acceptance of terms and conditions in connection with an online transaction, he thereby manifests his assent to an electronic agreement"). Plaintiff testified he remembered seeing the statement with the Customer Agreement hyperlinks and checking the box indicating his assent to the terms of the Customer Agreement. (Zhang Decl. (ECF No. 24-1) ¶¶ 27–28 ("I remember that I have seen this 'statement' box before" and "[a]pparently I checked the box saying 'I have read and agree to the statement above' ").) Because Plaintiff affirmatively checked a box confirming acknowledgment of the Customer Agreement and because the Customer Agreement was conspicuously presented twice in blue hyperlinked text against a background of black text, the application is an enforceable clickwrap agreement.

**\*7** Next, GCH argues Plaintiff cannot demonstrate the forum selection clause is unreasonable. (ECF No. 17-1 at 11.) Plaintiff argues the forum selection clause is unconscionable under New Jersey law. (ECF No. 24 at 20–23.) The Court agrees with GCH.

"[F]orum selection clauses are 'prima facie valid and should be enforced unless enforcement is shown by the resisting party to be "unreasonable" under the circumstances.' " *Foster v. Chesapeake Ins.*, 933 F.2d 1207, 1219 (3d Cir. 1991) (citing *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1907)). That

is, the forum selection clause will be enforced unless the party objecting to the clause's enforcement can establish "(1) that it is the result of fraud or overreaching, (2) that enforcement would violate a strong public policy of the forum, or (3) that enforcement would in the particular circumstances of the case result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable." *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202 (3d Cir. 1983); *City of Sterling Heights Police & Fire Ret. Sys. v. Reckitt Benckiser Grp. PLC*, Civ. A. No. 21915382, 2020 WL 7022654, at *2 (D.N.J. Nov. 30, 2020). As other courts have observed, "unconscionability and lack of mutuality between the parties are not defined in *Coastal Steel* as grounds on which to find a forum selection clause unenforceable." *C.I.N. Const., LLC v. Hunt Const. Grp., Inc.*, Civ. A. No. 08-5810, 2009 WL 2998965, at *6 (D.N.J. Sept. 18, 2009). Importantly, "[f]orum selection clauses are routinely upheld, even in situations involving adhesion contracts, unequal bargaining power, and the absence of negotiations over the clause." *Home Source Indus., LLC v. Freightquote.com, Inc.*, Civ. A. No. 14-2001, 2014 WL 6609051, at *5 (D.N.J. Nov. 19, 2014).

Even though Plaintiff has not submitted arguments under the three recognized grounds for finding forum selection clauses unreasonable, the Court will still review Plaintiff's arguments for procedural and substantive unconscionability. Plaintiff contends the forum selection clause is procedurally unconscionable because the design of the application buried the Customer Agreement, so it is not surprising "Plaintiff did not pay any attention to the embedded customer agreement." (ECF No. 24 at 20–21.) Additionally, Plaintiff points to the fact that it only takes five minutes to apply for and open an account with GCH as evidence that "Defendant has known all along that its 2019 Interface has fooled nearly all of its users not to click and read the customer agreement containing the forum selection clause when they clicked the box saying they have read and agreed to the statement" with the links to the agreement. (ECF No. 24 at 22.)

First, because the Court found the format and layout of the application provided Plaintiff with reasonable notice of the Customer Agreement, Plaintiff's argument that GCH's interface "buried" the terms of the Customer Agreement is unavailing. To the extent Plaintiff argues he "did not pay any attention" to the Customer Agreement, the Court is unpersuaded, as "[a] failure to read the terms and conditions, and specifically, the forum selection clause, does not render the forum selection clause invalid or diminish its force and effect." *Home Source Indus.*, 2014 WL 6609051, at *5; *Toll*

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 83 of 164 PageID: 212

*Jun Zhang v. Gain Capital Holdings, Inc., Not Reported in Fed. Supp. (2021)*

*Bros., Inc. v. Fields*, Civ. A. No. 10-04606, 2011 WL 463090, at *3 (D.N.J. Feb. 4, 2011) ("[F]ailure 'to read a contract does not excuse performance unless fraud or misconduct by the other party prevented one from reading.' " (quoting *Young v. Prudential Ins. Co. of Am.*, 688 A.2d 1069, 1077 (N.J. Super. Ct. App. Div. 1997))). GCH's alleged representation that the account application process takes only five minutes, (*see* ECF No. ¶ 8; ECF No. 24 at 5), does not render the forum selection clause procedurally unconscionable either. *See Valelly v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 464 F. Supp. 3d 634, 643 (S.D.N.Y. 2020) (enforcing agreement despite the plaintiff's argument that "Defendant's advertising estimates that opening a self-directed account can be accomplished in only ten minutes," which "suggests that Defendant does not encourage or expect applicants to read its disclosures in their entirety"). Therefore, the forum selection clause is not procedurally unconscionable.

**8** Regarding substantive unconscionability, Plaintiff argues the "forum selection clause was 'snuck' into Plaintiff's relationship with GainCap without Plaintiff's consent" and because "[t]he design of the 2019 Interface also makes it entirely unexpected for Plaintiff to be signing a contract with a subsidiary of GainCap with which he did not even know he had any connection." (ECF No. 24 at 23.) That is, Plaintiff did not believe he was only dealing with GCH as a subsidiary. (Zhang Decl. (ECF No. 24-1) ¶ 14.) Plaintiff's support for this appears to come from an "About Us" page, attached as Exhibit A to Plaintiff's opposition. (Ex. A to Zhang Decl. (ECF No. 24-2).) The "About Us" page, translated from Chinese to English by Plaintiff's interpreter, makes no mention of subsidiaries. (*See id.*) However, a translated version of the same page presented by GCH suggests Plaintiff's translator purposely left out mention of the subsidiaries in the translation. (Ex. C to Wong Decl. (ECF No. 26-4) (presenting redlined version of Plaintiff's translation of the "About Us" page and demonstrating Plaintiff left out the following: GCH is "regulated in 7 jurisdictions worldwide through our *subsidiaries* ....") (emphasis added).) Plaintiff also stated he believed he could litigate in the United States, and not the Cayman Islands, because GCH was "listed on the NYSE and regulated by U.S. regulatory bodies such as NFA and CFTC." (ECF No. 24-1 ¶ 33.) However, the "About Us" page Plaintiff relies upon—even the one provided by Plaintiff's own translator—lists GCH as subject to the regulatory authority of the Cayman Islands Monetary Authority. (*See* ECF No. 24-2.) The fact that the Cayman Islands is listed as one of GCH's regulators forecloses

Plaintiff's argument that the forum selection clause was so unexpected as to render it substantively unconscionable.

**B. The Application of the Forum Selection Clause**

GCH argues the forum selection at issue applies to this action because it covers all of Plaintiff's claims. (ECF No. 17-1 at 13–15.) Plaintiff argues nearly all of the loss at issue in this case arises out of his first account opened with GCH in 2017 ("Account I"), which is not subject to the forum selection clause. (ECF No. 24 at 6–7.) Additionally, Plaintiff contends GCH has no standing to evoke the forum selection clause under the second account Plaintiff opened in 2019 ("Account II"). The Court agrees with GCH.

The forum selection clause at issue, according to Plaintiff, provides the following:

> The Agreement and our relations before we entered into this Agreement shall be governed and construed in accordance with Cayman Islands Law. The Courts of Cayman Islands will have exclusive jurisdiction over any claim or matter arising under or in connection with the Agreement and the legal relationships established by the Agreement.

(Ex. C to Xu Decl. (ECF No. 17-5) ¶¶ 33.1–33.2.) Courts routinely find forum selection clauses properly apply to claims arising out of contractual relationships, like Plaintiff's tort and contract claims here. *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 68 (3d Cir. 2018) (providing that "we recognize that we should not permit a party to avoid a forum selection clause simply by pleading non-contract claims"); *Crescent Int'l, Inc. v. Avatar Communities, Inc.*, 857 F.2d 943, 944 (3d Cir. 1988) (finding that "pleading alternate non-contractual theories is not alone enough to avoid a forum selection clause if the claims asserted arise out of the contractual relation and implicate the contract's terms"); *Coastal Steel Corp.*, 709 F.2d at 203 (same). Therefore, the forum selection clause applies to Plaintiff's claims.

Plaintiff attempts to avoid application of the forum selection clause by arguing the clause cannot apply to Account I —the account that makes up "95% of loss at issue in

this case." (ECF No. 24 at 6.) As discussed, by checking the box on the account application, Plaintiff manifested an intent to be bound by the Customer Agreement's terms. The Customer Agreement itself clarifies its application to Account I and Account II, as it "supersedes all our previous terms and conditions and any amendments thereto" and applies "separately to each Account." (ECF No. 17-5 ¶¶ 1.1, 3.1.) Further, the Customer Agreement "governs [GCH's] trading services and all transactions we conduct with you." (*Id.* ¶ 1.1.) Therefore, by manifesting assent to the Customer Agreement when opening Account II in 2019, the terms within the Customer Agreement applied to all accounts Plaintiff had with GCH at the time, including Account I.

Lastly, Plaintiff argues GCH lacks standing to enforce the forum selection clause. (ECF No. 24 at 9–11.) The Third Circuit has held "that a forum-selection clause 'can be enforced only by the signator[y] to [the] agreement[ ].' " *In re: Howmedica Osteonics Corp*, 867 F.3d 390, 407 (3d Cir. 2017) (quoting *Dayhoff, Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1293–97 (3d Cir. 1996)). However, "[u]nder traditional principles of contract law, non-signatories may be bound by a forum selection clause if they are intended third-party beneficiaries of the contract, or if they are closely related parties." *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 59 (3d Cir. 2018). "In determining whether a non-signatory is closely related to a contract, courts consider the non-signatory's ownership of the signatory, its involvement in the negotiations, the relationship between the two parties and whether the non-signatory received a direct benefit from the agreement." *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 219 (3d Cir. 2015). As Plaintiff points out, the court in *McGraw-Hill* found the "closely-related doctrine" inapplicable under the facts presented before the court. (ECF No. 24 at 10.) In that case, McGraw-Hill attempted to argue the "closely-related doctrine" should apply to bind certain photographers to agreements between McGraw-Hill and Corbis Corporation, a stock photography agency. *In re McGraw-Hill*, 909 F.3d at 62–63. The Third Circuit declined to apply the "closely-related doctrine," in part, because it was "clear the photographers were not in an ownership or subsidiary relationship with Corbis." *Id.* at 63. Here, GCH, the parent of GGMI, is trying to enforce the forum selection clause against Plaintiff. Importantly, the Customer Agreement explicitly provides for enforcement by any of GGMI's affiliates. (ECF No. 17-5 ¶ 31.5 ("The Agreement may, however, be enforced by any of our Affiliates. We do require the consent of our Affiliates or any other third party to vary, amend, modify, suspend, cancel or terminate

any provision of the Agreement.").) Therefore, due to the Customer Agreement's explicit terms, it is foreseeable that GCH, as GGMI's corporate parent, could enforce the forum selection clause against Plaintiff. *In re McGraw-Hill*, 909 F.3d at 64. Accordingly, the forum selection clause applies to both Account I and II.

### C. *Forum Non Conveniens* Analysis

**\*9** Because the forum-selection clause was not unreasonable and applies to Plaintiff's claims, the Court must analyze the *Atlantic Marine* factors.

### 1. Availability of an Adequate Alternative Forum

"A successful *forum non conveniens* motion also requires the availability of an adequate alternative forum." *Wilmot v. Marriott Hurghada Mgmt., Inc.*, 712 F. App'x 200, 203 (3d Cir. 2017) (citing *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)). An alternative forum "is available if all defendants are amenable to process there" and it is generally adequate if "the plaintiff's claim is cognizable in the forum's courts." *Id.* (citing *Piper*, 454 U.S. at 254). Here, the alternative forum the Court must consider is the Cayman Islands. A defendant is "amenable to process" in an alternative forum if they consent to jurisdiction in the alternative forum. *See id.* at 204 (finding that the United Kingdom and Egypt were both adequate alternative fora because the defendant "consented to jurisdiction and service of process in both countries"); *Meridian Consulting I Corp.*, 2021 WL 689132, at \*15 (finding that "because EuroTec is located in Ontario and also agreed to jurisdiction there, I am satisfied that it would be amenable to process there"). Here, GCH consented to the jurisdiction of the Cayman Islands by selecting it as an alternative forum in its forum selection clause. *See Hage*, 2020 WL 3056442, at \*7 (finding that the defendant was "amenable to process in Texas state court" because it "expressly consented to the jurisdiction of the Texas state court by agreeing to the Texas forum-selection clause"). Therefore, GCH is amenable to process in the Cayman Islands. Additionally, while Plaintiff repeatedly disputes his claims' connection to the Cayman Islands, he does not argue his claims would not be cognizable in Cayman courts. (*See generally* ECF No. 24.) Because Plaintiff has not demonstrated he would be "deprived of any remedy" if required to litigate his claims in the Cayman Islands, *Trotter v. 7R Holdings LLC*, 873 F.3d 435, 434–44 (3d Cir. 2017),

Case 2:25-cv-02263-WJM-MAH Document 5-2 Filed 06/16/25 Page 85 of 164 PageID: 214

Jun Zhang v. Gain Capital Holdings, Inc., Not Reported in Fed. Supp. (2021)

the Court finds the Cayman Islands is an adequate alternative forum.

### 2. Public Interest Factors

The factors courts consider on a motion to dismiss for *forum non conveniens* include:

> the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Piper Aircraft*, 454 U.S. at 241 n.6 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947)). "This list of considerations to be balanced is by no means exhaustive, and some factors may not be relevant in the context of a particular case." *Van Cauwenberghe v. Biard*, 486 U.S. 517, 528–29 (1988). The Court will not address any private interest factors because, as noted above, when a valid forum selection clause applies, courts "must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Atl. Marine*, 571 U.S. at 64. Therefore, the arguments Plaintiff presents regarding the private interests in this action are unpersuasive. (ECF No. 24 at 7–9.) Plaintiff argues the public interest "certainly does not favor Cayman Islands" because "New Jersey is the corporate headquarters of GainCap, which is the owner of forex.com, the platform that Plaintiff signed up Account I," and "[t]he bank account that received Plaintiff's deposit is located in New York with the listed address of the account owner being in New Jersey." (*Id.* at 9.) Plaintiff also argues the "State of New Jersey and the U.S. federal government certainly have significant interests in preventing a New Jersey-based corporation from engaging in the wrongdoings alleged in the Complaint." (*Id.*) However, none of these arguments involve the public factors. *See Gulf Oil*, 330 U.S. at 509. Instead, a few public interest factors support dismissal. First, New Jersey does not have a "local interest" in deciding a "localized controvers[y]" at home,

since Plaintiff is a Chinese resident that contracted with a Cayman Islands business regulated by the Cayman Islands Monetary Authority. *See Atl. Marine*, 571 U.S. at 62 n.6 (listing private and public interest factors). And second, since Cayman law applies to the claims in this action, "having a trial of a diversity case in a forum that is at home with the law that must govern" also favors the Cayman Islands in this diversity action. Therefore, Plaintiff has not carried his burden under either prong of the *forum non conveniens* inquiry.

**\*10** Because Plaintiff has not carried his burden, the Court dismisses this action for *forum non conveniens* and need not reach the issue of whether the Complaint should be dismissed for failure to state a claim under Rule 12(b)(6). *See Hage*, 2020 WL 3056442, at \*9 (dismissing under doctrine of *forum non conveniens* and deciding not to reach "merits of whether the Complaint fails to state a claim"). Additionally, because the Court finds amendment would be futile, dismissal of Plaintiff's Complaint pursuant to the doctrine of *forum non conveniens* is with prejudice. "When a plaintiff does not seek leave to amend a deficient complaint after a defendant moves to dismiss it, the court must inform the plaintiff that he has leave to amend within a set period of time, unless amendment would be inequitable or futile." *Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002); *Hage*, 2020 WL 3056442, at \*9 (dismissing case for *forum non conveniens* and dismissing complaint with prejudice because "granting Plaintiff leave to amend the Complaint would be futile"); *Chisso Am., Inc. v. M/V HANJIN OSAKA*, 307 F. Supp. 2d 621, 626 (D.N.J. 2003) (granting motion to dismiss based on forum selection clause and dismissing complaint with prejudice).

### IV. CONCLUSION

For the reasons set forth above, GCH's Motion to Dismiss pursuant to the doctrine of *forum non conveniens* is **GRANTED** and its Motion to Dismiss for failure to state a claim is **DENIED AS MOOT**.

### All Citations

Not Reported in Fed. Supp., 2021 WL 2103233

---

### Footnotes

Jun Zhang v. Gain Capital Holdings, Inc., Not Reported in Fed. Supp. (2021)

1    Plaintiff provides screenshots of GCH's 2019 user interface. (ECF No. 24-5.) Among these screenshots are: the above statement, as translated into English; and a screenshot of the entire webpage where the above statement would be found. (*Id.*) While the full screenshot is not in English, there is a line of check marks (presumably tracking the progress of the application), across the top of the page. (*See id.*) To get to the page where the above text is found, it appears a user would have to proceed through three earlier stages of the application.

---

**End of Document**                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT H

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

🚩 KeyCite Yellow Flag

Distinguished by   North American Fire Ultimate Holdings, LP v. Doorly, Del.Ch.,   March 7, 2025

2015 WL 4503210

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

KAN–DI–KI, LLC (d/b/a Diagnostic Laboratories), Plaintiff,

v.

Robert SUER, Defendant.

C.A. No. 7937–VCP

|

Submitted: February 25, 2015

|

Decided: July 22, 2015

**Attorneys and Law Firms**

Mary B. Graham, Esq., Kevin M. Coen, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Robert P. Ducatman, Esq., Lisa B. Gates, Esq., Jones Day, Cleveland, Ohio; Attorneys for Plaintiff.

Arthur G. Connolly, III, Esq., Christos T. Adamopoulos, Esq., Ryan P. Newell, Esq., Connolly Gallagher LLP, Wilmington, Delaware; Attorneys for Defendant.

**MEMORANDUM OPINION**

PARSONS, Vice Chancellor.

**\*1**  In this contract action, the plaintiff seeks injunctive relief against the defendant for breaches of restrictive covenants, including non-competition, non-interference, and confidentiality provisions. Through two agreements, one executed roughly a year after the other, the defendant sold his interests in two businesses that provided mobile diagnostic laboratory and x-ray services to skilled nursing facilities. The plaintiff, a large vendor of that type of services, paid the defendant $4 million in the first transaction, and roughly $300,000 in the second. Between two and three years after the execution of the second agreement, the defendant began consulting for a management company that operates nursing facilities, including some facilities that were serviced by the plaintiff. Thereafter, and with the defendant's assistance, the management company aggressively pursued reductions in the outstanding invoices it owed to the plaintiff, and later terminated all its contracts with the plaintiff to replace it with other service providers.

The plaintiff brought this action for breach of contract and several other claims. During the litigation, the defendant filed for bankruptcy, and all claims were automatically stayed. Several months later, the plaintiff obtained limited relief from the stay to enable it to pursue its breach of contract claim to the extent it seeks injunctive relief. The plaintiff pursued that claim, and this Court conducted a five-day trial regarding it in October, 2014. The plaintiff contends that the evidence supports the conclusion that the defendant breached his obligations under the restrictive covenants, and that it is entitled to broad injunctive relief as a result. The defendant disputes that assertion, and also contends that the restrictive covenants are unenforceable under both Delaware and California law, that they have expired and should not be extended, and that injunctive relief is not appropriate in this case.

This Memorandum Opinion represents my post-trial findings of fact and conclusions of law. For the reasons stated herein, I hold that the covenants are enforceable, and that plaintiff has proven its claim for breach of contract and is entitled to injunctive relief. I also grant the plaintiff's pending motion for sanctions for alleged suppression or spoliation of evidence.

**I. BACKGROUND** [1]

**A. The Parties**

Plaintiff, Kan–Di–Ki, LLC, does business as Diagnostic Laboratories ("DL"). DL is a California limited liability company with its principal place of business in Burbank California. [2] Defendant, Robert D. Suer, is an individual residing in California. [3]

**B. Suer and DL Enter into Various Agreements**

**1. Suer's initial work for DL**

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 89 of 164 PageID: 218

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

DL is in the business of providing mobile diagnostic laboratory, ultrasound, and x-ray and related services to nursing homes, assisted living facilities, correctional facilities, and other long-term care facilities. [4] At present, DL operates in Louisiana, Texas, Arkansas, Kansas, Missouri, Nebraska, Colorado, Utah, Nevada, Arizona, New Mexico, California, Oregon, Washington, and Idaho. [5] DL is part of the western division of its parent entity, non-party TridentUSA Health Services ("Trident"), which operates in forty-three states. [6]

**\*2** Suer began working in the mobile x-ray business in the late 1980s as an x-ray technician. [7] In 1998, he took a position with DL's predecessor ("Old DL"), continuing as an x-ray technician but also marketing the company's services to nursing facilities. [8] In the early 2000s, Suer was promoted to senior vice president and his duties focused entirely on marketing and sales, as well as managing six or seven sales representatives. [9] In about 2006, Dr. Jason Liu, then a radiologist at Old DL, bought out the company's previous owner. [10] Not long thereafter, Liu fired Suer. [11] Rick Navarro, who currently is the Vice President for National Accounts at DL, reported to Suer in 2007, when Suer was fired. [12] Navarro testified that Suer was "extremely frustrated" by his termination, and stated, "I'm going to take down DL. I'm going to take down their business." [13]

In or around early 2007, Suer and a partner started a company called Reliable Mobile Medical Services, which operated in competition with Old DL. [14] According to Navarro, Suer's new company achieved at least some degree of success, and Liu was concerned enough about it that only six months after firing Suer, Liu sought to re-hire him. [15] Old DL re-hired Suer pursuant to an agreement dated August 28, 2007 (the "2007 Employment Agreement"). [16] The 2007 Employment Agreement provided for Suer to become President of Old DL, in exchange for which he would receive a $400,000 annual salary and certain other benefits. [17] While the 2007 Employment Agreement did not give Suer any formal ownership interest in Old DL, it provided that if during Suer's employment either Old DL or substantially all of its assets were sold, Suer would "be entitled to receive an amount equal to ten percent (10%) of the net proceeds payable to Dr. Liu (or to any other person or entity who is a shareholder of the Company immediately before such sale)." [18]

### 2. The DL Purchase Agreement

At some point in 2008, Frazier Healthcare ("Frazier") and Audax Group became interested in a transaction with Old DL. [19] Kelly McCullum, then an employee of Frazier, had conducted due diligence on Old DL since mid- or late–2006. On July 28, 2008, Frazier and Audax indirectly acquired Old DL through a Contribution and Equity Interest Purchase Agreement (the "DL Purchase Agreement" or "DLPA") [20] The DLPA was structured to include a "Reorganization" in which Old DL was converted into an LLC, the interests of which would be owned by Liu and Suer. [21] Liu and Suer, as "Sellers" under the DLPA, then would transfer their interests in that LLC—namely, Kan–Di–Ki, LLC, or DL— to the buyer-affiliated entities in connection with the DLPA closing. [22] McCullum became the President and COO of DL, and he retained that post until 2014. [23]

McCullum was not involved in the negotiation of the DLPA. Based on his familiarity with the transaction itself, however, McCullum testified that Suer was made a party to the DLPA because he was an "integral part" of the Old DL business, in that, for example, he occupied the position of President and held "a $4 million stake in the company." [24] When the transaction formally closed in September 2008, Suer was paid $4 million under the terms of the DLPA, as his share of the purchase price for the Old DL business. [25]

**\*3** Several provisions of the DLPA are important to Plaintiff's claims in this case. Section 6.9.1 provides in relevant part that:

> [E]ach Seller hereby agrees with the Buyer that such Seller will not ... at any time on or after the Closing Date, directly or indirectly, without the prior written consent of the Buyer, disclose or use, any Confidential Information involving or relating to the Business of any Acquired Company; *provided, however,* that the information subject to [this section] will not include any information generally available to, or known by, the public ..., or information

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

Case 2:25-cv-02263-WJM-MAH     Document 5-2     Filed 06/16/25     Page 90 of 164 PageID: 219

that is generally known to the industry relating to the Business.... [26]

Section 6.11, relating to non-competition and non-solicitation, states:

> For a period of five years from and after the Closing Date, no Seller will ... engage directly or indirectly in all or any portion of the Business as conducted as of the Closing Date in California, Oregon, Washington, Idaho, Nevada, Arizona, Utah, Wyoming, Montana, Colorado, New Mexico, Texas, Oklahoma, Kansas, Nebraska, South Dakota, North Dakota, Minnesota, Iowa, Missouri, Arkansas and Louisiana, and any other geographic area in which any of the Acquired Companies conduct Business as of the Closing Date.... [27]

The parties defined "Business" in Section 6.11 as meaning "the provision of mobile diagnostic laboratory, x-ray, pharmacy, and other services to nursing homes, assisted living facilities, jails and other long-term care facilities." [28]

Among the transactional documents executed in connection with the DLPA, Suer's Employment Agreement was cancelled, [29] and he entered into a new "Consulting Agreement" with DL. [30] Under that agreement, Suer was retained to provide services to DL in exchange for a base salary of $125,000 per year. [31] The Consulting Agreement had a twelve-month term with the possibility of renewal, but DL retained the right to terminate the agreement "at any time, with or without notice," subject to the payment of specified severance payments. [32]

The Consulting Agreement lasted only a couple of months before DL terminated it. [33] According to McCullum, the termination was in response to reports that Suer was preparing to compete with DL in violation of the DLPA covenants, but Suer denied having taken such actions. [34] Navarro testified

that Suer, again enraged, called him cursing and threatening "to come back and ... take business from DL." [35]

### 3. The APA

Suer consulted an attorney about the covenants in the DLPA and other documents. [36] His counsel opined that the non-competition provisions were unenforceable, and wrote to DL in January of 2009 to advise it of Suer's position to that effect. [37] That same month, DL responded by filing suit in this Court for injunctive relief against Suer. [38] That action was dismissed for lack of personal jurisdiction over Suer in March 2009. [39]

**\*4** During that early 2009 time period, Suer began discussions with Cedars Clinical Laboratory, a conventional —*i.e.,* non-mobile—laboratory in southern California. [40] Suer then formed BCCC Holdings, LLC ("BCCC"), and South Coast Clinical Laboratories ("South Coast"), and acquired the assets of Cedars Clinical through those entities. [41] After DL's suit against Suer was dismissed in March 2009, it did not attempt to sue him in California, where personal jurisdiction ostensibly would have been proper. [42] Instead, DL engaged Suer in discussions about a transaction relating to South Coast. [43]

On May 20, 2009, DL and Suer executed an Asset Purchase Agreement (the "APA"). Under the APA, DL acquired substantially all of South Coast's assets, including rights and interests in a certain laboratory license, permits, books and records, goodwill, intellectual property, claims, and other rights and interests. [44] The "Seller" under the APA was South Coast, but, due to the ownership structure Suer had erected, both he and BCCC were parties and signatories to the agreement as well. [45] In exchange for transferring the relevant assets and executing the relevant agreements, Suer, through South Coast, was paid $294,112 in cash. [46] The APA closing occurred in Wilmington, Delaware, where Suer physically executed the relevant documents. [47]

As with the DLPA, Suer characterizes the APA as merely "an avenue for imposing a new non-compete," asserting that "the business-purchase aspect was illusory" given South Coast's "negligible income and few assets." [48] Suer further intimates that he decided to enter the APA "[r]ather than litigate" with

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 91 of 164 PageID: 220

Kah-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

DL. In that regard, Suer testified that Adamson directly or indirectly threatened to file a new lawsuit against Suer in California, and the discussions temporarily stopped. [49]

Suer is a sophisticated businessman who ultimately decided to bind himself in the APA in exchange for negotiated consideration, and I find his reasons for doing so to be irrelevant. In any case, he has not contended that he was coerced to sign the APA or that it is void on grounds of duress, or made any similar argument. I therefore find unpersuasive the oblique comments in Suer's brief that purport to undermine the APA's validity. [50]

Among the provisions the parties agreed to in the APA are three restrictive covenants, dealing with confidentiality, non-competition, and non-interference. Section 5.3, the "Confidentiality Provision," states in relevant part:

> [South Coast] and [Suer and BCCC] hereby agree with Buyer that neither [South Coast] nor [Suer and BCCC], nor any of their respective Affiliates, will, at any time on or after the Closing Date, directly or indirectly, without the prior written consent of the Buyer, disclose or use any confidential or proprietary information, or any trade secret information, involving or relating to the Business. [51]

As used in the APA, the term "Business" referred to South Coast's business, which the APA specified as the business of "providing mobile diagnostic laboratory, pharmacy, ultrasound, rehab and x-ray services." [52]

 **\*5** In Section 5.4, the APA imposes certain non-competition and non-solicitation restrictions. Section 5.4.1 provides that:

> For a period of five years from and after the Closing Date, neither [South Coast] nor [Suer or BCCC] will ... directly or indirectly engage in, or directly or indirectly prepare to engage

in, in whole or in part, the Business in the Restricted Area. [53]

The "Restricted Area" under the APA resembles that under the DLPA. It includes: Delaware, California, Oregon, Washington, Idaho, Nevada, Arizona, Utah, Wyoming, Colorado, New Mexico, Texas, Oklahoma, Kansas, Nebraska, South Dakota, North Dakota, Minnesota, Iowa, Missouri, Arkansas, and Louisiana, plus "any other geographic area in which [DL] or its Affiliates conduct business as of the Closing Date." [54] The next provision of the APA states in relevant part:

> For a period of five years from and after the Closing Date, neither [South Coast] nor [Suer or BCCC] will ... directly or indirectly recruit, offer employment to, employ, engage as a consultant, lure or entice away ... any Person who is ... an employee of [DL], [South Coast] or any of their respective Affiliates, to leave the employ or engagement of Buyer.... In addition, for a period of five years from and after the Closing Date, neither [South Coast] nor [Suer or BCCC] will ... directly or indirectly solicit, divert, interfere with or accept business from, or attempt to directly or indirectly solicit, divert, interfere with or accept business from any Person that is ... a customer or supplier of [DL] or [South Coast], for the purpose of securing business competitive with Buyer. [55]

The parties further agreed in Section 5.4.3 that:

> [B]efore providing services, whether as an employee, consultant or otherwise, to any entity during the five-year period referred to in this Section 5.4, [Suer and BCCC] will

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

provide a copy of this Section 5.4 to such employer, and cause such employer to acknowledge to the Company in writing that it has read this Section 5.4. [56]

Thus, Section 5.4 contains non-competition and non-solicit covenants. The third major restrictive covenant in the APA is in Section 5.6, which pertains to non-interference. It states in part:

> Neither [South Coast] nor [Suer or BCCC] will ... take any action that is designed or intended to have the effect of encouraging any lessor, licensor, supplier, distributor or customer of [DL] or its Affiliates ... from altering its relationship with [DL] or its Affiliates in a manner adverse to [DL] or its Affiliates. [57]

The APA refers back to the DLPA, and in that regard states that, "Suer hereby acknowledges and re-affirms the validity and enforceability of each of his obligations set forth under the DL Purchase Agreement, and affirms that he has no intention of violating or challenging, and will not violate or challenge, the terms of any such obligations." [58] Collectively, I refer to the Non–Competition Provisions, the Non–Interference Provision, and the Confidentiality Provisions as the "Restrictive Covenants."

**\*6** Finally, the APA contains a "Survival" clause. In that regard, Section 6.3 states that, "The representations, warranties, covenants and agreements contained herein will survive for the longer of (i) five years, and (ii) the statute of limitations in respect of the subject matter described herein." [59]

The APA was not the only agreement executed in connection with the May 2009 transaction between DL and Suer. On the same day as the APA, DL and Suer entered into a new employment agreement (the "2009 Employment Agreement"). [60] That agreement outlined certain duties Suer

would perform, and prescribed his base salary ($87,852 per year) and certain incentive compensation schedules. [61] The 2009 Employment Agreement had a term of three years, but it provided that Suer could be terminated with or without Cause before that time period expired. [62]

### C. Suer Begins Working for North American

After the execution of the APA and the 2009 Employment Agreement, Suer expected to begin actively working for DL. In fact, however, Suer was not given any responsibilities other than completing the discrete tasks that were identified in the 2009 Employment Agreement, which included effecting a license transfer, among other things. [63] Beyond that, Suer was given no responsibility and was not re-integrated into DL. Instead, he was told that DL would call him if he was needed. [64]

The evidentiary record is largely silent with respect to the time period between May 2009 and January 2012, when Plaintiff claims the alleged breaches of the Restrictive Covenants began. In late January 2012, Suer began working as an independent contractor for North American Health Care ("North American"). [65] North American and its affiliates operate skilled nursing facilities in California, Arizona, Utah, and Washington. [66] North American also had a long-term business relationship with DL under which DL provided mobile x-ray and laboratory services to North American facilities. [67]

**\*7** At the recommendation of an administrator at one of North American's facilities, North American's COO, Timothy Paulsen, met with Suer early in 2012. [68] Because Paulsen believed Suer's experience in working for skilled nursing facilities service providers could be valuable to North American, he retained Suer as a consultant. [69] DL contends the provisions of the DLPA and APA required Suer to show North American copies of those Agreements and cause North American to acknowledge in writing to DL that it had reviewed the applicable non-competition agreements. [70] There is no dispute that neither Suer nor North American complied with those obligations.

Case 2:25-cv-02263-WJM-MAH   Document 5-2   Filed 06/16/25   Page 93 of 164 PageID: 222

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

### 1. North American cancels its contract with DL

According to Paulsen, Suer was put to work "digging into stacks and stacks of invoices," looking at how each vendor's invoices compared to North American's contracts with that vendor to determine if North American was being billed properly. [71] Suer audited invoices from DL, as well as other vendors that provided pharmacy, oxygen, and food services —"basically any vendors" North American was using at the time. [72] Suer was the "primary auditor" of North American's vendor invoices; he worked exclusively with Paulsen and provided him written reports. [73]

On March 21, 2012, Suer emailed Paulsen a draft letter addressed to DL, detailing "discrepancies" that North American had perceived based on its auditing of vendor billing statements. [74] Suer's cover email stated, "Tim, attached is a Word document for your review that I put together. I hope this gives you some kind of format. Sorry it took so long but I really needed to make sure we included as much information as possible." [75] The letter concluded by stating that North American was "currently holding all payments to Diagnostic Laboratories until we have some type of response from your company in regard to the errors that have occurred." [76] The next day, Paulsen emailed essentially the same letter that was attached to Suer's email to several individuals at DL. [77] Paulsen testified that he wrote the draft letter and gave it to Suer with instructions to give Paulsen numbers and documents that would illustrate the relevant billing discrepancies. [78] Individuals at DL met with Paulsen after receiving the March 22, 2012 letter to try to persuade him that North American's auditing analysis was erroneous. But Paulsen maintained his position, demanding that DL either write down its receivable balance or credit North American to offset the perceived over-billing. [79]

North American withheld payment on roughly $800,000 in charges invoiced by DL. [80] Documentary evidence from the end of March 2012 indicates that North American was planning to cancel contracts with DL relating to all of North American's skilled nursing facilities in the southern California area. [81] Suer actively assisted Paulsen in this regard. On April 10, 2012, Paulsen forwarded Suer an email chain between a North American facility administrator and DL entitled "Cancellation Letter." [82] In one of those emails, Paulsen

instructed the administrator to "Please call Bobby [Suer] to discuss a response to [DL]." [83]

**\*8**  Events became more contentious in April and early May, 2012. An attorney for DL emailed Suer and his attorney, advising Suer that, "You should stand down from your current activities with DL's competitors and customers and comply in full with all applicable agreements to which you are a party with us." [84] On May 7, 2012, outside counsel for DL sent a letter to John Sorensen, the CEO of North American, advising him that DL had become aware of North American's affiliation with Suer. [85] The letter enclosed copies of the APA and the DLPA, and stated that, "Mr. Suer has, in his recent dealings with your organization and others, breached these covenants and other obligations. It is possible that, inadvertently or otherwise, you may have induced a breach of these contracts." [86] The same day, DL's counsel sent cease and desist letters to the following competitors of DL: Town & Country Diagnostics ("Town & Country"); B.O.N. Clinical Laboratories, Ltd. ("B.O.N."); First Choice Mobile Radiology; Outreach Solutions, LLC; Quality Medical Imaging, Inc. ("Quality Medical"); and UCI Medical Center. [87]

In late May or early June, 2012, Paulsen met with McCullum and Bill Treese. Treese recently had been hired by DL, but he previously worked as a consultant for its competitors, including B.O.N. and Quality Medical. [88] McCullum invited Treese to the meeting because Treese had a relationship with Suer, and McCullum wanted him to warn Paulsen about doing business with Suer. [89] McCullum believed Suer was influencing Paulsen and North American's decisions about DL, and did not want Suer, "a disgruntled employee," to poison the "good corporate relationship" DL had had with North American. [90] Paulsen falsely told McCullum, however, that he had no knowledge of Suer's activities, and that Suer was not working with North American in any capacity. [91] Within the next few days, Paulsen forwarded to Suer a series of emails he had received from McCullum, relating to North American's contracts with DL at several facilities. [92] According to Paulsen, Suer needed the contract information to complete his audit of the DL invoices. [93] The exchanges between Paulsen and McCullum show that McCullum and others at DL were trying to avoid losing North American's business over the billing disputes. [94]

2015 IER Cases 186,616

Starting on June 26, 2012, at least eighteen North American facilities terminated the x-ray and laboratory services contracts they had with DL.[95] Each of the Cancellation Letters contained identical wording. Indeed, thirteen letters dated either June 26 or 28 contained the same typographical error, beginning the letter "Dear Mr. McCullem," even though the address block correctly identified the recipient as Kelly McCullum, DL's President.

Suer was directly involved in this coordinated effort of North American. On June 25, 2012, Suer emailed the administrator of North American's Park Ridge Skilled Nursing Center, stating:

> Attached is a copy of a cancellation letter for you to sign and send to Diagnostic Laboratory and Radiology.... As most of you are aware we have had severe over billing issues (Not charging the facility according to the contracts) ... At this time we will no longer want to utilize their services moving forward. Please open the attached cancellation notices with your named facility and sign then fax and mail (certified mail).[96]

Although the email is signed "Thank you, Tim Paulsen," it was sent by Suer.[97] The Park Ridge administrator sent its cancellation letter to DL the following day.[98] Similarly, in an email to Paulsen on July 3, 2012, Suer wrote, "Tim, here is the cancellation notice for Scottsdale to send to Shawn when he is ready. You have the cover letter. Thanks, Bobby."[99]

**\*9** Suer's involvement in this regard also is evidenced by several emails from Paulsen to North American facilities administrators. On July 5, 2012, Paulsen emailed several such administrators, saying North American had identified new vendors to replace some of the mobile lab and x-ray services in the southern California area.[100] He concluded by observing that, "You should see excellent services and a significant reduction in costs with these new vendors. But, as always, let us (Bobby Suer or myself) know if that is not the case."[101] Paulsen also sent an email on July 31,

2012 to numerous recipients, including individuals at DL and administrators at various North American nursing facilities, confirming that, pursuant to the Cancellation Letters, DL would cease providing services to certain North American facilities as of that date.[102] Suer was blind-copied on the email, along with three other North American employees.

Ultimately, all of DL's twenty-seven contracts with North American facilities were cancelled.[103] Sorensen, North American's CEO, testified that he believed DL to have engaged in "gross overbilling, calculatingly, very cleverly done, on a consistent basis for many, many, many months."[104] Sorensen believed that DL overbilled North American by about $950,000.[105] He also admitted that he "wouldn't know about it if it weren't for [Suer]."[106] Throughout August and September 2012, administrators at the North American facilities sent letters to DL, in which they detailed the final results of the billing audit for that particular facility, and then subtracted the purported overbillings from the total invoices outstanding to calculate a reduced, net amount North American owed to DL for that facility.[107] Paulsen testified that he drafted these letters, and Suer "provided numbers" for them.[108] By letters dated September 27, 2012, DL disputed North American's claims of overbilling, and rejected its suggestion that, by remitting payment for the undisputed amount, North American had paid DL in full.[109] On October 5, 2012, a North American facility administrator forwarded one such DL letter to Suer.[110]

Paulsen, with approval from Sorensen, made the final decision to terminate the contracts with DL.[111] Paulsen specifically denied that Suer encouraged Paulsen to cancel DL's contracts or had any part in that decision, except for reviewing the contracts and invoices and "giving [Paulsen] accurate numbers."[112] As in the situations previously noted, however, I consider Paulsen's efforts to minimize the importance of Suer's role in North American's decision to cancel its contracts with DL to be unreliable, at a minimum. Rather, I find that Suer played a key role in bringing about those decisions and that the preponderance of the evidence shows that it was unlikely that, based on Suer's prior interactions with DL, including his entry into the DLPA and APA, that Suer could or, in fact, did conduct the underlying North American "audits" of DL's invoices in an impartial and fair way, consistent with his contractual obligations to DL.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 95 of 164 PageID: 224
Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

Suer attempts to rebut this proposition by pointing to emails from the June–July 2012 time period in which he communicated with McCullum and Thomas McCaffery, DL's general counsel, and offered to help resolve the situation between DL and North American. [113] In addition, Suer communicated with Bill Treese, then an employee of DL, and sought to use Treese as a "conduit" to facilitate discussions between DL and North American. [114] Even assuming Suer made these overtures to DL in good faith, however, I consider it more likely than not that Suer was interested in trying to broker some form of compromise between North American and DL. But, that still would leave DL in a worse position than it was in when Suer began the course of conduct with North American that DL claims breached one or more of the Restrictive Covenants.

**\*10** This aspect of Suer's version of the relevant events brings up a related theory Defendant has advanced: that Treese was "brought into the fold" by DL in early 2012 "as its eventual star witness" in this litigation. [115] Suer further asserts that even before Treese left B.O.N. to work for DL, he "served as a mole, conversing with Suer and secretly reporting back to DL." [116] As colorful as those contentions are, they are only somewhat supported by the documentary evidence. For example, on April 4, 2012, Treese emailed Navarro and McCullum, writing:

> I received a call from Bobby last night frantically questioning who I have spoken to re N American [sic].... I am positive that he is at the breaking point and can be pushed off changing DL at the N American buildings. I believe that if he is given the option of an expensive, prolonged lawsuit or of suggesting to Tim that DL remain as the sole provider, he will choose the latter.

> I will get another call from him this morning.... It is imperative that I keep these lines of communication open so I continue to get information. It is in our best interest.... If we have to alter course on this plan I will do what is necessary to keep the accounts. [117]

That email was sent from Treese's B.O.N. email address, although he admits he was "transitioning from B.O.N. to become an employee of [DL]" at that time. [118] Three weeks later, McCaffery, DL's general counsel, sent an email entitled "litigation call" to Treese and Jones Day, DL's counsel in this action, in which he instructed an assistant to "set up a 60 minute call for Bill, [Jones Day] and me early next week." [119]

In July 2012, McCaffery asked Treese if he would travel to Cleveland, "[a]ll expenses paid." [120] Treese accepted, and spent at least a day and a night in Cleveland, meeting with Jones Day. [121] Before the end of July, Treese emailed Jones Day to say that he had "searched far and wide" and was going to send Jones Day his email correspondence with Suer. [122]

Treese's employment with DL lasted only from April to December of 2012. [123] Treese testified both evasively and unconvincingly about the circumstances in which his employment with DL ended. He described it as "a mutual parting of the ways," but also indicated that he knew he was going to be fired, for reasons unknown to him then or now. [124] The unpersuasive nature of that situation is enhanced by the fact that DL chose and paid for an attorney to represent Treese in connection with this "parting of the ways." [125] On December 11, 2012, Treese and DL executed a release and settlement agreement in connection with Treese's termination, not for cause. [126] Pursuant to that agreement, DL agreed to pay Treese $450,000 in equal installments until December 2015. [127] Among the obligations Treese undertook as consideration for that remarkably high severance payment was that he "shall be obligated to cooperate with [DL] in any litigation or administrative proceeding involving [DL]," and to refrain from "voluntarily aid[ing] or assist[ing] any person ... involved in any proceeding ... against [DL or its affiliates and employees]." [128] Treese also testified that Trident, DL's parent, is paying his legal fees and costs in defending a lawsuit B.O.N. brought against him in Nevada. [129] According to Treese, he took ninety to ninety-five percent of B.O.N.'s mobile x-ray and laboratory business when he moved to DL. [130]

**\*11** Based on those facts and other perceived inconsistencies, Suer urges this Court to disregard Treese's testimony entirely. I find the circumstances of Treese's departure from DL and his entry into a seemingly far more than generous settlement agreement sufficiently suspicious that they render Treese's credibility questionable, at best. As noted in several instances, *infra,* that lack of credibility is problematic for Plaintiff's effort to prove certain of the breaches of contract it has alleged. I decline, however, to disregard Treese's testimony entirely, and afford it some credibility, particularly in instances where it is corroborated by other witnesses' accounts or documentary evidence.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 96 of 164 PageID: 225

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

#### 2. North American finds vendors to replace DL

Plaintiff contends that Suer breached his obligations under the DLPA and the APA in numerous respects, and presented extensive evidence in that regard. The following facts, which I address in the order Plaintiff presented them, are relevant to the claimed breaches.

#### a. Schryver Medical

As to Schryver Medical, DL asserts that an April 2012 email from Suer to Mark Schryver evidences Suer's competition with DL. [131] Schryver owns Schryver Medical, which provided mobile laboratory and x-ray services to certain North American facilities in Washington, Utah, and Arizona. [132] The April 2012 email itself is ambiguous. A fair reading of that document, however, gives the impression that Suer's activity in this regard was nothing more than auditing the relevant bills and attempting to obtain credits for North American facilities already serviced by Schryver Medical, rather than attempting to replace DL with Schryver Medical at other facilities. [133] Schryver's deposition testimony does not alter that impression, [134] and it was the only testimony DL cited in support of its position on this issue. [135]

#### b. B.O.N.

Treese testified that in late 2011 or early 2012, while he was with B.O.N., Suer met with him and proposed that Suer would help Treese acquire North American's business in southern California, if B.O.N. would pay Suer $2,000 per facility. [136] Suer called that testimony "absolutely false," and denied that he ever made such a proposal to Treese. [137] Suer did exchange emails with Treese about meeting in August 2011, but those communications do not reflect whether the meeting took place, or the substance of what was discussed if they did. [138]

Treese further testified that he met with Paulsen and Suer on or around February 28, 2012, about a proposal for B.O.N. to provide mobile laboratory services for sixteen North American facilities in southern California. [139] Suer and Paulsen emphatically denied that Suer attended that meeting. [140] On March 1, 2012, Treese and Paulsen exchanged emails, in which Treese thanked Paulsen for the meeting and the two discussed potential services contracts. [141] Suer is neither copied on the emails, nor mentioned directly or indirectly in them. [142] Treese testified that he provided draft agreements to Paulsen, but that B.O.N.'s owners ultimately decided not to proceed with the contracts because they did not want to pay Suer's fee of $2,000 per-facility.

Suer's and Paulsen's accounts of these events differed dramatically from Treese's. Suer and Paulsen each testified that a deal for B.O.N. to service North American's southern California facilities made no sense because B.O.N. was located in Nevada. [143] The contemporaneous documents in the record do not indicate that Suer had a part in the discussions between Treese and Paulsen in late February and early March, 2012. [144] The only evidence of Suer's involvement in the potential transactions between B.O.N. and North American is Treese's testimony, which, for the reasons I discussed above, is not entirely credible. Specifically, in relation to the facts surrounding Suer and B.O.N., I find Treese's account less credible than the weight of the documentary and other testimonial evidence. Thus, DL has not proven by a preponderance of the evidence that Suer "acted as a facilitator and liaison between North American and B.O.N. to assist B.O.N." [145] in competing with DL. [146]

#### c. Quality Medical

**\*12** Treese also testified that Suer proposed to help Quality Medical, another direct competitor of DL's, to obtain mobile x-ray contracts with North American facilities, in exchange for a $10,000 per-month consulting fee. [147] On January 5, 2012, Treese emailed the administrator at Coventry Court, a North American facility then serviced by DL, with a proposed contract for Quality Medical to provide mobile x-ray and ultrasound services to Coventry Court. [148] Treese copied Suer on the email, and opened by saying that, "Our mutual friend asked that I email you the attached [contract] for your review." [149] Suer admitted that he was the "mutual friend," but he denied having told Treese to send the email. [150] Two weeks later, Suer emailed a list of North American facilities to Treese, writing simply, "here you go brother." [151]

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 97 of 164 PageID: 226

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

Unlike with B.O.N., the contemporaneous documents relating to Quality Medical corroborate Treese's testimony that Suer was assisting him in attempting to acquire business from North American for Quality Medical. On January 30, 2012, Roger Faselt, the owner of Quality Medical, emailed Treese contract proposals for x-ray services at eleven North American facilities. [152] Faselt wrote:

> Bill, I have attached the contracts. They are at 80% which would be a much better place for us to be. Discuss with BS, do we really need to go in that low at 70%, considering how high there [sic] charges are now? I know he is trying to save them money and justify his cut, but that whacks a lot of our profit right off the top.... Let me know what you think. [153]

The following morning, Treese forwarded that email to Suer without comment. [154] On April 3, 2012, Faselt again emailed Treese, attaching revised contracts for the North American facilities, and writing, "This is revised for BS." [155] Treese forwarded this email, too, almost immediately to Suer, with the annotation, "Roger's new contract." [156] Treese testified that Suer had requested the revised contracts. [157]

Suer "[a]bsolutely" denied having proposed to Treese any such arrangement with respect to Quality Medical. [158] He attributed his being copied on the emails from Treese concerning Quality Medical to Treese having asked Suer if he would help him obtain business from North American facilities, but Suer says he responded that he had no power to assist. [159] He further denied ever requesting any proposed contracts from Quality Medical, and dismissed all the emails as "a setup." [160] Suer's explanations in this regard are not credible in light of the contemporaneous documents that indicate his role was more active than he admits. Specifically, the emails involving Suer, Treese, and Faselt demonstrate that Suer was providing information to Quality Medical about the pricing they should offer to North American to capture its business—*i.e.*, whether Quality Medical needed to bid at 70% of a certain pricing schedule, or if 80% would be sufficiently low to ensure success. I infer that the 80% and

70% figures were with reference to the pricing schedules North American had in place with its then-current vendor, DL, and that Suer's input allowed Quality Medical to undercut DL. The documentary evidence also supports Treese's testimony that Suer expected some form of compensation for his assistance. In any event, the salient fact is that Quality Medical was bidding for North American's business with the active assistance of Suer.

**\*13** Taking all of the evidence regarding Quality Medical into consideration, I find that Suer did facilitate Quality Medical's acquisition of business from certain North American facilities that previously had been serviced by DL. In that regard, the record also shows that Quality Medical was one of the vendors selected to replace DL after North American cancelled its DL contracts in 2012. [161] Quality Medical currently provides x-ray services to twelve North American facilities. [162]

### d. UCI and Town & Country

DL asserts that Suer assisted North American in communicating with, and evaluating proposals from, University of California Irvine Medical Center ("UCI"), which provides x-ray and laboratory services in competition with DL. [163] Shaun Dahl, an administrator at North American's Coventry Court facility, was contacted by Kelly Ewing of UCI in or around December 2011 about the possibility of UCI providing services to Coventry Court. [164] DL contends that Dahl's testimony and certain text messages between Dahl and Suer from the April 2012 time period show that Suer helped UCI compete with DL. [165]

Dahl's testimony is inconclusive at best. The strongest impression it leaves is that, while Suer and Dahl had some communications relating to UCI, Suer did not take any action to facilitate UCI's acquisition of North American business. [166] The documentary evidence consists of a small number of text messages and one email that Dahl forwarded to Suer. That evidence reinforces the overall impression from Dahl's testimony, which is that Ewing repeatedly pursued him for business, and on occasion Dahl tried to direct him to Suer or Paulsen. [167] Ultimately, UCI failed to acquire any of North American's business. [168]

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 98 of 164 PageID: 227

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

DL also relies on Dahl's testimony and text messages with Suer to prove that Suer assisted Town & Country, another DL competitor. [169] Unlike UCI, Town & Country was successful in obtaining contracts to service certain North American facilities previously serviced by DL. [170] One text message from Dahl to Suer references a Rick Greene of Town & Country, but neither that message nor the context of the text messages in general suggest that Suer actively assisted Town & Country in acquiring business from North American. [171] As in the case of UCI, Dahl's testimony in this regard was inconclusive. [172] I note also that both UCI and Town & Country disclaimed in writing to DL that they had any affiliation whatsoever with Suer. [173]

 *14  On its own, this evidence would not enable me to find, by a preponderance of the evidence, that Suer assisted UCI or Town & Country in competing with DL for North American's business. As discussed *infra* in Section IV, however, DL has shown in its Motion for Sanctions that Suer recklessly destroyed or failed to preserve evidence that relates directly to the text messages exchanged between Dahl and Suer in connection with, among other things, the UCI and Town & Country situations. I therefore draw an adverse inference against Suer in this regard, and conclude that the apparently missing text message evidence involving Suer would have supported DL's allegations. [174] For that reason, I find that Suer did assist UCI and Town & Country in competing with DL.

### e. CERF Laboratories

DL avers that Suer assisted CERF Laboratories, a DL competitor, after it replaced DL as the provider for certain North American facilities. On July 24, 2012, Paulsen emailed administrators at several North American facilities, as follows:

> I understand that Elena from CERF Lab has been to visit a few of you this week (and will visit all soon). I apologize that her visit may seem rushed ("here's a contract, please sign ...") but we wanted to ensure that your lab services would not be interrupted when Diag Lab term[inates] on July 31st. If you have any concerns with the transition process, please contact me or Bobby Suer and we will make sure your needs are met. [175]

Suer evidently did have some contact with North American administrators in connection with the CERF transition. A text message from Suer to Dahl that also references "Elena," states, "I told Elena from cerf labs to get a hold of you to try a test with your computer e faxing. Not sure if u two connected to test it let me know." [176] Thus, Suer was involved in at least some capacity in assisting North American and CERF when CERF began servicing some of North American's facilities in July 2012. [177] This finding is corroborated by other evidence suggesting that Suer was involved on behalf of North American with the transition to new service providers generally in the July–August, 2012 time frame. [178]

### 3. Suer's use of DL's Confidential Information

Plaintiff also asserts that Suer breached his obligations under the Confidentiality Provision of the APA, based, in part, on the following. First, the record shows that in April 2012, when Suer was assisting Paulsen and North American in auditing invoices and confronting its service providers, Suer accessed a DL customer receivables list (the "Receivables List") that he had obtained in the course of his employment with DL and saved in his email account since 2008. [179] The Receivables List contained detailed information about DL's customers, including the volume of services DL was providing to each, as well as their outstanding invoices and payment history. [180] Aside from an email receipt showing that on April 16, 2012 Suer opened the email to which the Receivables List was attached, DL did not adduce any evidence that Suer actually accessed the List or used it. Thus, the record indicates, at most, that Suer read that particular email in April 2012. Beyond that, DL's evidence is circumstantial only and of limited probative value.

 *15  Second, DL contends that the facts surrounding Suer's assistance of Quality Medical in its pursuit of North American's business show that he used DL confidential information. Based on the relevant facts recited *supra,* I find that Suer was providing information and insight to Faselt and Quality Medical about DL's pricing schedule, and that more likely than not Suer used or disclosed DL's Confidential Information in that context.

Third, DL accuses Suer in general terms of improperly using his knowledge of DL's business to assist North American in altering its relationship with DL. The most particularized

Case 2:25-cv-02263-WJM-MAH Document 5-2 Filed 06/16/25 Page 99 of 164 PageID: 228

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

facts in this regard relate to Suer's knowledge that DL relied on certain large customers like North American, and that, because of pressures from its investors, if DL were confronted by its customers during the relevant time period about perceived over-billing, it would capitulate to their demands for invoice reductions or credits. The record supports DL's allegations that, during his meetings and communications with DL, Paulsen exhibited more than public knowledge of DL's vulnerability and business practices, and that Paulsen's approach to DL was particularly hard-nosed as a result. [181]

### 4. Later-occurring evidence

As the preceding sections demonstrate, the record DL adduced through testimony and documentary evidence focused heavily on Suer's actions during the first half of 2012. Only one written communication cited thus far occurred in August 2012, [182] and one other occurred in October 2012. [183] The rest are densely clustered in the months of March through July 2012. In that sense, the factual record goes mostly cold after July 2012, and totally cold after December 2012. [184] DL commenced this action on October 10, 2012. At trial in late 2014, DL also presented evidence of certain actions that occurred after 2012. I note two such actions in particular.

First, on September 16, 2013, an administrator at one of North American's facilities sent Suer an email on the subject "Lab Contract." The email stated, "Do you have any updates on a lab company for NorCal? Who are you looking at? Thank you for your assistance." [185] Two weeks later, the same administrator forwarded Suer an email that appears to be from a potential lab company, which stated: "Bobby, I received this in the email. Is this the company you have already been speaking with?" Two minutes later, Suer replied, "James yes. I will call u later [to] discuss." [186] Regarding these emails, Suer testified that a laboratory in northern California "went out of business completely and all the nursing homes up there were going to be without lab service," so North American was "frantically" looking for a replacement provider. [187] DL accuses Suer of improperly helping to "find a laboratory service provider for North American facilities in Northern California, a region previously served by DL." [188]

The cited emails arguably support that assertion, but only in the most general sense. Suer testified that North American

"had asked me to just research if I knew any laboratories up there." [189] DL presented no evidence as to what, if anything, Suer actually did in response to the September 13 email, or what he meant when he wrote his September 26 email, or whether he had further communications with the author and to what effect. [190] Thus, the evidence shows only that in September 2013 Suer provided some minimal assistance to North American in finding a laboratory services provider in northern California by searching for a vendor, and possibly spoke with at least one such vendor.

**\*16** The second action taken by Suer in September 2013 that DL highlights involves his mother, Chris Walter. She is a retired nurse who did some infection control work at Coventry Court, a North American facility. Walter emailed Suer when a payment owed to her was delayed, and he forwarded the email, without comment, to someone at North American. [191] DL complains that by "serving as a liaison to facilitate payment for an invoice from" his mother, Suer was "able to keep some of the North American business in the family" while also "displacing DL," which previously provided infection control services to Coventry Court. [192] Other than the email thread containing Suer's forwarding email, the record on this issue is paper thin. [193] According to Dahl, the administrator at Coventry Court, Paulsen referred Walter to him, not Suer. [194] Dahl did not know that she was related to Suer, and did not know why she sent the invoice to Suer. [195]

Plaintiff also claims that Suer's decision to depose Daniel Almblade in August 2014 amounts to a breach of the Non–Interference Provision of the APA. Almblade is an employee of LTC Supply, a company that adjudicates bills for skilled nursing facilities. [196] LTC is not a competitor of DL, but it is important to DL's business. That is because, in fulfilling its bill adjudication function, LTC Supply can stand between DL and some of its customer-facilities, insofar as the facilities rely on LTC's expertise with billing to review requests for proposals and to determine if the vendors, like DL, are fairly charging the facilities under their relevant services contracts. [197] When Suer sought the deposition of Almblade, an individual he knows through working in the industry, Almblade asked him why. [198] The only reason Suer gave was that Almblade would find the deposition "very informative." [199]

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 100 of 164
PageID: 229

DL posits that this statement, combined with some of the information provided to Almblade through Suer's counsel's questioning during the deposition, demonstrates that Suer's entire purpose in taking the deposition was to harm DL by undermining it in the eyes of LTC Supply. On balance, I find the evidence as to this aspect of DL's claim lacking. It could be inferred from the fact that Suer told Almblade that he would find the deposition "informative" that Suer intended to give information to Almblade in an effort to prejudice DL. That inference, however, has little else in the record to support it. Moreover, Suer, in defending against aggressive litigation from DL, reasonably could have concluded deposing Almblade, who is knowledgeable about bill adjudication and the nature of the skilled nursing facility industry, probably would lead to relevant evidence in this case. Based on the paucity of evidence as to Suer's allegedly improper motive in this regard, I find that DL failed to satisfy its burden of proof on this point.

### D. Procedural History [200]

Plaintiff, DL, commenced this action on October 10, 2012 and amended its complaint on February 4, 2013. The amended complaint (the "Complaint") charges Suer with breaches of the DLPA and the APA (Count I), misappropriation of trade secrets (Count II), and tortious interference with DL's contracts with North American (Count III). [201] DL's Complaint seeks the following by way of relief: a permanent injunction against further breaches of the Agreements; specific performance of the Restrictive Covenants; damages; and reimbursement of its attorneys' fees and costs. [202] On March 8, 2013, Defendant, Suer, moved to dismiss or stay this action in favor of arbitration. After full briefing and argument, I denied that motion. [203]

**\*17** On January 7, 2014, Suer filed a petition under Chapter 7 of the U.S. Bankruptcy Code, resulting in an automatic stay of this action. [204] On March 27, 2014, upon a motion by DL, the U.S. Bankruptcy Court for the Central District of California modified the automatic stay to permit Plaintiff to proceed with this action "with respect to its claims for injunctive relief from breach of contract." [205] DL's claims for misappropriation of trade secrets and tortious interference with contract remain stayed, as do any claims for monetary damages based on the alleged breaches of contract.

Suer moved for partial summary judgment on April 7, 2014, and amended that motion on May 23, 2014. Before argument on that motion, DL filed a motion of its own for sanctions for suppression or spoliation of evidence (the "Motion for Sanctions"). [206] Defendant responded by cross-moving for sanctions for witness tampering. [207]

At the pre-trial conference on September 24, 2014, I denied Suer's motion for summary judgment. Specifically, I held that material issues of fact precluded entry of judgment in favor of Defendant as to each of his three grounds for summary judgment. Those issues of fact related to: (1) the alleged expiration of the Restrictive Covenants under the terms of the DLPA and APA; [208] (2) the possibility of this Court tolling or otherwise extending those Covenants for purposes of an equitable remedy; [209] and (3) the validity of the Covenants under California law. [210]

A five-day trial was held from September 29 to October 3, 2014. At the close of trial, I reserved judgment as to Plaintiffs Motion for Sanctions, [211] and denied Defendant's cross-motion for witness tampering. [212] This Memorandum Opinion contains both my post-trial findings of fact and conclusions of law relating to the merits of DL's case, and my ruling on the outstanding Motion for Sanctions.

### E. Parties' Contentions

DL contends that it has proven that Suer breached the Non–Interference Provision of the APA, the Non–Competition Provisions in both the DLPA and the APA, and the Confidentiality Provisions in both the DLPA and the APA. Thus, Plaintiff argues that it is entitled to an injunction preventing Defendant from breaching those provisions in the future. In particular, DL asserts that: "Suer will continue hurting DL unless an injunction issues that prevents him from working for skilled nursing facilities, mobile x-ray vendors, and mobile laboratory vendors." [213]

Suer contends that the Covenants are unenforceable under both California and Delaware law. He also asserts that, in any event, the provisions of the DLPA and the APA have expired, and that no equitable tolling is appropriate here. Finally, Defendant denies that the record supports a finding that he violated the Covenants, and further argues that, even if such a breach is found, no injunctive relief is warranted here.

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

## II. LEGAL STANDARD

### A. Delaware Law Governs Both the DLPA and the APA

The parties dispute whether California or Delaware law governs the DLPA and the APA. "Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected bears some material relationship to the transaction." [214] By statute in Delaware, when parties to a contract memorialize in writing their agreement that Delaware law governs that contract, such a choice of law "shall conclusively be presumed to be a significant, material and reasonable relationship with this State and shall be enforced whether or not there are other relationships with this State." [215]

**\*18** The DLPA and the APA each contain a provision in which the parties agreed to be bound by Delaware law. [216] Additionally, Suer signed an affidavit in connection with his execution of the APA, in which he affirmed that he intended for Delaware law to apply to the APA, and for the provisions of that Agreement to prevent the parties to the APA from even arguing that the law of any jurisdiction other than Delaware should apply to that Agreement. [217] When sophisticated parties, like those in this case, execute agreements pursuant to which millions of dollars and control of various business entities change hands, this Court generally will enforce the parties' own choice of law provisions. [218] Allowing Suer later to walk away from the agreements he admittedly signed, and under which he was paid roughly $4.4 million in the aggregate, would both deprive DL of the benefit of its bargain and undermine the ability of commercial parties to establish with certainty the rules that will govern their relationship in future cases. [219] My decision to honor the parties' choice of Delaware law here is buttressed by the facts that multiple parties to the earlier of the relevant agreements are Delaware business entities, and the later agreement was executed in Delaware. [220] Thus, I find the parties' selection of Delaware law to be reasonable in light of their apparent contractual objectives. In accordance with 6 *Del. C.* § 2708(a) and the *Total Holding USA* case, therefore, I accept the contractually designated choice of Delaware law in this matter.

Suer argues that because DL seeks to enforce non-competition provisions, which are disfavored under California law, [221]

adhering to the parties' contractual choice-of-law provisions would undermine California public policy and run afoul of interstate comity. While Defendant invokes a valid principle of law in this regard, [222] his argument is not persuasive. To take advantage of this Restatement-based exception, Suer would have to demonstrate both: (1) that enforcement of the Non–Competition Provisions would be contrary to California public policy—even assuming that California would be the state whose law would apply if not for the choice-of-law provisions; and (2) that California has a "materially greater interest" than Delaware in the enforcement or non-enforcement of the Non–Competition Provisions. [223] California law generally does enforce non-competition agreements that were executed in connection with the sale of the goodwill of a business. [224] Based on the evidence adduced at trial, that carve-out from California's general rule against non-competes would apply to Suer in that he was a seller of the goodwill of a business under both the DLPA and the APA. [225] Suer makes no serious attempt to contend that those agreements were not legitimate sales of businesses within the meaning of the relevant carve-out. Admittedly, there could be scenarios in which an employer tries to skirt California's policy against non-competes by orchestrating a sham transaction. Based on the evidentiary record in this case, however, I am convinced that did not occur here. I therefore reject Defendant's arguments in this regard and conclude that Delaware law applies to both the DLPA and the APA.

### B. Applicable Legal Principles

**\*19** To prove a breach of contract under Delaware law, DL must show: (1) the existence of a contract; (2) breach of an obligation imposed by that contract; and (3) resulting damages. [226] After a full trial on the merits, a plaintiff bears the burden of proving the elements of its contract claim by a preponderance of the evidence. [227]

### III. ANALYSIS

Applying those principles to the evidence adduced at trial, I first conclude that the Restrictive Covenants in the DLPA and APA are enforceable under Delaware law. I next address whether the evidence shows that Suer breached those Covenants, and determine that it does. As to Defendant's

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 102 of 164
PageID: 231

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

contention that the Covenants have expired, I conclude that the plain language of the Agreements supports his assertion, but only as it relates to the Non–Competition Provisions, which were limited to five years. As to Suer's contention that the Covenants have expired, I conclude that the language of the Agreements supports that assertion, but find that fact ultimately irrelevant to the determinative issues of whether DL: (1) proved its breach of contract claim; and (2) is entitled to injunctive relief.

### A. The Covenants are Enforceable Under Delaware Law

Under Delaware law, a restrictive covenant, such as a non-competition provision, is enforceable if: (1) it meets general contract law requirements, (2) is reasonable in scope and duration, (3) advances a legitimate economic interest of the party enforcing the covenant, and (4) survives a balance of the equities. [228] If the restrictive covenant in question was obtained as "part of a contract for the sale of stock, this inquiry is less searching than if the Covenant had been contained in an employment contract." [229] Suer does not dispute that the DLPA and the APA meet the general contract law requirements of offer, acceptance, and consideration. [230] Thus, I limit my inquiry to the contested issues of whether the Restrictive Covenants are reasonable in scope and duration, advance a legitimate interest of DL's, and are not so inequitable that the Court should refuse to enforce them. For the reasons stated below, I conclude that the Covenants are enforceable under Delaware law.

First, the scope and duration of the Restrictive Covenants are reasonable under the circumstances of this case. [231] The Non–Competition Provisions have a term of five years, and their geographic scope includes the twenty-three states west of the Mississippi River. [232] Non-competition agreements of that length, and of that geographical scope and broader, have been found reasonable by Delaware courts in cases where the restrictive covenant is executed as part of the sale of a business as a going concern. [233] Based on the circumstances of this case, especially including the competitive nature of the industry and the depth of Suer's knowledge of DL's business practices, I find that the temporal and geographic limits of the Restrictive Covenants were reasonable in light of the parties' commercial goals in executing the DLPA and the APA.

**\*20** The strongest argument Suer makes in this regard is that DL has overreached geographically. When the more recent

of the contracts (the APA) was entered into, DL apparently operated only in Delaware and California. Through affiliates that were encompassed by the Non–Competition Provisions, however, DL also operated in New Mexico, Texas, Missouri, Oklahoma, Kansas, and Nebraska at that time. More importantly, during the period of the Non–Competition Provisions' effectiveness, DL's business expanded to include all the states covered by the "Restricted Area" except for Montana, Wyoming, North Dakota, Minnesota, and Iowa. Furthermore, for a noncompetition agreement to satisfy this element of the reasonableness test, Delaware law does not impose a strict requirement that the area covered by the covenant map perfectly onto the geographical area of the plaintiff's business. "[T]he reality is that it is the employer's goodwill in a particular market which is entitled to protection." [234] If that market or the customer base of the business "extends throughout the nation, or indeed even internationally, and the employee would *gain from the employment* some advantage in any part of that market," then the employer and the business may enter into an enforceable contract prohibiting the employee "from soliciting those customers on behalf of a competitor regardless of their geographic location." [235] Applying these legal principles to the facts of this case, I find unpersuasive Defendant's argument that the Restrictive Covenants were unreasonable based on the imperfect manner in which the Restricted Area mapped onto the actual area in which DL operated at the time of contracting. [236] The facts bear out the reasonableness of DL's desire to prevent Suer from competing or interfering in their business operations after they purchased his businesses, and the temporal and geographic scope of the Restrictive Covenants were reasonably calibrated to accomplish those mutually agreed upon goals.

The Restrictive Covenants also protect legitimate interests of DL. "Legitimate interests" recognized by Delaware law include protection of employer goodwill, and protection of employer confidential information from misuse. [237] By bargaining for the inclusion of the Restrictive Covenants in the DLPA and APA, DL was protecting its legitimate economic interest in maintaining the business relationships it or its predecessor had with the various skilled nursing facilities it provided services to, including the North American facilities, some of which ultimately terminated their relationship with DL. When it paid $4 million and then roughly $300,000 to acquire Suer's interests in two successive businesses, DL acted reasonably and legitimately in insisting on some measure of protection from the

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 103 of 164
PageID: 232

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

possibility that Suer simply would go out and take those clients or otherwise undermine DL's business to Suer's benefit by using information he gained during his involvement with the businesses DL had purchased. "In other words, [DL] safeguarded its investment in [Suer] by ensuring that he could not sell himself directly to a competitor serving [DL clients] and cut out [DL]." [238]  The Restrictive Covenants DL obtained therefore served a legitimate purpose for DL, and by seeking to enforce the terms of those Covenants, DL has not exceeded the scope of that legitimate interest. These same considerations lead me to conclude that, on balance, there is nothing inequitable about allowing DL to enforce the Restrictive Covenants according to the terms for which Suer and DL bargained. [239]

In sum, the Restrictive Covenants are enforceable under Delaware law, because they meet general contract law requirements, are reasonable in scope and duration, advance a legitimate economic interest of the party enforcing the covenant, and will survive a balancing of the equities.

## B. Defendant Breached the Restrictive Covenants

### 1. The Non–Competition Provisions

**\*21**  The DLPA Non–Competition and the APA Non–Competition Provisions are similarly worded, and each provides that for a period of five years from the execution of the respective agreement, Suer would not "engage directly or indirectly in all or any portion of the Business" within the Restricted Area. [240]  The DLPA generally defines Business as the business of the Acquired Companies; the Acquired Companies in that instance were essentially Old DL and related entities. [241]  The APA specifically defines "Business" as "the business of providing mobile diagnostic laboratory, pharmacy, ultrasound, rehab and x-ray services." Thus, the Non–Competition Provisions appear to be garden-variety covenants designed to prevent the seller of a business (Suer) from quickly going back to his established customers and re-taking their business from the buyer.

The factual record supports the conclusion that Defendant breached the Non–Competition Provisions, although not quite to the extent Plaintiff contends. The entirety of Suer's wrongful activity was committed in his capacity as a consultant for North American. North American operates skilled nursing facilities; it does not engage in

the Business from which Suer was barred by the Non–Competition Provisions—*i.e.,* providing mobile diagnostic services. Rather, North American was a customer of DL's services, not a competitor seeking to provide those same services in the market. Actions Suer took on behalf of North American were, therefore, by definition, generally not in competition with DL. Thus, I conclude that the record does not support DL's assertion that Suer *directly* engaged in competition that was proscribed by the DLPA or the APA. [242]

Each of the Non–Competition Provisions, however, also prohibits Suer from engaging in competitive Business *indirectly.* The evidence supports to some extent DL's claim that Defendant breached the Non–Competition Provisions by engaging indirectly in competitive Business by assisting competitors of DL. In particular, the factual record shows that Suer was involved in Quality Medical's efforts to replace DL as the service provider for several North American facilities. Those efforts were successful and Quality Medical was among the vendors North American selected to provide services to its facilities after cancelling the DL contracts. The emails from Faselt, combined with the testimonial evidence and other documents, demonstrate that Suer provided Quality Medical with information about DL's pricing that would have enhanced Quality Medical's ability to under-bid DL and succeed in acquiring some of the contracts previously held by DL. Thus, in those instances, Suer indirectly engaged in the Business of DL, by assisting one of its competitors in the provision of relevant services.

**\*22**  Plaintiff also proved that Suer provided assistance to at least UCI, Town & Country, and CERF Laboratories during the transition period after North American cancelled its DL contracts and began obtaining service from new vendors. Paulsen's email identifying Suer as a point person for making sure the North American facilities administrators' needs for such services were met evidenced Suer's involvement in this regard. I conclude, therefore, that by assisting CERL Laboratories and other vendors to replace DL as service providers at various North American facilities, Suer indirectly engaged in the Business in violation of the Non–Competition Provisions. That is, Suer lent his knowledge and expertise to North American on behalf of DL's competitors to facilitate their provision of the relevant mobile diagnostic services.

DL failed to prove, however, that Defendant breached the Non–Competition Provisions in connection with his alleged activities with Schryver Medical and B.O.N. For the reasons discussed above, the record does not support a finding that

Case 2:25-cv-02263-WJM-MAH   Document 5-2   Filed 06/16/25   Page 104 of 164
PageID: 233
Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

Suer's involvement with those companies rose to the level of assisting or facilitating their efforts to engage in DL's Business. One material difference between the facts relating to those competitors as compared to Quality Medical and CERF Laboratories is that the evidence regarding the latter two companies shows that Suer, in violation of the Non–Competition Provisions, took actions that advanced those companies' efforts to provide mobile diagnostic services. The same is not true with the others, despite Plaintiff's arguments to the contrary. The best example in this regard is with B.O.N. DL relied almost entirely on Treese's testimony to prove this particular breach. As previously discussed, however, the credibility of Treese's testimony is suspect. Based on that circumstance, together with absence of any contemporaneous documents showing that Suer played a role in B.O.N.'s attempt to engage in DL's Business in southern California, which ultimately failed anyway, I find that DL failed to meet its burden of proof in terms of the alleged breach involving B.O.N.

As it relates to Chris Walter, Suer's mother, the record also is devoid of adequate support for DL's claim that Suer breached the Non–Competition Provisions by forwarding an email from her to North American. Even if Walter's provision of infection control services fell within the proscribed Business of the DLPA and APA, Suer's forwarding of her email in search of payment of an invoice does not prove that he assisted her in acquiring the contract to provide those services in the first place. Indeed, the only evidence in the record, Dahl's deposition testimony, indicates that Suer did not have such a role. The other action Suer took in September 2013, communicating with unidentified laboratory services providers in northern California, similarly lacked sufficient detail or evidentiary foundation to support a conclusion that DL had shown, by a preponderance of the evidence, that Suer breached the Non–Competition Provisions in that regard.

### 2. The Non–Interference Provision

Pursuant to the Non–Interference Provision of the APA, Suer agreed that he would not take any action that is designed or intended to have the effect of encouraging any customer of DL to alter its relationship with DL. The evidence clearly shows that Suer violated this covenant by auditing DL's invoices and playing a pivotal role in North American's decision to make wholesale challenges to DL's billing. Even if the only result that flowed from Suer's actions in this regard was that North American succeeded in obtaining invoice credits

from DL, that may have been enough to demonstrate that he "encourage[d] a customer of DL's to alter its relationship with DL," and thereby violated the Non–Interference Provision. The record shows far more, however. In fact, I find that Suer's actions contributed significantly to North American's decision to cancel all of its contracts with DL. During the relevant time period, North American and Suer attempted to conceal from DL the fact that Suer was working at North American. In addition, Suer expressed his intent on more than one occasion to "take down DL." Considering all of these facts in the context of the evidence as a whole, I find that, through his actions, Suer not only encouraged, but actively facilitated, North American's drastic alteration of its relationship with DL.

**\*23** In denying that he engaged in actionable interference, Suer contends that simply auditing DL's bills should not qualify as interference under the APA. He asserts that the act of auditing was "neutral," and that he never "encouraged" North American to take actions adverse to DL, but rather tried to patch up the relationship at various points.[243] The evidence, however, belies Suer's benign characterization of the events relating to the relationship between North American and DL. Preliminarily, I question whether someone with Suer's extensive knowledge of DL's confidential information could perform the auditing function Suer undertook for such a major customer of DL as North American without inevitably violating either the Non–Interference Provision or the Confidentiality Provision. But, even assuming Suer could, the evidence shows that Suer not only audited DL's bills with an eye toward finding areas to dispute DL's invoices and extract concessions, but he also materially assisted North American in effectuating the resulting cancellations. Thus, Suer breached the Non–Interference Provision by participating in a partisan way adverse to DL in the auditing of DL's billing of North American, in encouraging and assisting North American to challenge DL's invoices and seek credits, stop payment, and ultimately terminate its contracts with DL.[244]

### 3. The Confidentiality Provision

The Confidentiality Provision of the APA prohibits Suer from directly or indirectly using or disclosing any of DL's confidential or proprietary information or trade secrets relating to the Business. The evidence demonstrated that Suer breached this covenant. The most prominent instance of Suer using and disclosing DL confidential information

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 105 of 164
PageID: 234

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

was in his assistance of Quality Medical. The Faselt emails showed that Quality Medical was able to pursue North American's business with the knowledge of exactly how low it needed to bid in order to beat DL's pricing. Defendant's only counter-arguments in this regard are that there is no evidence proving that Suer provided Quality Medical with any pricing information, and that the pricing information was well-known. Both of those contentions are controverted by the record, and in particular by the contemporaneous emails demonstrating that "BS" was being consulted as to the pricing of DL's services contracts. [245]

The record also shows that Suer accessed a DL customer Receivables List through his email account in April 2012. That List contained the names of DL's customers and provided for each customer contact information, and information as to the volume of its contract services and outstanding balances, among other things. Although this type of information appears to fall within the Confidentiality Provision, the weight of the evidence does not support a finding that Suer "disclosed" or "used" it in connection with his work at North American. Thus, this aspect of Plaintiff's claim for breach of the Confidentiality Provision has not been proven. DL counters that Suer never denied accessing or using the confidential customer Receivables List, but it was DL's burden to prove that he did so. DL did not prove by a preponderance of the evidence that Suer, in fact, did disclose or use information from the Receivables List.

### C. The Restrictive Covenants Have Expired

The Survival Clause in Section 6.3 of the APA provides that, "The representations, warranties, covenants and agreements contained herein will survive for the longer of (i) five years [*i.e.,* until May 20, 2014], and (ii) the statute of limitations in respect of the subject matter described herein." The parties vigorously dispute the effect of this provision on the issue of whether the Restrictive Covenants have expired. [246] DL interprets the Survival Clause to mean that, because Delaware has a three-year statute of limitations for breaches of contract, the Restrictive Covenants—including the Non–competition Provisions—were to remain in effect for a period of three years following the latest breach of those Covenants. Thus, Plaintiff asserts that: (1) because Suer continued breaching the Non–Competition Provisions until September 26, 2013, the Non–Competition Provisions will continue in effect until September 26, 2016; (2) because Suer continued breaching the Non–Interference Provision until August 2014, that

covenant survives until August 2017; and (3) because Suer breached the Confidentiality Provision in April 2012, that covenant survived until April 2015. [247] Alternatively, DL contends that the Court should equitably toll the relevant obligations under the Restrictive Covenants so that DL can enjoy the bargained-for benefit that it was deprived of by Suer's breaches. For the reasons stated in this Section, I conclude that the Restrictive Covenants have expired, and that DL's request for equitable tolling should be analyzed as a request for equitable relief from Suer's breaches, which I address in Section III.D *infra.*

### 1. Under the terms of the Agreements, the Restrictive Covenants have expired

**\*24** The parties executed the DLPA on July 28, 2008, and the APA on May 20, 2009. Because the APA came later (and "reaffirmed" Suer's commitments under the DLPA), I consider only the APA for purposes of whether any of Suer's obligations under the Restrictive Covenants remain in effect as a matter of contract law. The Survival Clause, which Plaintiff relies on for its interpretation of the length of the Non–Competition Provision, appears in Section 6.3, the final subsection of Section 6, which relates to "indemnification." [248] The Non–Competition Provision in Section 5.4 of the APA, however, expressly states that, "***For a period of five years from and after the Closing Date,*** neither [South Coast] nor [Suer and BCCC] will ... directly or indirectly engage in ... the Business in the Restricted Area." [249] DL either glosses over this language, or contends that the Survival Clause somehow overrides it, so that the Non-competition Provision does not expire five years after the Closing Date, but rather is extended for the statute of limitations period (three years) each time a breach occurs.

In effect, therefore, Plaintiff is asking the Court to apply a general clause in an unrelated part of the APA to override the specific language of the Non–Competition Provision in Section 5.4, so that potentially the length of that restrictive covenant will be longer. Under Delaware contract law, "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." [250] As it relates to the Non–Competition Provisions, therefore, DL's interpretation of the APA is unreasonable. The Non–Competition Provision of the APA, by the plain language of Section 5.4, began on the Closing

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 106 of 164
PageID: 235

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

Date of May 20, 2009, and expired five years later, on May 20, 2014. [251]

In arguing to the contrary, DL contends that if the Non–Competition Provisions are limited to the fixed five-year time period expressly contained within them, that would render Section 6.3(h) mere surplusage, a result eschewed by the applicable canons of contract interpretation under Delaware law. [252] I disagree. Reading the APA as a whole, which Delaware law requires me to do, makes it clear that Plaintiff's argument artificially puts Section 5.4 and Section 6.3 in conflict with one another, such that one or the other would contain a meaningless provision. Applying the statute-of-limitations extension trigger in Section 6.3(h) would require me to ignore the plain statement in Section 5.4.1 that the Non–Competition Provision lasts for five years from the Closing Date. The more reasonable reading of Section 6.3(h) is that it relates to the representations, warranties, covenants, and agreements "*contained herein*"—*i.e.,* in Section 6, concerning the parties' Indemnification obligations. [253] Thus, if a party has a right to Indemnification under Section 6.1 or 6.2, that right survives, under Section 6.3, for the longer of five years (romanette (i)), and the statute of limitations relating to the indemnified claim (romanette (ii)). That interpretation harmonizes Section 6.3 with the unambiguous language in Section 5.4 limiting the Non–Competition Provision to "a period of five years," and gives effect to the more specific of the two provisions. [254] I therefore conclude that the Non–Competition Provision lasted only for a period of five years from the Closing Date, and therefore expired on May 20, 2014.

**\*25** Unlike the Non–Competition Provision, neither the Non–Interference Provision nor the Confidentiality Provision contains a specific time limitation. [255] Relying again on the Survival Clause in Section 6.3(h), DL contends that the Non–Interference Provision survives until August 2017 because Suer continued breaching it until August 2014, and that the Confidentiality Provision survived until April 2015, based on Suer's breach in April 2012. I need not address continuing effectiveness of the Confidentiality Provision as a contractual matter, because even under Plaintiff's interpretation, it already has expired.

As to the Non–Interference Provision, DL relies on Suer's deposition of Almblade as evidence that an alleged breached occurred as late as August 2014, thereby causing that Provision to extend until August 2017. Even if I accept,

*arguendo,* [256] that DL's application of the Survival Clause to the Non–Interference Provision is sound, the factual record does not support this aspect of Plaintiff's argument. As I found earlier, DL failed to prove that Suer improperly interfered with DL's Business when he took Almblade's deposition. I also previously concluded that Suer's actions in connection with the unidentified vendor replacement in September 2013 did not amount to a breach of the Non–Interference Provision. [257] Thus, the last of the breaches of the Non–Interference Provision that DL proved at trial had ended by July 2012. Thus, even if Plaintiff's reading of the Survival clause were correct, the Non–Interference Provision expired at the end of July 2015, making it essentially moot, except as a potential basis for entry of a prospective permanent injunction.

### 2. Plaintiff's plea for "equitable tolling" is misplaced

DL also contends that, if this Court concludes the Restrictive Covenants have expired according to their terms, the Court can, and should, extend those Covenants on the ground of equitable tolling. [258] What DL really is seeking, however, is for the Court to consider the contractual time period for which Suer had agreed to refrain from breaching the Restrictive Covenants in fashioning what DL considers an appropriate injunction that will make Plaintiff whole and confer upon DL the benefit for which it bargained. [259] I address the availability of such relief in the context of discussing an appropriate remedy in the following Section. In my opinion, it is neither necessary nor productive to analyze the issue within the framework of attempting to use equitable tolling to enlarge the effective time periods of the Restrictive Covenants.

### D. Remedy

As noted above, Plaintiff's claims against Suer automatically were stayed when he filed for bankruptcy in January 2014, with the limited exception of DL's claim for injunctive relief for breaches of the DLPA and the APA. Thus, to the extent DL might have a valid claim for damages based on loss of business or other harm caused by Suer's breaches, no such claim is before me at this time. Instead, DL asks the Court to enjoin Suer from continued breaches of his obligations under the Restrictive Covenants. To merit a permanent injunction, as DL seeks, it must demonstrate: (1) actual success on the merits, (2) irreparable harm, and (3) that the balance of

Case 2:25-cv-02262-WJM-MAH    Document 5-2    Filed 06/16/25    Page 107 of 164
PageID: 236

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

the equities weighs in favor of issuing the injunction.[260] "Further, to gain specific performance of a covenant not to compete, these elements must be established by clear and convincing evidence."[261]

**\*26**  Before I address whether Plaintiff has satisfied those elements and is entitled to injunctive relief, I note that the parties dispute whether the Court's analysis must include a determination as to the allegedly "willful" nature of Suer's breaches.[262] DL cites cases from other jurisdictions that it contends support the proposition that "when determining whether an equitable remedy is appropriate courts look to whether the breach of a restrictive covenant was 'willful.' "[263] It is an equitable maxim that "he who comes into equity must come with clean hands."[264] But, the unclean hands doctrine has no application to DL's affirmative claims. Had Suer counterclaimed against Plaintiff and sought some form of equitable relief against it, which he has not, the unclean hands defense might have provided a basis to deny him such relief.[265] In analyzing a plaintiff's claim for breach of contract under Delaware law, however, the Court generally does not inquire into the defendant's state of mind.[266] I also see no merit in any argument by DL that the willfulness of Suer's breaches are relevant as part of balancing the equities in connection with my decision about the propriety of injunctive relief. The balancing of equities in that regard focuses on "balancing the interests sought to be protected by [DL] against the injury that injunctive relief would cause to [Suer]."[267] I therefore express no opinion as to whether Suer's breaches of the DLPA and the APA were "willful."

### 1. DL is entitled to injunctive relief

The first element in deciding whether injunctive relief is appropriate is actual success on the merits. As the foregoing analysis shows, DL has proven that Suer breached the Non–Competition Provisions, the Non–Interference Provision, and the Confidentiality Provision. The first of those breaches occurred, based on the evidence adduced, in or around January 2012 when Suer began working for North American and interfering with DL's business relationship with North American's facilities.

In terms of irreparable harm, I note that each of the parties to the APA "acknowledge[d] and agree[d] that the other parties hereto would be damaged irreparably in the

event any of the provisions of this Agreement are not performed ... or otherwise are breached or violated," and that "each party hereto will be entitled to an injunction ... to enforce specifically this Agreement...."[268] The DLPA contains a similar provision.[269] In the context of ordering injunctive relief stemming from breaches of a non-competition agreement, Chief Justice Strine, then writing as Vice Chancellor, observed that "our law has consistently found a threat of irreparable injury in circumstances when a covenant not to compete is breached."[270] Based on the arm's-length agreement between DL and Suer that any breaches of the DLPA or the APA would result in irreparable harm, and on the factual record presented as to the nature, extent, and effect of Suer's breaches, I find that this requirement for injunctive relief has been satisfied.

**\*27**  Finally, I consider whether the harm that the requested injunction would cause to Suer outweighs the benefits of granting DL the injunctive relief it seeks. Defendant asserts that DL's relationship with North American is broken beyond repair, and that there is therefore likely to be little benefit to DL from a grant of injunctive relief here. Suer also alleges that he is the sole breadwinner of his family and would suffer greatly if enjoined from continuing to work in the industry. I find no merit to the argument that, because a defendant irreparably may have destroyed a business relationship with a major customer of a plaintiff, there is nothing to be gained by holding the defendant to the promises he made and later broke. As to the alleged hardship to Suer personally, as I discuss in more detail below, Suer will not be prevented from working in the nursing home field altogether. He will be enjoined, instead, from continuing to breach the obligations he undertook in the DLPA and the APA. Thus, I conclude that the balancing of the equities supports the issuance of injunctive relief in DL's favor.

### 2. The scope of the Court's injunction

At various points throughout the briefing, DL offered differing definitions of what, precisely, it seeks to enjoin Suer from doing.[271] Plaintiff ultimately requested at argument that Suer be enjoined "from working with any mobile x-ray or laboratory vendor, skilled nursing facility, or skilled nursing management company for a period of ... two years and five months from the date of the injunction."[272] This request, however, goes considerably beyond the subject matter scope of the Restrictive Covenants DL bargained for from Suer. I

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 108 of 164
PageID: 237

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

address that issue next, and then will discuss the appropriate temporal duration of an injunction.

In terms of his obligations under the Non–Competition Provisions, Suer agreed not to "directly or indirectly engage ... in the Business," with "Business" meaning "providing mobile diagnostic laboratory, pharmacy, ultrasound, rehab and x-ray services." That was and is DL's line of business, and Suer promised not to compete with DL. Suer did *not* agree that he would refrain from working for skilled nursing facilities or skilled nursing management companies, except, perhaps, to the extent such a facility or company might engage in the business of providing mobile diagnostic services like DL. As for the Non–Interference Provision, Suer undertook not to "take any action that is designed or intended to have the effect of encouraging any lessor, licensor, supplier, distributor or customer of [DL] or its Affiliates ... from altering its relationship with [DL] or its Affiliates in a manner adverse to [DL] or its Affiliates." Nothing in that Provision precludes Suer from working for any particular company or type of company, but it does preclude him—regardless of where he works or the nature of his responsibilities —from taking actions designed to interfere with DL's business relationships. In determining an appropriate remedy, therefore, my initial focus will be on enjoining Suer from: competing with DL, as defined in the Non–Competition Provisions; interfering in DL's business relationships, as defined in the Non–Interference Provision; and disclosing or using DL Confidential Information, as that term is defined in the Confidentiality Provisions.

**\*28** The crux of this issue, and the reason the parties dispute it so vigorously, is whether Suer can continue to work for North American, and especially in the bill auditing function that gave rise to his multiple breaches of the Restrictive Covenants. Based on the record adduced at trial, it does seem to me that Suer will not be able to work on bill adjudication or auditing for North American or any other skilled nursing management company or for any skilled nursing facility for which DL currently provides services, because Suer has exhibited sufficient bias toward DL to make it unlikely that Suer could work in such a position without interfering with DL's current or prospective business relations. For that reason, Suer will be barred from bill adjudication or auditing at North American and the other types of companies mentioned above.

There is nothing about working for North American or another skilled nursing management company or skilled

nursing facility, however, that is inherently violative of the terms of the Restrictive Covenants. Thus, I will decline to bar Suer from otherwise continuing to work for North American generally or from working for another skilled nursing management company or skilled nursing facility. Delaware courts "will not rewrite contractual language covering particular topics just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiation process."[273] DL did not negotiate for restrictive covenants that would preclude Suer from working in the "nursing home industry," or for skilled nursing management companies generally. Had it wanted such a broad restrictive covenant, DL could have attempted to obtain it at the bargaining table.

Turning to the temporal component of the injunction, and consistent with my conclusion that DL is entitled to the benefit of its bargain, I have determined that the injunction should remain in effect for two years. DL contends that it bargained for five years of compliance with the Restrictive Covenants, and because Suer began breaching in January 2012, DL only received that benefit for roughly two years and seven months. Accordingly, DL seeks an injunction for the remaining two years and five months. Although I generally agree with DL's premise, I conclude based on all the circumstances of this case, that a slightly shorter injunction is warranted. For example, some of the more significant breaches of the Restrictive Covenants did not occur until several months after January 2012. In this regard, I note that North American did not send out its Cancellation Letters until the end of June or early July, 2012. Defendant offers several reasons why the length of DL's requested injunction is unreasonable, but none of them justify shortening its length more materially. I reject in particular the argument that the injunction against Suer should be reduced for the time that elapsed during the pendency of this litigation as "time served." DL did not bargain for the right to litigate endlessly with Suer, and I decline to adopt a rule that might incentivize contractual parties to breach their agreements and then run out the clock during litigation. For all of these reasons, I have decided to limit the length of the injunction to two years from its entry.

## IV. PLAINTIFF'S MOTION FOR SANCTIONS OR SPOLIATION

Before trial, DL moved the Court to order sanctions against Suer for alleged suppression or spoliation of evidence.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 109 of 164
PageID: 238

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

Plaintiff relies most heavily on documents it received from non-parties during discovery that it says Suer should have produced, but did not. In particular, Plaintiff points to three sets of text messages between Suer and Dahl of Coventry Court: (1) texts from between April and September 2012 relating to UCI, Town & Country, and CERF Laboratories; (2) texts from the early December 2012 timeframe relating to CERF Laboratories and UCI; and (3) texts from early December 2012 relating to Terrace View, another North American facility. DL also points to certain emails between Treese and Suer in April 2012 that were produced by Treese but not Suer. Finally, DL asserts that Suer violated this Court's May 20, 2014 order granting DL's motion to compel certain discovery (the "May 2014 Discovery Order"),[274] by failing to supplement his interrogatory responses and provide documents relating to his work for Pulmocare, an oxygen services vendor for skilled nursing homes. Based on this alleged misconduct, DL urges the Court to draw adverse inferences against Suer with respect to his alleged breaches of the Non–Competition Provisions and the Confidentiality Provision, and to afford no weight to any of Suer's testimony.[275] DL also seeks its fees and costs associated with its Motion for Sanctions.

**\*29** Suer essentially concedes that his duty to preserve evidence attached by April 4, 2012, at the latest, by which time he was communicating with his attorneys about possible allegations by DL that Suer was breaching his non-competition obligations.[276] As to why he failed to produce the relevant text messages, Suer now avers that he lost his cell phone in March of 2013.[277] Regarding the Treese emails, Suer asserts that, because they were sent and received between January and mid-April 2012, Suer deleted them in the ordinary course before his duty to preserve attached.

### A. Legal Standard

"A party in litigation or who has reason to anticipate litigation has an affirmative duty to preserve evidence that might be relevant to the issues in the lawsuit."[278] Whether a person has reason to anticipate litigation depends on whether the facts and circumstances lead to a conclusion that litigation is imminent or should otherwise be expected.[279] This Court may sanction a party who breaches this duty by destroying relevant evidence or by failing to prevent the destruction of such evidence.[280] It is appropriate, for example, for the Court

to draw an adverse inference "where a litigant intentionally or recklessly destroys evidence, when it knows that the item in question is relevant to a legal dispute or it was otherwise under a legal duty to preserve the item...."[281] In this context, Delaware courts have defined recklessness as "a conscious awareness of the risk that one's action or inaction may cause evidence to be despoiled."[282]

### B. Analysis

Based on the evidence discussed at length in this Memorandum Opinion, I find that Suer had reason to anticipate litigation by April 4, 2012, at the latest, when he began communicating with his attorney about the matters in dispute. Indeed, Suer makes no serious argument to the contrary. DL has at least a colorable argument that Suer's duty to preserve attached as early as January 2012, because Suer's summary judgment brief states that when he went to work for North American in January 2012, he "kn[ew] well that it could lead to a campaign of scorched-earth litigation against him."[283] This evidence buttresses my primary conclusion that Suer had reason to expect litigation by at least April 4, 2012. For purposes of the Motion for Sanctions, I need not decide whether Suer's duty to preserve arose even earlier, in January.

Based on the evidence presented, I am convinced that Suer was at least reckless with respect to his duty to preserve potentially relevant information and documents. With respect to the Treese emails, Suer does not dispute that he intentionally deleted them as late as April 18, 2012, which was two weeks after his duty to preserve attached. Thus, the deletion of those emails provides grounds for a finding of spoliation. This finding is supported further by the incriminating nature of the Treese emails and the fact that in a bankruptcy filing on April 16, 2012, Suer's wife explicitly mentioned the possibility that Suer would be involved in litigation with his former employer, *i.e.,* DL.

As to the text messages produced by Dahl but missing from Suer's production, the record on the Motion for Sanctions and at trial demonstrates that Suer's conduct was reckless. By December 2012, DL formally had requested production of relevant documents from Suer, including text messages. Suer represented to this Court in connection with his then pending motion to stay discovery that, "There is no reason for concern that any of the[ ] materials [DL sought in discovery]

2015 IER Cases 186,616

are 'subject to deterioration, manipulation, or even just being forgotten.' " [284] Relying in part on that representation, I granted Suer's motion and stayed discovery for a brief period of time. [285] In March 2013, only a few months after he assured the Court that no potentially relevant discovery would be in jeopardy, Suer allegedly lost his cell phone. While I infer no bad motive as to Suer's loss of this device, at no time has he ever explained to the Court what, if any, actions he or his counsel took between April 2012, when his duty to preserve arose, and March 2013 to attempt to preserve any information that might be on his phone or even to consider that issue. [286] Moreover, DL pressed Suer in 2014 as to whether he had produced all responsive text messages in his possession. Instead of admitting that Suer's phone was gone, his counsel stated that Suer had no text messages, and represented that Suer "emails for business purposes but generally does not text." [287] Based on these circumstances, I find that Suer was at least reckless in failing to take reasonable steps to ensure the preservation of potentially responsive information stored on his cell phone.

 **\*30** Suer makes several arguments against a finding of spoliation, but none are availing. He asserts that if he had used text messages frequently for business purposes, DL would have obtained a larger number of them in its far-reaching third party discovery and proffered them as evidence. Even if that were true, however, Suer still was reckless in failing to preserve and produce the text messages that he had that were responsive to DL's requests for production. Second, Suer contends that because DL's third-party discovery failed to produce many "other-ends" of the purportedly missing communications that he failed to provide, it should be inferred that no such communications exist. I disagree. Unlike Suer, the third parties were not under an obligation to preserve potentially relevant evidence, and it is plausible that, in the ordinary course of business, they could have deleted or failed to preserve texts that would have been relevant. Third, Suer insinuates that because DL failed to produce a large number, or perhaps any, text messages of its own, DL is in no position to challenge Suer's failure to do so. I reject that argument as well. DL's production or lack thereof is not at issue on the pending Motion for Sanctions. Moreover, there has been no showing that Suer ever made any motion to compel related to the absence of text messages from DL's production. [288]

In terms of sanctions for the spoliation, DL requests that I draw sweeping adverse inferences that Suer breached all of his Restrictive Covenants in relation to every breach DL

alleges, and that I categorically disregard Suer's testimony as not credible. Although I grant DL's motion, I do not consider such broad adverse inferences to be justified. Instead, I have drawn more narrowly tailored inferences as indicated at several points throughout this Memorandum Opinion. [289] For example, where I found that the evidentiary record appeared to be incomplete due to the absence of text messages that probably existed and should have been produced, I concluded that DL proved the specific breach it was attempting to prove, notwithstanding that the evidence of record, without more, might not have satisfied the preponderance of the evidence standard. Such inferences generally only confirmed conclusions that I otherwise reached on the basis of evidence DL did adduce. The few exceptions involved the Non–Competition Provision breaches relating to UCI and Town & Country.

Finally, I conclude that DL is entitled to the reasonable attorneys' fees and expenses it incurred in filing and prosecuting its Motion for Sanctions. This will include all such reasonable fees and expenses incurred through the date of the pre-trial conference, at which the Motion for Sanctions was argued. In terms of the trial and DL's post-trial briefing and oral argument, I hereby award DL its reasonable fees and expenses related to the Motion for Sanctions up to a maximum of $20,000. [290] If DL spent more than that amount after the pre-trial conference, it simply may include a statement to that effect in its affidavit and need not provide more detail.

## V. CONCLUSION

For the reasons stated in this Memorandum Opinion, I conclude that the Restrictive Covenants are enforceable under Delaware law, and that Plaintiff proved that Defendant breached those Covenants in the specific instances identified herein. Plaintiff, therefore, is entitled to injunctive relief in accordance with Section III.D.2, *supra.* Plaintiff shall submit, on notice to Suer, a proposed form of final order and judgment implementing the rulings contained herein. In addition, Counsel for DL, within ten days of the date of this Memorandum Opinion, shall submit an affidavit indicating the reasonable amount of such fees and costs. To the extent Suer objects to any aspect of that affidavit or the amount of fees and costs claimed, he shall state all such objections in a written filing within ten days after the date DL files its affidavit. DL may file a brief reply within five days thereafter.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 111 of 164
PageID: 240
Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

**All Citations**

Not Reported in Atl. Rptr., 2015 WL 4503210, 2015 IER
Cases 186,616

---

## Footnotes

1    To the extent any facts are in dispute, I have used a preponderance of the evidence standard to make the
     factual findings contained herein, unless otherwise noted.

2    Pre-trial Stip. and Order [hereinafter "Joint Stip."] II.A.1.

3    Joint Stip. II.A.2.

4    *Id.* II.A.3.

5    Tr. 6 (McCullum). Citations to the trial transcript are in the form "Tr. # (X)," with the testifying witness "X"
     identified if not apparent from the text.

6    *Id.*

7    *Id.* at 209–10, 330–33 (Suer).

8    *Id.* at 210–11, 332–33.

9    *Id.* at 211–12.

10   *Id.* at 334.

11   *Id.*

12   *Id.* at 550 (Navarro).

13   *Id.* at 555.

14   *Id.* at 214–15 (Suer).

15   *Id.* at 555–56.

16   *Id.* at 344–45 (Suer); JX 19 (the 2007 Employment Agreement).

17   2007 Employment Agreement § 3(a)–(b).

18   *Id.* § 10.

19   Tr. 7–9 (McCullum).

20   Joint Stip. II.A.5. The parties to the DLPA were: DL Group Holdings, LLC; Diagnostic Labs, LLC; Kan–Di–Ki
     Inc., d/b/a/ Diagnostic Laboratories; and certain "Sellers" defined as Suer and Liu.

21   JX 23 (the DLPA), Recitals; *id.* § 6.14; JX 425.

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 112 of 164
PageID: 241

2015 IER Cases 186,616

22    DLPA, Recitals; JX 29.

23    Tr. 5 (McCullum).

24    Tr. 15.

25    JX 28; Tr. 366, 506–08 (Suer). Suer characterizes his inclusion as a "Seller" under the DLPA as a sham devised by DL "to keep [him] under their control," by making him a "nominal 'owner' " even though his ownership was in fact "momentary" and "illusory." Def.'s Post-trial Br. 3–4. Suer also testified that he never was issued any equity interest or LLC units in DL. Tr. 371–72. But, Suer admits that he accepted $4 million in cash from DL in connection with this transaction. Tr. 366–67.

The documents in the record, pursuant to which Suer accepted that sum, refute his characterization of the relevant events. For example, in a sworn and notarized affidavit dated May 19, 2009, Suer attested that, "in furtherance of the transactions contemplated by the [DLPA], I became an owner of equity interests in Kan–Di–Ki, LLC ('*KDK*').... All of my equity interests in KDK were purchased by the buyer ... pursuant to [the DLPA.] I do not believe, and did not intend, my ownership of equity interests in KDK to constitute a 'sham transaction' under California law or otherwise." JX 50. Although Suer disputes the validity of certain documents that appear to bear his signature, he does not deny having signed the affidavit marked JX 50. Tr. 404. I note in this regard that the parties each presented expert testimony on the validity of certain documents purporting to bear Suer's signature, but which Suer denies signing. I found that testimony irrelevant to any material issue, factual or legal, because the documents in question are not relevant. JX 30–31. For that reason, I do not discuss any further the record relating to the alleged signature forgery.

26    DLPA § 6.9.1 (the "DLPA Confidentiality Provision'').

27    *Id.* § 6.11 (the "DLPA Non–Competition Provision").

28    *Id.*

29    Tr. 365–66 (Suer).

30    JX 24 (the Consulting Agreement).

31    Consulting Agreement § 4(a).

32    *Id.* §§ 2, 5.

33    Tr. 377–79 (Suer); *id.* at 28 (McCullum); *id.* at 558–59 (Navarro).

34    *Id.* at 28 (McCullum); *id.* at 378–79 (Suer).

35    *Id.* at 559.

36    *Id.* at 380–82 (Suer).

37    JX 35.

38    Tr. 30 (McCullum).

39    *Mobile Diagnostic Gp. Hldgs., LLC v. Suer,* 972 A.2d 799 (Del. Ch. 2009) (Chandler, C.).

40    Tr. 382–86 (Suer).

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 113 of 164
PageID: 242
Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

41    *Id.*

42    *Id.* at 30 (McCullum).

43    *Id.* The initial outreach in this regard apparently came from Adam Abramson, an employee of Audax, not DL.
      *Id.* at 391–93 (Suer); *id.* at 30 (McCullum).

44    JX 52 (the "APA") § 2.1.

45    APA, Recitals.

46    *Id.* §§ 2.4, 2.5.

47    *Id.* § 2.5.

48    Def.'s Post–trial Br. 5.

49    Tr. 394–98.

50    *E.g.,* Def.'s Post–trial Br. 5–6.

51    APA § 5.3 (the "APA Confidentiality Provision," and together with the DLPA Confidentiality Provision, the
      "Confidentiality Provisions").

52    *Id.,* Recitals.

53    *Id.* § 5.4.1 (the "APA Non–Competition Provision," and, together with the DLPA Non-Competition Provision,
      the "Non–Competition Provisions").

54    *Id.* § 1 (defining "*Restricted Area* ").

55    *Id.* § 5.4.2.

56    *Id.* § 5.4.3.

57    *Id.* § 5.6 (the "Non–Interference Provision").

58    *Id.* § 7.3.

59    *Id.* § 6.3 (the "Survival Clause"). The parties dispute the effect of this provision on the issue of whether
      the Restrictive Covenants have expired and are therefore unenforceable. As I discuss *infra,* this dispute is
      irrelevant for the APA Non–competition Provision, which expressly states that it runs "[f]or a period of five
      years from and after the Closing Date," which was May 20, 2009.

60    JX 54 (the "2009 Employment Agreement").

61    2009 Employment Agreement ¶¶ 2–3.

62    *Id.* ¶¶ 1, 5.

63    Tr. 411–12 (Suer). Suer complains that although he expected to gain experience from a management role at
      DL through the 2009 Employment Agreement, DL instead "froze him out," and "sent him home and gave him
      almost no work." Def.'s Post-trial Br. 5–6. To the extent Suer indirectly suggests that these events undermine
      the validity of the APA, I reject that argument. The 2009 Employment Agreement did not promise him any
      particular role within DL, nor did it even articulate specific duties he would be engaged in, other than "all duties

as may be assigned to you from time to time by the Board of Managers of the Company." 2009 Employment Agreement ¶ 2. The only concrete duty evident from the Agreement is the "License Transfer," which was carefully defined and included a separate salary payment, the "Licensing Assistance Salary." *Id.* ¶ 3(b). Thus, Suer's vague assertion that he "rightfully expected" a certain degree of involvement with DL and was given something less than that is unfounded.

64    *Id.* Plaintiff did not dispute this evidence.

65    Tr. 215 (Suer).

66    *Id.* at 1018 (Paulsen).

67    *Id.* at 959–60 (Paulsen).

68    *Id.* at 961 (Paulsen).

69    *Id.* at 961–63, 1022.

70    *Id.* at 1024–29; *id.* at 219–29 (Suer); DLPA § 6.11; APA § 5.4.3.

71    Tr. 963.

72    *Id.* at 964 (Paulsen).

73    *Id.* at 1034, 1045 (Paulsen).

74    *Id.*

75    JX 86.

76    *Id.*

77    JX 87. Any differences from the draft letter appear to be immaterial.

78    Tr. 965–66. Because of the language in Suer's March 21, 2012 email (JX 87), and the fact that it was sent to certain individuals at DL that Suer knew but Paulsen did not, it is possible that Suer drafted the JX 87 letter, rather than Paulsen. *See* Tr. 186–87 (McCullum). For purposes of my decision, however, I need not resolve that factual dispute.

79    *Id.* at 116 (McCullum).

80    *Id.* at 987–89 (Paulsen). DL apparently has never insisted that the $800,000 balance be paid. *Id.*

81    JX 88, 93, 94, 95, 100.

82    JX 109.

83    *Id.* Paulsen and other North American employees forwarded to Suer a number of communications with DL. *See, e.g.,* JX 117, 120.

84    JX 122; *see also* JX 104 (earlier communications between the same DL attorney and Suer).

85    JX 125.

86    *Id.*

2015 IER Cases 186,616

87    JX 126, 127, 128, 129, 130, 133.

88    Tr. 1231–32 (McCullum). Paulsen's and McCullum's testimony differed as to how many meetings took place between Paulsen and Treese. *See id.* at 999 (Paulsen). McCullum's testimony was more credible in this regard, but it ultimately is immaterial to my decision whether one or two meetings took place or precisely when.

89    *Id.* at 1232–33.

90    *Id.* at 1237.

91    *Id.* at 1237–38.

92    JX 148, 254, 145, 146, 147.

93    Tr. 979.

94    *E.g.,* JX 147.

95    JX 156–164, 168–171, 176–180 (the "Cancellation Letters").

96    JX 155 (emphasis omitted). In this regard, Paulsen testified that he wrote the email, but that Suer sent it (from Suer's own email) because Paulsen "was out of the office or something." Tr. 975. Based on the totality of the documentary and testamentary evidence surrounding these events, I do not find that assertion credible and find, instead, that Suer had a major role in drafting the email.

97    JX 155.

98    JX 162.

99    JX 175. Paulsen also denied that Suer would have written this cancellation notice, suggesting that he "may have sent it to [Suer] for review or something to look at." Tr. 977. As with JX 155, *supra* note 96, Paulsen's explanation is not credible.

100   JX 181.

101   *Id.*

102   JX 190.

103   JX 426; Tr. 44–45 (McCullum).

104   Tr. 1088.

105   *Id.* at 1089.

106   *Id.* at 1087.

107   JX 192–194, 196, 197, 199–203, 205–207, 209–215, 218, 219, 224–230, 244.

108   Tr. 1067 (Paulsen). Based on the documentary evidence, I find that Suer was at least a co-author of these letters. *See, e.g.,* JX 192 ("Tim[,] attached and complete [is] Palm Terrace ... Be there shortly to review[.] Bobby."); JX 204 ("Tim, Please disregard any previous versions of Brentwood this is the final version [sic]. I eliminated x-ray on this one because ... Also I rewrote the lab portion of the letter ... Let me know ... Bobby.").

109   JX 231–243.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 116 of 164
PageID: 245

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

110    JX 245.

111    Tr. 985 (Paulsen).

112    *Id.* at 986.

113    JX 183, 435.

114    Tr. 725 (Treese); JX 435; Tr. 155–56 (McCullum).

115    Defs.' Br. 8.

116    *Id.*

117    JX 102.

118    Tr. 740 (Treese).

119    JX 436. Treese did not recall whether such a conference call took place. Tr. 748.

120    JX 439.

121    Tr. 750–55 (Treese).

122    JX 450. At trial, Treese admitted that his statement to Jones Day in JX 450 was false, as he had "searched his emails quickly," and that it was "a little exaggeration" to say he searched far and wide. Tr. 756. Treese also admitted that he exaggerates from time to time. *Id.*

123    Tr. 743–47 (Treese).

124    *Id.* at 744; *see also id.* at 744–45 ("Q. Were you told why you were going to be terminated? A. No. Q. Did you ask? A. I did. Q. Were you told? A. There were a lot of reasons. Q. Were any cited? A. Nope. Q. Did you accept that answer? A. I did."); *id.* at 776 ("And I had asked you before why you were terminated from DL. A. Yes, sir. Q. And do you have an answer for that yet? A. No. I told you that I had counsel and I was told that there were many reasons. And I was given an offer and I took it. Q. Now, if I remember, you said you didn't ask what the reasons were. A. I said I did ask. Q. You did ask but didn't get an answer? A. I got a lot of answers. Q. What were the answers? A. I don't recall the answers."). Apparently, once Treese found out he was going to be terminated, he understood that an attorney would be hired to represent him, and that he was to communicate only through the attorney regarding this matter. *Id.* at 778.

125    Tr. 745–47 (Treese).

126    JX 249.

127    *Id.* § 3.1(a). Treese also is receiving certain health insurance benefits. *Id.* § 3.1. Suer improperly attempted in his post-trial brief to present evidence of a standard or typical severance package, in an effort to show that Treese's was excessive. DOB 44–45. Because Suer failed to provide advance notice of such evidence in accordance with the Rules and orders of this Court, I have not considered it. McCullum testified that DL's standard practice for such severance payments varied according to the situation. Tr. 178–82.

128    JX 249 § 4.4(b).

129    Tr. 754.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 117 of 164
PageID: 246
Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

130    Tr. 742.

131    JX 118.

132    *Id.*

133    *Id.*

134    Schryver Dep. 11–26, 41–43.

135    Pl.'s Opening Br. ("POB") 28–29; Pl.'s Reply Br. ("PRB") 12.

136    Tr. 699–700. Treese testified that he took that proposal to Mike and Sonia Avedissian, the owners of B.O.N. *Id.*

137    Tr. 1131–32.

138    JX 66.

139    Tr. 701–02; JX 455.

140    Tr. 1132–33 (Suer); *id.* at 998–99 (Paulsen).

141    JX 455.

142    *Id.*

143    Tr. 997–98 (Paulsen); *id.* 1133 (Suer).

144    JX 455; JX 135 (Letter from B.O.N. responding to a letter from DL, in which B.O.N. asserted that it was "in no way affiliated with Suer, nor has it been affiliated with Suer in the past.").

145    PRB 12; *see also* POB 29–30.

146    As discussed *infra* in Section IV, DL's successful Motion for Sanctions did relate to the Treese evidence insofar as Suer deleted his email communications with Treese in early 2012, and at least some of those deletions took place after Suer was under a duty to preserve. DL is thus entitled to an adverse inference against Suer regarding the Treese situation, as it is with the UCI, Town & Country, and CERF Laboratories. As noted below, in terms of UCI and Town & Country, the adverse inference against Suer materially impacted my findings relating to those alleged breaches. *See infra* Section I.C.2.d-e. The evidentiary record as to B.O.N., however, is sufficiently strong that an adverse inference does not cause me to reach a different conclusion. Additionally, as discussed *supra,* there are serious questions about the credibility of Treese's testimony in favor of DL, and I decline to overlook those concerns based on Suer's improper deletion of certain emails. Thus, despite its successful Motion for Sanctions, DL has not proven this particular alleged breach.

147    Tr. 709–10.

148    JX 73.

149    *Id.*

150    Tr. 1137 ("All I said is, 'You can contact them directly.' [Treese] wrote the e-mail. I did not respond to the e-mail. I did not say that you can go out—you know, it's not up to me. It has no bearing on me. I just—all I said to him was, 'If you want to contact them directly, be my guest. Contact them directly.' ").

151    JX 77. Suer explained that, "after I told [Treese] that I could not help him with anything, [he] asked me if I would forward him a copy of the North American facility list to him so that he could directly call any administrator or anybody. And so it was an attached list, just a list of all the facilities. That's all I gave to him, was a list." Tr. 1136–37.

152    JX 78; Tr. 710, 713–16 (Treese).

153    JX 78.

154    *Id.*

155    JX 96. The "BS" referred to in these emails was Suer. Tr. 714, 716 (Treese). I note that Suer did not deny that "BS" referred to him.

156    JX 96.

157    Tr. 716

158    *Id.* at 1134.

159    *Id.* at 1135–36.

160    Tr. 1140–41 (Suer). Suer also notes that the emails do not reference the alleged $10,000 fee, and that he "barely respond[ed] if at all" to those on which he was copied. DAB 41. As explained in the text, it is ultimately immaterial whether the alleged offer of a $10,000 per month consulting fee that Treese referred to actually was received by Suer. Further, I find Suer's minimal or non-existent responses insufficient to absolve him in this regard.

161    JX 423; JX 315; Tr. 716 (Treese); *id.* at 1154 (Suer).

162    Tr. 1061 (Paulsen).

163    Dahl Dep. 114; JX 140.

164    Dahl Dep. 112–15.

165    POB 34–35; JX 98–99.

166    Dahl Dep. 115–34; *see, e.g., id.* at 116 ("Q. Why did you connect UCI to Bobby? A. Bobby was consulting with Tim Paulsen, and since UCI was wanting to be in the business, I made that introduction."); *id.* at 119 ("Q. What did Bobby say upon receiving the UCI proposal? A. To the best of my recollection, I don't recall really discussing the UCI contract with Bobby. It was more with Tim that I had the conversations with. Q. Did Tim indicate that he had discussed it with Bobby? A. I don't recall."); *id.* at 125 ("Q. Was [Suer] giving you insights about UCI? A. He wasn't necessarily talking to me. As you can see, there was some time gap [in the text messages], so we weren't in direct communication. I think probably more so with Tim.").

167    The text messages reflect a relatively small number of communications spread over the period from April through December, 2012. JX 98–99, 221–222. They add little, if anything, to the weight of Dahl's deposition in relation to DL's assertions regarding UCI. Indeed, many of the texts appear to relate to Suer's auditing of bills for North American, and have nothing to do with UCI or other vendors. The April 10, 2012 email from Ewing to Dahl, which Dahl forwarded without comment to Suer, provides no basis for me to conclude otherwise. JX 108.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 119 of 164
PageID: 248

Kan-Di-Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

168    Dahl Dep. 118–19.

169    POB 37.

170    Dahl Dep. 132–33; JX 181.

171    JX 98–99, 221–222.

172    Dahl Dep. 132–37; *id.* at 135–36 ("Q. ... Why are you and [Suer] communicating about Town & Country? ... [A.] Rick [Greene] had called me about Beachside, and so I think I forwarded—I needed Rick's number here ... So I knew Bobby would have the number and so I thought it would be just the easiest thing to text him."). Treese's testimony about Suer's involvement with Town & Country contains no factual information that would cause me to alter my finding in this regard. Tr. 716–17 (Treese).

173    JX 137, 140.

174    See *Sears, Roebuck & Co. v. Midcap,* 893 A.2d 542, 552 (Del. 2006).

175    JX 187.

176    JX 98–99. Dahl's testimony about Suer and CERF comported with what can be gleaned from the face of the texts and email. JX 187; JX 98–99; Dahl Dep. 137–41, 196–97.

177    As noted *supra* in connection with UCI and Town & Country and discussed *infra* in Section IV, DL is entitled to have certain adverse inferences drawn against Suer because DL prevailed on its Motion for Sanctions. I did not rely on such an inference in finding that Suer assisted CERF Laboratories in this regard, but it would reinforce that conclusion.

178    On July 5, 2012, for example, Paulsen stated in an email to several North American facility administrators that: "As you are aware, we have been reviewing proposals from New Lab and Radiology vendors to replace some of our current contractors in southern California. Through this RFP process three new vendors have been identified.... You should see excellent services and a significant reduction in costs with these vendors. But, as always, let us (Bobby Suer or myself) know if that is not the case." JX 181. I therefore reject as unreliable Suer's testimony that North American "never asked me to do anything with replacement vendors." Tr. 431.

179    JX 454.

180    Tr. 107–08 (McCullum); *id.* at 623–26 (Navarro).

181    Tr. 22–23 (McCullum).

182    JX 192 (Aug. 2, 2012 email from Suer to Paulsen).

183    JX 245 (Oct. 5, 2012 email from Dahl to Suer).

184    As discussed *infra* in Section IV, a small number of text messages between Dahl and Suer, which were implicated in DL's Motion for Sanctions, were sent in early December.

185    JX 286.

186    JX 292.

187    Tr. 527 (Suer).

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 120 of 164
PageID: 249

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

188    POB 38–39; PRB 17–18.

189    Tr. 537 (Suer).

190    *Id.* at 308 (Suer) ("Q. ... You wrote that e-mail [JX 292]; isn't that true, sir? A. Yes."). Suer's deposition testimony failed to provide any additional detail. Suer Dep. 325–27 (referring to JX 292; "Q. What was the company with which you were speaking of [sic]? A. I have no idea.").

191    JX 288.

192    POB 38.

193    The parties did not cite to any trial or deposition testimony regarding JX 288 or the incident involving Walter, and the Court knows of none other than that from the Dahl deposition discussed in the text.

194    Dahl Dep. 173.

195    *Id.* at 176–77.

196    Tr. 564–68 (Navarro).

197    *Id.*

198    *Id.* at 853 (Almblade).

199    *Id.*; *id.* at 600 (Navarro).

200    In addition to the motions described in this Section, a number of other motions were filed, argued, and decided in this action. I note here only those that are relevant for purposes of this Memorandum Opinion.

201    Compl. ¶¶ 22–42.

202    *Id.* at Prayer for Relief A–F.

203    *Kan–Di–Ki, LLC d/b/a Diagnostic Labs. v. Suer,* C.A. No. 7937–VCP, at 32 (Del. Ch. June 19, 2013) (TRANSCRIPT).

204    D.I. Nos. 131–132; Joint Stip. II.A.14.

205    D.I. No. 133 Ex. A.; Joint Stip. II.A.15.

206    D.I. No. 215.

207    D.I. No. 220.

208    *Kan–Di–Ki, LLC d/b/a Diagnostic Labs. v. Suer,* C.A. No. 7937–VCP, at 90 (Del. Ch. Sept. 24, 2013) (TRANSCRIPT).

209    *Id.* at 94.

210    *Id.* at 95–96.

211    Tr. 1275–76.

212    Tr. 1289.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 121 of 164
PageID: 250

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

213    PRB 1–2.

214    *J.S. Alberici Constr. Co. v. Mid–W. Conveyor Co.,* 750 A.2d 518, 520 (Del. 2000).

215    6 *Del. C.* § 2708(a); *Total Hldgs. USA, Inc. v. Curran Composites, Inc.,* 999 A.2d 873, 884 (Del. Ch.2009) ("In light of [Section 2708(a) ], Delaware courts will generally honor a contractually-designated choice of law provision so long as the jurisdiction selected is reasonable in light of the parties' contractual objectives.").

216    DLPA § 12.10; APA § 7.6.

217    JX 50; Tr. 404–05 (Suer); *supra* note 25.

218    *E.g., Abry P'rs V, L.P. v. F & W Acq. LLC,* 891 A.2d 1032, 1047 (Del. Ch. 2006).

219    *Id.* at 1048.

220    *See* DLPA, Preamble; APA § 2.5; JX 51.

221    Cal. Bus. & Prof.Code § 16600 ("Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void.").

222    *E.g., Ascension Ins. Hldgs., LLC v. Underwood,* 2015 WL 356002, at *2 (Del. Ch. Jan. 28, 2015) ("[The Restatement (Second) of Conflict of Laws, which Delaware follows,] is generally supportive of choice-of-law provisions, but recognizes that allowing parties to circumvent state policy-based contractual prohibitions through the promiscuous use of such provisions would eliminate the right of the default state to have control over enforceability of contracts concerning its citizens.").

223    Those elements would have to exist under the relevant Restatement analysis for Suer to succeed on his argument. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 ("The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless ... application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.").

224    Cal. Bus. & Prof.Code § 16601 ("Any person who sells the goodwill of a business ... may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on....").

225    *See supra* Section I.B.1–2. The non-competition provisions DL seeks to enforce are found within, and were integral to, the agreements pursuant to which Suer sold the goodwill of his businesses, not within a separate employment agreement. That fact makes this case materially distinct from cases like *Ascension Insurance Holdings,* which Defendant cited in support of Suer's position at oral argument. *Ascension Ins. Hldgs., LLC,* 2015 WL 356002, at *3 ("The evidence does not support a finding that the covenant not to compete found in the EIA was a negotiated part of the asset purchase; thus, it could not have been relied upon by the parties as security against competitive impairment by the seller of the goodwill and assets purchased, which is the sole ground upon which California relaxes its public policy prohibition against covenants not to compete.").

226    *VLIW Tech., LLC v. Hewlett–Packard Co.,* 840 A.2d 606, 612 (Del. 2003).

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 122 of 164
PageID: 251
Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

227  *PharmAthene, Inc. v. SIGA Techs., Inc.,* 2011 WL 4390726, at *13 (Del. Ch. Sept. 22, 2011), *aff'd in part and rev'd in part on other grounds,* 67 A.3d 330 (Del.2013).

228  *Tristate Courier & Carriage, Inc. v. Berryman,* 2004 WL 835886, at *10 (Del. Ch. Apr. 15, 2004) (citing *Research & Trading Corp. v. Pfuhl,* 1992 WL 345465, at *11 (Del. Ch. Nov. 18, 1992)).

229  *Tristate Courier & Carriage, Inc.,* 2004 WL 835886, at *10 (citing *Faw, Casson & Co. v. Cranston,* 375 A.2d 463, 465 (Del. Ch.1977)).

230  *E.g.,* Def.'s Br. 29–35.

231  "When evaluating the reasonableness of a restrictive covenant, a court must consider how the temporal and geographic restrictions operate together. The two dimensions necessarily interact." *Del. Elevator, Inc. v. Williams,* 2011 WL 1005181, at *8 (Del. Ch. Mar. 16, 2011).

232  APA § 1 (defining "*Restricted Area* "). As discussed *infra* in Section III.C, the temporal duration of the Restrictive Covenants is a disputed issue in terms of whether an equitable basis exists for extending their effect. The Non–Competition Provisions were limited expressly to five years. The other Restrictive Covenants are not expressly limited to five years, but arguably are so limited by Section 6.3 of the APA. The parties' competing arguments on that issue, however, are not relevant to the question of enforceability.

233  *See Tull v. Turek,* 147 A.2d 658, 663–64 (Del.1958) (finding reasonable a ten-year non-compete that covered the State of Delaware); *O'Leary v. Telecom Res. Serv., LLC,* 2011 WL 379300, at *5 (Del.Super. Jan. 14, 2011) (finding reasonable a four-year non-compete that covered the entire United States); *Hough Assocs., Inc.,* 2007 WL 148751, at *14 (finding reasonable a five-year non-compete that extended for a fifty-mile radius around plaintiff's business).

234  *Pfuhl,* 1992 WL 345465, at *12.

235  *Id.* (emphasis in original).

236  DL and Suer dispute whether the geographic scope of a reasonable non-compete can extend to areas where a party's business is likely to go. DL cites non–Delaware case law supporting its argument, but I need not dilate further on the issue other than to say that DL has satisfied the relevant analysis as it is articulated in cases like *Pfuhl,* on which Suer heavily relies in this regard. DAB 30–31. If DL's business, in fact, had not expanded to cover nearly all of the states subject to the Restrictive Covenants, the geographical reasonableness of the Covenants might have presented a closer question. But, the facts bore out the expanding and geographically far-flung nature of DL's business in such a way that the parties reasonably could have required Suer to accept a non-compete of the scope and duration prescribed.

237  *Pfuhl,* 1992 WL 345465, at *12; *see also, e.g., Tristate Courier & Carriage, Inc.,* 2004 WL 835886, at *10.

238  *Hough Assocs., Inc.,* 2007 WL 148751, at *14.

239  I discuss the relevant equitable balancing issues raised in this case in more detail *infra,* in connection with my analysis of whether injunctive relief is appropriate.

240  DLPA § 6.11; APA § 5.4.1.

241  As discussed *supra,* Suer had approximately a ten percent profit participation interest in Old DL, which accounted for his being paid $4 million in connection with the DLPA.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 123 of 164
PageID: 252

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

242    Plaintiff asserts that, because Suer was paid for assisting competitors of DL, which Suer denies, he directly engaged in competitive Business. PRB 12. I conclude that that argument, including the factual dispute over whether and how much Suer was paid, is a red herring. Whether or not Suer received payment in exchange for his allegedly impermissible actions does not change the nature of those actions as either *direct* or *indirect* competition. Directly engaging in the proscribed Business would entail the actual provision of mobile diagnostic services to nursing facilities by Suer himself. DL does not assert that Suer, or his employer, North American, provided any such services directly, on their own account—nor could it so assert, based on the record adduced at trial. Assisting or facilitating another in the provision of those services amounts, at most, to *indirectly* engaging in the Business, regardless of whether Suer was paid for his assistance.

243    Def.'s Br. 56–57.

244    DL asserts that Suer also breached the Non–Interference Provision by "failing to refer customer inquiries to DL," and using the deposition of Daniel Almblade to smear DL. POB 49–50; PRB 10. As to the first point, I assume DL is referring to the September 2013 emails involving Suer and a potential replacement lab for a North American facility that had cancelled its contract with DL. Both that situation and the Almblade deposition are discussed *supra* in Section I.C.4. In both situations, the evidence is too weak to prove any breach of the Non–Interference Provision by Suer.

245    My specific conclusion as to Suer's use of DL confidential information in connection with Quality Medical comports with the evidence showing that Suer knew of DL's reliance on certain large customers, and knew that, because of certain pressures from its investors, DL would be willing to negotiate and capitulate to North American's demands for invoice reductions.

246    For reasons I explain more fully *infra,* this aspect of the parties' dispute is overblown and largely irrelevant. Whether the Restrictive Covenants remain in effect or already have expired does not impact the issue of whether Suer breached his obligations under the Covenants during the time period when they indisputably were in effect. I have concluded that he did. Thus, the relevant question becomes what injunctive remedy, if any, is appropriate. The squabble about whether the Restrictive Covenants already expired or still have a few months to run does not materially affect my determination in that regard.

247    POB 56–57.

248    APA § 6.

249    APA § 5.4.1 (emphasis added).

250    *DCV Hldgs., Inc. v. ConAgra, Inc.,* 889 A.2d 954, 961 (Del. 2005).

251    Although I need no other basis to reject DL's argument as to the expiration of the Non–Competition Provisions, I note that, under its interpretation, that Provision theoretically could extend for eternity. Suer could breach before May 20, 2014, triggering a three-year extension, and then breach again just before that extension ran out, and so on. Such an interpretation, however, would lead to an absurd result and thereby violate a basic canon of contract interpretation. *E.g., Osborn ex rel. Osborn v. Kemp,* 991 A.2d 1153, 1159–60 (Del. 2010).

252    *Id.*

253    APA § 6.3 (emphasis added) ("Survival. The representations, warranties, covenants and agreements contained herein will survive for the longer of (i) five years, and (ii) the statute of limitations in respect of the subject matter described herein.").

254    In a transcript ruling at the pre-trial conference, I denied Suer's motion for summary judgment in part on grounds that the Survival Clause was ambiguous. Having now had the benefit of a trial and post-trial briefing,

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 124 of 164
PageID: 253

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)

2015 IER Cases 186,616

I have concluded that the Survival Clause is not ambiguous and should be read as discussed here. That conclusion, however, does not mean that Suer is entitled to judgment as a matter of law, as he contends. *See* discussion on the propriety of injunctive relief here in Section III.D *infra*.

255    APA §§ 5.3, 5.6.

256    As stated *supra* in this Section III.C.1, I read Section 6.3(ii) as relating to the Indemnification obligations in Section 6, rather than any of the Restrictive Covenants in particular. In terms of the Non–Interference Provision, however, I need not even reach that issue.

257    *See supra* Section III.B.1.

258    POB 57–60; PRB 24–28.

259    *E.g.,* POB 1 ("DL, therefore, seeks an order enjoining Suer, for at least two years and five months from the date of judgment, from engaging in activities that are in breach of his covenants.").

260    *Concord Steel, Inc. v. Wilm. Steel Processing Co.,* 2009 WL 3161643, at *14 (Del. Ch. Sept. 30, 2009), *aff'd,* 7 A.3d 486 (Del. 2010).

261    *Hough Assocs., Inc. v. Hill,* 2007 WL 148751, at *14 (Del. Ch. Jan. 17, 2007); *see also, e.g., Cirrus Hldg. Co. v. Cirrus Indus., Inc.,* 794 A.2d 1191, 1201–02 (Del. Ch. 2001) ("[W]here, as here, the plaintiff ultimately seeks relief in the form of a decree of specific performance, the court must keep in mind, in assessing the reasonable likelihood of success, that the plaintiff will bear the burden of establishing its case by 'clear and convincing' evidence.").

262    Def.'s Br. 11; PRB 27. Suer asserts that the reason DL has advanced this issue is because a finding of willfulness here might have an effect in the bankruptcy action in California—*i.e.,* it might strengthen DL's hand in arguing against affording Suer a discharge in that proceeding.

263    PRB 27 n.6.

264    2 JOHN NORTON POMEROY, EQUITY JURISPRUDENCE §§ 363, 397 (5th ed. 1941).

265    *Nakahara v. NS 1991 Am. Trust,* 718 A.2d 518, 522 (Del. Ch. 1998) ("The unclean hands doctrine is aimed at providing courts of equity with a shield from the potentially entangling misdeeds of the litigants in any given case. The Court invokes the doctrine when faced with a litigant whose acts threaten to tarnish the Court's good name. In effect, the Court refuses to consider requests for equitable relief in circumstances where the litigant's own acts offend the very sense of equity to which he appeals.").

266    *See supra* note 226 and related text (identifying elements of a breach of contract claim). Whether the breach was intentional or willful is irrelevant.

267    *Pfuhl,* 1992 WL 345465, at *13.

268    APA § 7.8.

269    DLPA § 12.12.

270    *Hough Assocs., Inc.,* 2007 WL 148751, at *18; *see also id.* ("Measuring the effects of breaches like this involves a costly process of educated guesswork with no real pretense of accuracy. This court has been candid to admit this reality and to use injunctive relief as the principal tool of enforcing covenants not to compete.").

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 125 of 164
PageID: 254

Kan–Di–Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)
2015 IER Cases 186,616

271    *Compare* PRB 1 (seeking injunction "prevent[ing] [Suer] from working for skilled nursing facilities, mobile x-ray vendors, and mobile laboratory vendors."), *and* PRB 35 ("Suer should be enjoined from working for nursing homes, nursing home operating companies, and mobile x-ray and mobile laboratory providers. Under DL's proposed injunction, Suer could work for any vendor that does not compete with DL—for example, an oxygen company such as Pulmocare."), *with* POB 60 ("Suer will continue to cause harm to DL unless he is enjoined from working in the nursing home industry."), *and* POB 63 ("[I]f an injunction is granted, but Suer is permitted to continue working at North American or in the nursing home industry, it will be impossible to ensure his compliance.").

272    Arg. Tr. 50.

273    *Allied Capital Corp. v. GC–Sun Hldgs., L.P.,* 910 A.2d 1020, 1033 (Del. Ch. 2006).

274    D.I. No. 168.

275    Pl.'s Mot. for Sanctions for Suppression or Spoliation (the "Motion for Sanctions") 2; Pl.'s Reply in Supp. of Mot. 15.

276    Def.'s Opp. to Pl.'s Mot for Sanctions 8–9.

277    *Id.* at 12 n.6.

278    *Beard Research, Inc. v. Kates,* 981 A.2d 1175, 1185 (Del. Ch.2009), *aff'd sub. nom. ASDI, Inc. v. Beard Research, Inc.,* 11 A.3d 749, 750 (Del.2010).

279    *Id.* (quotation marks and citation omitted).

280    *Id.*

281    *Id.* at 1191.

282    *TR Investors, LLC v. Genger,* 2009 WL 4696062, at *17 (Del. Ch. Dec. 9, 2009), *aff'd,* 26 A.3d 180 (Del.2011).

283    Pl.'s Reply in Supp. of Mot. 5.

284    Def.'s Mot. to Stay Discovery [D.I. No. 20] 3.

285    *Kan–Di–Ki, LLC d/b/a Diagnostic Labs. v. Suer,* C.A. No. 7937–VCP, at 69 (Del. Ch. May 9, 2013) (TRANSCRIPT); D.I. No. 56; *see also* D.I. No. 50.

286    I am not suggesting that Suer had to go to arguably unreasonable or unduly costly lengths to satisfy his obligations in this regard. If Suer or his counsel had proffered evidence that they had considered whether and how to preserve any evidence that might exist on his cell phone, but concluded in good faith that it would have been impractical to do anything more than exercise care not to lose it, and that he did so but lost the phone anyway, perhaps that would have been enough to avoid a finding of recklessness. But, in the circumstances here, with no evidence to the contrary, I conclude that Suer consciously disregarded the risk that evidence regarding the requested texts might be lost and did nothing to mitigate that risk, even after affirmatively assuring the Court that there was no reason for concern in that regard. *See* Tr. 465–73 (Suer) (discussing measures taken to preserve emails, but not text messages).

287    Def.'s Mot. for Sanctions [D.I. No. 215], Ex. J.

288    DL also accuses Suer of spoliation relating to Pulmocare based on allegations that arose after this Motion for Sanctions was briefed. Those allegations, therefore, are not fully developed in the parties' papers, and have

**Kan—Di—Ki, LLC v. Suer, Not Reported in Atl. Rptr. (2015)**
2015 IER Cases 186,616

not been shown to rise to the level of an independent instance of spoliation. They do confirm, however, that on more than one occasion, Suer took his discovery obligations under the Rules and this Court's orders too casually. The 2014 Discovery Order required Suer to produce, among other things, any evidence relating to his receipt of funds in the skilled nursing industry after January 2010. Yet, Suer never disclosed that he worked for Pulmocare nor appropriately supplemented his responses to interrogatories or requests for production after the 2014 Discovery Order.

289    *See supra* Sections I.C.2.d-e.

290    In this regard, I note that DL devoted just over seven percent of its post-trial briefing to the Motion for Sanctions, and much of that referred back to the earlier briefing.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT I

Lyons Insurance Agency, Inc. v. Wilson, Not Reported in Atl. Rptr. (2018)

2018 IER Cases 353,522

KeyCite Yellow Flag

Distinguished by   North American Fire Ultimate Holdings, LP v. Doorly, Del.Ch.,   March 7, 2025

2018 WL 4677606

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

LYONS INSURANCE AGENCY, INC., Plaintiff,

v.

Howard WILSON and GMG Insurance Agency, Defendants.

C.A. No. 2017-0092-SG
|
Submitted: June 11, 2018
|
Decided: September 28, 2018

**Attorneys and Law Firms**

Michael P. Kelly, Andrew S. Dupre, and Janine L. Faben, of MCCARTER & ENGLISH, LLP, Wilmington, Delaware, Attorneys for Plaintiff.

Herbert W. Mondros and Krista Reale Samis, of MARGOLIS EDELSTEIN, Wilmington, Delaware; OF COUNSEL: Christopher A. Tinari and Michael R. Miller, of MARGOLIS EDELSTEIN, Philadelphia, Pennsylvania, Attorneys for Defendants.

## MEMORANDUM OPINION

GLASSCOCK, Vice Chancellor

**\*1** Madness, Einstein is famously (but apparently inaccurately) credited with saying, is illustrated by doing the same thing repeatedly while expecting different results. The individual defendant here, Howard Wilson, was in 2014 an employee of an insurance brokerage firm, USI Insurance Services ("USI"). Wilson left the employ of USI in July of that year, to work for another brokerage, the Plaintiff here, Lyons Insurance Agency, Inc. ("Lyons"). He brought with him his "book of business;" that is, his relationship with customers who had entrusted him with their insurance business. In fact, many of these customers left USI to become clients of Lyons. Wilson, however, was bound by a non-competition agreement

with USI. USI sued Wilson and Lyons in Pennsylvania state court, and obtained an injunction preventing Lyons and Wilson from providing insurance brokerage to the entities in Wilson's book of business. Lyons was forced to discharge those entities as customers. Nonetheless, and despite the fact that without the book of business, Wilson provided little value to Lyons, Lyons kept Wilson on the payroll during the two-year period of the injunction. Part of Wilson's job was to keep in contact with the entities in the book of business, whom Lyons regarded as prospective customers once the injunction lifted. At the end of two years, Lyons bought out the book of business from USI, terminating the injunction. Lyons paid USI approximately one half million dollars, with the anticipation that Wilson could then encourage the return of the book entities to the Lyons fold.

Wilson, however, doubted his ability to retrieve his former customers, some of whom had engaged another brokerage, GMG Insurance Agency ("GMG"), at Wilson's suggestion during the pendency of the injunction. Instead of working to entice the customers to return to Wilson at Lyons, Wilson took an easier path: He joined GMG and began servicing some of the customers in his book of business there. Wilson, however, has a non-compete provision in his Employment Agreement with Lyons. Lyons sued Wilson and GMG, seeking preliminary injunctive relief. I denied the preliminary injunction, noting that serves as a liquidated damages clause in the Employment Agreement as preclusive of a preliminary finding of irreparable harm. Both sides have filed cross-motions for summary judgement, which I find must be granted in part and denied in part. It is clear, however, that Wilson has breached his non-competition agreement with Lyons, as he had a similar provision in his agreement with USI. What remain are primarily issues relating to remedy, which I find require a more complete record. My reasoning follows.

## I. BACKGROUND

*A. The Parties*

Plaintiff Lyons is an insurance broker that serves clients in Delaware, Pennsylvania, and elsewhere. [1] Lyons is a Delaware corporation with a principal place of business in Wilmington, Delaware. [2]

Defendant Howard Wilson worked for Lyons from July 2014 to August 2016. [3] He executed a Confidentiality, Non-

2018 IER Cases 353,522

Solicitation, and Continuing Compensation Agreement (the "Employment Agreement") with Lyons on July 23, 2014. [4] He left Lyons on August 12, 2016. [5]

**\*2** Defendant GMG is an insurance broker that serves clients in Delaware, Pennsylvania, and elsewhere. [6] Its principal place of business is Bucks County, Pennsylvania. [7] Wilson began working at GMG on August 15, 2016, after leaving Lyons. [8]

### B. Factual Background

#### 1. Wilson joins Lyons

Prior to joining Lyons, Wilson worked as an insurance professional at USI. [9] Because the insurance business is based on personal relationships, insurance professionals such as Lyons are said to have a book of business, which consists of the client and prospective relationships that an insurance professional has made. [10] In July 2014, Wilson left USI to join Lyons, with the intention of bringing his book of business from USI. [11] Prior billings and experience indicated that the annual revenue of Wilson's book of business was over $500,000. [12] Lyons extended an offer of employment to Wilson on July 14, 2014; [13] Wilson accepted and signed the offer and the Employment Agreement on July 23, 2014. [14] The Employment Agreement defines Wilson's book of business (the "Book of Business") as "the customer relationships for which Employee is compensated during the term of his employment." [15] The same provision stipulates that the Book of Business is the property of Lyons, not Wilson. [16]

Approximately three-quarters of the clients in Wilson's Book of Business followed him from USI to Lyons. [17] Shortly thereafter, USI sued Wilson and Lyons in Pennsylvania state court, alleging breach of a non-competition agreement between Wilson and USI (the "USI litigation"). [18] Lyons had been aware of that non-competition agreement when it hired Wilson. [19] Although in the insurance brokerage industry an employer will often purchase a new employee's Book of Business from her previous employer, USI would not agree to a buyout and instead sought an injunction. [20]

The Pennsylvania court issued a preliminary injunction on August 8, 2014 (the "USI injunction"). [21] As a result, neither Wilson nor Lyons could service Wilson's USI clients. [22] The clients who had followed Wilson to Lyons were dispersed among other brokers, and Lyons encouraged Wilson to help them select new brokers. [23] At Wilson's suggestion, some of his former clients went to GMG. [24] Lyons paid for all of Wilson's expenses in the USI litigation. [25]

#### 2. Wilson's Employment at Lyons

In the two-year period that Wilson was employed at Lyons and the USI injunction was in place, Lyons paid Wilson an annual salary of $205,000, a $50,000 signing bonus, life, health, and disability insurance, and contributions to a 401(k) plan. [26] This salary was based, at least in part, on the value of the Book of Business that Wilson was supposed to have brought from USI to Lyons, but which was subject to the two-year USI injunction. [27] Lyons did not increase Wilson's salary after his first year at Lyons, as was contemplated (but not required) by Wilson's Employment Agreement. [28]

**\*3** While employed with Lyons, Wilson continued to contact and to meet with his former clients to the extent that the USI injunction would allow. [29] Maintaining those relationships was part of his employment duties. [30] Wilson was also expected to cultivate relationships with "prospects" in order to bring new business to the firm. [31] Prospects, as the name suggests, are potential clients with whom insurance brokers build relationships in the hopes of gaining new business. [32] Lyons paid for Wilson to attend meetings in Las Vegas, the Bahamas, and elsewhere, in order to maintain contact with his former clients and his prospects. [33] Contrary to Lyons' and Wilson's prior expectations, Wilson generated no income from his Book of Business because of the USI injunction. [34] Furthermore, he generated only $30,000 to $40,000 in new business during his employment with Lyons. [35]

#### 3. Wilson Leaves Lyons

On July 18, 2016, Lyons paid USI $525,000 to settle the USI litigation. [36] Consequently, the USI injunction was lifted and its non-competition requirements ended. [37] Wilson contacted

2018 IER Cases 353,522

the largest client in his Book of Business, OTG Management, Inc. ("OTG"), which was then serviced by GMG, to gauge OTG's interest in moving from GMG to Lyons. [38] OTG informed Wilson that it would not move its business at that time. [39] At that point, Wilson felt as though his "career was in balance." [40] Wilson took a vacation in July 2016. [41] Thereafter, Wilson resigned from Lyons effective on August 12, 2016. [42] He began employment with GMG on August 15, 2016. [43]

As part of his employment at GMG, Wilson serviced clients that were previously part of his Book of Business when he moved from USI to Lyons, but which were serviced by GMG following the USI injunction. [44] OTG was one such moved client. [45] The annual revenue of the moved clients was approximately $500,000. [46]

After he began working for GMG, Wilson contacted several of Lyons' existing clients using his GMG email address. [47] These were clients whose business Wilson had generated while employed at Lyons. [48] When contacting one such Lyons client, CODi, Wilson asked his contact at CODi to send him a copy of CODi's policy with Lyons. [49] Also, on October 4, 2016, Wilson circulated a spreadsheet to his GMG colleagues detailing Lyons business that Wilson hoped to move to GMG. [50] On December 21, 2016, Wilson met with a Lyons representative. [51] At that meeting, Wilson asked if Lyons would be willing to enter into an agreement that would allow Wilson and GMG to buy out the Lyons clients that Wilson had previously serviced. [52] Lyons declined, and those clients remained with Lyons. [53]

### 4. The Employment Agreement

When Lyons hired Wilson in July 2014, he signed the Employment Agreement that is at the heart of this dispute. [54] In entering the Employment Agreement, Wilson acknowledged that Lyons is engaged in a competitive industry, that Wilson would have access to proprietary and confidential information, that Wilson must keep that information in strict confidence, and that Lyons would be financially harmed if Wilson subsequently became employed by one of Lyons' competitors. [55]

The Employment Agreement contained a confidentiality provision that applied to Lyons' proprietary and confidential information, including customer and prospect identities and contact information, terms of customer and supplier contracts and proposals, and pricing policies. [56] Under the confidentiality provisions,

> **\*4** [a]t all times during and after Employee's employment with Lyons, Employee will not disclose or communicate any of the Proprietary Information to any competitor or other third party, or use or refer to any of the Proprietary Information for any purpose.... Employee understands that these provisions apply even to information of this type that is developed or conceived by Employee, alone or with others, at Lyons's instruction or otherwise. [57]

The Employment Agreement also prohibited Wilson from engaging in competitive behavior. It defined competitive behavior as, among other things, "engaging in activity ... that is competitive with any business conducted by Lyons at the time of [Wilson's] termination of employment or any business that Lyons proposed to be conducted during [Wilson's] employment with Lyons, or engaging in an activity that would be a violation of Section 4.3," the Employment Agreement's Non-Solicitation and Non-Hire Provision. [58] Section 4.3, in turn, prohibited Wilson from "impair[ing] or attempt[ing] to impair any relationship, whether contractual or otherwise, between the Company or any of the Company's subsidiaries and any other person or entity (including, without limitation, customers, prospective customers, and suppliers)." [59] This provision would remain in effect for two years after termination of Wilson's employment with Lyons. [60]

I surmise, based on this record, that insurance brokerages monetize their client services through receipt of commissions based on insurance premia paid by clients to insurance carriers. [61] The Employment Agreement contained a buyout provision that would take effect if Wilson left Lyons to work

2018 IER Cases 353,522

for a competitor and took some of his Book of Business with him. [62] This would be deemed "Moved Business," which the Employment Agreement defined as "the annualized amount of commissions generated by the portion of the Book of Business moved to Employee's new employer ... at the time such portion of the Book of Business is moved to Employee's new employer." [63] In the case of moved business, Wilson was to pay Lyons "an amount equal to 1.5 times the Moved Business." [64] This provision would apply for two years after Wilson's employment with Lyons terminated. [65]

### C. This Litigation

Lyons filed this action on February 7, 2017. Count I of Lyons' complaint seeks to hold Wilson liable for breach of contract. It alleges that Wilson engaged in competitive behavior, that he serviced his Book of Business at GMG, that he used Lyons' confidential information, and that he failed to pay the "purchase price" for the Book of Business, all in breach of the Employment Agreement. [66] Count II alleges that by his actions, Wilson breached the covenant of good faith and fair dealing. [67] In Count III, Lyons seeks what it denominates "quantum meruit" relief from Defendant Wilson in the amount of $525,000, the cost Lyons bore from the USI litigation. [68] Count IV seeks to hold Defendant GMG liable for aiding and abetting Wilson's breach of the Employment Agreement. [69] Count V seeks to hold the Defendants liable for unjust enrichment regarding the moved clients, [70] while Count VI seeks to hold the Defendants liable for civil conspiracy to deprive Lyons of its relationships with the moved clients. [71] Finally, Count VII seeks to hold Defendant GMG liable for tortious interference with contract and prospective economic relations, caused by GMG's alleged interference in the Employment Agreement that existed between Wilson and Lyons. [72] The Defendants' counterclaim seeks to hold Lyons liable for tortious interference with prospective contractual relations, which is allegedly the result of Lyons' filing the present suit. [73]

**\*5** I granted Lyons' Motion to Expedite on February 28, 2017. On July 12, 2017, I denied Lyons' Motion for a Preliminary Injunction. On August 8, 2017, Lyons moved for Summary Judgment on all counts. [74] I granted the Defendants' Motion to Allow Discovery on October 11, 2017, and I granted the Defendants' Motion for a Protective Order and to Quash Subpoena on December 14, 2017. After the

completion of discovery, on February 23, 2018, Lyons filed a Renewed Motion for Summary Judgment on Counts I, II, and VII. [75] Also on February 23, 2018, the Defendants filed a cross-Motion for Summary Judgment on all counts. [76] I heard oral argument on these Motions on June 11, 2018, at which time the parties agreed that there were no genuine issues of material fact. [77]

## II. ANALYSIS

Under Court of Chancery Rule 56, summary judgment will be granted if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." [78] The moving party bears the initial burden of demonstrating the "absence of a material factual dispute." [79] If the moving party makes this initial showing, "the burden shifts to the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial." [80] In reviewing a summary judgment motion, the Court "must view the evidence in the light most favorable to the non-moving party." [81] Thus, the Court must deny a request for summary judgment "if there is any reasonable hypothesis by which the opposing party may recover, or if there is a dispute as to a material fact or the inferences to be drawn therefrom." [82]

Where, as here, the parties have filed cross-motions for summary judgment and have not argued that a material issue of fact exists, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." [83] Nevertheless, "even when presented with cross-motions for summary judgment, a court must deny summary judgment if a material factual dispute exists." [84]

### A. The Employment Agreement is Enforceable

The Defendants contend that the Employment Agreement is overbroad and therefore unenforceable. Under Delaware law, a covenant not to compete must: (1) be reasonable in geographic scope and temporal duration, (2) advance a legitimate economic interest of the party seeking its enforcement, and (3) survive a balancing of the equities in order to be enforceable. [85]

This Court has previously held that it "may, in the appropriate circumstances, enforce an agreement without

2018 IER Cases 353,522

express territorial scope."[86] This is particularly true when an employer's non-compete agreement prohibits an employee from engaging in activity that is "in competition with" the employer's business, as opposed to prohibiting activity that is "similar to" that business.[87] Under this Court's precedent, non-compete agreements that prohibit conduct that is "in competition with" the employer's business or that prohibit soliciting the employer's clients "inherently establish a geographic limit that ultimately protects the legitimate economic interests of the employer and provide a reasonable and foreseeable basis for ascertaining the territorial scope of the covenant not to compete, even if no geographic limitation is expressly set forth in the agreement."[88]

**\*6** The Defendants posit that the Employment Agreement is unenforceable because, although it has a temporal limitation of two years, it has no specific geographic limitation.[89] That is incorrect. The Employment Agreement at issue in this case prohibits Wilson from impairing Lyons' relationships with any of its customers or prospective customers. It uses language that bars competition: it prohibits Wilson from engaging in "activity that is *competitive with* any business conducted by Lyons at the time of [Wilson's] termination of employment."[90] This is not a blanket prohibition on Wilson working elsewhere; rather, it protects Lyons' legitimate economic interests.[91] Such a restriction is enforceable under Delaware law.[92]

### B. Lyons' Claims

Lyons' complaint contained various allegations against Wilson, against GMG, and against the Defendants together, all of which relate to GMG's hiring Wilson on August 15, 2016, and the Defendants' subsequent conduct. I will discuss these claims in turn.

### 1. Wilson's Breach of the Employment Agreement

Lyons alleges that Wilson breached the Employment Agreement when he quit Lyons and joined GMG.[93] Specifically, Wilson purportedly breached the agreement by working for GMG and servicing Lyons prospects at GMG, by failing to pay the purchase price for his Book of Business when he left Lyons for GMG, and by using Lyons' confidential information.[94]

To succeed on its breach of contract claim, Lyons must show that there was a valid contract, breach of an obligation imposed by that contract, and resulting damages.[95] As I have discussed, the Employment Agreement between Lyons and Wilson is valid and enforceable. Thus, the next question is whether there was a breach of obligations imposed by that Agreement. To answer this question, I look to the terms of the Employment Agreement.[96]

### a. Competitive Behavior

Section 3.3.2 of the Employment Agreement prohibits Wilson from engaging in "Competitive Behavior."[97] This includes working for a company that engages in business that is competitive with Lyons' business within two years of leaving Lyons, as well as attempting to "impair any relationship, contractual or otherwise," between Lyons and its customers or prospective customers.[98] The prohibition on competitive activity continues for two years after an employee leaves Lyons, and the prohibition on interfering with Lyons' customer and prospective customer relationships has no specified end date.[99]

"Prospective customer" is not defined in the contract.[100] The parties have somewhat different interpretations; they agree that this term, at minimum, refers to the companies whose business Lyons is actively soliciting; thus, it is broader than a broker's actual clients.[101] Still, the parties disagree about which companies should be considered Lyons' prospective customers at the time Wilson left Lyons.[102]

**\*7** I find that Wilson breached the obligations imposed by the Employment Agreement. Lyons hired Wilson with the expectation that he would bring some of his Book of Business from USI to Lyons, which in fact would have occurred absent the USI injunction. Lyons paid Wilson's salary for two years while the injunction was in place, and it paid all of Wilson's legal fees associated with the USI injunction, to protect its interest in Wilson's Book of Business. Promptly after Lyons bought the Book of Business from USI and the injunction lifted, Wilson quit Lyons. He immediately began working for GMG, where he serviced clients who were in his Book of Business, without compensating Lyons for its interest in the Book of Business—an interest demonstrated by Lyons' investment in the Book of Business throughout the previous two years.

While it is true that Wilson's Book of Business dispersed to other brokers during the USI injunction, Wilson did not make a sincere effort to encourage that business to join Lyons' clientele after the injunction lifted, nor did he make a sincere effort to achieve any return on Lyons' investment in the Book of Business. Although at the moment the USI injunction lifted, none of the Book of Business was a Lyons customer, Wilson agrees that the companies in his Book of Business were Lyons prospects after the injunction lifted on July 18, 2016. [103] The Defendants apparently contend that although these companies were Lyons' prospects on July 18, 2016, they ceased to be Lyons' prospects less than a month later when Wilson joined GMG. They point to the fact that the largest client in the Book of Business told Wilson it would not move from GMG to Lyons *at that time*. [104] The Defendants' theory as to how this negates the entire Book of Business's status as prospects remains unclear to me.

Accordingly, the Book of Business entities must be considered prospective customers of Lyons as of August 12, 2016, the date Wilson left Lyons. [105] By servicing his Book of Business at GMG, Wilson helped ensure that none of those clients would move to Lyons. As such, he impaired Lyons' relationships with its prospective customers, in breach of the Employment Agreement. [106]

### b. Lyons' Confidential Information

Section 2 of the Employment Agreement is titled "Confidentiality." [107] It states that "at the outset of and during [Wilson's] employment with Lyons, Lyons will provide and teach [Wilson], and [Wilson] will have access to ... information that is proprietary and confidential to Lyons." [108] It prohibits Wilson from using or referring to any such confidential information "for any purpose," unless in furtherance of his employment with Lyons. [109] Lyons posits that Wilson breached this provision by using Lyons' confidential information to "capitalize" on Wilson's relationships with Lyons' customers and prospective customers. [110] Specifically, breach occurred when Wilson emailed Lyons' customer, CODi, to inquire about its policy with Lyons, and when he shared names of Lyons' clients with GMG as potential GMG prospects. [111]

**\*8** I find that Wilson did not breach the Employment Agreement with respect to Lyons' confidential information. First, Wilson did not breach the Employment Agreement by accessing Lyons' customer identities, because that information is, put simply, not confidential or proprietary. The record indicates that the insurance brokerage industry is small and competitive. [112] I find that the various brokers' client lists (as distinguished from proposals, policies, and other similar, confidential information) are common knowledge in the industry. [113] Thus, because customer identities are available not just to Lyons employees, but also to outsiders, Wilson could not have breached the confidentiality provision of the Employment Agreement by using Lyons' customer identities for GMG's benefit.

Wilson also did not breach the Employment Agreement as it relates to the terms of customer contracts because he did not use any of Lyons' confidential information. The language of the Employment Agreement only prohibits Wilson from using confidential information that he acquired within the scope of his employment with Lyons. While Wilson likely had access to policy information for CODi and other Lyons clients during his employment at Lyons, Wilson did not take that information with him to GMG. Instead, after he was employed with GMG, Wilson emailed Lyons' client (or clients)—using his GMG email address— and asked those clients to provide him with their Lyons policy information. [114] The contract between Lyons and Wilson does not (and cannot) prohibit clients from disclosing their own policy information to Lyons' competitors. Therefore, Wilson did not breach the Employment Agreement with respect to Lyons' confidential information.

### 2. Aiding and Abetting

It is well established that "Delaware law does not recognize the concept of aiding and abetting a breach of contract." [115] For that reason, Lyons' claim that GMG aided and abetted Wilson's breach of the Employment Agreement must be denied. The Defendants' Motion for Summary Judgment is granted on this count.

### 3. Tortious Interference

Tortious interference requires Lyons to show the existence of (1) a contract, (2) about which the particular defendant knew,

2018 IER Cases 353,522

(3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, and (5) which causes injury. [116]

Lyons alleges that GMG tortiously interfered with the Employment Agreement between Lyons and Wilson. [117] As I have already explained, the Employment Agreement is a valid contract, and Wilson is in breach. However, the factual record is not sufficiently developed as to whether GMG's actions satisfy the remainder of the tortious interference requirements. Accordingly, summary judgment on the tortious interference claim is denied. The claim remains.

### 4. Unjust Enrichment

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity or good conscience." [118] To recover on a claim for unjust enrichment, a plaintiff must demonstrate: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law. [119] Nevertheless, when "a contract comprehensively governs the parties' relationship, then it alone must provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied." [120]

*9 A contract comprehensively governs the dispute between Lyons and Wilson. As such, Wilson's Motion for Summary Judgment on the unjust enrichment count must be granted. As to the dispute between Lyons and GMG, Lyons did not argue that GMG was unjustly enriched in either its Renewed Motion for Summary Judgment or in its Answer to the Defendants' Motion for Summary Judgment, nor did it address unjust enrichment at oral argument. [121] I consider issues not so addressed to be waived. [122] For these reasons, the Defendants' Motion regarding the unjust enrichment claim must be granted.

### 5. Civil Conspiracy

Civil conspiracy requires Lyons to show (1) a confederation or combination of two or more persons, (2) an unlawful act done in furtherance of the conspiracy, and (3) that the conspirators caused actual damage to the plaintiff. [123] Lyons did not address civil conspiracy in its Renewed Motion for Summary Judgment, nor did it discuss civil conspiracy in its Answering Brief in Opposition to the Defendants' Motion for Summary Judgment. Lyons' claim is therefore waived. As such, as to this claim, the Defendants' Motion for Summary Judgment is granted.

### C. Remedy

Having found that Wilson breached the Employment Agreement, potentially with the tortious assistance of GMG, the question of the appropriate remedy remains. The parties have touched on the issue of damages, but it remains unclear to me what damages should be awarded under the unusual facts of this case, absent further development of the record. Lyons originally sought injunctive relief. Following the hearing on Lyons' request for a preliminary injunction, however, I found that the "buyout" provision of the Employment Agreement—discussed below—functioned as a liquidated damages clause, and prevented a finding of threatened irreparable harm, and thus injunctive relief, at that stage of the proceedings. That was a preliminary ruling, however, and a final injunction remains a viable remedy to the extent the facts warrant.

In the Employment Agreement, the parties agreed that Lyons would be financially harmed if Wilson became employed with a competitor. [124] Additionally, the Employment Agreement contains a "Purchase of Book" buyout provision, referenced above, that functions as a liquidated damages agreement. That provision states that if Wilson becomes employed with a competitor, and some or all of the Book of Business moves to the competitor "as a result" of the change in employment, he will owe Lyons 1.5 times the annual revenue of any "moved business." [125] Several clients, such as OTG, did move from Lyons to GMG; however, those clients moved as a result of the USI injunction, together with Wilson's advice to so move, given during his employment with, and at the behest of, Lyons. The record is unclear as to how the parties intended the buyout provision to work in this scenario. I note that the breach here is Wilson's anti-contractual competition through soliciting and servicing "prospective" Lyons clients from the Book of Business. The list comprising prospective clients is broader than the "moved clients" defined in the buyout, under the peculiar scenario here. I find that Lyons has suffered compensable damages as a result of the breach, but on this record I remain uncertain of the quantum of damages

2018 IER Cases 353,522

compensable and how that amount is guided or cabined by the buyout provision. If damages are not ascertainable, injunctive relief, for a period tolled by this action, remains a potential remedy.

**\*10** The parties should confer regarding the appropriate remedy. By October 22, 2018, the parties should inform me whether they have been able to reach an agreement, or whether further Court involvement is needed and what that involvement might entail.

### III. CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for Summary Judgment is granted in part and denied in part, and the Defendants' Motion for Summary Judgment is granted in part and denied in part. The parties should submit an appropriate form of order.

### All Citations

Not Reported in Atl. Rptr., 2018 WL 4677606, 2018 IER Cases 353,522

---

### Footnotes

1    June 14, 2017 Hr'g Tr. at 9:10–20, 15:17.

2    Compl. ¶ 4.

3    June 14, 2017 Hr'g Pl. Ex. 2; June 14, 2017 Hr'g Tr. at 50:9–12.

4    June 14, 2017 Hr'g Pl. Ex. 2, Confidentiality, Non-Soliciation, and Continuing Compensation Agreement [hereinafter, "Employment Agreement"].

5    June 14, 2017 Hr'g Tr. at 50:9–12.

6    *Id.* at 16:1–8, 139:1–5.

7    *Id.* at 47:9–11.

8    *Id.* at 136:8.

9    June 14, 2017 Hr'g Tr. at 28:1–12.

10    *Id.* at 19:6–10.

11    *Id.* at 106:9–20.

12    *Id.* at 30:3–7.

13    June 14, 2017 Hr'g, Pl. Ex. 1.

14    June 14, 2017 Hr'g, Pl. Ex. 2, Employment Agreement.

15    *Id.* § 4.1.

16    *Id.*

17    June 14, 2017 Hr'g Tr. at 30:19–20, 31:23–32:4.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 136 of 164
PageID: 265

Lyons Insurance Agency, Inc. v. Wilson, Not Reported in At. Rptr. (2018)
2018 IER Cases 353,522

18    *Id.* at 32:24–33:3.

19    *Id.* at 106:21–22.

20    *Id.* at 31:4–7.

21    June 14, 2017 Hr'g, Pl. Ex. 3.

22    June 14, 2017 Hr'g Tr. at 96:12–22.

23    *Id.* at 35:13–15, 36:11–14.

24    *Id.* at 94:5–7, 116:21.

25    *Id.* at 40:16–22.

26    *Id.* at 40:12–15; June 14, 2014 Hr'g, Pl. Ex. 1.

27    June 14, 2017 Hr'g Tr. at 40:5–22.

28    *Id.* at 77:17–78:5; June 14, 2017 Hr'g, Pl. Ex. 1 ("On your one year employment anniversary ... and pending approval from your manager and the CEO, David Lyons, Sr., your annual salary will increase to $230,000.").

29    June 14, 2017 Hr'g Tr. at 37:15–23.

30    *Id.*

31    *Id.* at 37:8–14.

32    *Id.* at 13:9–24.

33    *Id.* at 39:7–11, 102:7–13.

34    *Id.* at 52:3–16.

35    *Id.* at 78:19–24, 81:20–23.

36    *Id.* at 40:16–22.

37    *Id.* at 159:6–11.

38    *Id.* at 163:13–17.

39    *Id.*

40    *Id.* at 164:10–11.

41    *Id.* at 44:24–45:1, 161:7–9.

42    *Id.* at 46:1–2, 162:5–9.

43    *Id.* at 136:7–8, 162:8–9.

44    *Id.* at 162:10–163:9.

45    *Id.*

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 137 of 164
PageID: 266
Lyons Insurance Agency, Inc. v. Wilson, Not Reported in Atl. Rptr. (2018)
2018 IER Cases 353,522

46    *Id.* at 29:16–30:7, 151:3–8.

47    *Id.* at 53:11–55:10.

48    *Id.* at 67:14–17.

49    June 14, 2017 Hr'g, Pl. Ex. 8.

50    June 14, 2017 Hr'g, Pl. Ex. 10.

51    June 14, 2017 Hr'g Tr. at 68:11–19.

52    *Id.*

53    *Id.* at 69:8–10.

54    June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement.

55    *Id.* §§ 1.3–1.8.

56    *Id.* §§ 2.1–2.3.

57    *Id.* § 2.

58    *Id.* § 3.3.2.

59    *Id.* § 4.3(iii).

60    *Id.* § 4.3.

61    *See, e.g.*, June 14, 2017 Hr'g Tr. at 11:2–7, 13:13–14.

62    June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 4.1.

63    *Id.* § 3.3.5.

64    *Id.* § 4.1

65    *Id.*

66    Compl. ¶¶ 54–61.

67    *Id.* ¶¶ 63–68.

68    *Id.* ¶¶ 69–72.

69    *Id.* ¶¶ 73–77.

70    *Id.* ¶¶ 78–83.

71    *Id.* ¶¶ 84–89.

72    *Id.* ¶¶ 90–94.

73    Defs. Answer ¶¶ 1–14.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 138 of 164
PageID: 267
Lyons Insurance Agency, Inc. v. Wilson, Not Reported in A... Rptr. (2018)
2018 IER Cases 353,522

74    Pl. Mot. for Summ. J. at 33.

75    Pl. Renewed Mot. for Summ. J. at 37.

76    Defs. Mot. for Summ. J. at 39.

77    June 11, 2018 Oral Arg. Tr. at 3:13–17, 24:19–20.

78    Ct. Ch. R. 56(c).

79    *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346, 356 (Del. Ch. 2008) (quoting *Levy v. HLI Operating Co.*, 924 A.2d 210, 219 (Del. Ch. 2007) ).

80    *Id.*

81    *Merrill v. Crothall-American, Inc.*, 606 A.2d 96, 99 (Del. 1992).

82    *In re El Paso Pipeline Partners, L.P. Derivative Litig.*, 2014 WL 2768782, at *8 (Del. Ch. June 12, 2014) (quoting *Vanaman v. Milford Mem'l Hosp., Inc.*, 272 A.2d 718, 720 (Del. 1970) ).

83    Ct. Ch. R. 56(h).

84    *Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1119 (Del. Ch. 2008).

85    *Concord Steel, Inc. v. Wilm. Steel Processing Co., Inc.*, 2008 WL 902406, at *4 (Del. Ch. Apr. 3, 2008).

86    *Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *12 (Del. Ch. Oct. 23, 2002).

87    *Id.* at *13; *see also All Pro Maids, Inc. v. Layton*, 2004 WL 1878784, at *5 (Del. Ch. Aug. 9, 2004) *aff'd*, 880 A.2d 1047 (Del. 2005).

88    *Del. Exp. Shuttle*, 2002 WL 31458243, at *12.

89    Def. Mot. for Summ. J. at 21–22.

90    June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 3.3.2 (emphasis added).

91    *Compare Res. & Trading Corp. v. Pfuhl*, 1992 WL 345465, at *12 (Del. Ch. Nov. 18, 1992) (upholding a non-compete agreement that prohibited an employee from engaging in activity that "competes with" the employer's business) *with Caras v. Am. Original Corp.*, 1987 WL 15553, at *1–2 (Del. Ch. July 31, 1987) (a non-compete agreement that prohibited an employee from engaging in activity "similar to the employer's business" was not valid).

92    *See Del. Exp. Shuttle*, 2002 WL 31458243, at *12–13.

93    Pl. Renewed Mot. for Summ. J. at 20–32.

94    Compl. ¶ 57.

95    *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

96    *See Ostroff v. Quality Serv. Labs, Inc.*, 2007 WL 121404, at *11 (Del. Ch. Jan. 5, 2007) ("A contract's express terms provide the starting point in approaching a contract dispute.").

97    June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 3.3.2.

Lyons Insurance Agency, Inc. v. Wilson, Not Reported in Atl. Rptr. (2018)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 139 of 164
PageID: 268

2018 IER Cases 353,522

98    *Id.* §§ 3.3.2, 4.3.

99    *Id.*

100    *See generally* June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement.

101    June 14, 2017 Hr'g Tr. at 13:9–14, 166:16–21.

102    *See, e.g., id.* at 77:1–6, 132:11–17, 163:22–24.

103    *Id.* at 160:12–22.

104    *See id.* at 164:13–14 (an OTG representative told Wilson, "I'm not leaving in the middle of my policy period").

105    *Id.* at 162:5–9. I need not address the counterfactual scenario where Wilson made a rigorous effort to return his Book of Business to Lyons, yet failed. That is not what happened here; Wilson made no such effort, and instead left Lyons mere weeks after the USI injunction lifted.

106    Lyons posits that even if Wilson did not breach the Employment Agreement, his servicing the Book of Business at GMG constitutes a breach in the implied covenant of good faith and fair dealing. Pl. Renewed Mot. for Summ. J. at 30–32. Because I find that Wilson breached the Employment Agreement, I need not address Lyons' alternative argument.

107    June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 2.

108    *Id.* § 1(5).

109    *Id.* § 2.

110    Pl. Renewed Mot. for Summ. J. at 21–22.

111    June 14, 2017 Hr'g Tr. at 53:11–54:16, 146:22–24; June 14, 2017 Hr'g, Pl. Ex. 8.

112    *Id.* at 11:2–7; 13:13–14.

113    *Id.* at 12:1–18. The record in this case contains abundant evidence to this point. In the insurance brokerage industry, clients fluidly move from one broker to another. An astute employee will monitor these changes, so that information can be used to convert prospective clients into clients.

114    June 14, 2017 Hr'g Pl. Ex. 8.

115    *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 658 (Del. Ch. 2012) (citing *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002) ).

116    *WaveDivision Hldgs, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012).

117    Pl. Renewed Mot. for Summ. J. at 32–34.

118    *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988).

119    *Jackson Nat'l Life Ins. Co. v. Kennedy*, 741 A.3d 377, 393–94 (Del. Ch. 1999) (citing *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 585 (Del. Ch. 1998) ).

120    *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009).

121    *See generally* Pl. Renewed Mot. for Summ. J.; Pl. Answering Br. in Opp'n to Def. Mot. for Summ. J.; June 11, 2018 Hr'g Tr.

122    *See In re Crimson Exploration S'holder Litig.*, 2014 WL 5447419, at *26 (Del. Ch. Oct. 24, 2014) (waiving the plaintiffs' claim where they "did not mention [the claim] in their Opposition Brief or at the Argument") (citing *Emerald Partners v. Berlin*, 2003 WL 21003437, at *43 (Del. Ch. Apr. 28, 2003) ).

123    *Allied Capital Mgmt. Corp. v. GC-Sun Holdings, L.P.*, 910 A.3d 1020, 1036 (Del. 2006).

124    June 14, 2017 Hr'g Pl. Ex. 2, Employment Agreement § 1.8.

125    *Id.* § 4.1.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT J

Poretskin v. Chanel, Inc., Not Reported in Fed. Supp. (2024)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 142 of 164
PageID: 271

2024 WL 714232
Only the Westlaw citation is currently available.

**NOT FOR PUBLICATION**

United States District Court, D. New Jersey.

Courtney PORETSKIN, Plaintiff,

v.

CHANEL, INC., et al., Defendants.

Civil Action No. 23-22613 (SDW) (MAH)
|
Signed January 29, 2024

**Attorneys and Law Firms**

Mark A. Mulick, Mark Mulick, Esq., P.A., West Caldwell, NJ, for Plaintiff.

Arnold Gewan Sooklall, New Brunswick, NJ, Anthony M. Rainone, Brach Eichler LLC, Roseland, NJ, for Defendant Chanel, Inc.

**REPORT AND RECOMMENDATION**

Michael A. Hammer, United States Magistrate Judge

## I. INTRODUCTION

**\*1** This matter is before the Court on Plaintiff's motion to remand. *See* Pl.'s Mot. to Remand, D.E. 8. Defendant Chanel, Inc. ("Chanel") opposed the motion and filed a cross-motion to dismiss this action and compel arbitration or, alternatively, transfer this matter to the United States District Court for the Southern District of New York. Cross Mot. to Dismiss. D.E. 11. The Honorable Susan D. Wigenton, United States District Judge, referred these motions to the Undersigned for a Report and Recommendation. Pursuant to Federal Rule of Civil Procedure 78, and Local Civil Rule 78.1, the Court decided these motions without oral argument. For the reasons set forth below, the Undersigned respectfully recommends that the District Court deny Plaintiff's motion to remand, grant Chanel's request to transfer this matter to the Southern District of New York, and deny without prejudice Chanel's request to dismiss this action and compel arbitration.

## II. BACKGROUND

On October 5, 2023, Plaintiff filed a two-count Complaint in the Superior Court of New Jersey, Law Division, Middlesex County, against Defendants Chanel, Carl Poulter ("Poulter"),

Lisa Gasperini ("Gasperini"), and various John Does. Notice of Removal, Ex. 1, Compl., D.E. 1-1. Plaintiff filed a First Amended Complaint on November 16, 2023. *Id.*, Ex. 2, Am. Compl., D.E. 1-2. According to the First Amended Complaint, Chanel employed Plaintiff starting in 2010. *Id.* at ¶ 4. Plaintiff rose through the ranks at Chanel and, by April 2022, she was the Director of Fashion Quality and Aftersales. *Id.* In that capacity, Plaintiff reported to Carl Poulter, who oversaw fashion, fine jewelry supply chains, watches, and aftersales. *Id.* In turn, Mr. Poulter reported to Jose Monsanto. *Id.* Lisa Gasperini was a Human Resources Representative for Chanel. *Id.* at ¶ 3.

According to the First Amended Complaint, in or around April 2022, Defendant Poulter began to discriminate against Plaintiff on the basis of her gender, and subjected her to sexual harassment, and disparate treatment. *Id.* at ¶¶ 8-19. Plaintiff asserts that when she complained of the treatment, she suffered retaliation, particularly by Poulter. *Id.* Thereafter, she experienced a hostile work environment, culminating in her termination in January 2023. *Id.*

The First Amended Complaint brings claims against Defendants for discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD") N.J.S.A. 10:5-1 *et seq.* and for breach of contract in violation of NJLAD, New Jersey Wage Payment Law, N.J.S.A. § 34:11-4.1, *et seq.*, and the New Jersey Wage and Hour Law, N.J.S.A. § 34:11-56a, *et seq.* Plaintiff seeks compensatory damages, consequential damages, punitive damages, back pay, front pay, and benefits. Am. Compl., D.E. 1-2, Count I & II.

With respect to the breach of contract claim, Plaintiff contends that she executed an employment agreement with Chanel on February 9, 2018 ("Employment Agreement"), in which they agreed to pay her severance benefits. *Id.* at ¶ 21. Plaintiff asserts that Gasperini informed her at her termination meeting that she would not be receiving severance benefits. *Id.* at ¶ 22. As of the date Plaintiff filed her First Amended Complaint, she has not received any severance benefits in violation of the Employment Agreement. *Id.*

**\*2** Plaintiff served the Amended Complaint on Chanel via e-mail on November 20, 2023. Notice of Removal, D.E. 1, ¶ 4. Chanel removed the matter here on November 22, 2023 on the basis of diversity jurisdiction pursuant to 28 U.S.C. §§ 1441 and 1446 based on diversity of citizenship under 28 U.S.C. § 1332(a). *Id.* at 1. In the Petition for Removal, Chanel contends the amount in controversy exceeds $75,000

Poretskin v. Chanel, Inc., Not Reported in Fed. Supp. (2024)

Case 2:25-cv-02263-WJM-MAH   Document 5-2   Filed 06/16/25   Page 143 of 164
PageID: 272

and there is complete diversity between Plaintiff, a citizen of New Jersey, and the only served Defendant, Chanel, a corporation incorporated under the laws of New York with a principal place of business in New York. Notice of Removal, D.E. 1, ¶¶ 7, 8, 10, 12, 17.

Plaintiff now moves to remand this matter to the Superior Court of New Jersey, Law Division, Middlesex County pursuant to 28 U.S.C. § 1447 (c). *See* Mot. to Remand, D.E. 8. Plaintiff submits that there is a lack of complete diversity between the parties because Defendant Poulter is a New Jersey resident and was properly served on October 9, 2023. Mem. of Law in Supp., D.E. 8-2, at 4. Chanel opposes the motion to remand and cross-moves to dismiss and compel arbitration, or alternatively, transfer this matter to the Southern District of New York. Cross Motion, D.E. 11. Plaintiff filed a brief opposing the cross motion and asserting that service was proper. Br. in Opp., D.E. 12.

### III. DISCUSSION

#### A. PLAINTIFF'S MOTION TO REMAND

Plaintiff maintains that this matter must be remanded to state court because there is a lack of complete diversity between the parties as both Plaintiff and Poulter are citizens of New Jersey. Mem. of Law in Supp., D.E. 8-2, at 4. Chanel responds that that there is complete diversity because Plaintiff failed to properly serve Poulter. Br. in Opp., D.E. 12, at 1, 9-11. Therefore, Chanel reasons that it, a New York corporation, is the only properly served Defendant, and diversity of citizenship indeed exists. [1] *Id.* For the reasons herein, the Court agrees.

The Court cannot exercise jurisdiction over a party that has not been properly served. *Sportscare of Am., P.C. v. Multiplan, Inc.,* No. 10-4414, 2011 WL 589955, at *1 (D.N.J. Feb. 10, 2011); *Reddy v. MedQuist, Inc.,* No. 06-4410, 2009 WL 2413673, at *2 (D.N.J. Aug. 4, 2009). Moreover, the party asserting the validity of the purported service bears the burden of proof. *Reddy,* 2009 WL 2413673, at *2; *Grand Entm't Group, Ltd. v. Star Media Sales, Inc.,* 988 F.2d 476, 488 (3d Cir. 1993). Here, Plaintiff bears the burden of establishing that service of process was effectuated on Poulter because she is the party asserting the validity of the service.

Federal Rule of Civil Procedure 4(e), which governs service of process over individuals, states:

Unless federal law provides otherwise, an individual—other than a minor, an incompetent person, or a person whose waiver has been filed—may be served in a judicial district of the United States by:

(1) following state law for serving a summons in an action brought in courts of general jurisdiction in the state where the district court is located or where service is made; or

(2) doing any of the following:

(A) delivering a copy of the summons and of the complaint to the individual personally;

(B) leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there; or

**\*3** (C) delivering a copy of each to an agent authorized by appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e). Under New Jersey law, personal service is the primary method of obtaining personal jurisdiction. *See* N.J. Ct. R. 4:4-4(a), 4:4-5(a). A party accomplishes personal service by delivering:

> a copy of the summons and complaint to the individual personally, or by leaving a copy thereof at the individual's dwelling place or usual place of abode with a competent member of the household of the age of 14 or over then residing therein, or by delivering a copy thereof to a person authorized by appointment or by law to receive service of process on the individual's behalf...."

N.J. Ct. R. 4:4-4(a)(1). An individual's place of employment does not qualify as their "usual place of abode" or dwelling required under the Rules. *Reddy,* 2009 WL 2413673, at *4 ("The weight of persuasive authority, including authority from this jurisdiction, concludes that delivering service to an employer's office is not delivery to an individual's dwelling place.").

Poretskin v. Chanel, Inc., Not Reported in Fed. Supp. (2024)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 144 of 164
PageID: 273

Plaintiff, who has the burden to establish that service was proper, has failed to show that she served Poulter appropriately under the applicable Rules. And a review of the record indicates that Plaintiff did not properly serve Poulter. Plaintiff's affidavit of service does not demonstrate that Plaintiff's process server, Marian Zwierzynski, served Poulter personally or left a copy of the summons and complaint with a competent household member who was over the age of 14 and resided therein, as required by New Jersey Court Rule 4:4-4(a)(1). Instead, Ms. Zwierzynski states that she left a copy of the summons and complaint with Gino Passano, a purported security officer for Chanel, who she claims was authorized to accept service on behalf of Poulter. *Id.* Service in this manner is deficient according to the New Jersey Court Rule 4:4-4 because it occurred at Poulter's place of employment rather than at his "dwelling place or usual place of abode[.]" N.J. Ct. R. 4:4-4(a)(1); *see also Reddy,* 2009 WL 2413673, at *4.

Plaintiff argues that service was proper when the summons and complaint was handed to Mr. Passano, because Mr. Passano indicated to Ms. Zwierzynski that he had to call his superior and get authorization before he could accept the documents. *See* Cert. of Marian Zwierzynski, D.E. 12-2, ¶ 3; *see also* Br. in Opp., D.E. 12. Ms. Zwierzynski certifies that once Mr. Passano spoke to his superior, Mr. Passano indicated that he could accept the documents for Chanel and Poulter, but not Gasperini because Chanel no longer employed her. *Id.* Thus, Plaintiff maintains service on Poulter by these means was proper. Br. in Opp., D.E. 12, at 4-5. It appears from Plaintiff's argument that she contends that service of process on Mr. Passano was proper as the authorized agent of Poulter in accordance with Federal Rule of Civil Procedure 4(e)(2)(C). The Court disagrees.

Plaintiff does not claim to have served Poulter or Poulter's authorized agent. Instead, Plaintiff served a security officer at Poulter's place of employment. Plaintiff does not provide any evidence to show that this security officer was an agent "authorized by appointment or by law to receive service of process" on behalf of Poulter in accordance with Federal Rule of Civil Procedure 4(e)(2)(C). Simply because an Employee A agreed to accept service on behalf of Employee B, without any evidence Employee B so authorized Employee A, does not demonstrate that Employee A was authorized to accept service. *Gabros v. Shore Medical Ctr.,* 724 F. App'x 119, 122 (3d Cir. 2018) (plaintiff must present some evidence which establishes that person served was actually authorized to accept service of process on behalf of defendant). Plaintiff

provides no evidence to show Mr. Poulter authorized Mr. Passano to accept service on his behalf. *Id.*; *see also Snyder v. Swanson,* 371 F. App'x 285, 286-87 (3d Cir. 2010) (individual defendants were not properly served where their attorney, who was not authorized to accept service on their behalf, was served process); *Blount v. TD Bank, N.A.,* No. 20-18805, 2021 WL 2651760, at *3 (D.N.J. June 28, 2021) (leaving a summons and complaint at an individual defendant's place of employment does not constitute proper service); *Laffey v. Plousis,* No. 05-2796, 2008 WL 305289, at *5 (D.N.J. Feb. 1, 2008) (service was improper where plaintiff failed to show that United States Marshal's Office employee had either actual or apparent authority to accept service on behalf of certain individual defendants). That Mr. Passano's superior at Chanel generally authorized Mr. Passano to accept Mr. Poulter's documents, is plainly insufficient to establish that Mr. Passano ever was authorized to accept service of process on Mr. Poulter's behalf. *See Kornea v. J.S.D. Management, Inc.,* 336 F. Supp. 3d 505, 509 (E.D. Pa. 2018) (holding that fact that defendant's secretary could accept defendant's mail did not establish that the secretary also was defendant's agent authorized to accept service). The Court therefore concludes that Plaintiff has failed to meet her burden of showing that Poulter was properly served. Thus, complete diversity exists between the parties and removal was proper. Accordingly, the Court respectfully recommends that the District Court deny Plaintiff's motion to remand.

### B. CHANEL'S CROSS MOTION TO DISMISS OR TRANSFER

**\*4** Having concluded that Plaintiff's motion to remand should be denied, the Court now turns to Chanel's motion to dismiss and compel arbitration, or alternatively, transfer this matter to the United States District Court for the Southern District of New York. For the reasons set forth herein, this Court recommends that the District Court grant Chanel's request to transfer this matter to the Southern District of New York and defer to that Court concerning motion to dismiss and compel arbitration.

Title 28, Section 1404(a) of the United States Code provides that for the "convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." An action might have been brought in the transferee district if: (1) the transferee district has subject matter jurisdiction over the action; (2) venue is proper in the

Poretskin v. Chanel, Inc., Not Reported in Fed. Supp. (2024)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 145 of 164
PageID: 274

transferee district; and (3) the transferee district can exercise personal jurisdiction over the parties. *D'Ambola v. Daily Harvest, Inc.,* No. 22-6316, 2023 WL 3720888, at *2 (D.N.J. May 30, 2023). After concluding that the transferee district is one in which the action could have been brought, the Court must determine whether transfer is in the interests of justice and convenience. *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Texas,* 571 U.S. 49, 63 (2013).

Section 1404(a) exists to "prevent the waste of time, energy and money and to protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Ricoh Co. v. Honeywell, Inc.,* 817 F. Supp. 473, 479 (D.N.J. 1993) (internal citations and quotations omitted). The Third Circuit has recognized that the moving party bears the burden of establishing the propriety of transferring the case "with any affidavits, depositions, stipulations, or other documents containing facts that would tend to establish the necessary elements for a transfer under 28 U.S.C. § 1404(a)." *Plum Tree, Inc. v. Stockment,* 488 F.2d 754, 756-57 (3d Cir. 1973).

### 1. Whether this Action Could Have Been Filed in the Southern District of New York

As a threshold matter, the Court must first determine whether the Southern District of New York would have subject matter jurisdiction over the instant claims. The Court finds that it would. As set forth above, it does not appear that Plaintiff successfully served Mr. Poulter. Accordingly, Plaintiff and Chanel are citizens of different states and the amount in controversy exceeds $75,000.00. Notice of Removal, D.E. 1, ¶¶ 7, 8, 10, 12, 17. Thus, the Court finds that the Southern District of New York would have diversity jurisdiction over this matter in accordance with 28 U.S.C. § 1332.

Next, the Court considers whether the Southern District of New York has personal jurisdiction over Chanel. Chanel is "a corporation organized and existing under the laws of the State of New York with a principal place of business in New York." Notice of Removal, D.E. 1, ¶ 10. Because Chanel is located in the Southern District of New York, that Court has personal jurisdiction over Chanel. *Goodyear Dunlop Tire Operations, S.A. v. Brown,* 564 U.S. 915, 924 (2011) (finding that general jurisdiction can be exercised over a corporation in a jurisdiction "in which the corporation is fairly regarded as at home").

Finally, the Court must determine if the Southern District of New York would be an appropriate venue. Venue in actions based upon diversity jurisdiction is appropriate in:

**\*5** (1) a judicial district where any defendant resides, if all defendants reside in the same State,

(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or

(3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a). Again, as Chanel resides within the Southern District of New York, the proposed transferee district is an appropriate venue. Accordingly, the Court finds this matter might have been brought in that Court.

### 2. Forum Selection Clause

Having concluded that this matter could have been brought in the Southern District of New York, the Court now turns to Chanel's contention that the Employment Agreement on which Plaintiff bases her breach-of-contract claim contains a valid forum selection clause governing Plaintiff's claims. *See* Cross Motion, D.E. 11, at 17-18. The United States Supreme Court has instructed that if a contract contains a valid forum selection clause, then courts must "transfer the case unless extraordinary circumstances unrelated to the convenience of parties clearly disfavor a transfer." *See Atl. Marine Constr. Co.,* 571 U.S. 49, 50-51. Similarly, when a party seeks a transfer pursuant to § 1404 because of a forum selection clause, the Court has instructed courts to give the clause controlling weight, and plaintiff's choice of forum little if any weight. *Id.* at 51. *Id.* In that instance, a party can defeat transfer only if it can show that there are prevailing public interest factors, such as court congestion, or a special need to have localized controversies decided by courts familiar with the applicable law. *See id.* at 581 n. 6. Therefore, this Court must first resolve whether the Employment Agreement's forum selection clause applies in this action.

Enforcement of a forum selection clause is a procedural issue rather than a substantive issue. "In federal court, the effect to be given a contractual forum selection clause in diversity

Poretskin v. Chanel, Inc., Not Reported in Fed. Supp. (2024)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 146 of 164
PageID: 275

cases is determined by federal not state law." [2] *See Wall Street*, 189 Fed. App'x at 84. In the Third Circuit, forum selection clauses are presumptively valid and enforceable. *Id.* at 85; *Int'l Business Software Solutions, Inc. v. Sail Labs Tech., AG*, 440 F. Supp. 2d 357, 362 (D.N.J. July 25, 2006); *Cadapult Graphic Sys., Inc. v. Tektronix, Inc.*, 98 F. Supp. 2d 560, 564 (D.N.J. May 18, 2000). Hence, the party opposing the forum selection clause bears the heavy burden of making a "strong showing" that the clause is unreasonable, and therefore unenforceable. *See Cadapult*, 98 F. Supp. 2d at 565 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)).

**\*6** Generally, a forum selection clause is unreasonable if: (1) it is the result of fraud or overreaching; (2) its enforcement would violate the forum's strong public policy; or (3) its enforcement would, in the particular circumstances of the case, result in litigation in a jurisdiction so seriously inconvenient as to be unreasonable. *Id.*; *see also Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 880 (3d Cir. 1995) (stating that "[w]here the forum selection clause is valid, which requires that there have been no fraud, influence, or overwhelming bargaining power ... the plaintiffs bear the burden of demonstrating why they should not be bound by their contractual choice of forum") (internal quotation marks omitted).

First, Chanel argues that because the forum selection clause is valid and enforceable, this matter must be transferred to the Southern District of New York. Cross Motion, D.E. 11, at 17-18. The Court presumes, as it must, that the forum selection clause in the Employment Agreement is valid and enforceable against Plaintiff. *See Wall Street*, 189 F. App'x at 85 (forum selection clauses are presumptively valid). Thus, it is Plaintiff's heavy burden to demonstrate that the forum selection clause is unenforceable. *D'Ambola*, 2023 WL 3720888, at \*3. However, Plaintiff does not challenge the forum selection clause's validity. Indeed, Plaintiff brings a breach of contract claim for Chanel's failure to pay her severance benefits in accordance with the Employment Agreement, the very agreement that contains the forum selection clause at issue here. *See* Am. Compl., D.E. 1-2, ¶¶ 21-22. Plaintiff makes no substantive arguments regarding the forum selection clause's validity. Instead, Plaintiff posits that Chanel's request to transfer is moot because this Court lacks diversity jurisdiction over this matter. Br. in Opp., D.E. 12, at 7. Because Plaintiff provides no argument to challenge the validity and enforceability of the forum selection clause, the Court concludes that the clause is valid and enforceable.

Second, the language of the forum selection clause plainly encompasses these claims. The forum selection clause applies to "any suit, action or proceeding involving this Agreement[.]" Employment Agreement, D.E. 11-5, at ¶ 14. Here, Plaintiff alleges a sexual harassment claim arising out of her employment with Chanel, and a breach of contract claim due to Chanel's failure to pay her severance benefits in accordance with the Employment Agreement, Exhibit A, ¶ 7. Am. Compl., D.E. 1-2, ¶¶ 21-22; *see also* Employment Agreement, D.E. 11-5, Ex. A, ¶ 7. Therefore, the Court concludes that the Employment Agreement encompasses Plaintiff's claims. Even if Plaintiff had challenged Chanel's transfer argument, she could not both rely on the Employment Agreement while also arguing that it does not encompass her claims. Thus, the Court finds that the Employment Agreement encompasses Plaintiff's breach of contract claim.

Plaintiff does not argue that the forum selection clause was the result of overreaching or fraud, or that enforcement of the clause would be contrary to public policy or result in litigation in a location so inconvenient as to be unreasonable. As already noted, Plaintiff in fact advances no reason why the forum selection clause is unenforceable. Nor can the Court find from the evidence before it that enforcement of the forum selection clause would be contrary to public policy or result in litigation in a location so inconvenient as to be unreasonable or the clause was the result of overreaching or fraud. *See Cadapult*, 98 F. Supp. 2d at 565. Accordingly, the Court finds that Plaintiff has not met her burden of establishing that transfer to the forum indicated in the forum selection clause is unwarranted. Given the presumption of validity and the lack of any argument by Plaintiff to the contrary, the Court finds the forum selection clause is valid and enforceable.

### 3. Public Interest Factors

**\*7** Because the forum selection clause applies and the Court must give the clause "controlling weight," only public interest factors can prevent transferring this matter to the Southern District of New York. *See Atl. Marine Constr. Co.*, 571 U.S. at 51. Hence, the Court must consider whether transfer would result in easy, expeditious, or less expensive litigation. *See Jumara*, 55 F.3d at 879. The "public interests" factors include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious, or inexpensive; (3) the relative administrative difficulty arising from court congestion; (4) the local interest in deciding local

Poretskin v. Chanel, Inc., Not Reported in Fed. Supp. (2024)

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 147 of 164
PageID: 276

controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable law. *See Jumara*, 55 F.3d at 879-80. Balancing these factors also weigh in favor of transferring this case to the Southern District of New York.

Chanel contends that the Southern District of New York would have no issue enforcing a judgment because New York is Chanel's home state. Cross Motion, D.E. 11, at 17. As a general proposition, the Court agrees that it would be easier to obtain a judgment against Chanel in New York because Chanel is a citizen in that state. *See United States ex rel. Groundwater Tech., Inc. v. Sevenson Envtl. Servs., Inc.*, No. 00-311, 2000 WL 33256658, at *5 (D.N.J. 2000) (recognizing that it is easier to enforce a judgment obtained in a defendant's home state). Thus, the Court finds this factor favors transfer.

The Court next considers whether the remaining public interest factors weigh in favor of transfer. Although the allegedly injured party is a citizen of New Jersey, the Court finds that transfer to the Southern District of New York will allow for an easier, more expeditious, and less expensive litigation. *See Jumara*, 55 F.3d at 879. At a minimum, transfer would not materially render the litigation more difficult or protracted. This matter is in its infancy and discovery has not yet begun. Thus, there are no practical considerations to keep the matter in New Jersey. None of the remaining public interest factors weigh against transferring this matter to the Southern District of New York.

Thus, after considering whether the public interest factors are sufficient to defeat the "controlling weight" of the forum selection clause, *see Atl. Marine Constr. Co.*, 134 S. Ct. at 581-85, this Court agrees with Chanel that this action is governed by the Employment Agreement's forum selection clause. Plaintiff and Chanel must therefore "submit to the jurisdiction of all federal and state courts sitting in the State of New York, New York County" in accordance with the Employment Agreement. Employment Agreement, D.E. 11-5, at ¶ 14.

**4. Request to Dismiss and Compel Arbitration**

The Court does not reach Chanel's request that the Court dismiss this action and compel arbitration in deference to the transferee court. Accordingly, the Court recommends that the District Court deny without prejudice Chanel's request to dismiss this action and compel arbitration. *See Darrow v. Ingenesis*, No. 19-17027, 2020 WL 2059946 (D.N.J. Apr. 29, 2020) (denying Defendants' motion to dismiss or stay where case was being transferred so that transferee court could make those determinations).

**IV. <u>CONCLUSION</u>**

For the reasons set forth above, the Undersigned respectfully recommends that the District Court deny Plaintiff's motion to remand, grant Chanel's request to transfer this matter to the United States District Court for the Southern District of New York, and deny without prejudice Chanel's request to dismiss this action and compel arbitration.

The parties are reminded that under 28 U.S.C. § 636, and L. Civ. R. 71.1(c)(2), they have fourteen days to file and serve objections to this Report and Recommendation.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 714232

---

**Footnotes**

1    No party argues that Gasperini was served at the time of Removal. Similarly, Plaintiff does not challenge Chanel's contention that it is a New York corporation for purposes of diversity jurisdiction. Accordingly, this Court's analysis need not address Gasperini or the citizenship of Chanel.

2    Although federal law is applied when determining the effect of a forum selection clause, state law is applied when construing the terms of a forum selection clause. *See Wall Street v. Aubrey*, 189 Fed. App'x 82, 85 (3d Cir. 2006); *Bel-Ray Co., Inc. v. Chemrite (Pty.) Ltd.*, 181 F.3d 435, 441 (3d Cir. 1999).

**Poretskin v. Chanel, Inc., Not Reported in Fed. Supp. (2024)**

---

**End of Document**                                             © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Poretskin v. Chanel, Inc., Not Reported in Fed. Supp. (2024)

Case 2:25-cv-02263-WJM-MAH   Document 5-2   Filed 06/16/25   Page 149 of 164
PageID: 278

2024 WL 712583
Only the Westlaw citation is currently available.
**NOT FOR PUBLICATION**
United States District Court, D. New Jersey.

Courtney PORETSKIN, Plaintiff,
v.
CHANEL, INC. et al., Defendants.

No. 23-22613 (SDW)(MAH)
|
Signed February 21, 2024

**Attorneys and Law Firms**

Mark A. Mulick, Mark Mulick, Esq., P.A., West Caldwell, NJ, for Plaintiff.

Arnold Gewan Sooklall, New Brunswick, NJ, Anthony M. Rainone, Brach Eichler LLC, Roseland, NJ, for Defendant Chanel, Inc.

**ORDER**

WIGENTON, District Judge.

**\*1** Before this Court is the Report and Recommendation ("R&R") entered on January 29, 2024, by Magistrate Judge Michael A. Hammer ("Judge Hammer"), (D.E. 15), recommending that Plaintiff's Motion to Remand pursuant to 28 U.S.C. § 1447, (D.E. 8), be denied, Defendant Chanel, Inc.'s request to transfer this matter to the Southern District of New York be granted, and Defendant Chanel, Inc.'s Cross Motion to Dismiss this action and compel arbitration, (D.E. 11), be denied without prejudice. This Court has reviewed the reasons set forth by Judge Hammer in the R&R.[1] Based on the foregoing, and for good cause shown, it is hereby

**ORDERED** that the R&R of Judge Hammer is **ADOPTED** as the conclusions of law of this Court. Plaintiff's Motion to Remand, is hereby **DENIED**. Defendant Chanel, Inc.'s Cross Motion to Dismiss and compel arbitration, is **DENIED** without prejudice. Defendant Chanel, Inc.'s request to transfer this matter to the United States District Court for the Southern District of New York is **GRANTED**.

**SO ORDERED**.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 712583

---

**Footnotes**

1      The parties did not file objections to the R&R.

---

**End of Document**                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT K

2001 WL 1192203

UNPUBLISHED OPINION. CHECK COURT RULES
BEFORE CITING.

Court of Chancery of Delaware.

RHIS, INC., a Delaware corporation, Plaintiff,

v.

Jeffrey W. BOYCE, t/a Delaware
Home Inspection, Defendant.

No. Civ.A. 18924.
|
Submitted Aug. 14, 2001.
|
Decided Sept. 26, 2001.

**Attorneys and Law Firms**

Daniel R. Losco, Locso & Marconi, Wilmington, Delaware,
for Plaintiff.

Charles Gruver, III, Charles Gruver, III P.A., Hockessin,
Delaware, for Defendant.

*MEMORANDUM OPINION*

LAMB, Vice Chancellor.

## I. INTRODUCTION

**\*1** The operator of a home inspection business has sued
a former employee home inspector. The action concerns a
standard form written covenant, entered into in the context
of an at-will employment relationship, that obligates the
employee for a period of two years following termination of
his employment not to compete with his employer within an
extensive geographical area and not to solicit business from
the employer's referral sources. After being terminated, the
employee immediately opened a competing business within
the proscribed geographical area and solicited referrals from
persons known to him to have referred business to his former
employer.

I conclude that the covenant not to compete is unreasonable
and should not be enforced by injunction because the nature
of the plaintiff's business is such that it has no trade secret
or proprietary information that allows for the possibility of

unfair competition by the former employee. The fact that
the former employee became, as a result of his former
employment, a certified home inspector does not support
the entry of an injunction because the skills obtained by the
former employee belong to him. Moreover, it would work
a hardship on the former employee and his dependents to
prevent him from utilizing his training and qualifications as
a home inspector within the geographic area defined in the
covenant. I do, however, grant plaintiff's request for final
injunctive relief enforcing the covenant not to solicit business
or referrals of business from the former employer's sources
of business or referrals of business. Those relationships are
proprietary to the former employer's business, constituting as
they do goodwill, and are entitled to reasonable protection
from appropriation by the former employee. But, because
the trial record showed that the former employer's clientele
was both non-exclusive and relatively fluid, I will limit the
duration of that injunction to one year from the date of the
former employee's termination.

## II. FACTUAL AND PROCEDURAL BACKGROUND

RHIS, Inc. ("RHIS"), t/a Reliable Home Inspection Services,
is a home inspection company for prospective home buyers
doing business primarily in Delaware, Chester and Delaware
Counties in Pennsylvania, and Cecil, Hartford, and Kent
Counties in Maryland. In July 1997, RHIS hired Jeffrey
Boyce as a home inspector. Boyce had no prior experience as
a home inspector, but had worked in various capacities in the
construction business before joining RHIS.

On July 15, 1997, after a brief "probationary" period of
employment, Boyce was offered a permanent position and
executed with RHIS a covenant not to solicit and a covenant
not to compete (collectively, "the covenant") that operates
for a period of two years following the date Boyce leaves
the employ of RHIS. The covenant provides in relevant part
that Boyce will not "solicit or seek to solicit ... any client of
[RHIS] or referral source of [RHIS]." "Referral source" is
defined as "any individual or entity which has referred a client
to [RHIS] during the time [Boyce] is employed by [RHIS]."
The covenant further provides that Boyce will not "[w]ithin
the State of Delaware and within a one hundred mile radius
of [RHIS's] present place of business own, manage, operate,
be employed by, attempt to solicit business for, or control
any business similar to or competitive with that conducted by
[RHIS] ." This agreement was a standard form document that
RHIS expected many of its employees to sign.

**RHIS, Inc. v. Boyce, Not Reported in A.2d (2001)**
Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 152 of 164
PageID: 281
27 Del. J. Corp. L. 989

**\*2**  The only direct on-the-job training Boyce received at RHIS was to accompany John Kerrigan, who with his wife owns RHIS, on three home inspections. Thereafter, RHIS sent Boyce out on solo inspection jobs. Kerrigan and RHIS did encourage Boyce to become a candidate-member of the American Society of Home Inspectors ("ASHI"), a national organization of home inspectors. Once obtained, full ASHI membership provides a home inspector with a valuable credential and expands the client-base he can service since some clients require ASHI certification.

As an ASHI candidate-member, Boyce was required to perform 250 solo home inspections, complete 30 hours of continuing education, and pass two written examinations over a three-year period. RHIS paid several thousand dollars for Boyce's ASHI dues, continuing education materials, and exam fees so that Boyce could pursue his ASHI certification. RHIS also provided Boyce with the opportunity to perform the 250 solo home inspections needed to complete the program leading to ASHI certification. Of course, RHIS received substantial benefits from Boyce's associate membership in ASHI and his performance of more than 250 solo home inspections because RHIS was able to bill each of those inspections to its clients at a substantially higher amount than the fixed cost of paying Boyce.

RHIS obtains a large part of its business from realtors, who refer their client home-buyers to it. RHIS devotes substantial resources toward the establishment and maintenance of these referral relationships, which constitute an important element of its good will. In the course of performing his job at RHIS, Boyce became acquainted with a number of these referral sources and developed a relationship with them himself. In some instances, for example, referral sources who contacted RHIS would specifically ask to have Boyce assigned to a job because they preferred working with him to working with Kerrigan or other employees of RHIS.

Boyce's employment history at RHIS was not uniformly satisfactory. Over the years, RHIS unilaterally lowered Boyce's rate of compensation per job, raised it, and then lowered it again. These actions were taken in response to problems perceived by RHIS in Boyce's job performance, including mistakes he made that cost RHIS money to correct. Boyce was dissatisfied with his changing rate of compensation and also by the fact that, over time, the number of inspections that he was being asked to perform decreased.

In or about 1999, Boyce began to express his interest in opening his own home inspection business and, according to his testimony, initially believed that the period of the covenant had expired on the second anniversary of its date of execution. After speaking with a friend who suggested that the restrictive period of the covenant would not begin to run until Boyce's employment with RHIS ended, Boyce approached a secretary at RHIS and asked for a copy of the agreement. After reviewing the document, Boyce understood the terms of the agreement as written.

**\*3**  On February 18, 2001, Boyce unilaterally cancelled an appointment for a home inspection. Kerrigan fired Boyce after learning of this. Kerrigan knew of Boyce's desire to open a competing business and reminded him about the covenant during his exit interview. Boyce responded ambivalently, telling Kerrigan that he needed to work. Boyce is 39 years old and has one child who is dependent on his earnings for support. Boyce testified that he was no longer physically able to perform the sorts of jobs he used to have in the construction business.

One week after his termination, Boyce opened Delaware Home Inspections, an entity in direct competition with RHIS, and located within ten miles of RHIS. Boyce performed at least 60 home inspections, generating $13,060 (gross revenue) between March 21, 2001 and July 2001. A significant number of Boyce's referral sources for these jobs were realtors who were among RHIS's base of referral sources, and with whom Boyce had become acquainted while working for RHIS.

On May 24, 2001, RHIS brought this action to enjoin Boyce "from owing [sic], operating, managing, working for or controlling any business engaged in providing services substantially similar to those provided by RHIS ... [and] from soliciting or attempting to solicit the past or present clients [and referral sources] of RHIS." RHIS also seeks an award of "compensatory and punitive damages" for the intentional breach of the covenant as well as for libel and defamation of plaintiff's business. [1]

### III. LEGAL ANALYSIS

The evidence at trial was sufficient to prove that Boyce both operates a competing business within the proscribed geographic area and has solicited and is soliciting RHIS referral sources. Boyce defends, however, by arguing first

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 153 of 164
PageID: 282

that there is no contract between him and RHIS, and second that the covenant should not be enforced by injunction in the circumstances present. I address these arguments in turn.

A. Was there a valid contract between Boyce and RHIS? First, Boyce argues that there was no consideration to support the covenant between him and RHIS because he and RHIS signed the covenant 12 days *after* he began working for RHIS. Of course, a covenant not to compete must be supported by consideration. As Chancellor Marvel noted in *Faw, Casson & Co. v. Cranston:*

> It is generally agreed that mutual promises of employer and employee furnish valuable considerations each to the other for the contract. However, when the relationship of employer and employee is already established without a restrictive covenant, any agreement thereafter not to compete must be in the nature of a new contract based upon new consideration. [2]

Boyce argues that he became an employee of RHIS on July 3, 1997, the day he began working for RHIS and performing inspections, albeit accompanied by RHIS president John Kerrigan. Therefore, because he was not asked to sign the covenant until July 15, 1997, the argument goes, there was no new consideration for the promises he made in it.

 **\*4**  RHIS counters that Boyce was not hired on July 3, 1997 but was still a job applicant or a probationary employee until he was asked to sign the covenant 12 days later. As RHIS points out, the application for employment that Boyce signed on July 3, 1997 states, "Please note all offers of employment at RHIS, Inc. are subject to a 30 day probationary period." According to Kerrigan, before an applicant could be hired by RHIS, he or she needed to demonstrate an ability to work with customers and competency in performing inspections. It was only after Boyce accompanied Kerrigan on several home inspections and demonstrated his ability to perform the work that RHIS decided to offer him permanent employment.

Boyce disputes that he was a probationary employee, pointing out that he had received a small fee for the three home inspections on which he accompanied Kerrigan. Furthermore, it is undisputed that Boyce was covered by RHIS's workers compensation insurance before he was asked to sign the covenant. Boyce argues that these factors demonstrate that he was already an employee of RHIS at the time he was asked to sign the covenant.

I am satisfied from my review of all the evidence that Boyce was asked to sign the covenant in connection with the decision by RHIS to offer him permanent employment. Only after Kerrigan was satisfied that Boyce would be able to do the work required of him did RHIS agree to offer Boyce permanent employment as a home inspector. This change of employment condition from a probationary hire to a permanent employee is sufficient consideration to support the covenant. In *Faw, Casson & Co.,* Chancellor Marvel held that a covenant not to compete signed as a condition to accepting an offer of promotion was supported by adequate consideration. [3] Similarly, Boyce understood that the prospect of obtaining permanent employment at RHIS depended on his willingness to sign the covenant. Under *Faw, Casson & Co.,* I find that there is consideration to support the covenant.

Next, Boyce argues that RHIS breached the terms and conditions of his employment contract by unilaterally changing his rate of pay, thus, releasing him from any obligation to perform the covenant. The testimony showed that Boyce's pay was reduced on two separate occasions. The fact is that Boyce never treated these changes in his pay as a material breach of his employment contract. Instead, he accepted RHIS's unilateral actions and continued his employment by RHIS. Given these circumstances, I cannot conclude that RHIS's actions led to the termination of the covenant. [4]

Finally, Boyce argues that Kerrigan misrepresented the terms of the covenant to him at the time of its execution. Boyce claims that Kerrigan told him that the covenant only covered the two year period following the date of its execution, July 15, 1997. Trial testimony on this point was sketchy, proving little of what was said at the time Boyce signed the covenant. From my review of all the facts and circumstances, I am unable to conclude that Kerrigan, either intentionally or unintentionally, misrepresented the term of the covenant to Boyce. Boyce was neither rushed while reading it, nor was he prevented from taking the document home overnight or to a lawyer. Boyce, instead, quickly reviewed the document and signed it.

**\*5** Under Delaware law, "a party's failure to read a contract [cannot] justify its avoidance." [5] RHIS gave Boyce an adequate opportunity to review the terms of the covenant, and he executed it of his own volition. I note as well that the language of the covenant is clear, rather than confusing or ambiguous. Boyce understood it when he re-read it in 1999, and I am certain that Boyce would have been able to appreciate its meaning at the time he executed the agreement had he simply paid closer attention.

In conclusion, I find that the covenant was supported by consideration and that RHIS engaged in no unfair practices in securing Boyce's signature on the document.

B. Is the covenant between Boyce and RHIS enforceable?
Next I turn to the question of whether the covenant is enforceable under Delaware law. In *KPMG Peat Marwick LLP v. Fernandez,* this court said that "[u]nder Delaware law, a former employee's ... agreement not to compete will be specifically enforced, in the proper circumstances, and is not void as against public policy, when its purpose and reasonable operation is to protect the legitimate interest of the former employer." [6]

As Chancellor Allen recognized in *Bernard Personnel Consultants v. Mazarella,* applications for orders specifically enforcing contracts of this nature give rise to two sets of legal issues. The first set of issues goes to whether or not there is an enforceable contract, and "include questions concerning the reasonableness of the restriction agreed upon: is it appropriately limited in time and space, given the circumstances present; does it protect a legitimate interest of the employer; is it oppressive." [7] Further, as is stated in comment (g) to the Restatement to the Law of Contracts, Second, § 188: "[p]ost-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood. This is especially so where the restraint is imposed by the employer's standardized printed form."

The second set of issues is confronted when there is found to be a valid contract and focus on the balancing of equities in weighing whether or not to issue an injunction. These latter issues "reflect the traditional concern of a court of equity that its special processes not be used in a way that unjustifiably increases human suffering.... [I]n no context does [this principle] remain more vital than in the specific enforcement of restrictions upon a person's ability to seek alternative employment in a field in which she has acquired experience." [8]

The evidence at trial did not establish that RHIS employs any trade secrets or proprietary processes in its business that could be used by Boyce to compete against RHIS unfairly. [9] Instead, the focus of RHIS's trial evidence was on two things: (1) that it paid for Boyce to acquire his ASHI certification and, thus, had some right to prevent Boyce from using that certification to compete against it, and (2) that, as a part of his employment at RHIS, Boyce developed relationships with RHIS's business referral sources that he should not be able to exploit to the detriment of RHIS.

**\*6** The fact that RHIS assisted Boyce in obtaining his ASHI certification does not give it any legitimate interest in preventing Boyce from using that certification to compete. [10] At trial, Kerrigan testified and Boyce did not deny that Kerrigan introduced Boyce to ASHI, that RHIS paid for Boyce to become ASHI certified, and that RHIS was instrumental in helping Boyce obtain the 250 necessary solo inspections. The law is clear, nevertheless, that Boyce, not RHIS, owns both Boyce's membership in ASHI and the right to exploit it commercially. [11] In *Bernard Personnel Consultants,* Chancellor Allen stated that "[a]n employee who achieves technical expertise or general knowledge while in the employ of another may thereafter use that knowledge in competition with his former employer, so long as he does not use or disclose protected trade secrets." [12]

The second point raised at trial relates more directly to the covenant not to solicit RHIS referral sources than to the covenant not to compete itself. The trial evidence established both that Boyce's employment put him in a position to develop relationships with RHIS's "customers" (in this case, the realtors who referred business to it) and that RHIS has a legitimate interest in protecting those relationships from competition by Boyce. Moreover, the evidence at trial was clear and convincing that Boyce has succeeded in exploiting those relationships and, in doing so, has diverted business from RHIS. Boyce had access to and was familiar with RHIS's referral sources, and Boyce admitted that he had retained copies of many of the work orders listing the referral sources that he received from RHIS. Indeed, the trial evidence showed that over 78 percent of Boyce's business had been obtained

RHIS, Inc. v. Boyce, Not Reported in A.2d (2001)
27 Del. J. Corp. L. 989

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 155 of 164
PageID: 284

from RHIS's referral sources. This rises to a level greater than coincidental or innocent solicitation of a former referral source. Rather, I conclude that Boyce consciously focused his efforts on securing clients from RHIS's referral base.

The record before me indicates that there are certain clients from that referral base that preferred Boyce to RHIS, others who were indifferent and others who continued to refer business solely to RHIS. To the extent that Boyce's formation of a new business entity brought greater freedom of choice to the region's realtors in steering clients to a home inspector, and to the extent that additional competition both maintains a downward pressure on the cost of such inspections and created incentives to improve the quality thereof, there was a net social gain created by Boyce's move. However, this gain must be controlled both to the degree that RHIS had the right to protect its proprietary interest in the goodwill it had developed over the years and to the degree that RHIS had contracted with Boyce to do so.

The question is whether RHIS reasonably required Boyce to promise not to solicit RHIS's referral sources for a period of two years and, if so, whether it should be enforced by the special injunctive powers of this court. Under Delaware law, a restriction will not be enforced "that is more restrictive than [an employer's] legitimate interests justify or that is oppressive to [an employee]." [13] The evidence at trial established that RHIS's referral sources are not, in the main, exclusive relationships. That is, those who refer business to RHIS often also refer business to its competitors. The evidence also suggested that, in this business, referral sources are relatively transient, frequently shifting their referrals among different home inspection firms.

 *7  Nevertheless, Boyce did sign the agreement and was aware of its meaning. The question then is, if two years is unreasonable, what is a reasonable period to prohibit Boyce from utilizing RHIS's reference network? Joint Exhibit 19 demonstrates that over a five year period from 1996 to the present, the average realtor referred a client to RHIS once every three to four months. Hence, in the normal course of business, a one year period should be sufficient to enable RHIS to regularize communications with the typical realtor previously managed by an employee who has left the firm. [14] This is generous in that it assumes no efforts on RHIS's part. With even rudimentary business records RHIS could easily and immediately correspond with those realtors with whom a fired employee had most often worked so as to preclude those realtors' referrals leaving with that employee.

On the basis of this evidence, I am led to conclude that, in the market for home inspection services, a two year restriction on a former employee soliciting business from his former employer's referral network is unreasonably long. A period of two years is quite simply not necessary to protect RHIS's legitimate interests in its good will and could unreasonably burden competition in the home inspection services market. Moreover, the circumstances surrounding the execution of the agreement, including the unequal bargaining power between RHIS and Boyce, the form nature of the agreement and the fact that RHIS did not require some other, more highly qualified home inspectors to execute similar agreements, [15] all suggest that it would be unfair to enforce such a two year period of non-solicitation on Boyce.

I will issue an injunction lasting until the one year anniversary of Boyce's termination and precluding Boyce from soliciting business from any person known by him to have been a referral source of RHIS. In addition, for the same period of time, the injunction will preclude Boyce from performing home inspection services at the request of any of the realtors listed on Joint Exhibit 19. Those are all RHIS referral sources for which Boyce had already performed services at the time of trial.

C. Damages and fees
Finally, I will award RHIS damages equal to 25 percent of the gross revenues generated by Boyce or Delaware Home Inspection for the 47 jobs that are listed on Joint Exhibit 19 and for any additional jobs performed for the same referral sources since the date of that exhibit. I have chosen 25 percent as the appropriate amount because Kerrigan testified at trial that profit margins in the home inspection business varied between 25 percent and 50 percent. Since he was unable to be more precise in testifying to RHIS's profit margins, it is appropriate to award damages at the bottom end of the range identified by Kerrigan.

The demand by RHIS for an award of attorney's fees is denied. Normally, under the so-called American Rule, parties to litigation bear their own attorneys' fees and expenses. [16] A possibility of fee shifting is recognized where the conduct giving rise to the litigation is so egregious in nature as to justify an award of fees as an element of damages. [17] As Chancellor Allen explained in *Barrows v. Bowen,* however, this is a narrow exception, rarely to be encountered:

27 Del. J. Corp. L. 989

**\*8**  While this court can imagine situations which may be so egregious as to warrant an award of attorney's fees on the basis of fraud, the American Rule would be eviscerated if every decision holding defendants liable for fraud or the like also awarded attorney's fees. Even more harmful would be to extend this narrow exception to situations involving less than unusually deplorable behavior. [18] Plainly, Boyce's conduct does not meet this difficult standard. In the absence of a special fee shifting provision in the contract signed by him, I will not require Boyce to pay RHIS's fees relating to this litigation.

IV. CONCLUSION

For the reasons stated above, plaintiff's claim for permanent injunctive relief for violation of the non-compete covenant is DENIED. Plaintiff's claim for permanent injunctive relief on the non-solicitation agreement is GRANTED in part, and damages allowed to the extent specified in this opinion. Plaintiff's claim for an award of attorney's fees is DENIED.

Plaintiff should submit an appropriate form of order on notice within 10 days of the date of this opinion.

**All Citations**

Not Reported in A.2d, 2001 WL 1192203, 27 Del. J. Corp. L. 989

---

### Footnotes

1  Of course, as is well known, this court lacks jurisdiction to make an award of punitive damages. *Beals v. Washington Int'l, Inc.,* Del. Ch., 386 A.2d 1156, 1159-60 (1978); *see generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 2.5 (2000).

2  *Faw, Casson & Co. v. Cranston,* Del. Ch., 375 A.2d 463, 466 (1977) (*quoting James C. Greene Co. v. Kelley,* 134 S.E.2d 166 (1964)).

3  "[T]he agreement not to compete was an integral part of the overall promotion agreement and an element of consideration tendered by the defendant in exchange for his promotion to the position as manager ... a failure of consideration did not occur in the present case." *Faw, Casson & Co.,* 375 A.2d at 467.

4  Boyce cryptically states in his pre-trial brief that "[e]very contract or agreement entered into in Delaware imposes upon each part a duty of good faith and fair dealing in its performance and its enforcement." Boyce may be arguing that the subsequent pay reductions breached the implied covenant of good faith and fair dealing by "trapping" Boyce in an unfair employment arrangement. This issue was not developed either factually or legally at trial and will not be discussed in this opinion.

5  *Graham v. State Farm Mut. Auto. Ins. Co.,* Del.Supr., 565 A .2d 908, 913 (1989).

6  Del. Ch., 709 A.2d 1160, 1161 (1998). *See also Faw, Casson & Co.,* 375 A.2d at 465, wherein the court said: "an agreement by an employee not to follow his trade or business for a limited time and in a limited geographical area is not void as against public policy when the purpose of such agreement and its reasonable effect is to protect an employer from sustaining damages which an employee's subsequent competition may cause...."

7  Del. Ch., C.A. No. 11660, Allen, C., mem. op. at 5-6 (Aug. 28, 1990).

8  *Bernard Personnel Consultants,* Del. Ch., C.A. No. 11660, mem. op. at 6.

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 157 of 164
PageID: 286

RHIS, Inc. v. Boyce, Not Reported in A.2d (2001)
27 Del. J. Corp. L. 989

9      This fact distinguishes this case from *Computer Aid, Inc. v. MacDowell,* Del. Ch., C.A. No. 17481, Jacobs, V.C. (July 26, 2001), where the employer operated an extensive proprietary training program.

10     I need not consider whether or not RHIS could have contracted for Boyce to repay to it the costs associated with obtaining ASHI membership in the event that he did not remain its employ for some set period of time. This lesser obligation would be both better suited to the injury complained of and less restrictive of competition.

11     *Bernard Personnel Consultants,* Del. Ch., mem. op. at 4 (The knowledge and skills gained while in the employ of another belong to the employee and she is free to exploit them fairly).

12     *Id.* at 8 (*quoting Wilmington Trust Co. v. Consistent Asset Mgmt. Co., Inc.,* Del. Ch., C.A. No. 8867, mem. op. 13-14 (Mar. 25, 1987)). "The rule is no different when an employee begins his employment innocent of any knowledge in a field and acquires all of his expertise while on his employer's payroll." *Id.*

13     *Norton v. Cameron,* Del. Ch., C.A. No. 15212, mem. op. at 8, Steele, V.C. (Mar. 5, 1998).

14     *See Computer Aid, Inc.,* Del. Ch., .A. No. 17481, mem. op. at 11 (one year reasonable period of restriction, applying Pennsylvania law).

15     Employees of RHIS were not uniformly required to sign the non-compete clause that Boyce did, and there is evidence that those with ASHI certification or other qualifications that placed them on a more equal bargaining level with RHIS refused to sign the non-compete when they were asked to do so and were hired nonetheless.

16     *Brice v. State,* Del.Supr., 704 A.2d 1176, 1178 (1998)(*citing Goodrich v. E.F. Hutton Group,* Del.Supr., 681 A.2d 1039, 1043-44 (1996)).

17     *Arbitrium (Cayman Islands) Handels AG v. Johnston,* Del. Ch ., 705 A.2d 225, 233 (1997), *aff'd,* Del.Supr. 720 A.2d 542 (1998).

18     Del. Ch., C.A. No. 1454-S, 1994 WL 514868, 1994 Del. Ch. LEXIS 164, Allen, C., mem. op. at 5-6 (Sept. 7, 1994).

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT L

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 159 of 164
PageID: 288
Stanton v. Greenstar Recycled Holdings, L.L.C., Not Reported in F.Supp.2d (2012)

2012 WL 3201370
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

John STANTON, et al., Plaintiffs,
v.
GREENSTAR RECYCLED
HOLDINGS, L.L.C., et al., Defendants.

Civil Action No. 10–5658 (MLC).
|
Aug. 2, 2012.

**Attorneys and Law Firms**

David L. Cook, Trent S. Dickey, Sills Cummis & Gross PC, Newark, NJ, for Plaintiffs.

Joseph Nicholas Froehlich, Locke, Lord, LLP, Richard I. Scharlat, Seyfarth Shaw LLP, New York, NY, for Defendants.

**MEMORANDUM OPINION**

COOPER, District Judge.

*1 Plaintiffs, John Stanton and Harv Straus (collectively, "Plaintiffs"), commenced this action in New Jersey Superior Court against defendants, Greenstar Recycled Holdings, L.L.C. ("GRH") and Greenstar, LLC ("Greenstar" and collectively with GRH, "Defendants"), alleging claims for breach of contract with respect to Plaintiffs' employment agreements and seeking a judgment declaring that restrictive covenants contained in the employment agreements are unreasonable, unduly burdensome and not enforceable. (Dkt. entry no. 1, Rmv. Not., Ex. A, Compl.) On March 31, 2011, the District Court granted Defendants' motion to dismiss with prejudice parts of the Complaint, and remanded the action to state court. (Dkt. entry no. 16, 3–31–11 Mem. Op.; dkt. entry no. 17, 3–31–11 Order.) The Court, on a motion for reconsideration, subsequently vacated the 3–31–11 Order, and granted Plaintiffs leave to re-plead Counts I–IV in an amended pleading. (Dkt. entry no. 23, 8–29–11 Order.)

This action was reassigned to the undersigned on December 27, 2011. (Dkt. entry no. 31, 12–27–11 Order Reassigning Case.) On January 18, 2012, Plaintiffs filed the Second Amended Complaint, which asserts the four counts

contemplated by the 8–29–11 Order vacating the dismissal of certain claims with prejudice: (1) breach of contract—failure to pay two-year bonuses; (2) breach of contract—failure to pay five-year bonuses; (3) breach of contract—failure to provide vacation pay to John Stanton; and (4) declaratory judgment—restrictive covenants. (Dkt. entry no. 36, 2d Am. Compl.)

Defendants now move to dismiss Count 1 insofar as it alleges breach of contract for failure to pay a "$25,000 single stream bonus," and Count 2 in its entirety, for failure to state a claim on which relief can be granted, pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). (Dkt. entry no. 37, Mot. Dismiss & Def. Br. at 2–3.) Defendants also move to dismiss Count 4 insofar as it is asserted by Straus for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1), on the basis that the restrictive covenant challenged in that claim has expired and thus there is no case or controversy requiring resolution. (Def. Br. at 2–3.)

The Court decides the motion on the submissions of the parties, without oral argument, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, the Court will deny the motion with respect to Count 1 and Count 2, and grant the motion with respect to Count 4. Furthermore, the Court will *sua sponte* consider the question of mootness of Count 4 with respect to Stanton, and dismiss that claim with respect to both Plaintiffs.

**I. Background—Employment Agreements**
Stanton and Straus were principals of Global Recycling Solutions, LLC ("Global"), which was acquired pursuant to an asset purchase agreement ("APA") by Greenstar New Jersey, LLC, in July 2008. (2d Am. Compl. at ¶ 7.) The acquisition included Global's recycling operations at the Monmouth County Reclamation Center ("MCRC"). (*Id.* at ¶ 9.) By the terms of the APA, Plaintiffs entered into Employment Agreements with Recycled Holdings, LLC, to assist with the transition, including operations at MCRC. (*Id.* at ¶¶ 10–11 & Ex. A, Stanton Employment Agreement; Ex. B, Straus Employment Agreement ("Employment Agreements").) Recycled Holdings, LLC, was subsequently acquired by GRH, and became a subsidiary of Greenstar. (2d Am. Compl. at ¶¶ 16–17.) Thus, GRH is now party to Plaintiffs' 2008 Employment Agreements. (*Id.* at ¶ 17; Def. Br. at 4.)

**A. Bonus Provisions**

Case 2:25-cv-02263-WJM-MAH    Document 5-2    Filed 06/16/25    Page 160 of 164
PageID: 289
Stanton v. Greenstar Recycled Holdings, L.L.C., Not Reported in F.Supp.2d (2012)

**\*2** The Employment Agreements contained provisions conditioning Plaintiffs' receipt of certain "Special Bonuses" upon meeting specified performance milestones. (2d Am. Compl. at ¶ 35.) The "Two–Year Milestones" established that Plaintiffs would receive (1) a $25,000 bonus for the installation of "single stream" recycling at MCRC ("single stream bonus"); (2) a $25,000 bonus for achieving a Total Recordable Incidence Rate below five at MCRC; and (3) a $75,000 bonus for Plaintiffs' reaching a volume of 500 tons per month of net new business since January 1, 2008. (*Id.*) [1] The "Five–Year Milestones" provided for (1) a $75,000 bonus if Plaintiffs achieved a volume of 1,500 tons per month of net new business since January 1, 2008 ("tonnage bonus"); and (2) a $50,000 bonus if Plaintiffs successfully obtained a new five-year contract with Monmouth County ("renewal bonus"). (*Id.*)

Count 1 of the Second Amended Complaint alleges that Defendants breached the Employment Agreement by refusing to pay each of the two-year bonuses. (*Id.* at ¶ 153.) Specifically with respect to the single stream bonus, Plaintiffs allege that "Defendants intentionally frustrated the intent of the Employment Agreements by making it impossible for Stanton and Straus to achieve this bonus by, among other things, not installing the Single Stream screen ... even after purchasing it for the MCRC but then intentionally and in bad faith divert[ing] it to another facility." (*Id.* at ¶ 150.) Plaintiffs allege in Count 2 that Defendants breached the Employment Agreement by refusing to pay each of the five-year bonuses. (*Id.* at ¶ 166.) With respect to the tonnage bonus, Plaintiffs allege that they met the milestone as of 2010, and "are entitled to that payment within 60 days of the Five Year Milestone Date." (*Id.* at ¶ 163.) With respect to the renewal bonus, Plaintiffs allege that "by rejecting the New Global County Contract ... [Defendants] intentionally and in bad faith unfairly frustrated the bonus provisions of the Employment Agreements by making it impossible and/or impracticable for [Plaintiffs] to achieve" the renewal bonus. (*Id.* at ¶ 165.)

### B. Non–Competition Covenants
The Employment Agreements also contained "non-competition covenants," prohibiting Plaintiffs from engaging in certain business practices for a two-year period following the date of termination of their employment from GRH anywhere within 200 miles of any GRH facility (Stanton) or within 100 miles of such facility (Straus). (*Id.* at ¶¶ 24–29.)

Straus was terminated without cause from GRH effective June 26, 2009. (*Id.* at ¶ 71.) Stanton was terminated without cause from GRH effective June 21, 2010. (*Id.* at ¶ 74.) In Count 4, Plaintiffs seek a judgment declaring that the non-competition covenants are null and void because they do not protect a legitimate interest of Defendants, impose an undue hardship on Plaintiffs, and injure the public interest. (*Id.* at ¶ 186.)

## II. Motion to Dismiss Standard

### A. Rule 12(b)(6)
**\*3** In addressing a motion to dismiss a complaint under Rule 12(b) (6), the Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine, whether under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny,* 515 F.3d 224, 233 (3d Cir.2008). At this stage, a "complaint must contain sufficient factual matter, accepted as true to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'—that the 'pleader is entitled to relief.' " *Iqbal,* 556 U.S. at 679 (quoting Rule 8(a)(2)).

The Court, in evaluating a Rule 12(b)(6) motion to dismiss for failure to state a claim, may consider the complaint, exhibits attached thereto, matters of public record, and undisputedly authentic documents if the plaintiff's claims are based upon those documents. *See Pension Benefit Guar. Corp. v. White Consol. Indus.,* 998 F.2d 1192, 1196 (3d Cir.1993). The Employment Agreements are attached to the Second Amended Complaint and provide the basis for Plaintiffs' claims, and will be considered by the Court in deciding the motion.

### B. Rule 12(b)(1)
A motion to dismiss an action under Rule 12(b)(1) raises the question of the Court's subject matter jurisdiction over the action. A complaint must be dismissed for lack of subject matter jurisdiction if no "case or controversy" exists, as required by Article III of the United States Constitution.

Case 2:25-cv-02263-WJM-MAH   Document 5-2   Filed 06/16/25   Page 161 of 164
PageID: 290
Stanton v. Greenstar Recycled Holdings, L.L.C., Not Reported in F.Supp.2d (2012)

*Cospito v. Califano,* 89 F.R.D. 374, 379 (D.N.J.1981) (citing *Baker v. Carr,* 369 U.S. 186, 198, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)). Defendants' challenge to the Court's subject matter jurisdiction over Count 4, pertaining to the enforceability of the non-competition covenants, constitutes a facial attack "directed to the sufficiency of the pleading as a basis for subject matter jurisdiction," and therefore the Court must accept the allegations in the Second Amended Complaint as true for purposes of resolving the motion. *See Duruaku v. BB & T Bank,* No. 05–5285, 2006 WL 1805887, at *2 (D.N.J. June 29, 2006).

A claim fails to present a case or controversy and is constitutionally moot where "it is impossible for the court to grant any effectual relief." *Church of Scientology of Cal. v. United States,* 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992). "To avoid mootness, a claim must (1) present a real legal controversy, (2) genuinely affect an individual, and (3) have sufficiently adverse parties." *Cinicola v. Scharffenberger,* 248 F.3d 110, 118–19 (3d Cir.2001).

### III. Analysis

#### A. Count 1–Two-Year "Single Stream" Bonus

**\*4**  Count 1 of the Second Amended Complaint alleges, *inter alia,* that "Plaintiffs are entitled to the $25,000 Single Stream two-year bonus because Defendants ... [made] it impossible for Stanton and Strauss to achieve this bonus by ... not installing the Single Stream screen." (2d Am. Compl. at ¶ 150.) They further state that "Defendants unforeseeably failed to install the screen even after purchasing it for the MCRC." (*Id.*) To state such a claim, Plaintiffs must plead (1) a contract, (2) a breach of the contract, (3) damages resulting from the breach, and (4) that the party alleging the breach performed its own contractual duties. *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.,* 210 F.Supp.2d 552, 561 (D.N.J.2002).

Defendants contend that as a matter of contract law, Plaintiffs have failed to state a claim with respect to the single stream bonus because they admit that they did not satisfy the condition precedent contained in the Employment Agreements of installment of the single stream technology at MCRC. (Def. Br. at 8; 3–31–11 Mem. Op. at 7; dkt. entry no. 20, Pl. Br. Supp. Mot. for Reconsideration at 7 n. 3 ("Plaintiffs have not achieved the remaining two-year milestone requiring installation of a single stream recycling screen because Defendants diverted the screen from the MCRC to another Greenstar facility outside of New Jersey.").) They further argue that nothing in the Employment Agreements required GRH to install such a screen regardless of whether one had been obtained. (Def. Br. at 8; *see also* Employment Agreement at Section 3.1(d)(I);.) Plaintiffs respond that they have alleged a viable claim because the fact that the screen was not installed at MCRC was due to the bad faith of Defendants. (Dkt. entry no. 40, Pl. Br. at 9.)

A covenant of good faith and fair dealing is implied in every contract in New Jersey, and implied covenants are as effective components of an agreement as those that are express. *Wilson v. Amerada Hess Corp.,* 168 N.J. 236, 244, 773 A.2d 1121 (2001); *see also Sons of Thunder, Inc. v. Borden, Inc.,* 148 N.J. 396, 421, 690 A.2d 575 (1997) ("In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."). Where a contract vests one party with discretion, that party "must exercise discretion reasonably and with proper motive," not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectation of the parties. *Wilson,* 168 N.J. at 247, 251, 773 A.2d 1121.

The Court finds that Plaintiffs' allegations regarding the *reason* for their inability to satisfy the condition precedent allow this claim to survive the motion to dismiss. Although the 3–30–11 Opinion dismissed Count VI of the Amended Complaint, which alleged a stand-alone claim for breach of the implied covenant of good faith and fair dealing, it did not address the single stream bonus in doing so. (3–30–11 Mem. Op. at 8–9.) Defendants analogize to the contract renewal bonus in arguing that the single stream bonus reserved discretion to GRH with respect to installation of the single stream screen, by the Employment Agreements' specification that such screen must be installed "to the company's satisfaction." (Def. Br. at 8.) However, the Court finds that a reading of the Employment Agreements indicates that the parties all expressly contemplated that the single stream screen would be installed at MCRC, notwithstanding the "to the company's satisfaction" language, and Plaintiffs have alleged that Defendants "intentionally frustrated the intent of the Employment Agreements by making it impossible for [Plaintiffs] to achieve this bonus by ... not installing the Single Stream screen .... [and] divert[ing] it to another facility." (2d Am. Compl. at ¶ 150.) Furthermore, as noted above, it is incumbent on a party vested with discretion to exercise such discretion in a reasonable manner, and Plaintiffs have alleged that Defendants failed to do so. *See Wilson,* 168 N.J. at 251,

773 A.2d 1121 (stating that the implied covenant of good faith and fair dealing is breached where "a party exercising its right to use discretion ... exercises its discretionary authority arbitrarily, unreasonably, or capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract.").

**\*5** The Court will therefore deny the motion insofar as it seeks to dismiss with prejudice the part of Count 1 pertaining to the $25,000 single stream bonus. The claims for the other two-year bonuses set forth in the Employment Agreements also remain pending in Count 1.

### B. Count 2–Five–Year Bonuses

Count 2 of the Second Amended Complaint asserts a breach of the Employment Agreements' promise to pay two separate five-year bonuses conditioned on certain milestones being met. (2d Am. Compl. at ¶ 166.) Defendants contend that Count 2 insofar as it pertains to the $50,000 county contract renewal bonus must be dismissed because it is undisputed that the Plaintiffs did not achieve that milestone; Plaintiffs concede that the contract was never renewed. (Def. Br. at 9.) Defendants further argue that Count 2 insofar as it concerns the $75,000 tonnage bonus must be dismissed because the Employment Agreements clearly and unambiguously state that whether the tonnage condition precedent has been satisfied "is to be determined on July 2, 2013." (*Id.* at 12, 773 A.2d 1121.)

Plaintiffs respond that they have pleaded that they achieved the tonnage bonus as of sometime in 2010, and that the Employment Agreements expressly contemplate that the five-year bonuses are payable if achieved "prior to" the "Five–Year Milestone Date." (2d Am. Compl. at ¶¶ 163–65; Pl. Br. at 16–20.) They further argue that the renewal bonus was not met because the Defendants, in bad faith, refused to execute the renewal contract, and furthermore that the Employment Agreements only require that Plaintiffs "obtain" such renewal contract, not that GRH actually execute it. (Pl. Br. at 20–21.)

### 1. Tonnage Bonus

The Court finds that the interest in judicial efficiency counsels against dismissal without prejudice of the part of Count 2 asserting a breach of the Employment Contracts insofar as Defendants refuse to pay the tonnage bonus. The plain language of the Employment Agreements indicates that the five-year bonuses are not payable until "within 60 days after the fifth anniversary of" the date of execution of the

Employment Agreements, or July 2, 2013. (Employment Agreement at Section 3.1(ii).) However, such bonuses are ultimately payable at such time if either milestone was "achieved on *or prior to*" that date, and Plaintiffs have alleged facts supporting their claim that they achieved the condition precedent to being paid the tonnage bonus sometime in 2010. (2d Am. Compl. at ¶¶ 159–64.) There is no indication in the record that Defendants have any intention of paying Plaintiffs the tonnage bonus, insofar as they deny that Plaintiffs satisfied the threshold that would entitle them to the tonnage bonus. (Dkt. entry no. 38, Def. Am. Ans. to 2d Am. Compl. at ¶¶ 154–66.) Plaintiffs will be permitted to supplement their pleading after such time as the tonnage bonus becomes due to reflect whether nonpayment of the tonnage bonus occurs.

### 2. Renewal Bonus

**\*6** The contract language covering the renewal bonus reserves discretion to GRH to accept or reject any proposed renewal contract insofar as the putative contract's "[t]erms ... must be acceptable to the Company," and the Employment Agreements themselves do not require GRH to accept a contract negotiated on its behalf by Plaintiffs. (*See* 3–31–11 Mem. Op. at 7; Employment Agreement at Section 3.1(d)(ii).) Plaintiffs' pleadings concede that the contract renewal milestone was not achieved. (2d Am. Compl. at ¶¶ 134, 165.) Thus, Defendants contend that Plaintiffs cannot state a claim for breach of contract for Defendants' failure to pay that bonus, insofar as Plaintiffs failed to meet the condition precedent.

Plaintiffs respond that (1) they have pleaded that Defendants "arbitrarily, capriciously and unreasonably refused to execute the new five-year agreement" despite numerous efforts by the Plaintiffs to negotiate a renewal contract with terms acceptable to Defendants as contemplated by the Employment Agreements, and (2) the term " '*obtaining* a new contract with the County of Monmouth' which is 'acceptable to the Company' " is ambiguous, insofar as Plaintiffs contend that term can be reasonably understood to encompass their negotiations with the County, but Defendants contend must be understood to require that a contract actually have been "executed." (Pl. Br. at 19–20; 2d Am. Compl. at ¶¶ 101–136, 165.)

Whether a contractual provision is ambiguous is a question of law for the Court, requiring the Court to consider, based on the plain language in the contract, whether it is subject to reasonable alternative interpretations. *Nye v. Ingersoll Rand Co., 783 F.Supp.2d 751, 759 (D.N.J.2011).* Furthermore, "if

Stanton v. Greenstar Recycled Holdings, L.L.C., Not Reported in F.Supp.2d (2012)

the relevant terms in a contract are ambiguous, the issue must go to a jury." *Emerson Radio Corp. v. Orion Sales, Inc.,* 253 F.3d 159, 163 (3d Cir.2001). The Court finds that to the extent Plaintiffs allege a breach of the express terms of the renewal bonus, ambiguity of the contract language augurs against dismissal. Specifically, we find that the term "[t]he obtaining of a new contract" in the renewal bonus language is ambiguous, insofar as it is not clear whether it requires that a putative contract be actually executed by Defendants, or simply negotiated and presented to Defendants for their approval. (Employment Agreement at Section 3.1(d)(ii).) It is therefore plausible that the contract renewal negotiations detailed in Plaintiffs' pleading, paired with the allegations pertaining to Defendants' allegedly unreasonable rejection of the contract terms negotiated by Plaintiffs, state a claim for breach of contract with respect to the renewal bonus. (2d Am. Compl. at ¶¶ 101–36, 165–66.) *See, e.g., Barton v. RCI, LLC,* No. 10–3657, 2011 WL 3022238, at *8 (D.N.J. July 22, 2011) (allowing breach of contract claim to proceed based on finding that "confusion exists with respect to the application of the 'network integrity' clause").

**\*7** The Court further notes that it will not dismiss the breach of contract claim pertaining to the renewal contract bonus for lack of ripeness, for the same concerns of judicial efficiency discussed above with respect to the tonnage bonus claim. The Court will therefore deny the motion to dismiss insofar as it seeks dismissal of the part of Count 2 pertaining to the renewal bonus.

### C. Count 4–Non–Competition Covenants

The Employment Agreements each contain a non-competition restrictive covenant precluding Plaintiffs from engaging in certain business practices for two years following the date of termination. (2d Am. Compl. at ¶ 24; Employment Agreement at Section 7.1.) The Employment Agreements further provide that the "two-year Non–Competition Period may be extended by the Company for an additional year upon written notice given to Employee within 18 months following the date of termination and provided the Company continues payment to Employee of Base Salary" as set forth in the agreement. (Employment Agreement at Section 7.4.) Defendants contend that Count 4 is moot with respect to Straus, because the two-year non-compete period expired as of June 26, 2011. (Def. Br. at 14.) It appears to the Court that the two-year non-compete period expired as of June 21, 2012, with respect to Stanton. (*See* 2d Am. Compl. at ¶ 74.)

Plaintiffs state in their opposition that they would agree that Straus's covenant not to compete is moot in this action if Defendants conceded that "(1) the non-compete covenant has expired, and (2) Straus' non-compete covenant cannot be extended by Defendants or other affiliates for any reason." (Pl. Br. at 22.) Defendants conceded both of these points in their reply. (Dkt. entry no. 41, Def. Reply Br. at 8.) As a matter of law, a claim seeking a declaratory judgment providing relief from a contractual provision, court order, or the like, becomes moot when the provision expires by its own terms. *See Desi's Pizza, Inc. v. City of Wilkes–Barre,* 321 F.3d 411, 428 (3d Cir.2003) (citing *Hodges v. Schlinkert Sports Assocs.,* 89 F.3d 310, 312 (6th Cir.1996)).

The Court observes that to the extent Plaintiffs suggest that an actual claim or controversy may still exist due to the contractual provisions in the Employment Agreements permitting extension of the non-compete period, Plaintiffs have not alleged that Defendants have provided the notice contemplated in Section 7.4 of the Employment Agreements as a prerequisite to extending the non-compete period beyond a two-year term. Thus, there appears to be no contractual basis on which Defendants could at this point invoke the 18–month extension of the non-compete period with respect to either plaintiff. Were Defendants to attempt to invoke that extension, they would be estopped from doing so after making the representations discussed above. (Def. Reply Br. at 8; Pl. Br. at 22.)

We therefore find that the validity or enforceability of the Non–Competition Covenants, insofar as they have expired on their own terms with respect to both Plaintiffs, presents no live case or controversy over which the Court could exercise its jurisdiction. The Non–Competition Covenant in Straus's Employment Agreement is no longer enforceable on its own terms, and Count 4, seeking a declaratory judgment, is moot as to Straus. *Cf. Cinicola,* 248 F.3d at 119 (holding physicians' claims not constitutionally moot where potential contractual obligations remained). The Court finds no basis for concluding that the same reasoning would not now apply to Stanton as well, and therefore *sua sponte* finds that Count 4 is moot as to Stanton. Count 4 will be dismissed with prejudice in its entirety.

### CONCLUSION

**\*8** For the reasons discussed *supra,* the Court will deny the motion with respect to Count 1 and Count 2, and grant

the motion with respect to Count 4. The Court will further dismiss Count 4 with respect to Stanton. The Court will issue an appropriate Order.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3201370

---

## Footnotes

1    "Single stream" recycling refers to recycling technology that allows consumers to collect all their recyclables in one container for collection and processing, as opposed to requiring consumers to separate recyclables by type of material. (2d Am. Compl. at ¶ 32.)

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.